IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
No. __:____ HC _____

DERRICK JOVAN MCRAE,    )
             )
    Petitioner,    )
             )  **PETITION FOR WRIT**
v.            )  **OF HABEAS CORPUS**
             )  **28 U.S.C. § 2254**
ERIK A. HOOKS, Secretary,   )
N.C. Dep't of Public Safety, et al.,  )
             )
    Respondents.   )

# TABLE OF CONTENTS

INTRODUCTORY STATEMENT ................................................................................. 1

SUMMARY OF ARGUMENT ................................................................................. 2

PROCEDURAL BACKGROUND ............................................................................ 4

STATEMENT OF THE FACTS ............................................................................... 6

*SCHLUP* INNOCENCE GATEWAY ...................................................................... 29

    I.     PETITIONER'S CREDIBLE CLAIM OF ACTUAL INNOCENCE CREATES A "GATEWAY" TO FEDERAL HABEAS REVIEW ...................................... 29

    II.    PASSAGE THROUGH THE *SCHLUP* "INNOCENCE GATEWAY" IS NECESSARY TO AVOID A MISCARRIAGE OF JUSTICE .......................... 31

GROUNDS FOR RELIEF ........................................................................................ 43

    I.     THE STATE VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS BY FAILING TO DISCLOSE MATERIAL WITNESS STATEMENTS AS REQUIRED BY *BRADY V. MARYLAND* ...................................................................................... 45

    II.    THE STATE VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS BY FAILING TO CORRECT EDWARD TENDER'S FALSE TESTIMONY ABOUT HIS CRIMINAL CHARGES, IN CONTRAVENTION OF *NAPUE V. ILLINOIS* ...................... 63

    III.    THE STATE VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS BY FAILING TO DISCLOSE THAT EDWARD TENDER RECEIVED FAVORABLE TREATMENT FROM THE STATE IN EXCHANGE FOR HIS TESTIMONY, AS REQUIRED BY *GIGLIO V. UNITED STATES,* AND BY ALLOWING HIM TO TESTIFY FALSELY THAT HE RECEIVED NO SUCH TREATMENT, IN CONTRAVENTION OF *NAPUE V. ILLINOIS* ...................................................................... 75

    IV.    THE STATE VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS BY FAILING TO DISCLOSE THAT THURMAN NELSON RECEIVED FAVORABLE TREATMENT FROM THE STATE IN EXCHANGE FOR HIS TESTIMONY, AS REQUIRED BY *GIGLIO V. UNITED STATES*, AND BY ALLOWING HIM TO TESTIFY FALSELY THAT HE RECEIVED NO SUCH TREATMENT, IN CONTRAVENTION OF *NAPUE V. ILLINOIS* ...................................................................... 85

Case 1:21-cv-00577-LCB-JLW   Document 1   Filed 07/13/21   Page 2 of 124

V.    PETITIONER'S RIGHTS UNDER THE SIXTH AMENDMENT WERE
VIOLATED BECAUSE HE DID NOT RECEIVE CONSTITUTIONALLY
ADEQUATE COUNSEL AS DESCRIBED IN *STRICKLAND V.
WASHINGTON*..................................................................................... 95

**CONCLUSION**...........................................................................................**113**

**PRAYER FOR RELIEF**............................................................................**115**

**VERIFICATION**........................................................................................**117**

**CERTIFICATE OF SERVICE**..................................................................**118**

Case 1:21-cv-00577-LCB-JLW   Document 1   Filed 07/13/21   Page 3 of 124

# TABLE OF AUTHORITIES

**Cases**

_Adams v. Bertrand_, 453 F.3d 428 (7th Cir. 2006) ........................................................ 103

_Alcorta v. Texas_, 355 U.S. 28 (1957) ................................................................................ 64

_Anderson v. Terhune_, 516 F.3d 781 (9th Cir. 2008) ................................................ 44, 82

_Banks v. Dretke_, 540 U.S. 668 (2004) ........................................................................... 63

_Boone v. Paderick_, 541 F.2d 447 (4th Cir. 1976) ....................................................... 77

_Bowen v. Maynard_, 799 F.2d 593 (10th Cir. 1986) .................................................... 50

_Brady v. Maryland_, 373 U.S. 83 (1963) .......................................................... 3, 45, 46, 63

_Brumfield v. Cain_, 576 U.S. 305 (2015) ........................................................... 44, 80, 88

_Campbell v. Reed_, 594 F.2d 4 (4th Cir. 1979) ............................................................ 77

_Coles v. Peyton_, 389 F.2d 224 (4th Cir. 1968) ........................................................... 97

_Douglas v. Workman_, 560 F.3d 1156 (10th Cir. 2009) ........................................... 76

_Elmore v. Ozmint_, 661 F.3d 783 (4th Cir. 2011) ................................................. passim

_Finch v. McKoy_, 914 F.3d 292 (4th Cir. 2019) ............................................... 30, 39, 40

_Garcia v. Long_, 808 F.3d 771 (9th Cir. 2015) ............................................. 44, 71, 79, 89

_Giglio v. United States_, 405 U.S. 150 (1972) ......................................................... passim

_Haber v. Wainwright_, 756 F.2d 1520 (11th Cir. 1985) ........................................... 76

_Hamric v. Bailey_, 386 F.2d 390 (4th Cir. 1967) ....................................................... 65

_Hoots v. Allsbrook_, 785 F.2d 1214 (4th Cir. 1986) ............................................... 109

_House v. Bell_, 547 U.S. 518 (2006) ................................................................................ 30

_Juniper v. Zook_, 876 F.3d 551 (4th Cir. 2017) ......................................................... 42

_Kyles v. Whitley_, 514 U.S. 419 (1995) ................................................................. passim

_Lee v. Illinois_, 476 U.S. 530 (1986) ............................................................................. 31

_Lindsey v. King_, 769 F.2d 1034 (5th Cir. 1985) ....................................................... 50

_Long v. Hooks_, 972 F.3d 442 (4th Cir. 2020) (en banc) ................................... passim

_McQuiggin v. Perkins_, 569 U.S. 383 (2013) ...................................................... 2, 30

_Miller v. Alabama_, 567 U.S. 460 (2012) ........................................................................ 5

iii

Miller v. Pate, 386 U.S. 1 (1967). ............................................................... 65

Monroe v. Angelone, 323 F.3d 286 (4th Cir. 2003) ...................................... 57

Mooney v. Holohan, 294 U.S. 103 (1935). ................................................... 69

Napue v. Illinois, 360 U.S. 264 (1959) ................................................... passim

North Carolina State Bar v. Brewer, 644 S.E.2d 573 (N.C. Ct. App. 2007)..................... 83

On Lee v. United States, 343 U.S. 747 (1952)................................................ 32

Rompilla v. Beard, 545 U.S. 374 (2005)..................................................... 110

Schlup v. Delo, 513 U.S. 298 (1995) ............................................. 2, 3, 29, 30

Shih Wei Su v. Filion, 335 F.3d 119 (2d Cir. 2003) ........................................ 73

Spicer v. Roxbury Corr. Inst., 194 F.3d 547 (4th Cir. 1999) ......................... 46, 57

State v. Hamilton, 95 CRS 1670 (N.C. Super Ct. Apr. 23, 2003)............................. 82

State v. Hoffman, 95 CRS 15695 (N.C. Super. Ct. Apr. 30, 2004) ........................... 82

State v. McRae, 594 S.E.2d 71 (N.C. Ct. App. 2004).......................................... 4

State v. Sanders, 395 S.E.2d 412 (N.C. 1990) .............................................. 67

State v. Sandy, 788 S.E.2d 200 (N.C. Ct. App. 2016) ...................................... 67

State v. Scanlon, 626 S.E.2d 770 (N.C. Ct. App. 2006). ................................... 67

State v. Williams, 341 N.C. 1 (1995)...................................................... 67

State v. Williams, 669 S.E.2d 296 (N.C. 2008) ............................................ 48

Strickland v. Washington, 466 U.S. 668 (1984) ...................... 4, 96, 97, 98, 111

Strickler v. Greene, 527 U.S. 263 (1999).............................................. 46, 74

Teleguz v. Pearson, 689 F.3d 322 (4th Cir. 2012) ............................. 3, 29, 30, 34

United States v. Agurs, 427 U.S. 97 (1976)............................................ passim

United States v. Bagley, 473 U.S. 667 (1985) ......................... 47, 59, 64, 65, 72

United States v. Decoster, 624 F.2d 196 (D.C. Cir. 1976)................................. 105

United States v. Katz, 425 F.2d 928 (2d Cir. 1970)...................................... 105

United States v. Mooney, 497 F.3d 397 (4th Cir. 2007)................................... 97

United States v. Russell, 221 F.3d 615 (4th Cir. 2000) ................................. 105

United States v. Sanfilippo, 564 F.2d 176 (5th Cir. 1977)............................... 72

Wiggins v. Smith, 539 U.S. 510 (2003)........................................ 97, 102, 109

iv

<u>Williams v. Taylor</u>, 529 U.S. 362 (2000)................................................44, 50, 68, 111, 113

<u>Williamson v. United States</u>, 512 U.S. 594 (1994)........................................................ 31

<u>Wolfe v. Johnson</u>, 940 F. Supp. 2d 28 (E.D. Va. 2010)............................................ 33, 39

**Statutes**

28 U.S.C. § 2244(d)(1) (2012) ................................................................................... 2, 29

28 U.S.C. § 2254(d) (2012)..................................................................................<u>passim</u>

N.C.G.S. § 15A-1415(g) ................................................................................................. 5

**Other Authorities**

ABA Defense Function General Standards, Std. 4-4.1 .................................................. 105

**Constitutional Provisions**

U.S. CONST. amend. V ................................................................................................... 46

U.S. CONST. amend. VI .................................................................................................. 96

U.S. CONST. amend. XIV. .............................................................................................. 46

Case 1:21-cv-00577-LCB-JLW   Document 1   Filed 07/13/21   Page 6 of 124

NOW COMES Petitioner, Derrick Jovan McRae, pursuant to 28 U.S.C. § 2254, and through undersigned counsel, and respectfully moves this Court for a writ of habeas corpus requiring Respondents to release him from confinement or try him anew within a reasonable time, showing the Court as grounds therefore the following:

## INTRODUCTORY STATEMENT

More than twenty-five years ago, at the age of 16, McRae was arrested for first-degree murder and, two years later, was convicted and sentenced to life in prison. Despite ample evidence that law enforcement and prosecutors engaged in repeated, pervasive misconduct to obtain McRae's conviction, the State post-conviction court upheld the result from trial. That conclusion, reached by relying on incorrect legal standards and disregarding evidence, was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the evidence.

Among other things, the State Court failed to consider an undeniable reality—the weakness of the State's case. No physical evidence linked McRae to the scene, and multiple alibi witnesses testified that McRae was incapacitated at the time the State alleges he committed the crime. The State's grounds for charging McRae were based on statements it obtained by coercing incentivized individuals into implicating McRae. The statements, taken all together, created a narrative that was not just implausible, but impossible. The State then hid these statements from the defense and from the jury, denying McRae the opportunity to refute them and the jury the opportunity to weigh their incoherence for themselves. The State instead cut deals with two highly incentivized and wholly unreliable witnesses—a jailhouse informant (Edward Tender) and McRae's co-

1

defendant (Thurman Nelson)—allowed them to testify falsely, and, by withholding critically important impeachment evidence, denied the jury the opportunity to fully assess their credibility. McRae effectively faced this onslaught of State misconduct on his own, as his court-appointed attorney failed to effectively provide him with adequate representation. In sum, the system failed McRae at every turn.

Contrary to the State Court's flawed analysis, it is plain that the State's withholding of evidence, the prosecution's unabated gamesmanship, and the constitutionally deficient assistance of counsel deprived McRae of a fair trial and wholly support his innocence. As the State Court's decision was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the evidence, this case meets the standard outlined in 28 U.S.C. § 2254(d) (2012). Therefore, a writ should be granted.

## SUMMARY OF ARGUMENT

Although this petition is being filed outside of the Antiterrorism and Effective Death Penalty Act's ("AEDPA") one-year statute of limitations, 28 U.S.C. § 2244(d)(1) (2012), McRae's persuasive claim of innocence creates a gateway to federal habeas review under Schlup v. Delo, 513 U.S. 298, 314–15 (1995) and McQuiggin v. Perkins, 569 U.S. 383, 386 (2013). This gateway provides "a meaningful avenue by which to avoid a manifest injustice," Schlup, 513 U.S. at 327, ensuring that federal constitutional errors do not result in "incarcerating an innocent individual," McQuiggin, 569 U.S. at 393.

2

A review of all the evidence in this case makes clear that a fundamental miscarriage of justice would result by failing to review the merits of McRae's claims. A holistic examination of McRae's case, including the new evidence of the State's misconduct, makes clear that "the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt, such that his incarceration is a miscarriage of justice."[1] Teleguz v. Pearson, 689 F.3d 322, 329 (4th Cir. 2012) (citing Schlup, 513 U.S. at 327).

Under AEDPA, habeas corpus relief is available when a state court's decision on the merits is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if it is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2) (2012). The decision here necessitates relief under both standards.

The following constitutional claims are presented in this Petition:

(1) The State violated Petitioner's rights under the Fifth and Fourteenth Amendments by failing to disclose favorable, material witness statements as required by Brady v. Maryland, 373 U.S. 83 (1963);

(2) The State violated Petitioner's rights under the Fifth and Fourteenth Amendments by failing to correct Edward Tender's false testimony about his criminal charges, in contravention of Napue v. Illinois, 360 U.S. 264 (1959);

(3) The State violated Petitioner's rights under the Fifth and Fourteenth Amendments by failing to disclose that Edward Tender received favorable treatment from the State in exchange for his testimony, as required by

---

[1] For a full discussion of how McRae's claim satisfies the Schlup gateway, see infra pp. 29–43.

3

<u>Giglio v. United States</u>, 405 U.S. 150 (1972), and by allowing Tender to falsely testify that he received no such treatment, in contravention of <u>Napue</u>;

(4) The State violated Petitioner's rights under the Fifth and Fourteenth Amendments by failing to disclose that Thurman Nelson received favorable treatment from the State in exchange for his testimony, as required by <u>Giglio</u>, and by allowing Nelson to falsely testify that he received no such treatment, in contravention of <u>Napue</u>; and

(5) Petitioner's rights under the Sixth Amendment were violated because he did not receive constitutionally adequate counsel as required in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

## **PROCEDURAL BACKGROUND**

### A. Mistrial, Second Trial, and Appeal

McRae was indicted on March 18, 1996 in the small town of Rockingham, North Carolina, on charges of first-degree murder. (<u>State v. McRae</u>, No. 96 CRS 1576, Indictment for Murder (Richmond County).) The first trial, which was presided over by Judge Sanford L. Steelman, Jr., and began on April 27, 1998, resulted in a mistrial, with the jury voting eight to four to acquit. After a second trial, also presided over by Judge Steelman, Jr., and begun on May 11, 1998, less than two weeks after the first, the jury returned a verdict of guilty and Judge Steelman, Jr. sentenced McRae to life imprisonment without the possibility of parole. The North Carolina Supreme Court later affirmed the conviction. <u>State v. McRae</u>, 594 S.E.2d 71, 80 (N.C. Ct. App. 2004).

### B. Brief Post-Conviction Procedural History

On June 28, 2013, McRae filed a Motion for Appropriate Relief ("MAR") alleging ten claims. After an evidentiary hearing on Claims 1–9 was held before Judge W. David

4

Lee on December 1–3, 2014,[2] the State Court [hereinafter "MAR Court"] denied all nine claims with a written order on February 4, 2015. Claim 10 was later granted and a new sentencing hearing ordered that occurred between September 26-28, 2017. McRae was resentenced to life <u>with</u> the possibility of parole. (<u>See</u> <u>State v. McRae</u>, No. 96 CRS 1576, Resentencing Form (Sept. 28, 2017).) Based on evidence discovered while preparing for the sentencing hearing, McRae moved to amend his MAR under N.C. Gen. Stat. § 15A-1415(g), alleging an ineffective assistance of counsel ("IAC") claim.

Judge Lee granted the motion to amend and presided over an evidentiary hearing for the new claim on June 11-12, 2018. Based on evidence adduced at that hearing, McRae again amended his MAR to include additional evidence of his trial counsel's ineffectiveness. Judge Lee permitted the amendment and then denied all of the amended IAC claims with a written order on October 5, 2018.

On September 18, 2019, McRae filed a Petition for Writ of Certiorari with the North Carolina Court of Appeals, which denied the petition without explanation on November 13, 2019. On April 29, 2020, McRae filed a discretionary Petition for Writ of Certiorari with the North Carolina Supreme Court. The Supreme Court dismissed the Petition on March 12, 2021 without a written order.

---

[2] Claim 10—that McRae's mandatory life sentence without parole was unconstitutional following the Supreme Court's decision in <u>Miller v. Alabama</u>, 567 U.S. 460 (2012)—was held open pending decisions from precedential courts. (<u>See</u> 2015 MAR Order at 50.)

## STATEMENT OF THE FACTS

### A.  The Crime and the Investigation

In the early hours of Saturday, October 14, 1995, a young white man named Jeremy Lee Rankin was found shot to death with a crack pipe in his hand on the front porch of a house in Rockingham, North Carolina. (2-Trial-Tr.[3] 40:25 to 41:1–9; Rockingham Police Department File, Released to the Duke Law Clinic [hereinafter "RPD File"].) Rankin's time of death is unclear, though his mother, Jackie Rankin, testified that she last saw him at 10:30 PM on October 13. (2-Trial-Tr. 174:8.) Although not known to the defense at the time of McRae's trials, multiple warrants for Rankin's arrest had been issued earlier in the day on October 13. (Hamlet Police Department Records, Warrants for Arrest for Jerry Rankin (Oct. 13, 1995) (Ex.1 at 3–4, 7–8, 11–12).)

What is known today about the Rockingham Police Department ("RPD") investigation into Rankin's death is markedly different from the account the State presented at trial. In addition to the differences described below, the most revealing differences likely arose during the early months of the investigation, but what occurred then is unknown because that part of the RPD investigative file is missing. (See 1-MAR-Tr. 159:24 to 161:21 (discussing the missing four-and-a-half months from the RPD file).) For example, although notes from the RPD obtained years later by the Duke Law Clinic indicate that law enforcement originally intended to "look very close at the *victim* in this

---

[3] Because there were two trials and two MAR hearings, the respective transcripts will be cited in this format, that is "1-" referring to the first transcript and "2-" referring to the second, throughout the brief for clarity.

case" (RPD File, Derrick McRae Felony Report; Thurman Nelson Felony Report), likely because of his own arrest warrants for criminal activity, it is unknown to what extent, if any, the RPD did so.

The investigative file provided to the Clinic picks up after the four-and-a-half month gap with a barrage of nine statements obtained by the RPD from February 21 to March 1, 1996, with five of the nine statements collected over a 48-hour period.[4] Although most of the statements list independent and allegedly altruistic reasons for the witnesses suddenly coming forward, each statement was taken within a few days of the others, suggesting that a single concentration of investigative activity prompted their collection. Nearly all of these statements implicate McRae and his then-friend Thurman Nelson in Rankin's murder, but they materially differ in almost every other assertion of fact. The nine statements' wild inconsistencies raise serious questions about the reliability of any of them,[5] as well as the reliability and quality of the overall RPD investigation.[6]

_____

[4] The statements were taken in 1996 from the following people on the dates indicated: Tonya Lenell Clark (Feb. 28) (Ex. 3); Marlin Maurice Dumas (Feb. 26) (Ex. 4 at 1–2); Michael Anthony Ferguson (Feb. 21) (Ex. 5); Darious Jenkins Lockhart (Feb. 21) (Ex. 6 at 1–2); Thurman Nelson (Mar. 1) (Ex. 7 at 1–2); Larry Parker (Feb. 27) (Ex. 8); Surinna Parker (Feb. 27) (Ex. 9 at 1–3); Corey Spencer Robinson (Mar. 1) (Ex. 10); and Paul Montez Williams (Feb. 27) (Ex. 11).

[5] Specifically, a number of the statements incorrectly claimed that the murder occurred on the _night_ of October 14, 1995 rather than when Rankin was actually killed: either the night of October 13 or the early morning hours of October 14. (See T. Clark Stmt. (Ex. 3); T. Nelson Stmt. (Ex. 7 at 1); L. Parker Stmt. (Ex. 8); S. Parker Stmt. (Ex. 9 at 1).)

[6] Two of the individuals who provided statements implicating McRae have since provided sworn affidavits recanting their earlier statements and stating that the RPD

7

Tellingly, none of these statements were disclosed to the defense. (Affidavit of Defense Counsel George E. Crump, III (Dec. 6, 2010) [hereinafter "Crump Aff."] (Ex. 14 at 2–3).)

On February 29, 1996, based solely on these contradictory statements, without any physical evidence connecting him to the crime, then-16-year-old McRae was charged with the first-degree murder of Jeremy Rankin. (State v. McRae, No. 96 CRS 1576, Arrest Report for Derrick Jovan McRae (Feb. 29, 1996); State v. McRae, No. 96 CRS 1576, Indictment for Murder (Mar. 18, 1996).) A day later, on March 1, Nelson was also charged with first-degree murder, as a principal. (State v. Nelson, No. 96 CRS 1675, Arrest Report for Thurman Nelson (Mar. 1, 1996); State v. Nelson, No. 96 CRS 1675, Indictment for Murder (Mar. 18, 1996).)

McRae and Nelson's bonds were each set at $50,000. Nelson, who had private representation, posted bond only a few days after his arrest and was released. (Bond Receipt for Thurman Nelson (Mar. 8, 1996) (Ex. 2).) McRae was unable to post bond and

---

coerced them into signing them. See infra note 34. Additionally, at trial, multiple witnesses for the defense testified that the RPD had a pattern of repeatedly harassing individuals in the neighborhood, including McRae. (See 2-Trial-Tr. 249:13–24 ("I'm scared of all police . . . because I've seen some of the things they used to do us and there wasn't nobody doing nothing about it."); id. at 257:23 to 258:9 ("The [RPD] I seen do things that I don't trust . . . I seen them do some things I didn't like . . . they harass my daughter's boyfriend, threw him in the car and tried to make him say that McRae did the crime and I know he didn't.").)

remained incarcerated for the next two years pending trial. His mental health rapidly

declined and, because of that, he was declared incompetent to stand trial several times.[7]

Given the uncertainty of trial outcomes, George Crump, McRae's appointed

defense counsel, recommended that McRae take a plea deal.[8] (Letter from George Crump

III to Derrick McRae (Apr. 23, 1998) [hereinafter "Crump Letter"] (Ex. 15 at 3).) McRae

refused the deal, consistently asserting his innocence. With McRae's mental health

making him scarcely able to aid in his own defense,[9] Crump prepared for trial, using the

limited evidence disclosed by the State[10] and relying on the State's representation that an

eyewitness would testify against McRae.[11] (Id. at 4.)

---

[7] As discussed infra at notes 13 and 16, McRae was diagnosed with schizophrenia and the combination of his health and medication affected his appearance.

[8] The proposed deal was to plead guilty to second degree murder, which carried a sentence of approximately eight to ten years, with credit for the more than two years McRae had already served. (Ex. 15 at 3.)

[9] See 2-MAR-Tr. 10:6–10 ("[McRae's] ability was limited . . . he was a not a great historian.").

