# EXHIBIT 16

**Affidavit of Dr. Nicole F. Wolfe**

STATE OF NORTH CAROLINA              )
                                     )
                                     )   **AFFIDAVIT OF DR. NICOLE F. WOLFE**
                                     )
DURHAM COUNTY                        )

I, NICOLE F. WOLFE, M.D., being first duly sworn, declare as follows:

1. I am a physician licensed to practice in North Carolina, with a specialty in clinical and forensic psychiatry. Since 1994, I have worked for the State of North Carolina at Dorothea Dix Hospital in Raleigh.

2. In this capacity, I have evaluated hundreds of North Carolina pretrial detainees, among other things, evaluating their competency to stand trial. I have also been sworn into courts as an expert witness in forensic psychiatry well over 150 times.

3. The facts set forth in this affidavit are drawn from my own personal knowledge, with the recollection of some specific details refreshed by referring to the relevant records maintained by my office.

### Mr. McRae's Diagnosis and Treatment

4. I first met Derrick McRae when he was a pretrial detainee in Richmond County, North Carolina, and was sent to Dorothea Dix Hospital for evaluation and treatment in December 1996, about nine months after his arrest. He was not returned to Richmond County until April 1997. I was his assigned evaluating physician during his initial stay at Dorothea Dix and throughout his pretrial hospitalization.

5. During his first period of admission at Dorothea Dix, I diagnosed Mr. McRae as paranoid schizophrenic. He was extremely ill at the time, one of the most severe cases I can recall. On a scale of 1 to 10, with 10 being the most severely ill, I considered him a 10+.

6. After his return to Richmond County in April 1996, Mr. McRae was readmitted to Dorothea Dix in September 1997 and was not returned to Richmond County until November 1997. During that time, he was suffering from severe psychosis.

7. Mr. McRae was admitted to Dorothea Dix for two additional one-month periods leading up to his first trial in April 1998.

8. Some months before his first trial, I first prescribed Haldol for Mr. McRae. Haldol treats hallucinations but does not always remove other symptoms, such as illogical thinking or the "flattened face" appearance. I prescribed both a long-term injection of Haldol (lasting from two to four weeks) combined with daily oral tablets.

1

9. Mr. McRae complained about Haldol's side effects, and, on April 16, 1998, shortly before his first trial, I adjusted the dosage to reduce the strength of the injection and increase the strength of the daily tablets.

10. When Mr. McRae was returned to the Richmond County Jail on April 23, 1998, I emphasized that my assessment that Mr. McRae was competent to stand trial was valid only if Mr. McRae continued to receive the daily dose of Haldol, which had to be administered by Jail personnel. Yet, when he was returned to the Richmond County Jail, the daily dosing ceased.

11. Mr. McRae was scheduled to receive his next Haldol injection on May 14, 1998, three days after the commencement of the second trial, and nearly a full month after the previous injection. Mr. McRae did not receive that injection then or at any point during the second trial.

12. Mr. McRae's condition at the trial (slack face, disinterest), which the prosecutor pointed out to the jury as indicative of lack of remorse, was consistent with both his psychotic state and the effects of Haldol medication he was taking at the time.

## Mr. McRae's Second Competency Evaluation

13. When Mr. McRae was sent to Dorothea Dix for the competency evaluation before his second trial, the hospital staff was ordered to complete the evaluation and all related documentation in two days so that Mr. McRae could be transported back to Richmond County in time for trial, which was starting only a few days later.

14. Two days was a very short turnaround to complete both the evaluation and the documentation. I was unavailable to conduct the evaluation at the time, so it was conducted by Dr. Robert Rollins, who found Mr. McRae competent to stand trial.

15. The day after Dr. Rollins completed the evaluation and paperwork – and only three days before the second trial was scheduled to begin – Mr. McRae told Dr. Rollins that he did not need another Haldol shot and that, in fact, he had never suffered from mental illness. By that time, it was too late for Dr. Rollins to make a determination as to the effectiveness and/or need for another Haldol treatment if he was to meet the court-imposed deadline. Mr. McRae did not receive another shot of Haldol before the second trial.

16. Years after Mr. McRae was convicted, I learned that, shortly before his second trial, he rejected a plea bargain that would have resulted in only a two- to three-year sentence, with credit for time served. Given that he had already served more than two years in pretrial detention, he would have been released immediately or in approximately one year.

17. I did not know of this plea offer at the time Mr. McRae was evaluated before his second trial, and I believe Dr. Rollins did not know of it either.

2

Exhibit 16-2

Case 1:21-cv-00577-LCB-JLW   Document 1-16   Filed 07/13/21   Page 3 of 4

18. Knowing how defendants respond to plea bargains is a critical element in evaluating mentally ill defendants' ability to comprehend the charges against them. Forensic psychiatrists are routinely made aware of plea bargains because of their importance in evaluating a defendant's mental state.

19. Had I known of Mr. McRae's rejection of the plea offer made to him before his second trial, I probably would have found him incompetent to stand trial, but I certainly would have investigated his competency even more thoroughly, including discussing with him the possibility of taking an Alford Plea. I believe Dr. Rollins would have done the same.

20. When Mr. McRae was first admitted to Dorothea Dix Hospital, he was aggressive and combative, but this may have been due to his frustration with being in jail for a crime he always maintained he did not commit.

21. In my professional opinion, drawn from observing hundreds of mentally ill criminals over the years, Mr. McRae's condition (of severe mental illness) was inconsistent with some of the evidence that the State presented against him.

22. A few years ago, I contacted Christine Mumma, the executive director of the North Carolina Center on Actual Innocence, to tell her of the grave concern I had about Mr. McRae's conviction. Ms. Mumma advised me that the Duke Wrongful Convictions Clinic was investigating Mr. McRae's claim of innocence and that she would send the Clinic my contact information. The Clinic later contacted me, and I told them essentially what is contained in this affidavit.

This concludes my affidavit.

_____
Nicole F. Wolfe, M.D.

Subscribed and sworn to before me this 30 day of SEPTEMBER, 2011.

Notary Public _____ Joshua V. Davis

My commission expires: 04-15-2014

3