[10] The State provided Crump with a single, unbroken paragraph cobbled together from phrases strategically plucked from the undisclosed witness statements. The phrases were not attributed to any speaker or date and were not organized in a coherent manner. (Substance Oral Statements: Defense Copy (Ex. 12 at 1–2).) In contrast, the State's copy, which was *not* disclosed to the Defense, had each statement broken out and attributed to the appropriate speaker. (Substance Oral Statements: State Copy (Ex. 13 at 1–3).) In addition, the State provided Crump with a single map of the crime area; a notice of the State's intent to use McRae's juvenile record; thirty-seven photographs of the autopsy, crime scene, body, and crime area; McRae's arrest report; a waiver of rights form; and the eight-page autopsy. (Discovery Notice (Ex. 25 at 1–2).)

[11] To prepare, Crump also obtained some, but not all, of McRae's school records (see 2-MAR-Tr. 12:24 to 13:4), and limited portions of McRae's medical records (id. at 20:8 to

On April 27, 1998, after McRae was deemed competent, the State proceeded to trial. Crump was led to believe that McRae and Nelson would be tried together (id.), but, just before the proceeding, the State decided otherwise and McRae proceeded to trial alone, with Nelson testifying against him. (1-Trial-Tr. 26:24–25 to 27:1–4.)

## B. The Trials

McRae's first trial resulted in a hung jury, with jurors voting eight to four in favor of acquittal. (See 2018 MAR Order at 3 ¶ 6.) The State immediately pushed for a retrial, which began only ten days later on May 11, 1998. (2-Trial-Tr. 2:1.) Despite the near acquittal in the first trial, the State presented a nearly identical case at the second trial. The only difference between the two trials was the rapid deterioration of McRae's mental health—not caught by the court[12]—and his resulting demeanor.[13]

---

21:8). Crump also engaged private investigators (id. at 10:14 to 11:13), but barely utilized their services (id. at 40:16 to 41:25).

[12] Although the issue of McRae's competence was known to Judge Steelman, he did not evaluate his competence before the second trial began. McRae appealed his conviction on the basis of that failure, and, three years later, Judge Steelman conducted a retrospective competency hearing, finding that McRae had been competent at the time of his second trial. Dr. Wolfe later stated she "probably would have found [McRae] incompetent to stand trial," but at least would "have investigated his competency even more thoroughly." (Affidavit of Dr. Nicole F. Wolfe (Sept. 20, 2011) [hereinafter "Wolfe Aff."] (Ex. 16 at 2).)

[13] At the second trial, McRae's "slack face" and "disinterest" were due to the state of his health and the medication he was receiving at the time. (Ex. 16 at 2).) The prosecutor, ADA Scott Brewer, explicitly referenced McRae's appearance in his closing argument to the jury. Although the argument was not recorded, during a colloquy with the judge immediately following closing arguments, Brewer stated that he had argued to the jury that McRae "sat there staring into space uncaring, unfeeling, not paying attention and unremorseful." (2-Trial-Tr. 307:21–23.)

10

The information now known about the State's conduct fatally undermines the evidence it presented at trial. The State's entire case consisted of the uncorroborated and inconsistent testimony of Edward Tender, a 46-year-old inmate in the Richmond County Jail, and Thurman Nelson, who was still indicted on the same charge as McRae. Neither Tender nor Nelson testified that they had witnessed the murder; they testified only to what they claimed McRae told them, presenting starkly different accounts of the murder. The State offered no other evidence linking McRae to the crime.

On May 14, 1998, the second jury voted to convict and McRae was sentenced to life in prison without the possibility of parole. (2-Trial-Tr. 311:19–23, 317:18–21.)

    1.   <u>The State's Case</u>

        a.  Edward Tender.

Edward Tender testified falsely at McRae's trials and has since recanted his testimony multiple times. Contrary to the MAR Court's finding, Tender did not "affirm" his trial testimony at the MAR evidentiary hearing.[14]

When 16-year-old McRae arrived at the Richmond County Jail in late February 1996, Tender—a 44-year-old alcoholic with an extensive criminal record—was there awaiting trial for nineteen felonies and three misdemeanors, including for breaking and entering, larceny, and obtaining property by false pretenses. (Tender Criminal Record Summary (Ex. 17 at 1–2).) Given his charges, Tender was "facing about 20 years in prison" until the RPD offered him a deal if he "helped them with the Rankin murder

---

[14] For a discussion of Tender's statements at the MAR hearing, see <u>infra</u> p. 27.

Case 1:21-cv-00577-LCB-JLW   Document 1   Filed 07/13/21   Page 17 of 124

case." (Affidavit of Edward Tender (Mar. 21, 2013) [hereinafter "Tender Aff."] (Ex. 24 at 1).) Tender agreed to implicate McRae in exchange for a deal on his own charges (id.), and signed a statement for the RPD stating that McRae told him that he had killed Rankin and planned on killing some RPD officers (Tender Statement (Ex. 23 at 1–2)).

Tender did, in fact, get a significant benefit from that deal. Two days after giving his statement to the RPD, Tender went to court, and, as the chart below shows, twenty of his twenty-two charges were reduced to misdemeanors, dismissed completely, or otherwise very favorably resolved. (Tender Criminal Record Summary (Ex. 17 at 1–2).) His remaining two charges were held open for more than two years before finally being resolved on May 28, 1998, only two weeks after McRae was convicted at his second trial.[15]

---

[15] A detailed version of Tender's criminal charges as well as a timeline detailing when he was charged with the various offenses, and when and how they were resolved, are attached. (Ex. 17 at 1–3.)

While paragraph 10 of Tender's affidavit (Ex. 24 at 1) evidences his confusion about the timeline of the resolution of his charges, what is clear from his affidavit and criminal record is that resolution of his criminal charges depended on his implicating McRae in Rankin's death and that a full resolution occurred only after his testimony at McRae's trial.

| Charge | Offense Level | Date of Charge | Resolution | Date of Resolution |
|---|---|---|---|---|
| 16 counts of Obtaining Property by False Pretenses | Felonies | 1/5/96–1/19/96 | Reduced to Misdemeanor Common Law Forgeries, to which Tender plead guilty | 3/28/96 |
| 1 count of Larceny by Employee | Felony | 12/13/95 | Dismissed without leave by DA's Office | 3/28/96 |
| 1 count of Breaking and Entering | Felony | 1/6/96 | Reduced to misdemeanor Possession of Stolen Goods, to which Tender plead guilty | 3/28/96 |
| 1 count of Larceny after B & E | Felony | 1/6/96 | Dismissed without leave by DA's Office | 3/28/96 |
| 1 count of Simple Worthless Check | Misdemeanor | 9/22/95 | Tender plead guilty as charged | 3/28/96 |
| 2 counts of Probation Violation | Misdemeanors | 1/6/96 and 1/18/96 | Continued until after McRae convicted; then terms of probation unmodified | 5/28/98 |

(See id.)

At McRae's trial, Tender testified that McRae approached him in jail and told him that he shot Rankin in the head after he found him asleep on a porch. (2-Trial-Tr. 116:2–11.) According to Tender, McRae (who, along with Tender, is African American) told him he killed Rankin because Rankin was white, and McRae "wanted to kill all white people." (Id. at 116:14–16.) Tender described McRae—a teenager struggling with mental health issues—as a very well-read young man who spoke "like a revolutionary type . . . like a Malcolm X or Stokely Carmichael." (Id. at 119:13–17, 127:17–22.) Tender further stated that McRae spoke to him several times and told him about killing Rankin "[j]ust

about every time that he talked to" him. (Id. at 117:11.) No evidence presented at trial

corroborated Tender's testimony or his statement to the RPD.[16]

At both trials, Tender admitted that he had "some charges pending in court" when

he gave his initial statement to the RPD (id. at 119:23–25), but the jury never learned that

---

[16] Tender's description of McRae as a well-educated militant was divorced from reality. At the time of trial, McRae was a teenaged boy struggling with mental health issues who had dropped out of high school and had not obtained a GED. Two years of records from the Dorothea Dix Hospital in Raleigh further undercut Tender's description.

After his arrest, McRae spent more than two years cycling between the County Jail and Dix, where doctors assessed his competence to stand trial and treated him for his schizophrenia. McRae was prescribed powerful psychiatric drugs and experienced a repeated cycle of being returned to the County Jail, where his regimen of medication ceased, leading to the deterioration of his mental health and his return to Dix. In the two years that Dr. Nicole Wolfe and countless other staff members at Dix interacted with McRae, taking extensive notes about their constant interactions with him, there is not a single mention of Malcolm X, Stokely Carmichael, or any other Civil Rights Activist. (See 1-MAR-Tr. 371:5 to 373:25.) Over the thousands of pages of records, there is not a *single* indication that McRae ever made a statement to any staff member or doctor that stated or suggested any racial animus. (Id.)

Additionally, during the time period that McRae and Tender overlapped at the County Jail, the time where the two might have spoken was very limited. Not only was McRae frequently at Dix, but his symptom-related misbehavior at the County Jail (e.g,, flooding his cell) often resulted in his being sent to solitary confinement. It appears Tender did in fact see or hear of McRae, because he reported that McRae "acted like something was wrong with him mentally" (id. at 332:13–14), but it is highly unlikely they had many chances to interact at all, let alone establish a rapport.

Crediting Tender's trial testimony as accurate thus requires believing that for one month, McRae was a raging militant who told a complete stranger, unprompted, that he wanted to kill all white people, but that McRae then kept this alleged racial animus and militancy completely silent for two years while under constant observation.

14

he still had two charges pending at the time of his testimony.[17] When ADA Scott Brewer asked Tender what charges he had pled guilty to, Tender stated it was a "[misdemeanor] charge," for "possession of stolen goods," which falsely and significantly minimized his record. Tender also denied receiving a deal from the DA's office in exchange for testifying.[18] (Id. at 120:1–13.)

> b. Thurman Nelson.

Nelson also testified falsely at McRae's trials. Despite being charged with the same crime as McRae, also as a principal, Nelson obtained a substantially different outcome, repeatedly receiving favorable treatment from the State in exchange for his testimony.

Nelson was arrested and charged with Rankin's murder on March 1, 1996, the day after McRae was arrested. Unlike McRae, however, Nelson secured private representation from the experienced Van Camp Law Firm, receiving counsel from

---

[17] The MAR Court erred in finding that, when Tender testified at McRae's trials, he had "no cases pending against him." (2015 MAR Order at 10 ¶ 5.) How that error fatally corrupted the Court's analysis of McRae's related claim for relief is discussed infra at p. 79.

[18] Crump asked Tender about his misdemeanor plea, asking "what were you charged with though?" and Tender reaffirmed only that he was charged with "possession of stolen goods." (2-Trial-Tr. 128:15–18.) When Crump asked Tender for additional details of his convictions, Tender stated that "they were misdemeanors" and claimed that he did not remember if they were reduced from felonies. (Id. 129:11 to 130:23.) Brewer successfully objected to the line of questioning, preventing Crump from eliciting any further information. Crump did not press Tender on whether the statements were true, instead relying on his "sarcastic manner" in questioning to convey to the jury that he did not believe the statement. (2-MAR-Tr. 78:7–9.)

15

attorneys James Van Camp and Edward Meachum. Nelson was able to post the $50,000

bond, and, while the State was waiting for McRae to be rendered competent to stand trial,

Nelson remained out on bond, without a trial, for the following two years. During that

time, Nelson was charged with several misdemeanors and a felony, including two

separate "carrying concealed gun" charges, but he was never held and never had his bond

on the murder charge revoked or even modified.[19] (See Nelson Criminal Record

Summary (Ex. 19 at 1).)

  Brewer's own notes before the first trial indicate that he planned to call Nelson to

the stand only if the purported "eyewitness" was unavailable,[20] but, even then, he planned

to use him only if Nelson implicated himself in the crime. (DA, Witness Order List (Ex.

18).) Despite that plan, Brewer used Nelson at both trials and allowed him to testify to his

complete innocence and uninvolvement in the crime. (See 1-Trial-Tr. 161:13–20; 2-Trial-

Tr. 71:5–15.) Nelson, who remained charged with Rankin's murder throughout both

trials, denied having an agreement with the State (2-Trial-Tr. 67:8–14), but, as the chart

---

[19] Nelson's release following weapons charges is highly unusual given that he was
awaiting trial for first-degree murder, involving a gun. He was twice arrested while
carrying a concealed weapon (a 9 mm pistol) and, rather than moving for bond
revocation, "[w]hen they caught [him] with the guns, they told [him he] could go, just be
in court." (2-Trial-Tr. 83:17 to 84:2.)

[20] Brewer originally intended on calling Marlin Dumas, allegedly an eyewitness to the
shooting (later recanted), to the stand. (DA, Witness Order List (Ex. 18).) However,
Brewer chose not to have Dumas testify. This is likely because Dumas was incarcerated
at the time of McRae's trials for a capital murder conviction, and Brewer did not want to
use the testimony of a capital murderer—particularly when that murderer was the only
person whose statement placed himself at the scene. Infra notes 35–36.

below shows, his pending charges, including the murder charge, were either dropped or very favorably resolved shortly after McRae was convicted.[21] (See Nelson Criminal Record Summary (Ex. 19 at 1).)

| Charge | Offense Level | Offense Date | Date of Resolution |
| --- | --- | --- | --- |
| First Degree Murder (Rankin) | Felony | 10/14/1995 *(charged 3/1/1996)* | 8/26/98 |
| Carrying Concealed Gun (1st) | Misdemeanor | 8/24/1996 | 8/26/98 |
| Possession of Stolen Property | Felony | 11/27/1996 | 8/26/98 |
| Carrying Concealed Gun (2nd) | Misdemeanor | 3/7/1997 | 8/26/98 |
| Simple Poss. Sched. VI CS | Misdemeanor | 5/14/1998 | 8/27/98 |
| Reckless Driving to Endanger | Misdemeanor | 5/14/1998 | 8/27/98 |

(See id.)

It is now known that, at the time, the DA's Office did not offer formal agreements in exchange for testimony. Rather, it was well understood that, if a defendant cooperated with the State, he would receive favorable treatment, and Nelson benefitted from that understanding.[22] (1-MAR-Tr. 302:8 to 302:13.) Indeed, Eddie Meachum, one of Nelson's

---

[21] Other minor charges, such as traffic violations, were not included in this table. A detailed version of Nelson's charges as well as a timeline detailing when Nelson was charged with the various offenses, and when and how they were resolved, are attached. (Ex. 19 at 1–2.)

[22] At the 2014 MAR hearing, one of Nelson's lawyers, James Van Camp, testified to the practice of the DA's Office at the time of McRae's trials regarding witnesses who testified in support of criminal prosecutions while facing charges themselves. (See generally 1-MAR-Tr. 302–309.) He testified that the DA's Office would not enter into formal agreements with defendants/witnesses at the time, but there was an

lawyers, was apparently so confident that his client would receive a deal in exchange for his testimony that he was not present when Nelson testified at McRae's second trial. Instead, Meachum spoke to Brewer the night before and consented to Nelson testifying without counsel present.[23] (2-Trial-Tr. 60:2–19.)

At trial, Nelson was the only witness who testified to seeing Rankin and McRae interact on the day Rankin was murdered. Nelson testified that, before dark, he saw Rankin drive up in a red truck[24] and "pay" McRae for drugs with a piece of paper instead

_____

"understanding" that cooperating witnesses would be treated favorably in exchange for their testimony. (Id. at 302:8 to 302:13.) As Nelson's counsel, he expected Nelson to receive a benefit for testifying for the State: "It was generally understood, I understood it, that if a defendant cooperated, there would be some consideration for that, for that cooperation." (Id. at 302:15–17.) On what he meant by "consideration," Van Camp clarified, in "the result of his case. In this case, in Mr. Nelson's case." (Id. at 302:18–22.) On cross examination, Van Camp agreed that, at the time, "the State would actually make no offer to a witness such as . . . Nelson in exchange for his testimony," so you could never tell a client "[i]f you testify, you're going to get X, or there's going to be a guaranteed effect." (Id. at 307:1–19.) But, on redirect, Van Camp testified that he did not believe he ever had a client who testified for the State in ADA Brewer and DA Honeycutt's district who did not receive a benefit for testifying. (Id. at 308:6–12.)

[23] The jury was only informed that Meachum was not there because he was in federal court. (2-Trial-Tr. 60:4-5.) However, the private conversation between Meachum and Brewer must have included assurances that Nelson would receive favorable treatment on his own charges in exchange for his testimony at McRae's trial. Otherwise, it is unthinkable that Meachum, a former prosecutor in the same district as Brewer who at the time was practicing at the vaunted Van Camp law firm, would have left his still-charged client to testify without counsel present. Incontrovertibly, no seasoned attorney would allow his client to testify alone without concrete assurance of a deal. To do otherwise would violate the duties owed to his client.

[24] Post-conviction counsel discovered evidence that Rankin allegedly stole a red truck and crashed it at least a week before Nelson claimed Rankin drove it during the botched drug deal with McRae. See infra note 28.

18

of money. (Id. at 63:2, 64:8–10.) Nelson further testified that when McRae realized he had been ripped off, he told Nelson he was going "to get" Rankin, and later confirmed to Nelson: "I got him." (Id. at 64:21 to 65:16.) When pressed for details, Nelson stated that McRae had said he "shot [Rankin with] a .380 something," which he said he had seen McRae with often.[25] (Id. at 66:4–23.) Nelson also testified that the next time he saw McRae, between 10:30 PM and 11:00 PM the night Rankin was murdered, McRae was asleep. (Id. at 75:13–25.)[26]

          c.   Jackie Rankin.

The State also provided testimony from Jackie Rankin, the victim's mother.[27] Contrary to Nelson's testimony that Rankin drove a red truck the day of his murder, Jackie testified that when she last saw her son (around 10:30 PM the night of his death), he was on foot. (Id. at 174:6–8, 179:4–7.) Jackie further stated that, although she and her husband owned a red truck, her son "did not have permission to drive any of [their]

---

[25] Important details of Nelson's testimony changed as the trial progressed. For example, he first testified that McRae said he "got" Rankin at a time that preceded when Rankin's mother last saw him alive, but he later modified his testimony and said he was not sure when McRae made the admission. (Compare 1-Trial-Tr. 155:11–17 ("before it got dark") with 2-Trial-Tr. 65:2–16 ("not sure" when).) Brewer also corrected Nelson on the stand about when Nelson had seen McRae with the .380. (See 2-Trial-Tr. 66:15–19 (A: "I seen him often with it, afterwards." Q: "Before. Before." A: "Before I seen it.").)

[26] Notably, the time when Nelson saw McRae intoxicated and asleep is roughly the same time that Jackie Rankin, Jeremy Rankin's mother, testified that she last saw her son alive. (Id. 174:8.)

[27] The State's only other witnesses at trial were the man who found Rankin's body on his porch (Allen Davis), the doctor who performed Rankin's autopsy, two RPD detectives involved in the investigation, and the executive director of the local housing authority. None of these witnesses implicated McRae in the murder.

vehicles," and she had not loaned him the truck the last time he visited her at home, approximately two weeks before his death. (Id. at 177:13 to 178:23.) She also testified that, when she saw her son on the night of October 13, he appeared to be nervous. (Id. at 180:21–22.) Notably, at the first trial only, Jackie added that Rankin told her someone named Dale "was going to beat the ass out of him." (1-Trial-Tr. 79:5–13.)

## 2. The Defense

Due to his poor mental health at the time, McRae could not take the stand in his own defense. The core of his defense was an alibi. (See generally 2-Trial-Tr. 187–270.) Crump presented several witnesses who testified that on the evening of the murder, McRae attended a neighborhood party, where he became so intoxicated that he had to be carried home. (E.g., id. at 188:6 to 189:18, 206:1 to 207:21.) McRae's brother, John, testified that McRae was so intoxicated that he was vomiting, and that he helped McRae home and put him in bed by 8:30 PM. (Id. at 240:5 to 241:5, 245:4 to 246:2.) McRae's sister, Marnell, confirmed this account, testifying that McRae was still in bed asleep at 11:00 PM. (Id. at 273:15 to 274:1.) Multiple other witnesses, including co-defendant Nelson, confirmed seeing McRae passed out on his bed between 10:00 PM and 2:00 AM. (Id. at 75:13 to 76:2, 222:3–21, 227:10–22.) McRae's mother, Gloria, also confirmed that McRae never left the house that evening, testifying that she was awake all night taking care of her sick mother and never saw McRae emerge from his room. (Id. at 255:9 to 256:16.)

Other than presenting evidence of McRae's alibi defense, Crump did not develop much else in his defense, and he specifically failed to investigate the victim's crime-filled

20

background.[28] Despite seeing a complete preview of the State's case at the first trial, Crump failed to use this unique opportunity to undermine the prosecution, conducting no additional investigation between the two trials.[29]

Somewhat inexplicably, the second jury reached a unanimous verdict to convict when the evidence at the first trial was nearly identical, but that jury split 8 to 4 for acquittal. The only difference between the two trials was McRae's dramatically deteriorating mental health, the symptoms of which, as ADA Brewer pointed out in closing, made him look oddly vacant, disconnected, and unremorseful.

## C. Evidence Discovered After Conviction

Years after McRae's conviction, the favorable evidence discussed below was discovered, which of course the jury never had an opportunity to review. This new evidence demonstrates that McRae was arrested on the basis of contradictory statements obtained through coercion and on false, incentivized testimony.

### 1. Discovery of Suppressed Statements

In preparation for trial, defense attorney Crump moved for the State's witnesses to be identified, arguing it was necessary because McRae had been found incompetent

---

[28] As discussed further below, had Crump investigated Rankin, he would have discovered that multiple warrants for Rankin's arrest had been issued the day he was murdered, and that the red truck Nelson claims to have seen Rankin in had been stolen and wrecked nearly a week before the murder. (See Hamlet Police Department Records (Ex. 1 at 1–22) (including handwritten notes on Jerry Rankin, indicating that "Red truck stolen and wrecked on Dawkins Hill").)

[29] For a complete discussion of Crump's failure to conduct a reasonable investigation pre- and between trials, as well as a discussion of his ineffective trial performance, see infra pp. 95–113.

21

several times and was severely limited in his ability to assist in his own defense. (Motion for Identity of State's Witnesses, April 17, 1998 (Ex. 26 at 1–3).) The court denied the motion, but, at or before the first trial, the State provided two statements—Edward Tender's and Allen Davis's. (Crump Aff. (Ex. 14 at 3).) Davis was the man who found Rankin's body.

The State also provided a one-page document that included statements purportedly made by McRae to the people the State intended to call as witnesses. The statements were presented in one unbroken paragraph with no apparent order and no identifying information. (Compare Substance Oral Statements: Defense Copy (Ex. 12 at 1–2) (unbroken paragraph with no attribution), with Substance Oral Statements: State Copy (Ex. 13 at 1–3) (differentiated paragraphs with attribution); 1-MAR-Tr. 276:6 to 277:22 (former DA Parker describing the process of creating the documents).) Almost none of the statements were presented through State witnesses at trial.

During undersigned counsel's much later post-conviction investigation, the DA's Office provided its case file, which included documents revealing the sources of the statements: nine previously undisclosed purported witness statements taken by the RPD over a ten-day period more than four months after Rankin's murder.[30] These statements conflict with one another in nearly every respect, in small and large, material detail, including when the murder occurred and how many people were involved. They are consistent on only two points: that Jerry Rankin was killed on some day in October and

---

[30] See supra note 4 (identifying the relevant names and dates).

22

that McRae was involved. That pattern undeniably suggests the various individual's efforts to create a narrative around certain provided core facts, particularly McRae's involvement.

Significantly, many of the statements materially conflict with the case the State presented at trial through Tender and Nelson: i.e., that McRae was a black revolutionary intent on killing white people and started with Rankin (Tender) and McRae killed Rankin after a drug deal gone bad (Nelson). Four of the statements directly implicate Nelson in the murder, which of course countered his testimony of innocence and uninvolvement in the crime, and one—that of Marlin Dumas, a purported eyewitness who did not testify at trial—claims that both Nelson and McRae fired shots at Rankin from close range.[31] (M. Dumas Stmt. (Ex. 4 at 1–2); S. Parker Stmt. (Ex. 9 at 1–3); C. Robinson Stmt. (Ex. 10); P. Williams Stmt. (Ex. 11).)

Along with the statements' telling inconsistencies, the circumstances of how the RPD acquired the statements raise serious doubts about the accuracy and reliability of their contents. Although nearly all of the statements identify an independent altruistic reason the witness came forward to provide the statement so many months after Rankin's murder (e.g., "I could not get it off my mind"),[32] the short time period in which the

---

[31] As described infra pp. 91–94, all of these statements are untrue and Nelson is also likely innocent of Rankin's murder.

[32] See Dumas Stmt. (Ex. 4 at 2) ("The only reason I came to you tonight and told you about this is because it has been bothering me and I could not get it off my mind."); L. Parker Stmt. (Ex. 8) ("I decided to come forward because Jerry was a friend of mine and the person that killed him should be caught."); S. Parker Stmt. (Ex. 9 at 3) ("I decided to

statements were obtained suggests their collection was prompted by a single, targeted

burst of investigative activity.[33] The following timeline denotes when the RPD obtained

each statement during the investigation:



McRae was arrested and charged on the basis of these statements, but the State

called to testify only one of the people who provided a statement during this period,

---

come forward because I am tired of McRae and his 'boys' going around scaring
people.").

[33] Contrary to what the statements suggest, it is unlikely that all of these people came
forward independently so late in the investigation and in such a short time frame. Rather
than being a "coincidence" in time and purpose, it is likely that all the statements were
prompted by an external factor, such as intensified questioning of residents of the
relevant neighborhoods. Someone then likely suggested each statement provide an
independent reason for coming forward, possibly to lend them an air of credibility.

The fact that several statements also contain the same serious mistake—that the
murder occurred on the evening of October 14, when it actually occurred either very late
on October 13 or in the very early *morning* of October 14 (see T. Nelson Stmt. (Ex. 7 at
1); L. Parker Stmt. (Ex. 8); S. Parker Stmt. (Ex. 9 at 1); T. Clark Stmt. (Ex. 3))—suggests
they originated from a single source. That these four statements were all taken by the
same investigating officer (and that they were the *only* statements taken by that officer)
highly suggests that the officer provided those witnesses with at least some of the
information in their statements.

Nelson, McRae's co-defendant, who implicated McRae but testified to his own

innocence. ADA Brewer's trial preparation notes, obtained by undersigned counsel

during post-conviction representation, indicate that he planned to call several others,

including 15-year-old Darius Lockhart, who has since recanted his statement and said he

refused to testify when Brewer asked him to,[34] and another 15-year-old, purported

eyewitness Marlin Dumas, who, at the time of trial, was incarcerated in Virginia on a

separate capital murder charge.[35] Dumas has also since recanted the statement he signed

---

[34] Lockhart provided a sworn affidavit, attesting that "Derrick McRae has never told me that he was involved in the Rankin murder," and that "the statement attributed to me is false." (Lockhart Aff. (Jan. 21, 2014) (Ex. 21 at 2).) Lockhart, who was 15 years old at the time, was questioned alone and signed the statement because the RPD detectives "told [him he] would go to jail for a long time if [he] refused to sign it." (Id. at 1.)

On the decision not to testify, Lockhart's affidavit reads as follows: "I was asked by Assistant District Attorney Scott Brewer to testify about McRae allegedly telling me that he had killed Mr. Rankin. I told Mr. Brewer that the statement was false, and that McRae did not tell me he had killed Mr. Rankin. Mr. Brewer told me to leave the courthouse." (Id. at 2.)

[35] Brewer's pretrial notes—"witness order list"—specifically noted the following: "Thurman Nelson—only if (1) he admits being there; or (2) can't find Dumas." At some point, Dumas's name was crossed off of the list and Thurman Nelson was called to testify instead, without admitting "being there." (See DA, Witness Order List (Ex. 18).)

Although undersigned counsel does not credit Dumas's statement, Brewer and the police may have believed it and, if so, they believed Dumas was the only person the RPD spoke to who was at the scene of Rankin's shooting. When Dumas was convicted of capital murder in Virginia on July 18, 1997, nearly a year before McRae's first trial (1-MAR-Tr. 190:7–25; Dumas Sentencing Order, July 9, 1997), his purported role in the Rankin case shifted. Based on his claim that he was present during Rankin's murder, he should have been investigated as a suspect, particularly after his later involvement in the Virginia murder. Yet none of this information, including Dumas's statement, was disclosed to the defense. At the MAR hearing, Detective Robert Vorhees admitted it would be important to know that the State's only eyewitness was also charged with

25

for the RPD.[36] (DA, Witness Order List (Ex. 18) (Brewer's pretrial notes); Lockhart Aff. (Ex. 21 at 1–2); Dumas Aff. (Ex. 20 at 1–2).)

    2.   Tender's Recantation

Beginning in 2009, Tender, an alcoholic who has "battl[ed] with recovery" (1-MAR-Tr. 116:1–2, 123:22–24), repeatedly recanted his trial testimony on numerous occasions to different individuals. In his first meeting with any member of the Duke Law Clinic, Tender spontaneously referenced the McRae case, stating that the RPD "framed" McRae and admitting that McRae never confessed to him or said anything about Stokely Carmichael or Malcolm X. (Llewelyn Aff. (Ex. 22 at 2).) Tender said he testified falsely at trial because ADA Brewer offered him "a lenient sentence, which [he] ended up getting." (State v. McRae, No. 96 CRS 1576, Transcript of Edward Tender Interview (Feb. 18, 2013).) After revealing that the prosecution had coached him on his false

_____

capital murder (1-MAR-Tr. 189:23 to 190:6), nothing in the record or files disclosed to the defense indicates the RPD ever investigated Dumas as a suspect. Either the RPD did not do so, which raises serious concerns about the reliability and integrity of the RPD investigation, or the RPD investigated Dumas and withheld the results of that investigation from the defense—perhaps as part of the missing four-and-a-half months of the investigative file. If the latter, the information that the State's only eyewitness was an incarcerated capital murderer would certainly be material enough by itself to meet Brady's standards.

[36] Dumas was 15 years old at the time he signed the RPD statement stating he was an eyewitness to Rankin's murder. In a sworn affidavit, Dumas confirms that "[n]one of that [was] true," and that he "never thought [McRae] could kill anyone." (Dumas Aff. at 2 (Sept. 23, 2011) (Ex. 20 at 2).) In his affidavit, Dumas also stated that the RPD picked him off the street, "kept [him] in handcuffs[,] and questioned him for 17 hours" until he agreed to implicate McRae. (Id.)

testimony, Tender added, "Is there anything you can do to help this boy?" (Llewelyn Aff. (Ex. 22 at 2).)

In Tender's multiple recantations, including in a sworn affidavit and a recorded interview by a private investigator, he has consistently maintained that his initial statement to the RPD and his subsequent trial testimony were false, and that they were given in exchange for favorable treatment by the State. (1-MAR-Tr. 321:4 to 332:18 (recording of Edward Tender, offered for impeachment only); Tender Aff. (Ex. 24 at 1–2).) Tender continued to affirm his recantation up until the MAR hearing, when he wavered but never directly affirmed his trial testimony.

Instead, when presented with his trial testimony at the MAR hearing, Tender said he could not recall if it was accurate "right off hand" as it had "been twenty something years" and his "mind ha[d] been through a lot." (1-MAR-Tr. 120:15–18.) Tender qualified each answer he gave by consistently stating that his memory was unclear. When asked if he had testified at all, Tender answered yes, "[i]f I can remember correctly." (Id. at 125:7–9.) When asked if he testified truthfully at McRae's first trial, he stated yes, "to the best of [his] knowledge" and then immediately added "I can't remember." (Id. at 125:12–15.) When asked if he testified truthfully at the second trial, he did not respond affirmatively, and only answered, "[b]est that I can remember" (id. at 125:16–18), but later clarified "I can't remember" (id. at 315:19). Yet in its Order, the MAR Court found that "Tender stated that to the best of his recollection he testified truthfully during both of [McRae's] trials," and that his "testimony under oath ha[d] been consistent." (2015 MAR Order at 11 ¶ 10, 12 ¶ 13.)

27

### 3. McRae's Medical Records

During its investigation, undersigned counsel also obtained numerous medical records, spanning thousands of pages, from the two years of McRae's confinement pretrial. McRae was closely observed over that period, with countless medical professionals and others recording each interaction. (See 1-MAR-Tr. 372:16 to 373:12.) Yet not a single entry corroborates Tender's claim that McRae was a well-read militant motivated to kill Rankin out of racial animus. (Id. at 371:5 to 373:25.) This utter lack of corroboration further demonstrates that, as Tender has repeatedly admitted, he fabricated the story about McRae to benefit himself and his trial testimony was entirely false.

### 4. Rankin's Criminal Records

Undersigned counsel also obtained police records showing that Rankin had engaged in a crime spree the week before his death, committing several acts of larceny, and that multiple warrants had issued for his arrest. (See Hamlet Police Department Records (Ex. 1 at 1–22).)[37] Among other things, the records reveal that Rankin stole and crashed a red truck approximately a week before Nelson claimed to have seen Rankin drive up in one.[38] (Id. at 17.) The records also reveal that other people may have had a

---

[37] These records include six separate arrest warrants issued on Oct. 13, 1995.

[38] Nelson's statement to the RPD describing a red truck is at odds with the statements of other witnesses, which did not mention a truck. Additionally, Jackie Rankin, the victim's mother, testified that her son was on foot when she met him on the night of the murder. (2-Trial-Tr. 179:4–7.) The uncorroborated presence of the red truck in Nelson's statement strongly suggests that this fact was provided to him by the RPD. Either the RPD knew Rankin's family owned a red truck, which, according to Jackie, Rankin did not have access to (id. at 177:13 to 178:23), or knew Rankin had recently stolen a red truck.

28

motive to harm Rankin, such as the "Dale" that Rankin nervously told his mother "was going to beat the ass out of him." (1-Trial-Tr. 79:5–13.) None of these records were disclosed to the defense.[39]

## ***SCHLUP* INNOCENCE GATEWAY**

### I. PETITIONER'S CREDIBLE CLAIM OF ACTUAL INNOCENCE CREATES A "GATEWAY" TO FEDERAL HABEAS REVIEW

As this petition is filed outside the one-year statute of limitations of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2244(d)(1) (2012), McRae seeks federal habeas review by this Court based on the Schlup v. Delo actual innocence gateway. This gateway is available if a review of all the evidence "establish[es] sufficient doubt about [Petitioner's] guilt" such that a refusal to consider the merits of his claim "would be a miscarriage of justice *unless* his conviction was the product of a fair trial." Teleguz v. Pearson, 689 F.3d 322, 327 (4th Cir. 2012) (quoting Schlup v. Delo, 513 U.S. 298, 316 (1995)).

To pass through the gateway, Petitioner must show that new, reliable evidence not presented at trial makes it "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Schlup, 513 U.S. at 327. This threshold determination is "separate from its inquiry into the fairness of [Petitioner's]

---

[39] The records were from the Hamlet Police Department, which is a neighboring town very close to Rockingham and in the same county (Richmond). If the RPD, itself, never obtained the records, that failure demonstrates the great harm caused by the RPD's failure to "look very close at the *victim* in this case," which is what investigators viewed as important as part of their investigation. (Derrick McRae Felony Report (Ex. 27 at 3).) Of course, the RPD likely did "look very close" at Rankin and documented that part of the investigation in the now-missing first four-and-a-half months of the case file.

29

trial," Teleguz, 689 F.3d at 330, as it is undertaken prior to consideration of Petitioner's substantive claims. Though this gateway standard is demanding, it does not "require absolute certainty about the petitioner's guilt or innocence." House v. Bell, 547 U.S. 518, 538 (2006). When assessing an allegation of actual innocence, the court does not "make an independent factual determination about what likely occurred," id. at 538, but instead considers "how a reasonable juror would perceive *all* of the evidence in the record," Teleguz, 689 F.3d at 330 (emphasis added).

The United States Court of Appeals for the Fourth Circuit recently explained the proper approach to this determination. The court "must first turn to the evidence and testimony considered at the [original] trial," then consider any new evidence proffered since trial "that has a bearing" on actual innocence. Finch v. McKoy, 914 F.3d 292, 294, 297 (4th Cir. 2019). Finally, the court must weigh the entire record holistically, considering the strengths and weakness of the original case presented, and examining the interaction between the old and new evidence. See id. at 299–301 (finding the new evidence bolstered the original alibi defense and undercut the testimony of State witnesses). If, after reviewing this record, it is "more likely than not *any reasonable juror would have reasonable doubt as to the petitioner's guilt,* then the petitioner has satisfied the Schlup standard." Teleguz, 689 F.3d at 328 (emphasis added) (internal quotations omitted) (citing House, 547 U.S. at 538). Once this standard is met, Petitioner is entitled to review on the merits of his substantive claims, Schlup, 513 U.S. at 317, regardless of AEDPA's statute of limitations, McQuiggin v. Perkins, 569 U.S. 383, 386 (2013).

A consideration of all available evidence in this case—particularly considering the weakness of the State's case and the new reliable evidence pointing to McRae's innocence—persuasively demonstrates that multiple reasonable jurors would have reasonable doubt about his guilt.

## II. PASSAGE THROUGH THE *SCHLUP* "INNOCENCE GATEWAY" IS NECESSARY TO AVOID A MISCARRIAGE OF JUSTICE

### A. The Evidence Presented at Trial was Weak and Unreliable

The crux of the State's case against McRae, which led eight jurors in the first trial to vote to acquit, was the highly incentivized and flatly inconsistent testimony of Nelson and Tender, neither of whom claimed direct knowledge of the crime.

Although the jury was told Nelson was also charged as a principal in Rankin's murder, the State allowed him to testify against McRae while unequivocally proclaiming his own innocence and lack of involvement. (2-Trial-Tr. 71:5–15.) Because he was charged with the murder himself, Nelson was highly incentivized to cooperate with the State and, as discussed below, was amply rewarded for that cooperation. This is precisely the scenario that causes the testimony of co-defendants to be recognized as "presumptively suspect": Co-defendants have a "strong motivation to implicate the defendant and to exonerate [themselves]." Lee v. Illinois, 476 U.S. 530, 541 (1986). Courts have repeatedly warned that such self-serving statements, especially if the witness has "significant motivation to obtain favorable treatment" or if they "shif[t] blame to someone else," should be viewed with suspicion. E.g., Williamson v. United States, 512 U.S. 594, 620 (1994) (Kennedy, J., concurring) (internal quotations omitted). Nelson's

31

testimony, shifting all blame onto McRae while proclaiming his own complete lack of involvement (2-Trial-Tr. 71:5–15), exhibited these exact defects.

Similarly, Tender, an alcoholic jailhouse informant, was also presumptively unreliable. As courts have made clear, "[t]he use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility."[40] E.g., On Lee v. United States, 343 U.S. 747, 757 (1952). Here, Tender testified that McRae, who was a 16-year-old stranger developing a serious mental illness and known to be nearly incommunicative at the time, spontaneously confessed to him, a 44-year-old seasoned inmate. That alone "raise[s] serious questions of credibility," but McRae and Tender also had very limited opportunities to interact, which raises additional questions.

The wild differences between Tender and Nelson's stories further reveal how unreliable each witness was. Tender testified that McRae was a well-read militant motivated to kill Rankin—and other white people, naming some in the courtroom—out of racial animus (2-Trial-Tr. 116:12–16), but Nelson testified that McRae killed Rankin because of a botched drug deal (id. at 63:12 to 65:16). The State presented no evidence corroborating either Tender or Nelson's accounts.

---

[40] According to the National Registry of Exonerations, jailhouse informants have played a role in 206 proven wrongful convictions in the United States, including 15.8 percent of the 1079 recorded murder cases. See Browse Cases: Detailed View, Nat'l Registry of Exonerations, www.law.umich.edu/special/exoneration/Pages/detaillist.aspx (last visited Jul. 8, 2021).

32

As stated by a district court performing a <u>Schlup</u> analysis, "two stories of what occurred on the night of the murder . . . [with] almost no other evidence that would support one version over another . . . *is enough to raise doubt in a reasonable juror's mind.*" <u>Wolfe v. Johnson</u>, 940 F. Supp. 2d 280, 286–87 (E.D. Va. 2010) (emphasis added), <u>aff'd sub nom.</u> <u>Wolfe v. Clarke</u>, 691 F.3d 410, 426 (4th Cir. 2012).

The State presented no eyewitness testimony or physical evidence connecting McRae to the crime. Just the testimony of these two men—Tender and Nelson—both of whom had much to gain, and in fact did gain, from testifying for the State at McRae's trials. Even with that benefit, however, neither man gave the State very much, and yet the second jury voted to convict.

In sum, this fragile case, which the State presented the second time the same as the first, even after the 8/4 vote to acquit, rested entirely on the stories told by Tender and Nelson and the perceived credibility of those two men.

## B.  The Newly Discovered Evidence Further Discredits the State's Case

In support of his claim of actual innocence, McRae offers the following evidence: (1) the nine witness statements described above that the State did not provide to the defense in violation of <u>Brady</u> (<u>See</u> <u>e.g.</u>, Ex. 3–11); (2) affidavits from two of the witnesses who gave these statements, confirming the RPD fabricated the statements and coerced witnesses into signing them (Ex. 20–21);[41] (3) Tender's recantation,

---

[41] These witness affidavits were not submitted at the 2014 MAR hearing, as they were irrelevant to the consideration of the merits claim—namely, whether the suppression of the statements violated McRae's constitutional rights. They are being submitted here,

Case 1:21-cv-00577-LCB-JLW   Document 1   Filed 07/13/21   Page 39 of 124

demonstrating the testimony he gave at trial was false (Ex. 24 at 1–2); (4) evidence of the favorable treatment Tender and Nelson received in exchange for their cooperation with the State, which was not disclosed to the defense in violation of <u>Giglio</u> (Ex. 17 at 1–3; Ex. 19 at 1–2); (5) Dr. Wolfe's testimony with respect to medical records undercutting Tender's trial testimony; and (6) records detailing Rankin's crime spree the week before his death that were either never discovered or never disclosed by the State (Ex. 1 at 1–22).

Weighing the weakness of the State's case against this new evidence demonstrates that, but for the constitutional errors in the case, no reasonable juror would have found McRae guilty beyond a reasonable doubt.

### 1. The New Evidence Significantly Undercuts Nelson and Tender's Credibility

Although the jury heard some evidence suggesting Nelson and Tender were compromised witnesses, the jury did not know the full scope of the evidence undermining their credibility.

---

however, as they are relevant to the <u>Schlup</u> gateway analysis, a distinctly federal standard. Not all evidence considered under a <u>Schlup</u> analysis must be previously presented in state court. <u>See</u> <u>Teleguz</u>, 689 F.3d at 332 (stating "the district court may make determinations about the probative force of relevant evidence that was either excluded or unavailable at trial") (internal quotations omitted). While assessing a <u>Schlup</u> claim, a federal district court has the discretion to hold an evidentiary hearing if deemed necessary to develop facts or assess the credibility of evidence not presented in the state court. <u>See</u> <u>id.</u> at 331–32 ("It is well established that the district court is permitted under <u>Schlup</u> to make some credibility assessments when, as here, a state court has not evaluated the reliability of a petitioner's newly presented evidence that may indeed call into question the credibility of the witnesses presented at trial.") (internal quotations and alterations omitted).

The jury did not know that, while charged with Rankin's murder, Nelson was repeatedly allowed to remain free on bond, even after being arrested for serious crimes, including gun charges. (See Nelson Criminal Record Summary (Ex. 19 at 1).) Although the jury was aware that Nelson was out on bond, his subsequent crimes and favorable treatment were kept from them.[42] Although Nelson testified that he did not have a deal from the State in exchange for his testimony (2-Trial-Tr. 67:8–14), the extraordinary treatment he obtained before trial (remaining out on bond), the lenient disposition he obtained after trial (murder and other charges dropped, and receiving only eight-month sentence for remaining charges), and the confidence his own lawyers possessed about the ultimate disposition of the murder charge (allowing Nelson to testify at McRae's trial without counsel present (2-Trial-Tr. 60:2–19)) demonstrate that a deal *had* to exist between Nelson and the State, even if only the customary tacit kind of the time, and that his testimony to the contrary was false.

The jury also did not know Tender's full criminal record, including the very favorable disposition of the many charges he was facing at the time he first implicated McRae in Rankin's murder. Tender testified that he was facing only misdemeanor

---

[42] The jury heard that Nelson was on bond for the first-degree murder charge. (2-Trial-Tr. 78:13–16.) However, when Crump attempted to question Nelson about what he had been charged with *after* he was released on bond, Brewer successfully objected. (Id. at 78:18–21.) Crump was only allowed to elicit Nelson's testimony about his subsequent charges on voir dire. (Id. at 82:1 to 87:8.) The result is that the jury never heard Nelson's testimony regarding the gun offenses he committed while out on bond for first-degree murder, nor did they hear how, despite the severity of these charges, his bond was never revoked. (See id. at 84:1–2 (on voir dire) ("[W]hen they caught me with the guns, they told me I could go, just be in court.").)

charges and had no pending charges at the time of trial. (Id. at 119:23 to 120:3.) However, Tender's full criminal record shows that this testimony was false. (See Tender Criminal Record Summary (Ex. 17 at 1–2).) As the chart above shows (page 13), when Tender provided his statement to the RPD, he was in the Richmond County Jail charged with twenty-two charges, nineteen of which were felonies. All but two of the charges were very favorably resolved shortly afterward and Tender was released, but two charges remained open for the full two plus years before McRae was convicted and only then they were resolved, two weeks later. (Id.)

In addition to this strong inferential evidence that Nelson had a deal with the State, Tender himself has admitted that the RPD and Brewer gave him a deal for implicating McRae. (Tender Aff. (Ex. 24 at 1); State v. McRae, No. 96 CRS 1576, Transcript of Edward Tender Interview (Feb. 18, 2013).) The favorable treatment Tender received, the utter lack of corroboration of his testimony, his spontaneous and repeated recantations, and the similar recantations of Lockhart and Dumas (see Lockhart Aff. (Ex. 21 at 1–2); Dumas Aff. (Ex. 20 at 1–2)) all leads to the inescapable conclusion that Tender's testimony was utterly false. Although Tender did not recant again at the MAR hearing while the SBI agent was still present, he also did not affirm his trial testimony or deny his several previous recantations. (See supra p. 27 (discussing Tender's statements at the MAR hearing).)

The totality of the evidence regarding Tender leads to the inescapable conclusion that, as Tender himself admitted, Tender was a troubled man, beset by alcoholism and frequent run-ins with the law, who did what he had to do to save himself, even if that

36

meant falsely implicating McRae. (See Llewelyn Aff. (Ex. 22 at 2).) However, he was also a man of faith and military service, with a sense of right/wrong and honor. The battle between all of those qualities and traits resulted in what happened here: The creation of a crazy story of Black militancy more suited to Tender's age and experience than McRae's, a later recantation and plea for someone to help McRae, and, still later, a marked inability to testify under oath that his earlier implication of McRae was truthful and a retreat instead into uncertainty, a fog of memory, and lost eyeglasses—culminating in Tender's claim he could not read any documents during the MAR hearing (1-MAR-Tr. 118:12–14, 122:21–22). Tender testified falsely at McRae's trial and, at the MAR hearing, revealed that it was false perhaps as well as a flawed man could have. He was certainly aware that he had nothing to gain by plainly recanting his trial testimony, and, given the evidence of corrosive law enforcement misconduct in this case, potentially had much to lose by doing so. If nothing else, Tender knew how to take care of himself.

As plain from the descriptions above, Tender and Nelson presented wildly divergent motives for Rankin's murder, which independently raises concerns about the veracity of either, but the motives are also individually strongly contradicted by the new evidence. That is, Tender's claim that McRae was a well-read militant motivated by racial animus is utterly unsupported by the numerous entries in the thousands of pages of medical records maintained while McRae was being observed and treated for the more than two years before trial. The observations and treatments were all minutely recorded, with providers noting the details of each interaction, including what McRae said and did. (See 1-MAR-Tr. 372:16 to 373:12.) Not a note indicates that McRae evidenced any sort

37

of racial animus toward white people, let alone any militant beliefs or plans. (Id. at 371:5 to 373:25.)

Similarly, the motive Nelson testified to—the purported botched drug deal—is undercut by the entire record. Nelson testified that he saw Rankin driving a red truck during the alleged drug transaction. (2-Trial-Tr. 62:18 to 63:2.) However, Rankin's criminal records show that he stole a red truck and crashed it at least a week before. (See Hamlet Police Department Records (Ex. 1 at 13).) This strongly suggests that this aspect of Nelson's testimony was false—no other part of the record corroborated Nelson's account and others would have witnessed this transaction had a young white man driven a red truck into the JFK housing project. Additionally, at trial, Rankin's mother testified that (1) Rankin was on foot the night of his murder and (2) he had no access to the Rankin family's red truck for at least a week before his death, which was a different red truck than the one he stole and crashed. (2-Trial-Tr. 177:13 to 178:23, 179:4–7.) Even if one accepts Nelson's testimony as true, he only claimed McRae made self-incriminating statements and he denied believing them himself. (Id. at 65:16, 77:11–18.)

Rankin's criminal records also show that, at the very least, McRae was not the only individual with a reason to wish Rankin harm. Rankin committed acts of larceny from multiple individuals, even stealing a gun, and had multiple warrants out for his arrest. (See Hamlet Police Department Records (Ex. 1 at 1–22).) Relatedly, on the night of his murder, Rankin appeared nervous and told his mother that "Dale" wanted to "beat the ass out of him." (1-Trial-Tr. 79:12–13.) Thus, ample evidence suggests that others may have murdered Rankin, yet there is no evidence in the RPD case file that anyone else

38

was ever investigated. Of course, that evidence may be in the missing four-and-a-half months of the RPD's case file.

These flaws in Tender and Nelson's testimony are amplified and exacerbated by the nine suppressed witness statements. The Fourth Circuit has explicitly affirmed that contradictions between only "two stories of what occurred"—with "almost no other evidence that would support one over another"—are enough to give a reasonable juror doubt. See Clarke, 691 F.3d at 414–15 (citing Wolfe, 940 F. Supp. 2d. at 286–87) (affirming the district court's ruling that the petitioner had met the Schlup standard). Here, there are *multiple accounts*— several of which do not even have the correct date and time of the murder—that differ on the alleged motive, location, and who was involved.[43] Several of the statements also expressly contradict Nelson's testimony, with many directly implicating him in the murder. Although the MAR Court concluded that the statements all implicated McRae, it ignored the obvious credibility issues presented by the inconsistent statements and the lack of an investigation to corroborate or reconcile these inconsistencies.

Considered cumulatively, as it must be here, this new evidence "weakens [the State's] previously submitted evidence" in such a way as to "give pause to any reasonable juror," Finch, 914 F.3d at 300–01, but it also correspondingly strengthens McRae's alibi defense. McRae presented multiple witness who testified that he attended a cookout party on the evening of October 13, drank too much alcohol and grew intoxicated, had to be

---

[43] See supra pp. 21–26.

helped home, and was asleep by 9:00 PM. (See generally 2-Trial-Tr. 187–270). The witnesses' accounts were consistent with one another, and also corroborated by Nelson, who stopped by McRae's house and saw him asleep before 11:00 PM, and by Rankin's mother, who testified Rankin was still alive around that same time. (Id. at 75:13–25, 174:8.) When compared with Tender and Nelson's unreliable testimony, especially as undercut by the new evidence described above, McRae's consistent and corroborated alibi evidence appears even stronger than at trial. See Finch, 914 F.3d at 301 (reasoning that new evidence might give greater weight to the defense's case, making testimony from alibi witnesses "seem more credible"); see Long v. Hooks, 972 F.3d 442, 484 (4th Cir. 2020) (en banc) (Wynn, J., concurring) (holding that, in light of the new evidence, "a jury would surely view [the petitioner's] alibi with a much more open mind today").

## 2. The New Evidence Introduces Undeniable Skepticism About the Quality and Integrity of the RPD's Investigation

The new evidence not only undercuts the State's case, it also raises serious concerns about the quality and reliability of the RPD's investigation. After the first four-and-a-half months of activity unknown to the defense (because that part of the case file is missing), the only evidence the RPD produced against McRae was the flurry of contradicting statements implicating him. The telling contradictions, and the short timeline in which all of the statements were produced, so long after the murder, strongly suggest that the RPD did not suddenly collect these statements in good faith from altruistic witnesses. Instead, it is highly probable that the Lockhart and Dumas affidavits speak to a recurring pattern of coercion and abuse. (Lockhart Aff. (Ex. 21 at 1–2); Dumas

40

Aff. (Ex. 20 at 1–2).) That is, rather than properly investigate Rankin's murder, the RPD picked up vulnerable individuals and interrogated, threatened, and coerced them into signing statements implicating McRae, systematically fabricating a case against him. Why the RPD targeted McRae is still unknown, but, at the time, he was an exceedingly vulnerable teenager beginning to exhibit symptoms of his deteriorating mental health.

Dumas's false statement, even without his subsequent affidavit recanting his statement, is particularly telling. Unlike the other statements, Dumas's described an eyewitness account of the murder. (M. Dumas Stmt. (Ex. 4 at 1–2).) Yet nothing in the RPD investigative file—at least, nothing disclosed to the defense—indicates that the RPD investigated Dumas, even after learning he was later convicted of capital murder in Virginia. This failure suggests either one of two things: (1) If Dumas's original statement was given voluntarily, then the RPD failed to investigate the only person to place himself at the murder, demonstrating that the RPD investigation was incomplete and unreliable; or (2) if Dumas's affidavit disavowing his statement and explaining how it came about is true, then the RPD intimidated him into falsely implicating McRae, demonstrating their investigation was coercive and unreliable.

Rankin's criminal records similarly demonstrate that the RPD investigation was incomplete and unreliable. Rankin was found shot once in the head, execution style, with a crack pipe in his hand. The circumstances of his death, the police records detailing his crime spree, and his mother's testimony about "Dale" all demonstrate that there were multiple people with a motive to harm Rankin. The RPD itself was aware of at least some of the potential issues with Rankin, noting that investigators needed to "look very close at

41

the *victim* in this case." (Derrick McRae Felony Report (Ex. 27 at 3).) However, no evidence regarding Rankin's criminal record, arrest warrants, or auto theft were turned over to the defense before trial,[44] and there is no evidence available to the defense indicating the RPD investigated anyone other than McRae in connection with Rankin's murder.

This creates only two possible inferences. Either the RPD failed to investigate *anyone* for over four months, despite indications that there were multiple people with reason to harm the victim, or the RPD *did* fully investigate other possible suspects and Rankin's background but never disclosed that information to the defense. In short, either the RPD investigation was grossly insufficient or the RPD concealed—and continues to conceal—evidence of alternate suspects from the defense. Courts have long recognized that new evidence suggesting alternate suspects is classic Brady material. Juniper v. Zook, 876 F.3d 551, 570 (4th Cir. 2017) (citations omitted).

Given the extensive evidence of State misconduct in the entire record, and the lack of affirmative evidence linking McRae to the crime, there is ample reason to be skeptical of any evidence presented by the State. Further, the rampant suppression of evidence suggests that this new evidence, including the nine suppressed statements, was withheld

---

[44] Although Crump, McRae's defense counsel, may have been ineffective in failing to uncover some of this evidence himself, the State did not meet its duty to turn the evidence over.

because it was favorable to McRae's case.[45] As the United States Court of Appeals for the Fourth Circuit has suggested, the suppression of evidence "raise[s] the question of why, if this evidence was *not* meaningful, [the State] chose to hide it." Long, 972 F.3d at 482 (Wynn, J., concurring); cf. Kyles v. Whitley, 514 U.S. 419, 429 (1995) ("Because the State withheld evidence, its case was much stronger, and the defense case much weaker, than the full facts would have suggested.").

In sum, all of the new evidence was either withheld from the defense at trial, in violation of the State's Brady obligations, or was never discovered by the State in an investigation that was at best incompetent or at worst fabricated. Considering this new evidence together with the scant evidence presented against McRae at trial, it is more likely than not that no reasonable juror would have convicted McRae. McRae's conviction stood on the narrowest of margins, as demonstrated by the original eight jurors that voted for acquittal. Had the entire picture been actually presented at trial, no reasonable juror could have found McRae guilty beyond a reasonable doubt.

Accordingly, as McRae's compelling claim of actual innocence opens the gateway to federal habeas review, this Court may review his constitutional claims.

## **GROUNDS FOR RELIEF**

As demonstrated above, McRae's claim of actual innocence opens the *Schlup* gateway to federal habeas review. Accordingly, as McRae has exhausted his claims in

---

[45] The Fourth Circuit has also stated that "extensive suppression of evidence" by the State may indicate that, at the very least, further discovery should be granted before a court "makes its final determination on the actual innocence question." Long, 972 F.3d at 470.

43

state court, this Court may review his claims that the State violated his constitutional rights.

Per AEDPA, habeas corpus relief is available when a state court's decision on the merits is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if it is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2) (2012).

Under § 2254(d)(1), a state court decision is considered "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in" Supreme Court precedent or if the state court reaches a different outcome than the Supreme Court "on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 405, 413 (2000). Conversely, a state court's decision is an unreasonable application of clearly established federal law when it "identifies the correct governing legal principle" from Supreme Court precedent but applies it to the facts of a particular case in a manner that is objectively unreasonable. Id. at 409, 413.

Under § 2254(d)(2), a state court's factual determination can be unreasonable in a variety of ways. For example, a state court may make an unreasonable determination of facts by failing to consider relevant evidence in the record, see Brumfield v. Cain, 576 U.S. 305, 322–24 (2015), or by drawing inferences that are clearly contradicted by the record, see Garcia v. Long, 808 F.3d 771, 780 (9th Cir. 2015).

Here, habeas relief should be granted as the MAR Court's decision "collides with AEDPA on all grounds." Garcia, 808 F.3d 776 (quoting Anderson v. Terhune, 516 F.3d

44

781, 786 (9th Cir. 2008)). As described next, the MAR Court's decision is contrary to *and* an unreasonable application of clearly established Supreme Court precedent, and is based on unreasonable determinations of facts in light of the evidence presented.

## I. THE STATE VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS BY FAILING TO DISCLOSE MATERIAL WITNESS STATEMENTS AS REQUIRED BY *BRADY v. MARYLAND*

The MAR Court found that the State failed to disclose the nine witness statements described above[46] (2015 MAR Order at 26 ¶ 1, 27 ¶ 5), but, in a decision that was contrary to *and* an unreasonable application of clearly established federal law, namely Brady v. Maryland, 373 U.S. 83 (1963) and its progeny, held that no constitutional error occurred (2015 MAR Order at 44 ¶ 23).

According to the MAR Court, the suppressed statements were not favorable because they did not exculpate McRae, had only limited impeachment value, and were not "material" under Brady. (2015 MAR Order at 31 ¶ 22, 40 ¶ 10.) The Court erred by conflating favorable evidence with exculpatory evidence and by ignoring the value of the suppressed statements for impeaching the integrity of the RPD investigation, contrary to, and in an unreasonable application of, Brady and Kyles v. Whitley, 514 U.S. 419 (1995).

The MAR Court also unreasonably applied Kyles by failing to weigh the suppressed evidence cumulatively and consider it in light of the weakness of the State's case.

---

[46] See supra note 4.

45

Finally, the Court erred in finding that McRae had not established that the failure to discover the evidence "was not due to a lack of due diligence" (2015 MAR Order at 44 ¶ 22), unreasonably applying <u>Brady</u>'s due diligence standard by shifting the burden of proof to the defense.

### A. Constitutional Grounds for Relief

<u>Brady</u> and its progeny have well established that, as a matter of constitutional due process, the State has an affirmative obligation to disclose material evidence favorable to the defense. Suppression of such evidence violates a defendant's rights under the Fifth and Fourteenth Amendments,[47] regardless of the good or bad faith of the prosecutor, <u>Brady</u>, 373 U.S. at 87, and whether the evidence was requested by the defense, <u>Kyles</u>, 514 U.S. at 433. Evidence known to the police is considered known to the prosecution, which has an affirmative duty to obtain information in the possession of other state agencies and disclose it if it is favorable to the defense. <u>Id.</u> at 437–38.

The three essential components of a <u>Brady</u> violation are: "(1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the state, whether willfully or inadvertently; and (3) it must be material." <u>Spicer v. Roxbury Corr. Inst.</u>, 194 F.3d 547, 555 (4th Cir. 1999) (citing <u>Strickler v. Greene</u>, 527 U.S. 263, 281–82 (1999)). Constitutional error results when the suppressed evidence is material—that is, where there is a "reasonable

---

[47] <u>See</u> U.S. CONST. amend. V ("No person shall . . . be deprived of life, liberty, or property, without due process of law"), amend. XIV. § 1 ("nor shall any State deprive any person of life, liberty, or property, without due process of law").

46

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985). While it is the defendant's burden to establish a "reasonable probability" of a different outcome, the proof required is less than a preponderance: "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles, 514 U.S. at 434.

In determining materiality, the court must consider the evidence "collectively, not item by item," id. at 436, and evaluate its cumulative effect not only upon the jury, but also upon "the preparation or presentation of the defendant's case," Bagley, 473 U.S. at 683. Additionally, to properly assess materiality, the suppressed evidence must be examined in light of the strength or weakness of the State's case. See Kyles, 514 U.S. at 453–54 (discussing how the suppressed evidence would have allowed the jury to find the State's evidence far less credible than it appeared at trial).

Here, the State withheld the nine favorable witness statements from the defense, prejudicing McRae's right to a fair trial. The statements' cumulative effect, when placed in context, "put[s] the whole case in such a different light as to undermine confidence in the verdict." Id. at 435.

**B. The MAR Court's Failure to Recognize the Suppressed Evidence as Favorable and Material Was Contrary to, and an Unreasonable Application of, Clearly Established Supreme Court Precedent**

> 1. The MAR Court Incorrectly Defined Favorability and Overlooked Evidence that Tended to Be Favorable to Petitioner

Contrary to well-established federal law, the MAR Court defined "favorable evidence" as only either "exculpatory or useful in impeaching the State's evidence." (2015 MAR Order at 38 ¶ 4 (citing State v. Williams, 669 S.E.2d 290, 296 (N.C. 2008)).) Consistent with this incorrect, restrictive definition, the MAR Court then addressed only whether each piece of suppressed evidence was exculpatory or could be used to impeach a State witness (see, e.g., id. at 29 ¶ 10), concluding that each of the statements "inculpates [Petitioner] in some fashion" (id. at 41 ¶ 11), and that, collectively, the only value they offered was to "inculpate[]" McRae's co-defendant, Nelson (id. at 31 ¶ 22).

The MAR Court further found that any "positive information that could have been elicited . . . [was] sparse" (id. at 41 ¶ 13), and that, therefore, the suppressed statements "serve[d] simply as attestations to the verdict's veracity" rather than providing any value to the defense (id. at 42 ¶ 15). As discussed below, this conclusion was contrary to, and an unreasonable application of, well-established federal law.

> a. Evidence need not affirmatively exculpate the defendant to be favorable under Brady.

Contrary to well-established federal law, the MAR Court conflated favorable evidence with exculpatory evidence. Kyles ruled that such a conflation is erroneous. In that case, the State argued that a computer printout of license numbers of cars parked at the crime scene on the night of the crime, which did not list the number of the

48

defendant's car, "was neither impeachment nor exculpatory evidence because [the defendant] could have moved his car before the list was created and because the list [did] not purport to be a comprehensive listing of all the cars" at the scene. 514 U.S. at 450–51. The Supreme Court rejected that reasoning, explaining that "[s]uch argument . . . confuses the weight of the evidence with its favorable tendency." Id. at 451. The correct standard is whether the evidence "*would have had some weight and its tendency would have been favorable*" to the petitioner. Id. (emphasis added).

In a strongly worded 2020 opinion, the United States Court of Appeals for the Fourth Circuit also emphasized that "conflating favorable evidence with exculpatory evidence" was contrary to clearly established Supreme Court precedent, as Kyles "rejects the notion that evidence must be *impeachment or exculpatory* evidence in order to be favorable." Long v. Hooks, 972 F.3d 442, 461 (4th Cir. 2020) (en banc) (emphasis added) (internal quotations omitted) (citing Kyles, 514 U.S. at 450–51). The Fourth Circuit clarified that erroneously conflating favorability with exculpation might easily cause a court to "fail[] to recognize the impeaching nature" of suppressed evidence. Id.

The MAR Court here committed this exact error in analyzing each of the nine suppressed statements, quickly concluding that each suppressed statement was not favorable because it "did not provide any *exculpatory material*." (See, e.g., 2015 MAR Order at 29 ¶ 8 (emphasis added)[48]). The MAR Court thus directly departed from Kyles

_____

[48] Specifically, the MAR Court, after erroneously finding that the statements were not favorable, then, based on that finding, mistakenly concluded that the statements would have had "no impact" on the trial: "Dumas' statement would therefore have had no

49

and reached a conclusion that contradicted clearly established federal law. See <u>Williams</u> <u>v. Taylor</u>, 529 U.S. 362, 405 (2000) ("A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases.").

> b. Evidence that tends to discredit the investigation and present different versions of the same events is favorable to defense.

The MAR Court's reliance on the incorrect favorability standard caused it to overlook the significant impeachment value of the suppressed statements. As <u>Kyles</u> recognized, "[a] common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible <u>Brady</u> violation." 514 U.S. at 446 (quoting <u>Bowen v. Maynard</u>, 799 F.2d 593, 613 (10th Cir. 1986)); <u>see</u> <u>Lindsey v. King</u>, 769 F.2d 1034, 1042 (5th Cir. 1985) (concluding withheld evidence was favorable as it had the potential for "discrediting, in some degree . . . the police methods employed in assembling the case against him"). Here, however, although the MAR Court recognized that "'favorable'" evidence included material "useful in impeaching the State's evidence" (2015 MAR Order at 38 ¶ 4), it failed to consider how, among other things, the suppressed statements impeach the integrity of the RPD's investigation into Rankin's murder.

---

impact on the trial." (2015 MAR Order at 28 ¶ 7); "[Surinna Parker's] statement would therefore have had no impact on the trial." (<u>id.</u> at 29 ¶ 9); "Larry Parker's statement does not provide any material to impeach the State's witnesses." (<u>id.</u> at 29 ¶ 10); "Robinson's statement provides no exculpatory material." (<u>id.</u> at 29 ¶ 12); "Lockhart's statement provided no exculpatory material" (<u>id.</u> at 30 ¶ 16).

Supreme Court precedent clearly establishes that inconsistent witness statements have significant impeachment value. In Kyles, for example, the Supreme Court found that suppressed inconsistent statements were favorable to the defense, as their disclosure would have "raised opportunities to attack not only the probative value of crucial physical evidence and the circumstances in which it was found, *but the thoroughness and even the good faith of the investigation, as well*." 514 U.S. at 445 (emphasis added). The Court also noted that the police had failed to investigate one of the witnesses, despite the fact that the witness made numerous "affirmatively self-incriminating statements." Id. at 447. The Court reasoned that disclosure of those statements would have allowed the defense to make a "vigorous argument that the police had been guilty of negligence" and, given the police's failure to treat the witness as a suspect, could have "throw[n] the reliability of the investigation into doubt." Id.

In the present case, as in Kyles, the differing versions of the statements could have been used to impeach the quality and integrity of the RPD investigation and generally "throw the reliability of the investigation into doubt." The suppressed statements were inconsistent as to the (1) the details of the alleged drug transaction, (2) date and time of Rankin's death, (3) the number and identity of the people involved, and (4) the specific events leading up to it.[49] (1-MAR-Tr. 38:13 to 41:15.) The statements were also

---

[49] For instance, Dumas described witnessing McRae and Nelson—and only them—each shoot Rankin around 12:30 AM. (M. Dumas Stmt. (Ex. 4 at 1).) However, Larry Parker described hearing only a single gunshot around 10:45 PM and witnessing "6 black males" running by shortly after. (L. Parker Stmt. (Ex. 8).) Larry's daughter Surinna, who lived only a few houses away from her father, described a single gunshot occurring at 11:30

51

inconsistent with the known physical evidence, including the number of shots fired[50] and the RPD's apparent investigative conclusions.[51]

Yet, despite the RPD's collection of nine incompatible stories,[52] nothing indicates the RPD took steps to determine which, if any, were accurate. Instead, as in <u>Kyles</u>, it seems that law enforcement and the prosecution had a "remarkably uncritical attitude" about the different accounts, simply selecting one (Dumas's purported eyewitness account) to serve as the basis of McRae's and Nelson's indictments and later, after Dumas was charged with the Virginia murder, selecting two markedly different (from Dumas's and from each other) accounts (Nelson's and Tender's) to serve as the proof offered at trial. That shift, without any investigation or discovery of new, corroborating

---

PM, after which only three people ("McRae, Jeremy, and Thurmond") ran by. (S. Parker Stmt. (Ex. 9 at 2).) The statements also varied as to nearly every other detail. For example, Surinna Parker also described finding "an object wrapped heavily in plastic"— what her statement implies is the murder weapon—and going to get her father, Larry Parker. (<u>Id</u>.) Larry's statement, however, omits that detail entirely. (L. Parker Stmt. (Ex. 8).)

[50] Although only one bullet and one casing were found at the scene, Dumas's statement unequivocally claims—in detail—that McRae and Nelson each fired a shot at Rankin. (M. Dumas Stmt. (Ex. 4 at 1).) Both McRae and Nelson were indicted on that claim.

[51] For example, the RPD report adopts Nelson's description of a one-on-one drug transaction between McRae and Rankin, and does not include any details from Surinna Parker's statement, including that the allegedly same drug transaction she witnessed involved five men. (<u>Compare</u> Derrick McRae Felony Report (Ex. 27 at 2) <u>with</u> S. Parker Stmt. (Ex. 9 at 1–3).)

[52] With the later addition of Tender's statement to the RPD, the investigation actually produced *ten* incompatible version of events.

52

evidence, demonstrates a "remarkably uncritical attitude" toward the evidence and, in a larger sense, the inappropriateness of the prosecution.

It is not merely the inconsistencies that "would have raised opportunities to attack . . . the good faith of the investigation." Kyles, 514 U.S. at 445. Rather, these inconsistencies also throw the telling *similarities* between the statements into sharp focus, namely, how the authors of the statements all allegedly came forward spontaneously over such a short period of time more than four months after Rankin's murder, with many of their statements offering separate "altruistic" reasons for doing so. The clearly disingenuous, cookie-cutter explanations proffered by each witness—e.g., "I could not get it off my mind"—suggest that, rather than experiencing a sudden, collective altruism, they were told to include the reasons in their statements to conceal the truth about how they all came to provide statements at about the same time. That is, after whatever investigative activities occurred during the first four-and-a-half months of investigation, which presumably were memorialized in that now-missing part of the case file, the RPD rounded up a number of vulnerable people—some of whom were very young and others who had their own legal problems—and somehow managed to extract statements from them implicating McRae. Curiously, as the newly discovered statements reveal, the particulars of the statements were, put colloquially, "all over the place," suggesting that the RPD did not exert control over the witnesses' full accounts, only the target of them— Derrick McRae.

The MAR Court, however, dismissed these large discrepancies as only "relatively minor inconsistencies" and concluded they were "readily explained by the lapse of

53

approximately four-and-a-half months between the murder and the statements being obtained." (2015 MAR Order at 41 ¶ 13.) This conclusion seems independently odd given the vivid yet wildly inconsistent details in many of the statements, but it also was contrary to, and an unreasonable application of, well-established precedent under § 2254(d). As Kyles dictates, when assessing the significance of suppressed evidence, "however [it] would have been used," courts must ask if it "would have had *some weight and its tendency would have been favorable*" to the defendant. Kyles, 514 U.S. at 451 (emphasis added). Again, as Kyles also points out, inconsistencies between versions of evidence provide the defense a crucial opportunity to attack "thoroughness and even the good faith of the investigation." Id. at 445. That certainly would have been true here.

The Fourth Circuit's analysis in Long v. Hooks is particularly edifying. In that case, the State suppressed numerous conflicting forensic reports, but the state court ruled that no Brady violation occurred as the suppressed evidence "did not qualify as exculpatory." 972 F.3d at 461. The Fourth Circuit squarely rejected that conclusion, making it clear that "failing to account for the impeaching value of the *two differing* versions" of the various reports when assessing favorability is both contrary to, and an unreasonable application of Brady and Kyles. 972 F.3d at 461 (internal quotations omitted).

In the present case, the MAR Court engaged in the same flawed analysis. By dismissing the nine fundamentally incompatible accounts detailed in the suppressed statements, the MAR Court overlooked how the defense could have used the statements to attack the integrity and quality of the RPD investigation. Contrary to the MAR Court's

54

finding, the suppressed statements did not possess "relatively minor inconsistencies." They related wildly inconsistent, totally irreconcilable accounts of Rankin's murder and McRae's purported involvement in it. Quite simply, the purported details of the crime were so distinct that each account could be true only if many of the others were false.

The MAR Court also failed to recognize the value of the suppressed statements in both impeaching Nelson, one of the State's two key witnesses, and in further impeaching the State's overall investigation. The Court found that the only value the statements served was "to impeach Nelson at trial regarding *his* involvement in the murder," a value it considered "*de minimus.*" (2015 MAR Court at 31 ¶ 22.) Yet several of the suppressed statements both implicated and directly contradicted Nelson, thus providing the defense with a valuable means of impeaching the State's investigation and serving a far greater purpose than "only to put Nelson at the scene." (<u>Id.</u> at 28 ¶ 7.)

As in <u>Kyles</u>, disclosure of the statements could have allowed the defense the opportunity to attack the State's use of Nelson as a witness, "throw[ing] the reliability of the investigation into doubt." 514 U.S. at 447. On a fundamental level, if the State had disclosed Dumas's statement, which directly stated that Nelson shot Rankin, it is difficult to imagine how the State could have allowed Nelson to testify as he did. Without Nelson's testimony, the only evidence implicating McRae would have been Tender's

wholly uncorroborated and, in other ways, patently unbelievable story about McRae's militant stance against white people.[53]

The State's case against McRae rested almost entirely on the credibility of its witnesses and the integrity of the investigation—the withheld statements would have impeached both.[54] The MAR Court's disregard for the statements' full impeachment value, then, is especially salient. The Court's conclusion that the statements were not favorable to the defense was thus contrary to <u>Kyles</u> and—as the Fourth Circuit made clear in <u>Long</u>—an unreasonable application of clearly established law per § 2254(d).

2. <u>The MAR Court Unreasonably Assessed the Materiality of the Suppressed Statements</u>

In analyzing the impact the suppressed statements would have had on McRae's trial, the MAR Court concluded that "[t]he result of the trial would have been the same under either scenario" and that "[c]onfidence in the jury verdict is not undermined." (2015 MAR Order at 42 ¶ 15.) The MAR Court reached this conclusion by building upon

---

[53] If the State had disclosed Dumas's statement, there is also the real possibility that Crump could have raised an alternative perpetrator defense. Indeed, Crump could have established the fact that Dumas, a convicted capital murderer, was the only person who claimed, and told the RPD, that he was present when Rankin was killed, and that Dumas's statement provided (at least some) accurate, relevant details regarding the crime (<u>e.g.</u>, the house at which the murder occurred and that Rankin was shot on the porch). (<u>See</u> M. Dumas Stmt. (Ex. 4 at 1).) This line of argument would have bolstered McRae's alibi defense, and Crump could have further undermined the police investigation by asking the detectives why they did not investigate Dumas for Rankin's murder when he admitted to being present.

[54] As discussed <u>infra</u> pp. 91–94, impeaching Nelson with these statements does not necessarily serve to establish that he was involved in the murder. Rather, the suppressed statements, taken in context of the case as a whole, further demonstrate that Nelson was trapped in a coercive situation and agreed to give false testimony to extricate himself.

its incorrect assessment of favorability and by unreasonably applying clearly established federal law.

> a. The MAR Court failed to consider the suppressed statements in light of the weakness of the State's case.

The Supreme Court has repeatedly emphasized that, in determining "materiality" under Brady, the suppressed evidence must be assessed in the context of the State's case. See, e.g., United States v. Agurs, 427 U.S. 97, 112 (1976) ("[T]he omission must be evaluated in the context of the entire record."). This requires an examination of the strength of the State's case, given that, if a "verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." Id. at 113; see Monroe v. Angelone, 323 F.3d 286, 302 (4th Cir. 2003) (weighing the strength of the State's case and finding it "somewhat thin and entirely circumstantial").

Thus, materiality is a context-specific determination. In Spicer v. Roxbury Correctional Institute, for example, the Fourth Circuit found suppressed impeachment evidence material in light of the weakness of the State's case: no physical evidence linked the defendant to the crime; more than six months passed before he was linked to it; and his conviction was based solely on the questionable identification testimony of three witnesses. 194 F.3d at 560. Similarly, in Kyles, after examining the State's insubstantial case, the Supreme Court found suppressed impeachment evidence material given that the eyewitnesses were inconsistent and unreliable and that the investigation was "insufficiently probing." 514 U.S. at 454. The Court also found it particularly relevant

57

that the case was "significantly weaker" than the one presented to a *first* jury, "which could not even reach a verdict." Id.

Here, contrary to this controlling precedent, the MAR Court failed to consider the weakness of the State's case in assessing the materiality of the suppressed statements. In fact, the MAR Court did not examine the State's case at all. (See 2015 MAR Order at 42 ¶ 15 ("These statements now serve simply as attestations to the verdict's veracity.").)

Yet, as in Spicer and Kyles, the State's case here was notably weak: no physical evidence linked McRae to the crime; he was not linked to the crime in any way until more than four months later; and his conviction was based solely on the conflicting testimony of Nelson and Tender, both of whom were highly incentivized to testify falsely. It is the weakness of the State's case that imbues the suppressed statements with their real power, and, therefore, materiality. As noted above, McRae's first trial ended in a hung jury, with eight jurors voting for acquittal. The evidence presented at the second trial was nearly identical to the first, with the State using Nelson's and Tender's testimony as the lone evidence directly implicating McRae in Rankin's murder. Thus, the State's case was razor thin, and the suppressed statements had to be assessed in that context, the proper framework for assessing materiality. The MAR Court's failure to conduct that assessment was an objectively unreasonable application of clearly established federal law under § 2254(d).

It is notable for materiality that the State *itself* discredited the statements. As the Fourth Circuit has pointed out, the State cannot be forgiven its Brady violation by the mere fact that it did not *use* the evidence it suppressed. In Long, the State did not disclose

58

biological material collected by law enforcement, later arguing that, because the material was never tested, its non-disclosure did not constitute a Brady violation. In rejecting this argument, the Fourth Circuit stated that approach unreasonably applied Kyles, which requires assessing the value of the suppressed material to the defendant "however the evidence would have been used." Long, 972 F.3d at 466 n.12 (quoting Kyles, 514 U.S. at 451). Further, the Fourth Circuit emphasized that this argument "beg[ged] the question of why the [evidence] was collected in the first instance if it would be of no value." Id.

Here, the State chose to offer none of the evidence at trial that it relied upon to arrest and indict McRae. It must be assumed that the State chose not to use these statements either because they were not useful to the State's case or because they were not sufficiently credible to be submitted at trial. This itself demonstrates their materiality for McRae's defense.

    b. The MAR Court did not examine the suppressed evidence collectively.

The Supreme Court has also ruled that, in making materiality determinations, courts must consider the suppressed evidence "collectively, not item by item." Kyles, 514 U.S. at 436. This requires that courts consider the cumulative effect of all of the suppressed evidence, id. at 436–37, not only upon the jury, but also upon defense counsel's preparation or presentation of the defense's case, Bagley, 473 U.S. at 683.

Although the MAR Court stated that it "carefully examined each of the statements and . . . considered them both individually and cumulatively" (2015 MAR Order at 27 ¶ 5), it incontrovertibly did not. Instead, the MAR Court specifically analyzed the

statements *separately*, finding that "each statement inculpates the defendant," and "[n]one of the statements exculpate the Defendant or lessen his involvement in the crime." (See id. at 31 ¶ 22.) By analyzing each statement individually, the Court found that the result of the trial would have been the same if the statements had not been suppressed as they did "not create a reasonable doubt that otherwise did not exist." (Id. at 40 ¶ 10.) The Court concluded that if the State had disclosed the statements, either Crump would not have done anything with them, or he would have called their authors to testify, "inevitably invit[ing] further inculpatory evidence" (id. at 42 ¶ 14), and exposing McRae to "the swords of even more exacting justice" (id. at 40 ¶ 10). This approach—failing to cumulatively assess the collective context of the statements—was an unreasonable application of clearly established federal law.

Here, when the suppressed statements are considered cumulatively, their materiality is undeniably revealed. Without the suppressed statements, McRae did not know that the State had a veritable "smorgasbord" of stories about his involvement in Rankin's murder, and his ignorance of that fact allowed the State's selection of one without corroboration or some other justification to go unchallenged. Relatedly, as described above, the various statements' irreconcilable details and common aspects draw into question the veracity of each and every statement, the reliability of the police investigation, and the good faith of the investigation and prosecution generally.

The context of the collection and suppression of the statements also demonstrates that the State based McRae's arrest and indictment on one uncorroborated statement and then abandoned that evidence—and all of the other statements collected before McRae's

60

arrest—and shifted to purported evidence created afterward.[55] The suppressed statements therefore demonstrate, at best, a careless approach to justice—a "remarkably uncritical approach" to the evidence. Yet the MAR Court failed to consider this cumulative value of the suppressed statements, entirely overlooking the State's cavalier approach to the quality and reliability of the investigation. Instead, the Court simply concluded that the statements would have no impact on the jury's verdict. (Id. at 42 ¶ 15.) This conclusion was, as in Long, "not just wrong" but a "patently unreasonable" application of clearly established federal law under § 2254(d). 972 F.3d at 468.

3. The MAR Court Unreasonably Applied *Brady's* Due Diligence Standard

In denying McRae's Brady claims, the MAR Court also unreasonably applied what it termed the Brady test's "fourth and final element": that "the Defendant must prove his failure to discover[] the allegedly favorable evidence was not the result of a lack of due diligence." (2015 MAR Order at 42 ¶ 16.) The MAR Court found that because Crump spoke to some of the witnesses who provided statements to the RPD (id. at 34 ¶ 36), was provided funds for investigators (id. at 34 ¶ 37), and because witnesses known to McRae allegedly had "personal information" about the murder (id. at 35 ¶ 40), McRae did not meet "his burden of demonstrating that the failure to discover any allegedly favorable evidence was not the result of a lack of due diligence." (Id. at 44 ¶ 22.)

---

[55] Nelson's statement, which formed the basis of his testimony and was one of the few disclosed to the defense at trial, was taken on March 1, 1996, two days *after* McRae's arrest.

Case 1:21-cv-00577-LCB-JLW   Document 1   Filed 07/13/21   Page 67 of 124

This unreasonable conclusion, however, "turns the burden of proof completely on its head." Long, 972 F.3d at 464. In Long, the State argued that Brady was not violated because defense counsel could have obtained the suppressed forensic lab results by testing the evidence themselves or by questioning witnesses at trial. Id. The Fourth Circuit rejected this approach as objectively unreasonable, emphasizing that "[t]he burden of proof in criminal cases rests with the State, and remains with the State throughout the course of the trial" and that "[i]t is axiomatic that it is not the defendant's job to prove himself innocent." Id.

This application—firmly described by the Fourth Circuit as unreasonable under § 2254(d)—is precisely the same one as the MAR Court used here. The MAR Court reasoned that "[e]ffective criminal investigations necessarily include interviews of known associates of the accused as well as neighbors" (2015 MAR Order at 44 ¶ 19), and, therefore, as Crump could have theoretically found and interviewed the same people as law enforcement, McRae had "not met his burden of demonstrating" he could not have obtained the suppressed statements on his own (id. at 44 ¶ 22). Not only does this evince a fundamental misunderstanding of the kind of information a defense lawyer can elicit from people they approach,[56] it also inappropriately shifts the burden of proof to the

---

[56] The MAR Court's position incorrectly presumes the exact same people could be found and would tell defense counsel precisely what they told the RPD—and that they provided statements to the RPD, as well. However, few people will readily share information about a murder with all-comers, including defense counsel, but will talk to the police if called upon to do so, and certainly if pressured to do so. Even more people will be reluctant to (even refuse to) volunteer to anyone, but especially the person's defense lawyer, that they provided a statement to the police implicating the lawyer's client.

defendant. To find otherwise—i.e., to relieve the State of its constitutional obligation as long as it does not directly impede the defense—would endorse the type of gamesmanship expressly rejected by Brady and its progeny. See 373 U.S. at 88 (stating that withholding evidence "casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice"); Banks v. Dretke, 540 U.S. 668, 696 (2004) ("[A] rule thus declaring 'prosecutor may hide, defendants must seek,' is not tenable in a system constitutionally bound to accord defendants due process.").

_____

In sum, the MAR Court's conclusion that McRae's constitutional rights were not violated by the State's failure to disclose the suppressed statements was contrary to, and an unreasonable application of, clearly established federal law, as determined by the Supreme Court. The inclusion of the suppressed statements would have significantly weakened an already strikingly weak case, as evidenced by the first jury's eight to four vote to acquit. Thus, there is more than a reasonable probability that the second jury— seeing the nearly identical case—would have voted to acquit, as well. The result, after considering the favorability and materiality of the suppressed evidence, is that McRae's verdict is not worthy of confidence.

## II. THE STATE VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS BY FAILING TO CORRECT EDWARD TENDER'S FALSE TESTIMONY ABOUT HIS CRIMINAL CHARGES, IN CONTRAVENTION OF *NAPUE v. ILLINOIS*

In assessing McRae's claim under Napue v. Illinois, 360 U.S. 264 (1959), the MAR Court, in a decision that was contrary to, and an unreasonable application of,

63

clearly established federal law, concluded that Tender's "testimony with regard to his criminal history . . . was not misleading" (2015 MAR Order at 15 ¶ 6), and thus the State's failure to correct it did not create a constitutional defect (id. at 16 ¶ 5). Applying a standard contrary to clear Supreme Court precedent, the MAR Court also found that Brewer "did not knowingly use any false or misleading information" in regard to Tender's testimony and in a further unreasonable application, determined that McRae's defense attorney, Crump, had the ability to cross-examine Tender about "any uncertainties." (Id. at 15 ¶ 6.) The MAR Court reached this incorrect conclusion by applying an "actual knowledge" standard, directly contradicting Napue.

The MAR Court also unreasonably applied clearly established federal law by assessing a false testimony claim based on the witness's state of mind and the defense's actions, and thereby erroneously shifting the burden of proof to the defense.

Finally, the MAR Court's erroneous conclusions were frequently based on unreasonable determinations of the facts in light of the evidence presented.

### A. Constitutional Grounds for Relief

Federal law clearly establishes that the use of false testimony to obtain a conviction violates a defendant's right to due process. Napue, 360 U.S. at 269. Due process is violated not only when a prosecutor suborns perjury, but also when a prosecutor, "although not soliciting false evidence, allows it to go uncorrected when it appears." Id.; United States v. Bagley, 473 U.S. 667, 679 n.8 (1985). The State's duty to correct applies not only to perjured testimony, but also to testimony that is misleading or that creates a false impression. See Alcorta v. Texas, 355 U.S. 28, 31–32 (1957) (finding

64

a defendant "was not accorded due process of law" due to a witness's uncorrected, misleading testimony); Hamric v. Bailey, 386 F.2d 390, 394 (4th Cir. 1967) (citing Miller v. Pate, 386 U.S. 1, 6–7 (1967) ("[D]ue process is violated not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows creates a false impression of a material fact."). The State's duty applies regardless of the individual prosecutor's knowledge of the statement's falsity, as a defendant's due process rights are violated whether "the prosecution knew, or *should have known*" that the testimony was untrue. United States v. Agurs, 427 U.S. 97, 103 (1976) (emphasis added).

The prohibition on the uncorrected use of false testimony applies to any evidence material to the outcome, which may include a witness's motive for testifying. See Napue, 360 U.S. at 269–70 (finding a defendant's due process rights violated when a witness falsely denied receiving lenient treatment from the State). False testimony is material if there is "any reasonable likelihood that the false testimony *could have affected*" the outcome.[57] Agurs, 427 U.S. at 103 (emphasis added). In a case where the "reliability of a given witness may well be determinative of guilt or innocence," failure to correct false testimony affecting credibility easily satisfies this materiality standard. Giglio v. United States, 405 U.S. 150, 154 (1972) (citing Napue, 360 U.S. at 269).

---

[57] This materiality standard is notably lower than that required for a successful Brady claim, where the defendant must show a reasonable likelihood that the outcome of the proceedings *would* have been different had the suppressed evidence been disclosed. Bagley, 473 U.S. at 682.

Here, Tender testified that he faced only "some charges pending in court" when he gave his initial statement to the RPD. (2-Trial-Tr. 119:23–25.) When asked what he had pled guilty to, Tender responded: "Misdemeanor charge. I think it was possession of stolen goods, *a* misdemeanor." (Id. at 120:1–3 (emphasis added).) However, at the time Tender provided his statement to the RPD, he was facing twenty-two charges, nineteen of which were felonies. (Tender Criminal Record Summary (Ex. 17 at 1–2).) Before McRae's trial, he pled guilty to twenty of these charges. (Id.) Thus, Tender's testimony that he had pled guilty to a *single* misdemeanor was incontrovertibly false.

Tender's testimony also created the misleading impression that all of his charges were resolved by the time of McRae's trials when, in reality, two charges remained open until after McRae was convicted, more than two years later. (Id.) ADA Brewer, who either knew or should have known that this testimony was false or misleading, took no action to correct it.[58] As this false testimony went directly to Tender's credibility, a core of the State's case, it was undeniably material, and the failure to correct it violated McRae's due process rights.

---

[58] In fact, at trial, Brewer took steps to ensure the truth about Tender's charges was not revealed. Brewer objected to Crump's questions regarding what Tender was charged with as well as whether his charges for forgery were reduced from felonies. (2-Trial-Tr. 128:19 to 129:4, 130:16–25.) Brewer continued this practice from the first trial, where he also objected to questions pertaining to Tender's charges. (1-Trial-Tr. 100:14–17.)

**B. The MAR Court Reached Its Conclusion by Contradicting Precedent, Misapplying Clearly Established Law, and Overlooking Incontrovertible Evidence that the State Failed to Correct Tender's False and Misleading Testimony About His Criminal Charges**

1. The MAR Court's "Actual Knowledge" Standard Contradicted Clear Precedent

Contrary to clearly established federal law, the MAR Court concluded that no constitutional violation had occurred because, at the MAR hearing, "Brewer professed to have had *no knowledge*" of the false testimony and "did not *knowingly use* any false or misleading information." (2015 MAR Order at 15 ¶¶ 5–6 (emphasis added).) Thus, the Court used an "actual knowledge" standard, ruling that the "Defendant must establish that the 'testimony was *in fact* false,'" and "that the prosecution *actually knew* the evidence was false, rather than merely showing the prosecution 'should have known' that the evidence was false."[59] (Id. at 15 ¶ 1 (emphasis added).) The MAR Court reasoned that if there was no evidence that Brewer *actually* knew that Tender's testimony regarding his

---

[59] The MAR Court incorrectly relied upon a limited standard articulated in State v. Sanders, 395 S.E.2d 412 (N.C. 1990), which instructed that "actual knowledge" was sufficient to satisfy the knowledge requirement, but did not reject or discuss the "should have known" standard. See id. at 423 (discussing the prosecution's concession that portions of a police officer's testimony were false). Notably, the North Carolina Court of Appeals has recently affirmed that the applicable standard in North Carolina, consistent with decades of federal law, is that due process is violated when a State witness offers false testimony, without correction, that the prosecution "*knew or should have known* was false." State v. Sandy, 788 S.E.2d 200, 203 (N.C. Ct. App. 2016) (emphasis added) (citing Napue, 360 U.S. at 269). Indeed, North Carolina courts have consistently cited Sanders only for the rule that demonstrating false testimony is material entitles a defendant to a new trial, not that it is limited to testimony that is actually known to be false. E.g., State v. Williams, 459 S.E.2d 208, 217–18 (N.C. 1995); State v. Scanlon, 626 S.E.2d 770, 787 (N.C. Ct. App. 2006).

67

criminal record was false, McRae's constitutional rights were not violated. (See id. at 16 ¶¶ 4–5.)

At the MAR hearing, Brewer sought refuge in his own claimed ignorance, stating that at the time of trial, he had no "personal knowledge of what [Tender's] criminal history was" and did not recall ever seeing his criminal record. (1-MAR-Tr. 395:17 to 396:8.) Accordingly, Brewer tried to absolve himself of his failure to correct the false testimony, stating that "if Mr. Tender had testified incorrectly at trial regarding his criminal history, [Brewer] wouldn't have been in possession of any information that would have allowed him to identify that." (Id. at 396:9–15.) The MAR Court was satisfied by Brewer's claims, concluding that the "Defendant failed to demonstrate that Brewer was aware of any false testimony." (2015 MAR Order at 15–16 ¶ 2.)

Federal law, however, clearly establishes that if "the prosecution knew, or *should have known*" that the witness's testimony was false or misleading, it has an independent obligation to correct that testimony to avoid any constitutional violation. Agurs, 427 U.S. at 103 (emphasis added); Giglio, 405 U.S. at 153; Napue, 360 U.S. at 269. Further, a prosecutor's negligence does not alleviate his duty to correct false or misleading testimony. See Giglio, 405 U.S. at 154 ("[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor."). Thus, the MAR Court's conclusion directly contradicted clear Supreme Court precedent, resulting in a decision contrary to federal law under § 2254(d). See Williams v. Taylor, 529 U.S. 362, 405 (2000) ("[A] state-court decision is contrary to [Supreme] Court's precedent if the state

68

court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law.").

A prosecutor cannot claim safe harbor by "profess[ing] to have had no knowledge" of the false testimony at the time of trial. (2015 MAR Order at 15 ¶ 5.) Even supposing that Brewer did not have actual knowledge of the basic facts by which his own key witness could be impeached—itself a dubious conclusion, as discussed below—his lack of diligence could not excuse his violation. That is not and cannot be the standard. To find otherwise would create perverse incentives for the State to be willfully ignorant of its own cases to avoid triggering any constitutional obligations, a contrivance that is illogical and "inconsistent with the rudimentary demands of justice." Mooney v. Holohan, 294 U.S. 103, 112 (1935).

<div align="center">

2.  The MAR Court Unreasonably Found Brewer had no "Actual Knowledge" of Tender's False Testimony

</div>

The MAR Court not only used a standard contrary to clearly established federal law, it also made unreasonable determinations of facts in light of the evidence before it.

Despite Brewer's attempt to hide behind a lack of personal knowledge, it is clear that he knew, especially at McRae's second trial, of the misleading nature of Tender's testimony. One would expect that a seasoned prosecutor in a first-degree murder case would know the criminal history of one of his principal witnesses, especially a witness like Tender, whose testimony allegedly arose from his own incarceration and who would undoubtedly face defense challenges regarding the resolution of his charges. However,

<div align="center">

69

</div>

this Court need not rely only on the expectation that Brewer would know such details about his cases.

At both trials, Brewer asked Tender about the charges pending at the time he gave his statement to the RPD. In both, Tender testified he pled guilty to a "misdemeanor," although, in the first trial, he specified that he was convicted of "a misdemeanor for receiving stolen goods." (1-Trial-Tr. 89:17–18.) At the first trial, Crump elicited slightly more from Tender on cross, including that his felony charges were reduced to *misdemeanors* (plural), to which Tender pled guilty. (Id. at 101:8–10.) Then Brewer redirected and suggested anew that Tender pleaded guilty to a single charge: "And when you plead guilty to *your charge* . . . ." (Id. at 103:10 (emphasis added).) Thus, before the second trial, even if Brewer did not obtain Tender's criminal history, he *knew* that Tender was not convicted of a single charge, and he therefore *knew* that Tender's testimony at the second trial—that he plead guilty to "misdemeanor charge. I think it was possession of stolen goods, misdemeanor" (2-Trial-Tr. 120:1–3)—was false and misleading. The MAR Court's determination that Brewer had no "actual knowledge" of Tender's false testimony was therefore not just wrong—it was unreasonable.

Further, Brewer's actions thwarting Crump on cross-examination strongly suggest that he was aware of the falsity of Tender's testimony. At both trials, Brewer blocked Crump from eliciting information from Tender that might have revealed the full truth about his criminal record. Although it is unclear if Crump knew about the charges Tender had pending at the time, at minimum, Crump knew that Tender had been charged with more than a single misdemeanor. When Crump attempted to challenge Tender on cross,

70

Brewer objected and successfully blocked Crump from asking any follow-up questions. (Id. at 128:15 to 129:13.)

Brewer's effort reveals one of two things: Either Brewer was wholly aware of Tender's criminal history and took affirmative steps to block it from coming into evidence (which itself demonstrates materiality), or he did not know about Tender's history but was astute enough to know that the avenue Crump was exploring was harmful to the State's case. Either explanation reveals both Brewer's cavalier approach to the case and his deliberate effort to keep information from the jury, and both suggest that Brewer had far more knowledge of the false and misleading nature of Tender's testimony than he claimed. The MAR Court's "strained interpretation" otherwise "constitute[d] an unreasonable determination of the facts." See Garcia v. Long, 808 F.3d 771, 780–81 (9th Cir. 2015) (discussing how nothing in the record supported the state court's unreasonable findings of fact).

3. The MAR Court Unreasonably Applied Federal Law by Focusing upon the Witness's State of Mind and the Defense's Actions

The MAR Court also found that the false testimony "was not misleading" (2015 MAR Order at 15 ¶ 6), because the *witness* did not "knowingly [testify] in a false or misleading manner" (id. at 14 ¶ 4). This focus on the witness's mental state, seeming to assume a witness must intentionally mislead the jury in order to trigger the State's constitutional duty, was an unreasonable application of clearly established federal law under § 2254(d). It is well established that the focus is on what the prosecutor knows or should have known about the veracity of the testimony and her response to it, not on the

71

knowledge or intent of the person testifying. See Bagley, 473 U.S. at 679 n.8 (due process is violated when the prosecutor allows material false testimony to go uncorrected).

The MAR Court also ruled that there was no constitutional violation because Crump "was in a position to refresh Tender's recollection or to impeach" him regarding his criminal history. (2015 MAR Order at 15 ¶ 5.) This determination cannot be correct. The State is not absolved of their constitutional obligation merely because the defense "was in a position to further examine [the witness] about any uncertainties." (Id. at 15 ¶ 6.) As federal law makes clear, the State cannot present evidence it knows or should know to be false and then shift the burden of correcting it to the defense.

A Fifth Circuit case is illustrative: In United States v. Sanfilippo, the prosecution fulfilled its pretrial obligation and disclosed to the defense that a witness had received a deal. 564 F.2d 176, 177 (5th Cir. 1977). At trial, however, when defense counsel asked the witness about the deal's terms, the witness falsely testified that no deal had been offered. Id. Because the prosecution failed to correct that false testimony, the Fifth Circuit found that the defendant's due process rights were violated, regardless of the defense's knowledge that the testimony was false. Id. at 178. The court clarified that "the purpose of disclosing . . . a plea bargain is to furnish defense counsel with information . . . to attack the credibility of the witness. The defendant gains nothing, however, by knowing that the Government's witness has a personal interest in testifying *unless he is able to impart that knowledge to the jury*." Id. (emphasis added). The court emphasized

72

that "[d]ue process is violated when the prosecutor, although not soliciting false evidence from a Government witness, allows it to stand uncorrected when it appears." Id. at 178.

Similarly, the Second Circuit has noted that the effort the defense is required to assert is limited by the realities of the case. In Shih Wei Su v. Filion, 335 F.3d 119 (2d Cir. 2003), the prosecution falsely represented that no deal had been made with a witness, and, as a result, the defense decided not to cross-examine that witness. Id. at 123–24. The State argued that since the defense had *some* knowledge that a deal could have been made, the defense failed to exercise due diligence by choosing not to cross-examine the witness. Id. at 125. The Second Circuit rejected this argument:

> It follows that when a prosecutor says that there was no deal and later elicits testimony from a witness denying the existence of a deal, it would be an unreasonable application of federal law, as determined by the Supreme Court, to fault the defendant for not proceeding in his cross-examination on the assumption that the prosecutor is a liar.

Id. at 128.

Here, Crump attempted to impeach Tender with his criminal record but was successfully blocked by both Tender's evasions and Brewer's objections. If Crump was merely blocked by Tender's evasions, then Brewer still had a constitutional obligation to correct the resulting misleading testimony. If Brewer was fully aware of the falsity of Tender's testimony and deliberately blocked Crump's attempts to bring his criminal record before the jury, as discussed above, then it is nonsensical to blame Crump for his inability to successfully do so. Crump's only available option would have been to assume that Brewer was lying, something the Second Circuit described as involving "enormous

73

tactical danger." Id.; see also Strickler v. Greene, 527 U.S. 263, 286–87 (1999) (rejecting the "novel suggestion that conscientious defense counsel have a procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred"). The burden of correcting false testimony lies with the prosecution, not the defense, and it is unreasonable under § 2254(d) to rule otherwise.

### 4. Tender's False Testimony Was Undeniably Material

It is clearly established that where the "reliability of a given witness may well be determinative of guilt or innocence," the failure to correct false testimony affecting a witness's credibility is material. Giglio, 405 U.S. at 154. Here, Tender was one of the State's two key witnesses. Although his testimony presented a different motive than Nelson's, it was nonetheless critical in linking McRae to the murder, describing how McRae allegedly confessed to killing Rankin and providing a motive—racial animus— that, although uncorroborated, reverberated through the courtroom.[60] In contrast, Nelson only described the botched drug deal between Rankin and McRae and, in bare detail, McRae telling him he was going to get Rankin and, later, that he "got him." Simply put, without Tender's more detailed and explicit testimony—allegedly coming straight from McRae—there would be "no evidence to carry the case to the jury." Id.

Additionally, Tender's false testimony not only concealed the bulk of his criminal history—a history particularly useful in assessing his motives for testifying—but also

---

[60] During his testimony, Tender claimed McRae told him "that he was going to kill Detective Brigman, McQuage and Bill Sweat of the Richmond County Sheriff's Department. He wanted to kill all white people." (2-Trial-Tr. 116:12–15.)

74

concealed crimes especially relevant to a credibility determination: that of Common Law Forgery, a crime in which dishonesty is a requisite element. The crime Tender admitted to—Possession of Stolen Goods—does not raise the same innate credibility concerns as the crimes that Tender concealed and that Brewer let go unmentioned.

_____

In sum, the MAR Court's conclusion that McRae's constitutional rights were not violated by the State's failure to correct Tender's false testimony was contrary to, and an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was based upon an unreasonable determination of facts. Given the remarkable weakness of the State's case, the jury's determinations would have undoubtedly been affected by knowledge of Tender's full criminal record, rendering his false testimony material. *See* Agurs, 427 U.S. at 113 (finding that, "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt"). Thus, the State's failure to correct this false testimony violated McRae's constitutional rights.

**III. THE STATE VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS BY FAILING TO DISCLOSE THAT EDWARD TENDER RECEIVED FAVORABLE TREATMENT FROM THE STATE IN EXCHANGE FOR HIS TESTIMONY, AS REQUIRED BY *GIGLIO v. UNITED STATES,* AND BY ALLOWING HIM TO TESTIFY FALSELY THAT HE RECEIVED NO SUCH TREATMENT, IN CONTRAVENTION OF *NAPUE v. ILLINOIS***

Making an unreasonable determination of facts by overlooking undeniable evidence, the MAR Court concluded that "Tender was not offered a deal relating to the

disposition of his 1996 charges in exchange for his trial testimony against [McRae] in 1998." (2015 MAR Order at 11 ¶ 12.) Further, in determining that no constitutional violation occurred by the State's failure to disclose a deal or correct Tender's testimony to the contrary (id. at 16 ¶ 5), the MAR Court again applied an "actual knowledge" standard contrary to Giglio v. United States, 405 U.S. 150 (1972), and other clearly established Supreme Court precedent.

### A. Constitutional Grounds for Relief

The prohibition against the use of false testimony and the affirmative duty to correct false or misleading testimony, as fully outlined above, extends to impeachment evidence. See Napue v. Illinois, 360 U.S. 264, 269 (1959) (stating this ban "does not cease to apply merely because the false testimony goes only to the credibility of the witness"). When a State's case "depend[s] almost entirely on [a witness's] testimony," that witness's credibility is a critical issue. Giglio, 405 U.S. at 154–55. In particular, testimony related to a witness's motives for appearing, such as if the witness has formed a deal with the State, goes directly to that witness's credibility and must be disclosed. See id. (stating a jury was entitled to know of "any understanding or agreement" between the witness and the government "as to a future prosecution"). As multiple circuits have affirmed, a deal does not need to be formal or explicit for its disclosure to be required. See, e.g., Douglas v. Workman, 560 F.3d 1156, 1186 (10th Cir. 2009) ("[a] deal is a deal—explicit or tacit," and its disclosure is required under Supreme Court precedent); Haber v. Wainwright, 756 F.2d 1520, 1524 (11th Cir. 1985) ("Giglio did not speak in terms of the state's duty to disclose only bona fide enforceable grants of immunity. Its

76

reach extends to *any* understandings or agreements.") (internal quotations and alterations omitted).

Here, it is indisputable both that Tender was facing numerous felony charges when he first implicated McRae and that he still had two charges pending when he testified in both of McRae's trials. It is also indisputable that shortly after he first implicated McRae, the vast majority of those charges were reduced or dismissed. (Tender Criminal Record Summary (Ex. 17 at 1–2).) Even if Tender's favorable treatment were not explicitly conditioned on his testimony, the lack of an explicit agreement does not undercut the existence of a deal.[61] As the Fourth Circuit has repeatedly made clear, any "tentative promise of leniency might be interpreted by a witness as contingent upon the nature of his testimony." Campbell v. Reed, 594 F.2d 4, 7 (4th Cir. 1979); Boone v. Paderick, 541 F.2d 447, 451 (4th Cir. 1976) ("[R]ather than weakening the significance . . . of an agreement of favorable treatment, tentativeness may increase its relevancy."). The remaining two charges, which were left open for two years before McRae was brought to trial, were resolved only four days after he was convicted, further strongly indicating that Tender had a deal or strong understanding with the State. See Campbell, 594 F.2d at 8 ("That a witness may curry favor with a prosecutor by his testimony was demonstrated

---

[61] Tender has, in fact, sworn that the favorable disposition of his charges was the result of his cooperation in implicating McRae. (See Tender Aff. ("I provided false statements to the detectives and testified falsely against Derrick McRae to improve my outcome on my cases.") (Ex. 24 at 1).) Moreover, as discussed supra note 22, it was common practice for that DA's Office to not enter into formal agreements with defendants/witnesses, but that there was a common understanding that cooperating witnesses would be given favorable treatment in exchange for their testimony. (See generally 1-MAR-Tr. 302–309.)

when the prosecutor renegotiated a more favorable plea agreement with [the witness] *after* [the defendant] was convicted." (emphasis added)).

The disposition of these charges, along with multiple other factors, incontrovertibly indicate that a deal existed between the State and Tender. The State, however, did not disclose this deal and failed to correct Tender's false testimony to the contrary. Given the importance of Tender's testimony to the State's case against McRae, the State's failure to correct his false testimony deprived the jury of key evidence related to his credibility and violated McRae's constitutional rights. <u>Giglio</u>, 405 U.S. at 154–55.

**B. The MAR Court Overlooked Undeniable Evidence that a Deal Existed, and Contradicted Supreme Court Precedent in Determining the State Did Not Violate Petitioner's Rights**

    1. <u>The MAR Court Unreasonably Determined the State Had Not Made a Deal with Tender</u>

At the time Tender provided his statement to the RPD, he faced twenty-two charges, nineteen of which were felonies. (Tender Criminal Record Summary (Ex. 17 at 1–2).) Twenty of these charges were either reduced or dismissed on March 28, 1996, only two days *after* Tender gave his initial statement to the RPD. (<u>Id.</u>) Despite the extremely telling timing of these favorable resolutions, the MAR Court unreasonably found, based on Tender's testimony only,[62] that "[t]he State disposed of [these cases] not because of an

---

[62] The MAR Court only cited to three sources, all of which were Tender's own testimony: (1) the first trial, where Tender testified the District Attorney reduced his charges based on lack of evidence (1-Trial-Tr. 101:15–23), (2) the second trial, where Tender claimed he did not receive any special treatment (2-Trial-Tr. 130:14–15), and (3) the MAR hearing, where Tender again stated his charges were dropped due to lack of evidence (1-MAR-Tr. 339:22 to 340:15).

78

arraignment [sic] with Tender, but because the State had weak cases against Tender."

(2015 MAR Order at 10 ¶ 4.)

Critically, the MAR Court also found Tender testified at McRae's trial "with no cases pending against him." (Id. at 10 ¶ 5.) This was incorrect. Per his criminal record, which was introduced as evidence at the MAR hearing (Def. Ex. 15), Tender had two open misdemeanor charges when he testified, both of which he had accrued between December 1995 and January 1996. These charges, which had remained open for the more than two years it took to render McRae competent to stand trial, were resolved on May 28, 1998, only two weeks after McRae was convicted. (Tender Criminal Record Summary (Ex. 17 at 1–2).) The MAR Court's unreasonable factual error—flatly contradicted by the state records before it—undoubtedly contributed to the Court's unreasonable determination that "Tender was not offered a deal." (2015 MAR Order at 11 ¶ 12.) See Garcia v. Long, 808 F.3d 771, 781 (9th Cir. 2015) (explaining that a state court's factual determinations were unreasonable under § 2254(d) as "the state court's view of the record [was] belied by" additional evidence in the record).

Not only does the resolution of these charges point to the existence of a deal, but Tender himself has confirmed it, indicating the existence of the deal in his persistent recantations over the years, including in a sworn affidavit and audio recording. Despite that, the MAR Court found that "Tender's more recent departure from his sworn [trial] testimony was *not* under oath" and that his "testimony under oath has been *consistent* and has served in *no way* to recant previous testimony." (2015 MAR Order at 12 ¶ 13 (emphasis added).) This unreasonable determination of facts is directly contradicted by

79

the record and outright disregards Tender's sworn affidavit. Under the law, Tender's affidavit was a recantation "under oath," which necessarily demonstrates that, contrary to the MAR Court's findings, Tender's testimony under oath has *not* been consistent. The MAR Court thus reached its conclusion that Tender has not convincingly recanted only by overlooking the evidence in the record contrary to that conclusion. Thus, the MAR Court's finding was not merely erroneous, it was unreasonable under § 2254(d). See Brumfield v. Cain, 576 U.S. 305, 322–24 (2015) (finding state court's selective recognition of evidence resulted in unreasonable determination of facts under § 2254(d)).

In keeping with his multiple recantations, Tender has also never affirmed his original testimony. The MAR Court, however, incorrectly found that, at the MAR hearing, Tender "testified that he firmly remembered Defendant admitting to murdering Rankin," and that he not only had *not* recanted, but that he had "*reaffirmed* his trial testimony." (2015 MAR at 17 ¶ 4 (emphasis added).) These findings are also directly contradicted by the record. Far from reaffirming his trial testimony, Tender's testimony at the 2014 MAR hearing was vague and full of equivocations. For example, when asked about his initial statement implicating McRae, Tender maintained that he could not recall its accuracy "right off hand," as it had been decades and his "mind ha[d] been through a lot." (1-MAR-Tr. 120:15–18.) When Tender was asked if McRae had ever told him that he was involved in Rankin's death, Tender responded "I can't remember" (id. at 123:13–15), and when Tender was asked if his testimony at McRae's trials was truthful, Tender first stated "yes, sir, to the best of my knowledge," but then immediately qualified the statement by saying "I can't remember." (Id. at 125:7–18.)

80

Tender also testified that when he originally spoke to the Duke Law Clinic and recanted his trial testimony, his mind was "substantially better" than it was at the MAR hearing. (Id. at 120:23 to 121:2.)

Given all that, Tender's vague equivocations at the MAR hearing did not repudiate his recantation but instead evinced a fearful reluctance to, in effect, betray the State.

In sum, the MAR Court made several factual errors contradicted by the record and then used those errors to draw unsubstantiated conclusions. Thus, the MAR Court's conclusion that Tender had reaffirmed his trial testimony was an unreasonable determination of the facts in light of the evidence in the case.

The MAR Court's conclusion also disregarded the substance of Tender's testimony, which, riddled with inconsistencies and divorced from any factual reality, demonstrated its own falsity.[63] Brewer himself, evidently aware of the implausibility of Tender's testimony, was reluctant to use Tender as a witness, as his handwritten personal witness list notes: "Eddie Tender—only if others back up." (DA, Witness Order List (Ex. 18).) To find a deal did *not* exist, one would have to believe that Tender—an alcoholic, career criminal, and in need of a deal because of his own charges—agreed to testify against a stranger for purely altruistic reasons. One would also have to believe that Brewer, a highly experienced prosecutor, put an unreliable witness on the stand and let him testify not only without "others back[ing him] up," but also contrary to the State's

---

[63] As discussed supra pp. 37–38, Tender's bizarre testimony describing McRae as an educated Black militant motivated by racial animus is uncorroborated by the record and undercut by years of medical records to the contrary.

only other witness implicating McRae. Finally, one would have to believe that Tender's charges were simply favorably resolved on their own merits, coincidentally aligning with the timing of Tender's initial statement and his testimony against McRae.

Such beliefs strain credulity. Simply put, "only one reasonable conclusion can be gleaned," see Anderson v. Terhune, 516 F.3d 781, 784 (9th Cir. 2008) (rejecting the state court's factual determinations as unreasonable under § 2254(d)), that Tender had a deal with the State.[64] The MAR Court's determination to the contrary was not just an incorrect determination of fact, it was unreasonable under § 2254(d). The MAR Court's factual errors, however, also informed its errors of law.

2.  The MAR Court's "Actual Knowledge" Standard Contradicted Supreme Court Precedent

As fully discussed above, federal law clearly establishes that the duty to correct false testimony does not depend on the prosecutor's actual knowledge. For instance, in Giglio v. United States, an unindicted co-conspirator made a deal with the State in exchange for his testimony, but he testified that he received no favorable treatment. 405 U.S. at 151–52. The prosecutor who tried the case was personally unaware a deal had been made and failed to correct the false testimony. Id. at 152. The Supreme Court held that the State cannot sidestep its duties merely because an individual prosecutor was not

---

[64] In fact, in the same judicial district at the time of McRae's prosecution, prosecutors, including Brewer, were determined to have withheld evidence of deals made with witnesses in exchange for their testimony. (See State v. Hoffman, Order (95 CRS 15695) at 7 (N.C. Super. Ct. Apr. 30, 2004) (granting new trial because State withheld evidence of witness's federal immunity agreement); State v. Hamilton, Order (95 CRS 1670) at 22–23 (N.C. Super Ct. Apr. 22, 2003) (granting new trial because State failed to produce impeachment evidence relating to co-defendant).)

82

aware a deal existed with the witness, as "[t]he prosecutor's office is an entity and . . . [a] promise made by one attorney must be attributed" to the State. Id. at 154.

At trial, Tender denied receiving any special consideration in exchange for his testimony against McRae (2-Trial-Tr. 120:4–6, 130:14–15), but, as discussed fully above, a deal plainly existed and Tender's testimony was therefore false. This falsehood triggered the State's constitutional duty to correct the testimony, which Brewer unquestionably failed to do.

The MAR Court only briefly touched on this false testimony claim, relying instead on its unreasonable determination that there was "no evidence to support that a such a deal existed." However, it again used an "actual knowledge" standard, contrary to clearly established federal law, in quickly dispatching the claim. The Court accepted Brewer's testimony that not only had he never made a deal with Tender, but that "[n]o one ever told [him] any deal was made," and "[D.A.] Honeycutt was the only person in the office who could make a deal in exchange for testimony."[65] (1-MAR-Tr. 395:7–16.) The MAR Court concluded that accordingly, McRae failed to show that Tender's testimony "was in fact false or that *Brewer knew it to be false*." (2015 MAR Order at 16 ¶ 3 (emphasis added).) Again, this standard directly contradicts Supreme Court precedent. The duty to

---

[65] Brewer was once prosecuted by the State Bar for concealing a deal made in exchange for witness testimony in a capital murder case—one tried in the same year McRae was convicted. See North Carolina State Bar v. Brewer, 644 S.E.2d 573, 574–76 (N.C. Ct. App. 2007). Although the case against Brewer was dismissed as time barred, the court made it clear that the decision rested solely on procedural grounds. Id. at 578.

83

correct false testimony is triggered by the testimony itself, not by the actual knowledge of the prosecutor.

Here, the clear weight of the evidence—and Brewer's own conduct—demonstrates that a deal existed. Thus, even assuming that Brewer was personally unaware of any deal with Tender, his lack of personal knowledge is irrelevant. If a deal existed, Brewer had a duty to correct Tender's false testimony.

### 3. Tender's False Testimony Was Undeniably Material

As discussed above, Tender's testimony was crucial to the State's case, thus any "evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility," and undoubtedly "the jury was entitled to know of it." Giglio, 405 U.S. at 155. The State's failure to correct his testimony thereby created a "constitutional infirmity" that likely "had an effect on the outcome of the trial." Napue, 360 U.S. at 271–72 (internal quotations omitted).

The fact that the jury heard some evidence regarding Tender's possible incentive to testify for the State does not render harmless Brewer's failure to correct his false testimony. The Supreme Court made clear in Napue v. Illinois that a jury's awareness of other reasons to believe that a witness is incentivized does not cure the fundamental damage caused by the presentation of false testimony. Id. at 270. In Napue, itself, the principal witness for the State testified falsely that he received "no consideration for his testimony," and the lower court found no constitutional violation because "the jury had already been apprised that someone" told the witness they were going to try to help him with his charges. Id. at 267-68. The Supreme Court rejected this reasoning, holding "we

84

do not believe that the fact that the jury was apprised of other grounds for believing that the [witness] may have had an interest in testifying against petitioner turned what was otherwise a tainted trial into a fair one." Id. at 270.

In the present case, any information that the jury heard regarding Tender's possible incentive to testify for the State did not cure the State's failure to disclose the existence of a deal. Rather, as in Napue, if the jury had received the full information, "it might well have concluded that [the witness] had fabricated testimony in order to curry the favor . . . of the State." Id.

In sum, the MAR Court made unreasonable factual determinations and applied legal standards that were contrary to clearly established federal law, as determined by the Supreme Court. As the State failed to disclose the existence of the deal with Tender, and failed to correct Tender's material, false testimony, McRae's constitutional rights were violated.[66]

IV. **THE STATE VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS BY FAILING TO DISCLOSE THAT THURMAN NELSON RECEIVED FAVORABLE TREATMENT FROM THE STATE IN EXCHANGE FOR HIS TESTIMONY, AS REQUIRED BY *GIGLIO v. UNITED STATES*, AND BY ALLOWING HIM TO TESTIFY FALSELY THAT HE RECEIVED NO SUCH TREATMENT, IN CONTRAVENTION OF *NAPUE v. ILLINOIS***

Making an unreasonable determination of facts by overlooking undeniable evidence, the MAR Court found "[n]o evidence was presented which support[ed]

---

[66] Further, while the MAR Court ultimately did not decide this issue on a Brady analysis, these same facts would necessarily also constitute a Brady violation.

[Petitioner's] contention that an arrangement existed between the State and Nelson, whereby Nelson would receive some benefit to in exchange for favorable testimony against [Petitioner]." (2015 MAR Order at 20 ¶ 3.)

In determining that no constitutional violation occurred by the State's failure to disclose a deal or correct Nelson's testimony to the contrary (id. at 22 ¶ 5) or by the State's failure to correct Nelson's testimony regarding his alleged involvement in the murder if it was false (id. at 25 ¶¶ 2–3), the MAR Court again applied an "actual knowledge" standard contrary to Giglio v. United States, 405 U.S. 150 (1972), and other clearly established Supreme Court precedent.

Finally, the MAR Court unreasonably applied clearly established federal law by focusing on Nelson's state of mind rather than the State's knowledge.

### A. Constitutional Grounds for Relief

As fully detailed above, the State has affirmative obligations to (1) disclose any deals made with witnesses in exchange for their testimony, Napue v. Illinois, 360 U.S. 264, 269–70 (1959), and (2) correct any false or misleading material testimony, Giglio, 405 U.S. at 154.

Here, the State failed to meet both obligations. In light of the entire record, as discussed below, it is inconceivable that the State did not enter into a deal with Nelson in exchange for his testimony, a deal that was never disclosed. Nelson, like Tender, was allowed to deny that anyone had "made any promises" to him about receiving favorable treatment from the State. (2-Trial-Tr. 67, 84.) Nelson also testified to his complete and total innocence in the murder (id. at 67:2–4, 71:5–15), even though he remained charged,

86

casting the blame fully on McRae. As Nelson's testimony was crucial to the State's case, Brewer had a constitutional obligation to correct this false testimony. Brewer's failure to do so deprived the jury of key evidence. See <u>Giglio</u>, 405 U.S. at 154–55 (stating "evidence of any understanding or agreement as to a future prosecution" of a key witness "would be relevant to his credibility and the jury was entitled to know of it").

### B. The MAR Court Misinterpreted the Record, Overlooking Undeniable Evidence that a Deal Existed and that Nelson Testified Falsely, and Contradicted Supreme Court Precedent in Determining the State Did Not Violate Petitioner's Rights

#### 1. The MAR Court's Conclusion that No Deal Existed Was Unreasonable in Light of the Entire Record

In concluding that no deal existed between Nelson and the State, the MAR Court relied on the following: (1) Brewer's testimony that no deal was made (2015 MAR Order at 19 ¶ 1); (2) Nelson's trial testimony that no deal was made (<u>id.</u> at 19 ¶ 3); and (3) the 2014 MAR hearing testimony of one of Nelson's lawyers (Van Camp) that no deal was explicitly made (<u>id.</u> at 20 ¶ 5). Based on this, the MAR Court found that "the evidence supports the finding that no such arrangement existed." (<u>Id.</u> at 20 ¶ 3.) In so finding, the MAR Court ignored the other evidence before it.

Nelson and McRae were both charged as principals in the first-degree murder of Rankin, presumably because their arrest warrants and indictments were based on Dumas's purported eyewitness account, which Dumas has since recanted. In the two-plus years between McRae's arrest and his trials, during which the State was attempting to render McRae competent to stand trial, Nelson was out on bond. During that time, he was charged with multiple unrelated crimes, including two separate charges of carrying a

87

concealed weapon, possession of stolen goods, assault on a female, and reckless driving. (Nelson Criminal Record Summary (Ex. 19 at 1).) Despite these additional charges, Nelson's bond on the murder charge was never revoked or modified.

Notably, the MAR Court discussed *none* of the charges Nelson accrued while on bond, despite having Nelson's criminal record before it. Disregarding evidence in the record and then stating "no evidence was presented which support[ed] Defendant's contention that an arrangement existed" (2015 MAR Order at 22 ¶ 2), is not just incorrect, it is unreasonable under § 2254(d). See Brumfield v. Cain, 576 U.S. 305, 322–24 (2015) (finding state court's cherry-picked recognition of evidence in the record while ignoring other evidence was an unreasonable determination of facts under § 2254(d)).

Similarly, the MAR Court did not discuss the advantageous resolutions Nelson received *after* McRae was convicted. Shortly after McRae's conviction, Nelson's murder charge was dismissed, and all of his other felony and misdemeanor charges were resolved very favorably. (Nelson Criminal Record Summary (Ex. 19 at 1).) Although the MAR Court noted that "Nelson's charge for the murder [of] Rankin was still pending" when Nelson testified against McRae (2015 MAR Order at 47 ¶ 5), the Court did not mention the fact that the charge was later dismissed and the favorable resolution of all the other charges. Overlooking this other evidence that strongly suggested a deal between Nelson and the State, the MAR Court instead held that "the evidence supports the finding that no such arrangement existed." (Id. at 20 ¶ 3.) Again, this disregard of evidence was more than incorrect; it was unreasonable under § 2254(d). See Garcia v. Long, 808 F.3d 771,

88

781 (9th Cir. 2015) (finding the state court's neglect of evidence that contradicted its own "view of the record" resulted in an unreasonable determination of facts under § 2254(d)).

The MAR Court also did not discuss the critical fact that one of Nelson's lawyers, Edward Meachum, privately consented to let Nelson testify without counsel present in McRae's second trial. (2-Trial-Tr. 60:2–19.) No seasoned lawyer, as Meachum was, would allow a client facing a murder charge to testify alone without a deal in place. If Meachum did so *without* a deal, he would have subjected Nelson to the risk of very severe consequences and otherwise violated his ethical duties to protect his client, subjecting himself to the risk of an ethics charge.

Yet the MAR Court, again, limited its discussion to only certain evidence in the record, for example, never mentioning the evidence of Meachum's consent to let Nelson testify alone. A conclusion that "no evidence was presented" to support a deal, while disregarding the evidence supporting the existence of one, is an objectively unreasonable determination of facts.[67] In sum, the MAR Court failed to consider the evidence before it and then claimed to have no evidence.

2.  The MAR Court's "Actual Knowledge" Standard Regarding False Testimony Contradicted Supreme Court Precedent

The MAR Court further compounded its unreasonable determinations of fact by using a legal standard contrary to clearly established federal law, once again stating the

_____

[67]Accepting this rationale—i.e., that a court can disregard extraordinarily telling evidence of an arrangement as long as there is no *explicit* proof of one—would create perverse incentives and drive such deals even further underground. This result directly contravenes the intent behind the Supreme Court's rulings in Napue and Giglio.

89

"Defendant must establish that the prosecution *actually knew* the evidence was false." (2015 MAR Order at 22 ¶ 1.) Accepting Brewer's testimony at the MAR hearing that he "had no personal knowledge of any information which implicated Nelson as the responsible party for the murder," and, in fact, he "had no personal knowledge of the crime at all" (id. at 24 ¶ 6), the MAR Court found that "[n]o evidence was presented which supports the contention that, had Nelson's testimony been false, Brewer was in a position to identify it as such" (id. at 25 ¶ 3).

Setting aside the implausibility that Brewer would have no knowledge about Nelson's involvement, let alone "no personal knowledge of the crime," in *the very murder* he was prosecuting, the MAR Court's insistence on the State's actual knowledge of false testimony is contrary to clearly established federal law. As detailed above, the correct standard is what the State knew or *should have known*. Agurs, 427 U.S. at 103 (emphasis added).

Additionally, in an unreasonable application of this clearly established precedent, the MAR Court again focused on the *witness's* state of mind, rather than the prosecutor, stating that no evidence supported a finding "that Nelson testified falsely regarding his lack of involvement in the murder." (2015 MAR Order at 25 ¶ 2.) As set out fully above, this inappropriate focus upon the witness's intent—rather than on the false nature of the testimony and the State's response to it—is an unreasonable application of federal law under § 2254(d).

90

3. <u>The MAR Court Unreasonably Failed to Scrutinize the State's Actions</u>

Apart from relying on the incorrect legal standard, the MAR Court's deference to Brewer's improbable testimony suggests a general unwillingness to closely scrutinize the State's behavior. The MAR Court narrowly focused its inquiry on whether Nelson had falsely testified about receiving a deal: finding that no such deal existed, no false testimony was given and thus no due process violation had occurred. Yet, setting aside the substantial evidence of a deal described above, Nelson's denial of a deal was not the only flaw in his testimony. There are three possibilities regarding the veracity of Nelson's testimony about Rankin's murder: (1) it was completely false; (2) it was completely true; or (3) it was a combination of the two. In brief, regardless of whether Nelson's testimony was true, false, or only partly false, the State's use of it either directly violated McRae's right to due process or revealed the coercive nature of the RPD's investigation, both of which cast doubt on the integrity of the State's entire case.

The first possibility—that Nelson's testimony was completely false and that Nelson was, in fact, involved in Rankin's murder—is consistent with the State's theory of the crime, which was premised on both men being involved. This possibility is evidenced by the State's indictment of both as principals in the first-degree murder of Rankin, the maintenance of Nelson's charge throughout McRae's trials, and by Brewer's personal trial notes, which indicated Nelson's testimony was contingent upon Nelson placing himself at the scene. (<u>See</u> DA, Witness Order List (Ex. 18) ("Thurman Nelson—only if (1) he admits being there").)

91

However, if the State believed Nelson was involved in the crime, then the State allowed him to testify falsely to his *own complete innocence* and uninvolvement in the crime, casting full and sole responsibility on McRae. (<u>See</u> 2-Trial-Tr. 71:5–15; 1-Trial-Tr. 161:13–15.) Given that Nelson's testimony would have to be considered false under this scenario, then Brewer's failure to correct his testimony—even if Nelson testified truthfully to McRae's involvement (which he did not)—violated due process and deprived McRae of a fair trial.

The second possibility—the best-case scenario for the State—is that Nelson's testimony, including his avowal of innocence, was completely accurate. If his testimony was accurate, then no due process violation occurred. This appears to be the path Brewer attempted to take at the 2014 MAR hearing. As the MAR Court noted, Brewer testified he had "no personal knowledge of any information which implicated Nelson," was unfamiliar "with any incontrovertible evidence" that Nelson was responsible for the murder, and he called Nelson as a witness, "even though he was charged with murder himself, because he had knowledge of the crime." (2015 MAR Order at 24–25 ¶¶ 6–7.)

However, this best-case scenario throws the coercive nature of the State's conduct into sharp focus. The State targeted and charged both McRae and Nelson. If Nelson testified truthfully to his innocence *while still charged as a principal with the very same murder*, then the inescapable conclusion is the State knowingly charged an innocent defendant or at least maintained that charge through two trials to ensure they could convict a different one. Once Nelson testified at McRae's first trial to his own innocence and uninvolvement, Brewer knew what his testimony was and likely would be at the

92

second trial. At that point, if he believed Nelson had testified truthfully, he should have dismissed the charge against him; if he did not believe his testimony, he should have maintained the charge but corrected his testimony—and certainly not allow him to the testify the same way at McRae's second trial.

Further, several of the suppressed statements directly implicated Nelson. If Nelson testified truthfully to his own innocence, then the statements are rendered completely unreliable. That is, if McRae was guilty and Nelson falsely accused, those suppressed statements—the same statements that formed the entire basis for McRae's prosecution and Nelson's indictment—are false as well.

In short, this scenario suggests the State left Nelson's indictment standing to guarantee McRae's conviction, which casts the State's entire case into doubt. Even if, arguably, the State was unsure of either Nelson's guilt *or* innocence, the tenuousness of the State's case is still apparent. At best, which is still constitutionally infirm, the State charged Nelson with a crime they were uncertain he committed, though for which they had at least some evidence he did, and then allowed him to give uncorrected, misleading testimony as to his own innocence, shifting the entirety of the blame upon McRae.

The third and likeliest scenario, however, based on the ample evidence demonstrating the coercive quality of the State's investigation, is that Nelson's testimony was both true *and* false. It is highly likely that Nelson was, like McRae, completely innocent of the crime and attempting to avoid a conviction. Testifying against his friend was Nelson's only way to extract himself from the situation he was trapped in. Thus, he

93

testified truthfully to his own innocence but, to escape his own charges, agreed to falsely implicate McRae in a crime that neither of them committed.[68]

Under any scenario, Brewer's use of Nelson's testimony undercut the integrity of the State's entire case. No matter the inference to be drawn about the State's use of Nelson's testimony while maintaining the charge against him, it is clear that some form of state misconduct occurred. Yet, despite this, the MAR Court accepted Brewer's testimony and implicitly endorsed the State's unconstitutional gamesmanship.

#### 4. Nelson's False Testimony Was Undeniably Material

As detailed fully above, it is clearly established that the failure to correct false testimony affecting the credibility of a key witness is material. Giglio, 405 U.S. at 154. Nelson is clearly a key witness, as he is the only State witness to describe McRae interacting with the victim on the day of the murder. As the State presented no other evidence linking McRae to the scene of the crime, and offered *none* of the evidence it relied upon to make McRae's arrest, Nelson's testimony was essential. Without his testimony, the State had no case. Evidence that Nelson was receiving favorable treatment for his testimony thus would have been critical to the jury's assessment of his credibility.

---

[68] A fourth possibility technically exists: Nelson was involved in the murder and lied about his own innocence, but also lied about McRae's involvement. Given the lack of evidence tying Nelson to the crime, it seems unlikely that this fourth scenario occurred. However, if it were true—that the actual murderer helped the State convict an innocent man—then either the State intentionally prosecuted the more vulnerable person to obtain *a* conviction by any means necessary, regardless of guilt, or the State's investigation and prosecution were grossly incompetent.

94

As with Tender, the fact that the jury heard that Nelson may have been incentivized to cooperate with the State did not relieve Brewer of his constitutional obligation to correct Nelson's false testimony. As <u>Napue</u> made clear, the mere fact the jury had other reasons to suspect a witness is incentivized does not cure the constitutional infirmity caused by the presentation of false testimony. <u>See</u> 360 U.S. at 270 ("[W]e do not believe the fact that the jury was apprised of other grounds for believing that the [witness] may have had an interest in testifying against petitioner turned what was otherwise a tainted trial into a fair one."). Here, not only did that same infirmity go uncured, but Nelson also testified to his complete and total innocence in the murder. (2-Trial-Tr. 67:2–4, 71:5–15.) Further, Crump's attempts to elicit information regarding Nelson testifying while charged on cross-examination led to Nelson again denying he had received any favorable treatment. (<u>Id.</u> at 84:3–11.)

In sum, contrary to the MAR Court's flawed analysis, the State failed to disclose the deal it had with Nelson and failed to correct his false testimony in violation of McRae's constitutional rights. Thus, the MAR Court made an unreasonable determination of facts and used legal standards contrary to clearly established federal law, as determined by the Supreme Court.

V. **PETITIONER'S RIGHTS UNDER THE SIXTH AMENDMENT WERE VIOLATED BECAUSE HE DID NOT RECEIVE CONSTITUTIONALLY ADEQUATE COUNSEL AS DESCRIBED IN *STRICKLAND v. WASHINGTON***

Unreasonably applying clearly established Supreme Court precedent, the MAR Court found that "[i]t cannot be said that the strategic choices [made by Crump] were not

95

reasoned and informed choices among possible defenses," and thus the Court could not "conclude that counsel's representation was constitutionally defective in any regard." (2018 MAR Order at 5 ¶¶ 6, 10.)

In further misapplication of federal law, the MAR Court assessed McRae's ineffective assistance of counsel claim and found reasonable defense counsel Crump's failure to pursue what the Court termed "tangential facts" learned during the first trial (id. at 4 ¶ 1). According to the MAR Court, pursuing the new facts risked compromising Crump's efforts to pursue the alibi defense he had already presented at the first trial. (Id. at 4 ¶ 1.) Yet, given the significance of the leads that Crump could have pursued after hearing the State's case, his failure to investigate was not a "reasoned and informed choice."

The MAR Court's erroneous conclusion that Crump's (1) failure to investigate was reasonable, (2) incorrect reasoning that his failure could be cured by cross examination, and (3) failure to examine the totality of evidence and assess the strength of the State's case was an unreasonable application of clearly established federal law, as determined by the Supreme Court.

## A. Legal and Constitutional Grounds for Relief

Federal law governing the right to effective assistance of counsel is clearly established.[69] Strickland v. Washington, and later cases have made plain that criminal defense lawyers have "a duty to make reasonable investigations or to make a reasonable

---

[69] See U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense.").

decision that makes particular investigations unnecessary." 466 U.S. 668, 690–91 (1984); see United States v. Mooney, 497 F.3d 397, 404 (4th Cir. 2007) (holding that trial counsel is "charged with the responsibility of conducting '*appropriate investigations, both factual and legal*, to determine if matters of defense can be developed'" (quoting Coles v. Peyton, 389 F.2d 224, 226 (4th Cir. 1968))). Thus, failing to pursue investigative leads constitutes deficient performance if "[a]ny reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses." Wiggins v. Smith, 539 U.S. 510, 525 (2003).

To establish that trial counsel's representation was constitutionally inadequate, a defendant must satisfy the familiar two-prong test: (1) counsel's performance "fell below an objective standard of reasonableness," and (2) counsel's deficient performance prejudiced the defendant, creating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688, 694.

For the first prong, the reasonableness of counsel's performance is to be determined in light of all the circumstances and by referring to prevailing norms of practice. Id. at 695. Although the Supreme Court has cautioned against engaging in a "*post hoc* rationalization of counsel's conduct [in lieu of] an accurate description of their deliberations," Wiggins, 539 U.S. at 526–27, Strickland provided guidance on assessing the reasonableness of counsel's decision-making. While defense counsel's "strategic choices made after thorough investigations of law and facts relevant to plausible options are virtually unchallengeable," any choices "made after *less than complete investigation*

97

*are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation*." <u>Strickland</u>, 466 U.S. at 690–91 (emphasis added).

For the second prong, prejudice is assessed by considering "the totality of the evidence before the judge or jury," to determine, absent trial counsel's deficient performance, whether "the decision reached would reasonably likely have been different." <u>Id.</u> at 695–96.

Here, going into McRae's second trial, defense counsel Crump enjoyed an advantage unavailable to most in his position—that is, he had a full preview of how the State was going to prosecute its case against his client. When the first trial resulted in a hung jury, Crump was also aware of how weak the State's case was. With this knowledge, Crump should have used the time between trials, no matter how little, to conduct at least some investigation to more effectively combat the now-known testimony of the State's witnesses. Instead, Crump conducted no additional investigation, instead choosing to focus exclusively on re-issuing the same seven subpoenas for the same alibi witnesses he called at the first trial.

No "reasonable professional judgment" supported Crump's fidelity to his previous, single strategy or his failure to conduct any additional investigation between the first and second trials. Crump's failure to conduct a targeted investigation before the second trial undeniably prejudiced McRae, resulting in constitutionally defective assistance of counsel.

**B. The MAR Court's Unreasonable Application of Clearly Established Supreme Court Precedent Ignored Defense Counsel's Failure to Adequately Investigate Critical Evidence and Improperly Concluded His Cross-Examination Technique Served as a Sufficient Substitute**

    1. <u>The MAR Court Mischaracterized Critical Evidence as "Tangential" and "Incidental"</u>

At the near perfect preview of the State's case at the first trial, Crump was made aware of several pieces of key evidence that necessitated further investigation before the second trial. The specific evidence that the MAR Court deemed "incidental" and "tangential" but was in fact central to an appropriate defense was the following:

- Whether the red truck at the center of Nelson's testimony—the one Rankin allegedly drove during the purported botched drug deal with McRae—was unavailable that night because it had been involved in an earlier accident, or whether a red truck was even available to Rankin at all (2018 MAR Order at 3 ¶ 7);

- Whether Tender and McRae's locations in the County Jail provided an opportunity for McRae to confess to Tender, as Tender claimed he did (<u>id.</u>);

- Whether Rankin's nervousness when he met his mother a few hours before his murder and his statement to her that someone named Dale "was going to beat the ass out of him" indicated someone other than McRae was responsible for Rankin's murder (<u>id.</u>); and

- Whether, as Tender claimed, McRae was a "book smart black militant who wanted to kill white people" (<u>id.</u> at 3 ¶ 8).

After the first trial, however, Crump conducted *no* investigation into any of points of information. He did not inquire into the availability of the red truck on the night of the murder, follow up on a request for the location of Tender's and McRae's assigned cells in the County Jail, investigate who Dale might have been, or determine whether anyone other than Tender—any teacher, friend, family member, medical provider, County Jail detainee or guard, etc.—had any reason to believe McRae was a book smart militant intent on killing white people.

The MAR Court rejected these new avenues of investigation as unnecessary, explaining that: (1) pursuit of evidence relating to the red truck and Tender's limited access to McRae in the County Jail should not "supplant, on the eve of the second trial, the . . . 'I was elsewhere' defense" (id. at 4 ¶ 2); (2) Jackie Rankin's testimony about Rankin's nervousness and statement about Dale "neither suggests third party guilt ascertainable upon further investigation (and provable ten days hence) nor, except conjecturally, that others may have wanted to harm the victim" (id. at 4 ¶ 3); and (3) Tender's testimony that McRae was a Black militant intent on killing white people "did not reasonably require that more time be expended proving the negative" (id. at 4 ¶ 4).

Contrary to the MAR Court's findings, the evidence Crump failed to investigate was not "incidental" or "tangential" to McRae's case. Among other things, it was tightly linked to the reliability of the State's two highly incentivized witnesses and, relatedly, McRae's claim of innocence. Had Crump investigated these new leads, he would have learned, at minimum, the following: (1) Rankin allegedly stole a red truck and crashed it at least a week before he allegedly drove it during the botched drug deal Nelson claimed

100

to have witnessed; (2) Rankin's nervousness was likely due to the fact that multiple warrants for his arrest had been issued earlier that same day and "Dale," who Rankin said was looking for him, may have been someone in connection with the warrants; and (3) nothing in the voluminous records related to McRae and his case, other than Tender's testimony, indicates that McRae was book smart or had any racial animus toward white people (e.g., nothing in his school, court, and medical records).[70] (See Hamlet Police Department Records (Ex. 1 at 1–22) (including incident reports, arrest warrants, and notes related to Rankin) (documenting points 1 and 2).)[71]

The evidence Crump failed to pursue also had great potential to bolster—rather than, in the MAR Court's view, "supplant"—arguments that were available at the first trial, including McRae's alibi defense. Evidence that undercuts the "factual" underpinnings of the State's case necessarily bolsters a defendant's alibi defense, a defense that is especially (but often unfairly) suspicious when presented by a defendant's family members and friends, as here. Thus, the alibi defense could still have been

---

[70] During his pretrial investigation, Crump only received McRae's school records and limited medical records. As previously discussed, he did not have McRae's extensive medical records, which plainly revealed that McRae had no indication of racial animus. See supra pp. 37–38. When pressed on his strategy for rebutting Tender's testimony about McRae's revolutionary beliefs and high level of intelligence, Crump testified, "[t]he only thing I did with Edward Tender [between the two trials] was get his record such that I could call the clerk during the second trial." (2-MAR-Tr. 78:13–15.) He admitted that, among other things, he did not develop any evidence to rebut claims of McRae's animus against white people as a motive for the murder. (Id. at 78:16 to 79:12.)

[71] Upon information and belief, additional records related to Rankin's theft of the red truck were once available (see Hamlet Police Department Records (Ex. 1 at 13) (Handwritten Note)), as well as jail records regarding Tender and McRae's locations in the County Jail.

presented, along with any bolstering evidence that was discovered during the necessary between-trials investigation.

> ### 2. Contrary to the MAR Court's Unreasonable Application of Law, Crump's Failure to Investigate Between Trials was Constitutionally Inadequate

Before McRae's second trial, Crump did not make a reasonable investigation nor, contrary to the MAR Court's findings, arrive at a reasonable decision rendering further investigation unnecessary.

In an instructive case, Elmore v. Ozmint, the Fourth Circuit assessed the reasonableness of trial counsel's decision in a second trial to adhere to the same strategy developed for the first, rather than investigating the State's forensic evidence between trials, and concluded that the state court's "performance-prong analysis of [the defendant's] ineffective assistance claim was both an unreasonable application of, and contrary to, the controlling Strickland principles." 661 F.3d 783, 866 (4th Cir. 2011). The court wrote that, once the defendant's earlier convictions were reversed, his counsel "had a rare second chance to contest the State's case—along with near-perfect knowledge of what that case would be." Id. at 854. Thus, the court determined, "this is one of those instances of deficient performance in which counsel, despite a professional obligation to conduct an investigation, has failed to investigate the defense at all or has performed an investigation so minimal that no strategic reason could be given for the failure to investigate further." Id. at 866 (internal citations and alterations omitted); see also id. at 864 ("Because Elmore's lawyers' investigation into the State's forensic evidence never

102

started, there could be no strategic decision either to stop the investigation or to forgo use of the evidence that the investigation would have uncovered.").

A similarly edifying case is Adams v. Bertrand, 453 F.3d 428 (7th Cir. 2006). As in Elmore, the trial counsel in Adams was in the "unique, and enviable, position of having seen the state's entire case against his client." Id. at 437. The defense lawyers "witnessed a dress rehearsal of the state's case and could prepare accordingly before the second trial," but instead remained committed to the strategy employed in the first trial. Id. In overturning a state court finding that counsel's decision was reasonable, the Seventh Circuit concluded counsel's "knowing disregard" was unreasonable under Strickland, finding that "counsel's failure to investigate properly a crucial witness, stemming from an intransigence regarding his trial strategy, . . . constituted ineffective assistance of counsel." Id. at 438.

The same analysis is applicable here. Crump was in that "unique, and enviable, position" of witnessing a "dress rehearsal" of the State's case, and yet he stayed committed to the strategy he adopted before knowing much at all about the evidence the State would present. Thus, Crump's uninformed "intransigence" about his strategy was unreasonable under Strickland.

Here, misapplying this clearly established precedent, the MAR Court endorsed Crump's between-trials activity as "adequate and reasonable." Pointing to Crump's investigation over the two years *before* McRae's first trial as evidence of the reasonableness of his overall representation, the MAR Court identified only the following as Crump's between-trials activity:

103

During the ten day interval between the first and second trials Mr. Crump was diligent in re-issuing the seven subpoenas for witnesses who had supported and that he reasonably expected to continue to support [McRae's] alibi defense. As current defense counsel notes, the majority of jurors in the first trial concluded that the defendant was innocent. It is undeniable that this majority reached this conclusion only after a vigorous alibi defense was presented; and further, only after the incidental evidence discussed below had also come before them.[72]

(2018 MAR Order at 3 ¶ 6.)

The fact that Crump presented a vigorous alibi defense that was largely successful at the first trial does not cure his failure to adequately investigate later that which requires investigation, even if only enough investigation to support a decision not to investigate any further. As mentioned above, Crump did no investigation between trials. By "nonetheless approving [his] performance," the MAR Court unreasonably applied Strickland. See Elmore, 661 F.3d at 864 (holding that the post-conviction court unreasonable applied Strickland because there can be no reasonable decision to stop an investigation that never started).

The Court's emphasis on the shortage of time between the first and second trials is also misplaced. Crump, a seasoned lawyer at the time of McRae's trials, should have specifically moved for more time to investigate the leads that arose during the first trial.[73]

---

[72] In the first trial, the jury learned that Rankin was nervous "Dale" wanted to harm him (1-Trial-Tr. 79:5–13), but in the second trial the jury did not hear anything about Dale or anyone else with a possible motive to harm Rankin.

[73] Crump did request additional time, which was denied, but only to allow McRae's treating State psychiatrist to return from vacation and evaluate his competence before the second trial.

If the Court denied the motion, the shortage of time between trials and the consequent inability to pursue the new leads would have been preserved for appeal. Even without the extra time, however, any reasonable lawyer could have accomplished more in the week between trials than solely ensuring that subpoenas were re-issued for previously used alibi witnesses, as Crump testified he did in this case.

Of course, to fully understand the impact of a failure to investigate, "claims based on a duty to investigate must be considered in light of the strength of the government's case." United States v. Decoster, 624 F.2d 196, 210 (D.C. Cir. 1976). If, for example, the State has an "overwhelming case based on documents and the testimony of disinterested witnesses, there is not too much the best defense attorney can do," id. (quoting United States v. Katz, 425 F.2d 928, 930 (2d Cir. 1970)), but, where the case is not "overwhelming," a reasonable defense attorney is expected to "conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case," United States v. Russell, 221 F.3d 615, 620 (4th Cir. 2000) (quoting ABA Defense Function General Standards, Std. 4-4.1).

Here, the State's case was decidedly not "overwhelming," and it was not "based on documents and the testimony of disinterested witnesses." Indeed, the first trial resulted in a hung jury, with eight jurors voting for acquittal, demonstrating the weakness of the State's case. At the first MAR hearing, Crump himself testified there was "just a scintilla of evidence against Derrick McRae" (1-MAR-Tr. 91:23 to 92:6), evidencing his full awareness of how weak the State's case was. Yet, like the ineffective counsel in Elmore, Crump did not "capitalize on [his] comprehensive knowledge of the State's case," instead

105

"opt[ing] for capitulation." Elmore, 661 F.3d at 862. In endorsing Crump's performance, the MAR Court unreasonably applied Strickland.

### 3. Crump's Failure to Investigate Rankin Fully Before Trial Constituted Ineffective Assistance of Counsel

Even before the first trial, Crump's failure to investigate the victim's background was unreasonable. Crump knew that Rankin was found deceased on the porch of someone else's home with a crack pipe in his hand. A reasonable investigation would have sought to determine the source of the victim's drugs—especially as McRae was adamant about his innocence—and whether the victim's drug use provided another individual with a motive to kill him.[74] Crump, however, never investigated Rankin's background or the circumstances of his apparent drug use. (2-MAR-Tr. 60:2–14.)

The MAR Court, however, concluded that Crump "conducted an adequate and reasonable investigation of the facts and circumstances before the defendant's first trial" and that the "strategic choices" Crump made prior to trial "were objectively reasonable." (2018 MAR Order at 5 ¶¶ 6, 8.) Yet Crump's decision *not* to investigate Rankin before McRae's trials was not, as the MAR Court suggested, "a reasoned and informed" strategic choice he made in favor of pursuing McRae's alibi defense. Crump did not attempt to investigate the victim's background and then make an informed decision that pursuing it further would not benefit his client. Instead, Crump did not investigate Rankin at all, despite the suggestive circumstances of his death.

---

[74] Of course, after learning about the threats from "Dale" during the first trial, this investigative avenue would have taken on even greater significance.

106

As Crump entirely failed to investigate Rankin, he did not possess the information necessary to make an informed, strategic decision. See Wiggins v. Smith, 539 U.S. 510, 525–26 (2003) (finding counsel's failure to pursue leads important to choosing between possible defenses "underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment").

A Sixth Circuit case is illustrative: In Foster v. Wolfenbarger, defense counsel failed to investigate potential alibi witnesses thoroughly, choosing instead to pursue only a mistaken identification defense, a choice which the state court considered to be a reasonable, strategic decision. 687 F.3d 702, 707–09 (6th Cir. 2012). The Sixth Circuit firmly rejected the state court's conclusion as unreasonable under § 2254(d), noting "[t]he requirement that trial counsel fully investigate a possible defense is clearly established Supreme Court precedent under Strickland and its progeny." Id. at 709. The court also noted this was not a case where trial counsel had to "choose between two different avenues and pick the theory of the case that counsel believed was stronger." Id. at 708. Rather, they "*chose not to investigate an avenue that potentially could have bolstered the defense that counsel was already pursuing*." Id. (emphasis added).

Here, any evidence Crump adduced about Rankin's background would have only served to bolster McRae's alibi. Had Crump pursued this investigative avenue at any time in the two years before the first trial, he could have found ample evidence, as detailed above, that there were a number of other individuals with a motive to hurt Rankin— evidence that would have necessarily undercut the State's case and bolstered McRae's

107

alibi. Not pursuing this line of investigation, then, was not a strategic choice, but constitutionally deficient performance, and the MAR Court's failure to recognize it as such was unreasonable under § 2254(d).

4. The MAR Court Unreasonably Concluded that Crump's Failure to Investigate Was Cured by His Cross-Examination

In addressing Crump's failure to investigate Tender's claims regarding McRae's alleged racial animus, the MAR Court found that not only was additional investigation unwarranted, but that Crump's "effective cross examination" was sufficient to nullify any error. (See 2018 MAR Order at 4 ¶ 4.) As Supreme Court precedent makes clear, however, even a "generally creditable" trial performance cannot excuse an "apparent and pervasive failure" to conduct a reasonable investigation or make an informed decision that further investigation was unnecessary. Kimmelman v. Morrison, 477 U.S. 365, 386 (1986).

During the first trial, Crump learned that the State's case rested on the testimony of Nelson and Tender, and, as evidenced by the focus of his cross-examination of both men at the second trial, he fully understood the weaknesses of their testimony, individually and in combination. Yet, despite that understanding, he did not investigate those weaknesses before the second trial. Instead, as he testified at the 2018 MAR hearing, he decided to rely solely on his cross-examination skills to demonstrate his rejection of the State's case.[75] For example, Crump testified that certain lines from his

---

[75] Crump's cross-examination actually introduced evidence harmful to McRae with no attempt at mitigation or follow up. On his cross-examination of Tender, Crump had

cross examination demonstrated that he was "being firm and showing that [he] questioned what [Tender was] saying" (2-MAR-Tr. 77:24–25), and questioning in a "somewhat of a sarcastic manner . . . implying that [he didn't] believe this" (id. at 78:7–9).

But no measure of firmness or level of sarcasm can reasonably substitute for the evidence Crump would have obtained through the targeted investigation any reasonable attorney would have conducted after the first trial. Indeed, "[a]ny reasonably competent attorney would have realized that pursing [the leads that arose] was necessary to making an informed choice among possible defenses." Wiggins, 539 U.S. at 525. In fact, defense counsel have a general duty "to investigate possible methods for impeaching prosecution witnesses." Hoots v. Allsbrook, 785 F.2d 1214, 1221 (4th Cir. 1986). Given that, Crump was obligated to investigate the leads elicited at the first trial for, if nothing else, impeachment evidence he could have used during his next cross-examination of Nelson and Tender. For example, had Crump conducted even a minimally competent investigation before the second trial, he might have obtained evidence that Tender and

---

Tender read into the record his prior consistent statement. (2-Trial-Tr. 120:20 to 124:13.) Rather than undercutting Tender's testimony, this bolstered Tender by showing his direct testimony matched what he said two years before. Although Tender's earlier statement had been marked for admission into evidence, it was never admitted. Thus, the only reason the jury knew that Tender's prior statement was consistent with his trial testimony is because Crump put it into the record. This also had the impact of allowing Tender to repeat, without challenge, the most harmful facts from his direct examination on cross. (See, e.g., id. at 124:4-6 ("Derrick McRae came to me and said that he was going to kill some of the police.").) Crump however, "thought it was very good cross-examination." (2-MAR-Tr. 78:8.)

McRae were never near each other in the Richmond County Jail, which would have proved that Tender was lying about McRae confessing to him there. Due to the passage of time, the jail placement and movement records are no longer available.

Crump also failed to use the information he already had to conduct effective cross-examinations. For example, he knew from Rankin's mother's testimony at the first trial that the last time she saw Rankin he was nervous and told her that a man named "Dale" was going to "beat his ass." At the second trial, when Rankin's mother again noted that Rankin was nervous but did not mention "Dale" or any other reason for Rankin's nervousness, Crump could have asked about "Dale" but failed to do so, even though he knew the mother's testimony "helped McRae" and showed that Rankin was "nervous about somebody" other than McRae. (2-MAR-Tr. 70–71.)

As Crump failed to conduct an investigation both before and in between the two trials, he was unprepared and unable to deliver effective representation. See Elmore, 661 F.3d at 863 ("[B]ecause the lawyers had twice squandered opportunities to investigate[,] . . . they were unarmed for the battle."). Thus, the only thing Crump could do was attempt to demonstrate his own disbelief and disrespect for the witnesses' testimony through a firm and sarcastic cross-examination, which of course does not satisfy Strickland.

As the Supreme Court has noted, defense counsel's other efforts—such as attempting to undercut a witness's credibility on cross-examination—cannot excuse a failure to investigate. See Rompilla v. Beard, 545 U.S. 374, 381–83 (2005) (finding defense counsel's "number of efforts," including interviewing family members and medical professionals, did not cure their failure to investigate available mitigating

110

evidence); see Kimmelman, 477 U.S. at 385–86 (concluding counsel's competent trial performance could not make up for their failure to conduct a reasonable investigation). The Supreme Court has expressly rejected the argument that defense counsel's performance on cross-examination can "lift counsel's performance back into the realm of professional acceptability" and overcome a failure to conduct pretrial discovery. Kimmelman, 477 U.S. at 385–86.

### 5. The MAR Court Failed to Examine the Totality of Evidence

A defendant is prejudiced by trial counsel's ineffective assistance if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome." Id. Thus, as Strickland makes clear, a prejudice analysis requires an evaluation of "the totality of the evidence before the judge or jury." Id. at 695.

The proper approach is aptly demonstrated in Elmore, where the Fourth Circuit found that the state court unreasonably "broke from Strickland by considering less than the totality of the evidence, and . . . unreasonably discounted evidence favorable to [the defendant] by unduly minimizing its import and evaluating it piecemeal." 661 F.3d at 868. The Fourth Circuit reiterated that failing to properly consider the totality of the evidence—that is, failing to weigh all trial and post-conviction evidence favoring acquittal against the State's evidence of guilt—is an unreasonable application of Strickland. Id. (citing Williams v. Taylor, 529 U.S. 362, 398 (2000)). When the court properly evaluated the trial evidence, along "with the collective evidence that a

111

reasonable investigation . . . would have uncovered," id., it found that the State's case was "underwhelming," thus establishing that counsel's ineffective assistance prejudiced the defendant, id. at 869–71.

Similarly, in Foster, the Sixth Circuit rejected as unreasonable the state court's determination that the defendant was not prejudiced, concluding instead that the information defense counsel failed to investigate "could have potentially tipped the jury to vote for acquittal." 687 F.3d at 709. Of particular note was that "the jury's verdict rested on a narrow ground," having initially deadlocked, thus any additional evidence counsel could have presented "had a strong likelihood of tipping the scales in the other direction." Id. at 710.

Here, the MAR Court failed to properly assess the impact of Crump's ineffective assistance and thus unreasonably applied Strickland. The MAR Court articulated the appropriate prejudice standard, concluding there was "no reasonable probability that, but for Mr. Crump's failure to further investigate . . . the result of the second trial would have been different" (2018 MAR Order at 5 ¶ 5), but it reached this conclusion based on a cursory analysis that failed to consider the weight of the State's case. Although the Court noted that its conclusion was "based on the totality of the circumstances" (id. at 5 ¶ 8), nothing in the Court's Order indicates any such consideration.

The MAR Court instead engaged in precisely the "piecemeal" approach rejected in Elmore, quickly dismissing the evidence Crump could have adduced as "incidental" and "tangential." In so doing, the MAR Court failed to weigh the evidence against the State's case, not considering, for example, how it could have bolstered McRae's alibi defense or

112

undercut Tender's and Nelson's testimonies—some of the only pieces of evidence proffered by the State that purported to connect McRae with the crime.

Although the MAR Court noted that "the majority of jurors in the first trial concluded that the defendant was innocent" (id. at 3 ¶ 6), it failed to consider that this fact demonstrated how narrow of a margin the later conviction stood on and how any additional evidence bolstering McRae's defense could have tipped the scales. In fact, the Court's conclusion that this evidence would not have changed the outcome contradicted its *own* finding of facts—namely, that the majority of jurors in the first trial voted to acquit "*only after the incidental evidence discussed below had also come before them*." (Id.) The Court itself recognized the impact of this evidence toward proving McRae's innocence, yet failed to consider that anything bolstering such evidence could have resulted in a different outcome. Thus, the MAR Court's failure to do so was an unreasonable application of clearly established federal law. See Williams, 529 U.S. at 397–98 (reviewing a state court's decision under § 2254(d) and finding the failure to evaluate all available evidence was an unreasonable application of Strickland).

<div align="center">**CONCLUSION**</div>

Petitioner presents new and reliable evidence of his actual innocence, discovered after trial, which creates a gateway for federal habeas review. As it is more likely than not that a reasonable juror would have reasonable doubt, there is no bar to this Court's consideration of the merits of Petitioner's constitutional claims.

Further, in denying Petitioner's Brady claim, the MAR Court's decision was contrary to, and an unreasonable application of, the clearly established federal law of

<div align="center">113</div>

Brady and its progeny, and based on an unreasonable determination of facts.

Additionally, in denying Petitioner's Napue and Giglio claims, the MAR Court's decision was contrary to, and an unreasonable application of, the clearly established federal law of Napue, Giglio, and their progeny, and based on unreasonable determinations of facts.

Finally, in denying Petitioner's Strickland claim, the MAR Court's decision was an unreasonable application of the clearly established federal law of Strickland and its progeny. Therefore, Petitioner is entitled to habeas relief.

## PRAYER FOR RELIEF

Wherefore, Derrick Jovan McRae respectfully petitions this Honorable Court for the following Relief:

1. An Order pursuant to Habeas Rule 4 directing Respondents to file an Answer;

2. An Order pursuant to Habeas Rule 5 directing the Respondents or, in the alternative, Petitioner, to file copies of the trial transcript, transcripts of post-conviction proceedings, an appellate briefs and opinions;

3. An opportunity to address the Court further through briefing and oral argument;

4. A writ of habeas corpus directing Respondents to free Petitioner or retry him within a reasonable time; and

5. Such other and further relief as seems just and proper to the Court.

Respectfully submitted, this 13th day of July, 2021.

<div style="margin-left:40%;">

/s/ Jamie T. Lau
N.C. Bar No. 39842
Duke University School of Law
Wrongful Convictions Clinic
Box 90360
Durham, N.C. 27708
Telephone: (919) 613-7764
E-mail: jamie.lau@law.duke.edu

/s/ Theresa A. Newman
N.C. Bar No. 15865
Duke University School of Law
Wrongful Convictions Clinic
Box 90360
Durham, N.C. 27708
Telephone: (919) 613-7133
E-mail: newman@law.duke.edu

</div>

115

/s/ James E. Coleman, Jr.
N.C. Bar No. 46900
Duke University School of Law
Wrongful Convictions Clinic
Box 90360
Durham, N.C. 27708
Telephone: (919) 613-7057
E-mail: jcoleman@law.duke.edu

*Counsel for Derrick J. McRae*

## VERIFICATION PURSUANT TO 28 U.S.C. § 2242

I, Jamie T. Lau, solemnly attest that I am an attorney for Petitioner, Derrick J. McRae, in this matter and that I have read the foregoing Petition for Writ of Habeas Corpus and that the same is true to my knowledge except as to those matters alleged upon information and belief, and as to those matters, I believe them to be true.

This 13th day of July, 2021.

/s/ Jamie T. Lau
N.C. Bar No. 39842
Duke University School of Law
Wrongful Convictions Clinic
Box 90360
Durham, N.C. 27708
Telephone: (919) 613-7764
E-mail: jamie.lau@law.duke.edu

*Counsel for Derrick J. McRae*

117

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that the undersigned has this day served the foregoing PETITION

FOR WRIT OF HABEAS CORPUS upon the Attorney General of North Carolina by

depositing a copy thereof, postage prepaid, in the United States mail, addressed as

follows:

The Honorable Josh Stein
Attorney General of North Carolina
<u>Attention: Appellate Section</u>
PO Box 629
Raleigh, N.C. 27602

This 13th day of July, 2021.

<u>/s/ Jamie T. Lau</u>
N.C. Bar No. 39842
Duke University School of Law
Wrongful Convictions Clinic
Box 90360
Durham, N.C. 27708
Telephone: (919) 613-7764
E-mail: jamie.lau@law.duke.edu

*Counsel for Derrick J. McRae*