EXHIBIT O

MAR Hearing Transcript Vol. I (pp 1-151)

STATE OF NORTH CAROLINA     IN THE GENERAL COURT OF JUSTICE

COUNTY OF RICHMOND        SUPERIOR COURT DIVISION

                         FILE NO. 96 CRS 001576


versus                     TRANSCRIPT

                         VOLUME I OF III

DERRICK MCRAE

                         Defendant

_____


Transcript of proceedings in the General Court of
Justice, Superior Court Division, Richmond County, North
Carolina, at the December 1, 2014 session, before the
Honorable David Lee, presiding.



Patrice B. Lee, CVR-CM

Official Court Reporter

Superior Court

**A P P E A R A N C E S**


**ON BEHALF OF THE STATE**

Ryan Haigh, Special Deputy Attorney General

114 W. Edenton Street

Raleigh, NC  27602

Steven M. Arbogast, Special Deputy Attorney General

114 W. Edenton Street

Raleigh, NC  27602


**ON BEHALF OF THE DEFENDANT**

Jamie T. Lau, Esquire

Wrongful Convictions Clinic

210 Science Drive

Durham, NC  27708

James E. Coleman, Esquire

210 Science Drive

Durham,NC  27708

Theresa A. Newman, Esquire

210 Science Drive

Durham, NC  277008

# I N D E X

**WITNESSES FOR THE DEFENSE**                                 **PAGE**

MR. GEORGE E. CRUMP, III

       Direct Examination                              22

       Cross Examination                               61

MR. EDWARD TENDER

       Direct Examination                             115

       Cross Examination                              125

MR. ROBERT VOORHEES

       Direct Examination                             126

**EXHIBITS FOR THE DEFENSE**

1          Discovery Form                               61

2          Discovery Form                               61

3 – 11     Witness Statements                           61

12         Notice to Mr. McRae                          61

13         Attorney Timesheet                           61

14         Motion for Witness                           61

15         Criminal Disposition                         61

16         Criminal Record                              61

17         Transcript of Second Trial                  114

18         Testimony of Mr. Sturdevant                 114

19         Statement by Mr. Tender                     126

1              (The case of the State of North Carolina versus

2              Derrick McRae, Richmond County, File No. 96 CRS

3              001576, was called for hearing on December 1,

4              2014.  The defendant and all counsel are

5              present.)

6         THE COURT:  Good morning.  I apologize for being a

7    little bit tardy.  This is swearing in day for all politicians

8    that were elected to start are sworn in the first Monday in

9    December, so I was in another county this morning.  First,

10   Counsel, if you will state your appearances and we will move

11   forward as expeditiously as we can.

12        MR. HAIGH:   Ryan Haigh, for the State.

13        MR. ARBOGAST:  Steven Arbogast for North Carolina,

14   Your Honor.

15        MR. LAU:  Jamie Lau for Mr. Mcrae and James Coleman

16    for Mr. Mcrae.  Theresa Newman is also making an appearance.

17    She is back with Mr. Mcrae now.  We would ask the Court

18    respectfully to begin this hearing, Mr. Mcrae's family

19    brought clothes for him to wear today, and we would ask that

20    he be allowed to change into those clothes prior to coming

21    out today, with your permission.

22        THE COURT:  I have no problem with that.  As you well

23    know, this is a matter before me and I don't necessarily

24    notice clothes, but if you want to do that, that is fine.

25        MR. LAU:  That would be fantastic.

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1          THE COURT:  Some judges don't appreciate people

2   appearing in court with pants around their ankles or matters

3   of that nature.  I don't look, I guess you should do a better

4   job.  If he's more comfortable in some street clothes, I

5   certainly don't have any problem with that.

6          MR. LAU:  Thank you, Your honor.

7          THE COURT:  It'll take me a little while to get all

8   set up.  Gentleman, how do you want to proceed? Evidentiary

9   hearings and MARs are few and far between, but it's

10  ordinarily my practice, if you so desire, to allow both

11  defense counsel and the State to make opening statements if

12  you wish to do so, in terms of the forecast or prediction of

13  what you believe the real issues boil down to in the case.  I

14  read this file over a period of time, actually, reread the

15  motion  last night, so I'll try to call on my memory to pull

16  in as much of this as we can, but I do want to give you an

17  opportunity to make opening statements if you wish to do that

18  and we can get underway.  Anything else we need to address?

19         MR. LAU:  We actually moved at the beginning of this

20  hearing -- based on some of the State's subpoenas, it appears

21  that they are prepared to call individuals who gave

22  statements to the Rockingham Police Department that didn't

23  testify at trial.  We would move now to exclude any testimony

24  from any witnesses, fact witnesses, who did not appear at

25  trial.  State versus  Peterson makes clear that the

Case 1:21-cv-00577-LCB-JLW   Document 10-16   Filed 12/15/21   Page 6 of 153

1       limitation at such an MAR hearing, and I have that case for

2       you.  It's the evidence directly relevant to a claim that you

3       can't collaterally try to establish that the outcome would

4       have been the same through evidence of guilt that wasn't

5       presented at trial.  So, we would move at the outset on the

6       basis -- I know some of the individuals who gave those

7       statements and did not end up testifying are here  in court

8       today on subpoenas from the State, so we would move to

9       exclude any testimony from those individuals at the outset.

10              THE COURT:  My recollection is some of what the issue

11      here had to do with some statements or information in the

12      State's file that was not turned over, and that some,

13      perhaps not all those people, testified at the trial on

14      behalf of the defendant.

15              MR. LAU:  Only two of those individuals testified for

16      the State.

17              THE COURT:  You have reference now of people -- other

18      than those two?

19              MR. LAU:  People other than those two.

20              THE COURT:  What's the State's position?

21              MR. HAIGH:  Your Honor, I'll stipulate to that.

22      There is nobody in the courtroom here today that we

23      subpoenaed that gave a statement that did not testify.

24              THE COURT:  Sounds like it may be  moot then.

25              MR. LAU:  We'll be in agreement then, Your Honor.

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1          THE COURT:  We will wait just a few minutes for the

2     defendant then.

3          MR. HAIGH:  Your Honor, there is one other thing.

4          THE COURT:  Yes, sir.

5          MR. HAIGH:  If we could sequester the witnesses, Your

6     Honor.

7          THE COURT:  What says the defendant to that request?

8          MR. LAU:  We would object simply for the burden it is

9     on the witnesses to be waiting, not knowing when they're

10     going to be called outside the courtroom.  We don't think

11     that there is anything that they would hear from prior

12     witnesses' testimony that would change the course of the

13     nature of their testimony.

14          THE COURT:  What makes you think that?

15          MR. LAU:  Because each individual is going to be

16     testifying to separate events within their own personal

17     knowledge that doesn't build on the prior testimony of the

18     other witnesses.  With that said, we would imagine that there

19     is no way in which the other witnesses could corrupt those

20     testifying afterwards.  It's a matter of important public

21     significance we have individuals as well who are here to

22     testify who is a state psychologist from Dorothea Dix, a

23     psychiatrist, and her testimony is very unlikely -- as a

24     professional who often testifies on behalf of the

25     prosecution, I can't see any impact on her testimony.  Our

1    position would be that it's unnecessary; but, of course, we

2    would leave it to the Court.

3            THE COURT:  With all due respect to any witnesses who

4    may be out there, I'm not so concerned about the

5    inconvenience of them not being in the courtroom, I guess I'm

6    always erring on -- attempting to err on the side of assuring

7    that there is not a problem in that regard if something does

8    come up through the questioning of a witness here that might

9    be the same general area of inquiry that would be asked of

10   another witness who is here.  I think the better course would

11   be to sequester at least fact witnesses.  What says the State

12   to the -- is it Dr. Wolf or who is that?

13           MR. LAU:  It is Dr. Wolf.

14           THE COURT:  Any problems with Dr. Wolf remaining

15   here?

16           MR. HAIGH:  No, Your Honor, that's fine.

17           THE COURT:  I'm going to allow Dr. Wolf to remain,

18   but I would sequester the other potential fact witnesses.  In

19   order to do that and make it stick better or have some record

20   of it, I need to know who that is and I need to speak with

21   them and be sure they understand what the rules are with

22   respect to sequestration.  Do you have a list of those who

23   you are asking to be sequestered?

24           MR. HAIGH:  Your Honor, we haven't been provided a

25   list of Mr. McRae's witnesses.

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1          MR. LAU:  The two witnesses that would impact today

2     would be Mr. Edward Tender as well as Robert Voorhees.  Those

3     are the two individuals who will be testifying of the folks

4     who are here today.  They will testify should time allow.

5     Michael Parker will also be here later today, the former

6     elected DA of the prosecution district, so he would also be

7     an individual that would be subject to that court order.

8          THE COURT:  So Mr. Voorhees and Mr. Tender are in the

9     courtroom right now?

10          MR. LAU:  Yes.  Mr. Tender is here.  Mr. Voorhees has

11     not arrived yet.

12          THE COURT:  Mr. Tender, I am going to ask that you --

13     when we actually get into the process of hearing testimony,

14     unless you are the first witness called, I'm going to ask

15     that you step out of the courtroom.

16          If we can make some accommodation for him, Sheriff,

17     somewhere else on this floor.

18          We want you to be comfortable, but just out of the

19     abundance of caution, I'm going to ask that you not be in here

20     while these other fact witnesses are testifying.  After you've

21     testified, you're welcome to stay as long as you'd like.  Once

22     you've testified, there is no bar to your being present for

23     further testimony.  Do you understand that? Anything else?

24          MR. HAIGH:  Nothing from the State, Your Honor.

25          MR. LAU:  Nothing further.

1           THE COURT:  We will just wait for the defendant to

2    come out.

3           THE COURT:  The Sheriff makes a good point ladies and

4    gentlemen, this is a specially commissioned session of court

5    for the purposes of hearing a motion for appropriate relief

6    filed on behalf of Derrick McRae, so you may have been

7    subpoenaed or you may be a defendant in the regular ongoing

8    session of criminal Superior Court which is in the next

9    courtroom, in the big courtroom, it' Courtroom E I believe it

10   is.  Make sure you're in the right courtroom.  If you have some

11   involvement with the McRae matter, you are in the right place.

12   If you have other matters in Richmond County of a criminal

13   nature this morning, then you're probably not in the right

14   place.  You need to be in the next courtroom, so just be aware

15   of that.

16          Thank you, Sheriff.

17          MR. LAU:  Your Honor, I apologize, if I may,

18    Mr. Thurmond Nelson has arrived in the courtroom.  He is also

19    a witness that has been subpoenaed.  My understanding is both

20    by the defense and the State, so accommodations would also

21    have to be made for Mr. Nelson as well.  Of course, any other

22    witnesses that the State may have, we would ask likewise that

23    they be.

24          THE COURT:  All right.  Where is Mr. Nelson?

25          MR. LAU:  He's in the white shirt in the back row,

                        PATRICE B. LEE, CVR-CM
                        OFFICIAL COURT REPORTER

1  Your Honor.

2  THE COURT:  Okay.  Mr. Wilson, you may have come in

3  late, excuse me, Mr. Nelson, you may have come in late, but

4  I'm going to allow the motion that's been made to sequester

5  the witnesses, so that when we start taking evidence, unless

6  you're called as the first witness, I'm going to ask that

7  you, along with Mr. Tender, be outside of the courtroom and

8  remain outside of the courtroom until you are called to

9  testify.  Do you understand that?

10  THE WITNESS:  Yes, sir.

11  MR. HAIGH:  Your Honor, the only other witness that I

12  see in the courtroom is Mr. Crump.  He's been subpoenaed by

13  the State.

14  THE COURT:  All right.  And what's your position?

15  MR. LAU:  We anticipate calling Mr. Crump at the

16  outset of the evidentiary hearing.

17  THE COURT:  All right.

18  MR. LAU:  So there will be no need to sequester him.

19  THE COURT:  Good morning, Mr. Crump.  You may stay

20  with us then.  You may remain after you testify.  Give me

21  just a minute to get this computer set up.  All right.  Let

22  the record reflect that the defendant, Mr. McRae, is present

23  in the court with us this morning.

24  Good morning, Mr. McRae. I'm doing well.  I hope you

25  are.

1          Also, Ms. Newman has joined us.  Good morning, Ms.

2    Newman.

3          MS. NEWMAN:  Good morning.

4          THE COURT:  As I explained to counsel before you

5    folks came in, it's my practice to allow you, if you wish to

6    do so, to make a brief opening statement before we actually

7    get into the evidentiary hearing.

8          So, Mr. Lau or any of your colleagues, if you wish to

9    make an opening statement on behalf of the defendant, I'll be

10   glad to hear one.

11         MR. LAU:  Yes, Your Honor, but apparently we have

12   another witness who has shown up.

13         THE COURT:  Okay.  All right.

14         MR. LAU:  I'm afraid this may occur throughout the

15   day, but Mr. Voorhees has arrived, so we would ask that he be

16   accommodated by the Sheriff.

17         THE COURT:  Where is Mr. Voorhees?

18         THE WITNESS:  Yes, sir.

19         THE COURT:  Mr. Voorhees, a motion was made earlier

20   that witnesses be sequestered in this matter; that is, they

21   be outside of the courtroom during the testimony of other

22   fact witnesses, and you are on that list, so unless, and

23   until you are called to testify -- once the actual testimony

24   commences, I'm going to need to ask that you remain outside

25   of the courtroom until you are actually called as a witness.

1    Once you have been called and testified, you may remain or

2    you may, with the consent of counsel, be released from your

3    subpoena, but until then, we need to ask that you remain

4    outside once the testimony starts.  You're welcome to stay

5    until, I believe, the defendant intends to call Mr. Crump.

6    So, when he's called for, I will need to ask you, as well as

7    these other witnesses whom I've already spoken to, just

8    remain outside of the courtroom until you are called.

9            THE WITNESS:  Yes, sir.

10           THE COURT:  All right.  Thank you.

11           MR. LAU:  Your Honor, this case involves several

12   claims of a constitutional nature and 15A 1420(c)(5)of the

13   General Statutes describes the burden that must be

14   established at this proceeding with respect to those claims,

15   and we must show by a preponderance of the evidence that

16   those constitutional violations have occurred.  After we've

17   made that showing, the burden then shifts onto the State to

18   show, by clear and convincing evidence, that it was a

19   harmless error.  That Mr. McRae would have been convicted

20   despite the constitutional violations which occurred.  I

21   submit to this Court that the evidence is going to clearly

22   show that those constitutional violations occurred.

23           Mr. Crump will get up and he will testify to

24   statements that he did not receive from the prosecutors in this

25   case.  Statements that from the state's very own filings were

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1  inconclusive and conflicting.  The States says they're

2  conflicting.  They are inconsistent and conflicting with

3  respect to Mr. Nelson.  We submit to you they are inconsistent

4  and conflicting with respect to Mr. McRae as well.

5         The case that guides these claims is Kyles v Whitley

6  which was decided by the U.S. Supreme Court in 1995.  In that

7  case, very similarly, witnesses who didn't testify gave

8  inconsistent statements to the police.  The Court found that

9  those were material, and part of the reason they found that

10 they were material was it showed a remarkably uncritical

11 attitude by law enforcement with respect to their

12 investigation, that had the jury known, the jury was

13 unlikely -- or there was a reasonable probability that the

14 outcome would have been different at trial.  Importantly, in

15 Kyles versus Whitley, similar to Mr. McRae's case, the Courts

16 reference back to the first trial, the trial in which the jury

17 was hung.  There was a mistrial declared.  They said that in

18 light of the inconsistent statements from witnesses, like in

19 this case who never testified, in light of those inconsistent

20 statements, they showed that the Government's case was much

21 weaker than that case heard by the first jury that was hung and

22 a mistrial was declared.

23        Thus, they said they had to be material.  They had to

24 be prejudicial to the defendant to not have those statements.

25 Here, you will see, like in Kyles, a remarkably uncritical

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1    attitude by law enforcement investigating this case.  You will

2    see numerous statements that were taken together, one perhaps

3    could be true, but it's not one statement was truth, all of the

4    remaining statements were false.  Yet, there was no attempt to

5    establish which, if any, of these statements were actually

6    true.  Mr. Crump never had the materials to challenge the

7    investigation in this case.  Kyles is instructed in that matter

8    as well.  Kyles says you don't have to call those witnesses

9    themselves to give testimony, you can challenge law enforcement

10   with those statements and you can challenge their

11   investigation.  In Kyles, the evidence -- there was in these

12   statements, inculpatory evidence like in the statements we have

13   here.  Yet Kyles says that's irrelevant because of what it

14   shows about the police investigation, and here you are going to

15   hear a lot about the police investigation in this case.

16               Second, you will hear Mr. Edward Tender take the

17   stand, and he's going to say, regrettably, during a period of

18   time he was an alcoholic -- a period of time when his life was

19   spiraling out of control -- because of his alcoholism, he did

20   what, unfortunately, criminal defendants do at times, he made a

21   statement which was false implicating Derrick McRae in this

22   case, and as a result of that statement he benefited by serving

23   no time in jail when charged with numerous felonies.

24   Mr. Tender -- you'll also hear that two charges, despite a

25   comprehensive plea agreement that resolved all those felony

1  charges -- two charges were held open for a period of two

2  years, and those charges were not resolved until two weeks

3  after Mr. Tender gave testimony favorable to the State.

4          The burden on us, with respect to a recantation, is

5  to demonstrate to this Court that the recanting witnesses'

6  testimony today is likely to be true -- more likely to be true

7  than the testimony that was given at trial.  In addition to

8  Mr. Tender, you're going to hear the State's very own

9  psychiatrist describe the medical records in this case,

10  describe the pretrial holding of Mr. McRae where he was

11  observed on a 24-hour basis for months prior to his trial as

12  the defendants tried to render Mr. McRae competent by getting

13  him on the right regimen of medications.  During the course of

14  those observations -- contrary to what Mr. Tender's testimony

15  was at trial, that Mr. McRae was this black militant adhering

16  to Stokely Carmichael and Malcolm X intent on killing white

17  people -- he made no references to race at any time.

18          Now, these are not interviews from law enforcement,

19  this is observations from the staff at the State's hospital,

20  and he doesn't even know what time that they are paying

21  attention to him, yet, zero references at all, zero indication

22  that there was any racial prejudice from Mr. McRae.  In

23  addition to that, the medical records -- when he's well

24  medicated, appropriately medicated and at times when he's

25  experiencing psychosis - indicate that he was withdrawn, a

loner, not someone to talk to others.  Unlike the testimony

from Mr. Tender, that Mr. McRae approached him, talked

regularly to individuals while incarcerated and told him about

the crime.

In addition, during that period of time, he

consistently maintained to anyone, when asked, his innocence in

the case, clearly demonstrating that Mr. Tender's testimony

would have been completely out of character for Mr. McRae and

there is nothing to corroborate and support his testimony.

THE COURT:  All right.  Thank you.

MR. HAIGH:  Your Honor, the State will reserve its

opening statement to just prior to us presenting evidence.

THE COURT:  Okay.  All right.  Evidence then on

behalf of the defendant.

MR. LAU:  The defense calls Mr. George Crump, Your

honor.

THE COURT:  Mr. Crump, if you will come up please,

sir.

The witness, Mr. Crump, was sworn and testified

as follows to the examination of counsel.

THE COURT:  Are there any others in the courtroom who

were subpoenaed in this case other than Dr. Wolf?  Seeing

that there are none, I believe that all the other witnesses

--

THE BAILIFF:  We have one, Judge.

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1          THE COURT:  Yes, sir.  Your name?

2          THE WITNESS:  Jeremy Sturdevant.

3          THE COURT:  Jeremy Sturdevant?  Is he subpoenaed?

4          MR. HAIGH:  I believe that the State may have

5    subpoenaed Mr. Sturdevant, Your Honor.

6          THE COURT:  All right.  Mr. Sturdevant, I've

7    explained to these others that, because you're a potential

8    fact witness, we are asking that all of those witnesses,

9    other than the  witness who is testifying, remain outside of

10   the courtroom until you are called.  You will need to remain

11   with us, but if you will just remain outside, there are

12   several others out there that are under the same order.

13         MR. HAIGH:  Your Honor, if I may, it sounds like

14   Dr. Wolf will actually be presenting fact testimony as

15   opposed to expert testimony based upon the opening statement,

16   and so, I'd ask that she be removed from the courtroom.

17         THE COURT:  All right.  What do you say to that

18   Mr. Lau?

19         MR. LAU:  Yes.  I don't think we ever indicated that

20   she would be doing anything other than that.  As a clinical

21   psychiatrist, I don't believe that she would be corrupted by

22   any of the prior testimony or that her viewpoints would

23   change with respect to any of the prior testimony that she

24   hears.

25         MR. HAIGH:  Your Honor --

                    PATRICE B. LEE, CVR-CM
                    OFFICIAL COURT REPORTER

1          THE COURT:  I'm sorry.  I thought I understood you to

2     say that you did not have an objection to Dr. Wolf.

3          MR. HAIGH:  And that was based upon my understanding

4     that, you know, she was going to provide expert testimony

5     which would allow her to hear the testimony of other people,

6     Your Honor.

7          THE COURT:  Okay. Let me ask that Dr. Wolf be

8     sequestered as well.

9           Dr. Wolf, I'll ask that you try to find a

10    convenient place for you to remain.

11         DR. WOLF:  I actually do think that my testimony is

12    still related to my giving expert testimony.

13         MR. LAU:  There would be some opinion that she would

14    give based on -- or her position as a State Psychiatrist, an

15    expert in psychiatry.

16         THE COURT:  Sure.

17         MR. LAU:  So it would go to the fact witness as well

18    as expert witness.

19         THE COURT:  I guess my point is, would her testimony,

20    as an expert, be the same whether she's in the courtroom or

21    not?  Wouldn't it be the same?  Wouldn't you expect it to be

22    the same?

23         MR. LAU:  Can I take a minute to confirm with Ms.

24    Wolf?

25         THE COURT:  Sure.

1          MR. LAU:  Thank you very much, Your Honor.  If I may,

2    having talked with Dr. Wolf, there are two things that we

3    would like to inform this Court of.  She believes strongly

4    that having reviewed Mr. Tender's prior testimony with

5    respect to Mr. McRae, what he purportedly told Mr. Tender,

6    that it would be important to her professional opinion to

7    hear Mr. Tender's testimony.  Moreover, she also will talk

8    about Mr. McRae's behavior over that two-year period, and the

9    fact that he consistently maintained his innocence during

10   that period, and she thinks it is extremely relevant to her

11   testimony to hear the nature of the environmental stressors

12   that he was under as a result of this investigation, the

13   testimony regarding that investigation when she's giving that

14   testimony, and it would be our position that she should be

15   here for that testimony given that that's going to impact the

16   professional opinion she may have with respect to how those

17   stressors impacted Mr. McRae and how they relate to his

18   persistent declarations of innocence while at the State's

19   psychiatric hospital.

20          THE COURT:  What says the state?

21          MR. HAIGH:  A couple of things, Your Honor.  First

22   and foremost, what is proposed by Mr. McRae'ss counsel is

23   that a witness will be commenting on the veracity of the

24   testimony of another witness which is not permitted.

25   Moreover, the doctor was not -- we were not notified of the

1    expert witness testifying in this case and given the lack of

2    notice, I believe that she will be precluded from testifying

3    in any expert context anyway.

4         MR. LAU:  Your Honor, with regard to notice,

5    obviously, Ms. Wolf has been active in this case that the

6    State is well aware of.  Additionally, the State, at the

7    respective competency hearing, stipulated and had in its

8    possession the entire records that Ms. Wolf will comment on

9    from Mr. McRae's pretrial detention.  So, any suggestion that

10   they have been unable to prepare for Ms. Wolf testifying

11   today would be a result of their own lack of diligence, not a

12   result of their not having any formal notice.  There is

13   nothing in post conviction that says we have to give the

14   State notice that Ms. Wolf is going to testify and again, I

15   emphasize that the State had the very records that Ms. Wolf

16   is going to talk about and their lack of preparation is not

17   our problem.  It should be the State's onus to go through the

18   case, to learn the case, to learn the materials in the case,

19   and at the retrospective competency hearing, they were

20   provided the very materials that Ms. Wolf has provided.

21        THE COURT:  I'm a little concerned that you suggest

22   the State lacks preparedness or that they ought to do things

23   in a certain manner, Mr. Lau.  I think the State has brought

24   a latitude of discretion, as do most any attorneys who appear

25   in court do, what they think is in the best interest, in this

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1    case, of the State, but I am -- did you have anything further

2    that you wanted to add?

3              MR. HAIGH:  Just briefly, Your Honor.  The issue of

4    competency, to which the doctor testified to, has already

5    been resolved.  It was resolved years ago.  The matter to

6    which she was involved isn't a matter before the Court.  If

7    you look at the claims in the MAR, and you stated that you

8    have, there is nothing in there that resurrects any of those

9    claims associated with the state of mind of the defendant or

10   his competency, so based upon that, I don't even see how that

11   would be relevant, Your Honor.

12             THE COURT:  In my discretion, I'm going to allow her

13   to remain here to the extent that she hears other fact

14   witnesses and may herself testify to facts in the case.  I

15   think I'm tasked with determining the veracity and

16   credibility of testimony, and I will view that in light of

17   the knowledge that she is in the courtroom when others are

18   testifying.  So, I am going to allow her to remain.  Anything

19   further?

20             MR. HAIGH:  Nothing from the State Your Honor.

21             THE COURT:  All right.  Mr. Crump, having been duly

22   sworn, he is your witness, Mr. Lau.

23                          **DIRECT EXAMINATION**

24   BY MR. LAU:

25        Q    Good morning, Mr. Crump.  First for the record, can

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1  you state your full name for the court?

2       A     George E. Crump, III.

3       Q     And Mr. Crump, how are you currently employed?

4       A     I'm a general practitioner and that's my sole

5  occupation, and it's my full-time occupation.  I practice here

6  at Rockingham.

7       Q     And how long have you been practicing here at

8  Rockingham?

9       A     I have practiced since August 31st 1977.  I'm on my

10 38th year.

11      Q     And during the course of your practice, was there a

12 time that you became known to Mr. McRae?  That you met

13 Mr. McRae?  That you would have represented Mr. McRae?

14      A     I met Mr. McRae on or about March 26, 1996.  I had

15 been appointed to represent him on a murder case.

16      Q     At that point in time, had you represented other

17 individuals with respect to murder cases?  Or was this

18 something that you were experiencing new?

19      A     I represented quite a few people on murder cases.  I

20 got off the State court appointed list in 2006, and I've

21 continued to do a substantial amount of federal criminal law

22 since then.  Prior to 2005, I tried ten murder cases to a jury,

23 and that's where ten times a jury was impaneled.  One of those

24 cases was a mistrial with Derrick McRae.  One case was a

25 capital murder case which at the end of six days, the defendant

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1   pled guilty to second-degree murder.  One case was a capital

2   murder case where I was the lead attorney, one case was a

3   capital murder case where I was second, but I have tried ten.

4   I counted Derrick McRae as two, but I've tried ten murder cases

5   to a jury.

6       Q    So, for the record, from March 26, 1996, when you

7   began representing Mr. McRae, on or about that time, you

8   represented him through the course of both of his trials in the

9   case in question?

10      A    That's correct.

11           MR. LAU:  May I approach, Your Honor.

12           THE COURT:  Yes.

13  BY MR. LAU::

14      Q    Mr. Crump, can you identify the document that I

15  handed to you?

16      A    Yes.  This is a discovery form, and it is a typical

17  discovery form that the district attorney's office of this

18  district would use back in the mid-90s, and it's a discovery

19  form stating what discovery the district attorney's office

20  furnished to me and when they furnished it to me.

21      Q    And is this a true and accurate copy of the form that

22  you have in your file from Mr. McRae's case?

23      A    It is.

24      Q    And have you had an opportunity, prior to today, to

25  review your file and to determine that it indeed contained all

1    the materials that are listed here on the general felony

2    discovery report?

3        A    No.  But let me rephrase that it's actually a

4    surprise answer.  I have -- I reviewed my discovery file with

5    very close attention to whether a number of statements which

6    the defendants presented attorneys were furnished to me, and

7    those particular statements were not in my file.  So, I have

8    gone through my files several times -- I went through my file

9    at length about an hour and 45 minutes in late 2010, and then I

10   went through them again a little over a month ago, but in going

11   through my file -- what I'm particularly paying attention to is

12   did the state -- did the district attorney's office furnish me

13   those particular statements that Derrick McRae's present

14   lawyers furnished to me.  For example, I did look and see if

15   there was a map in my file.

16       Q    So we'll come back to that if you don't mind, but let

17   me ask you another question off this general felony discovery

18   form.  If you look at the column entitled Faith Giving, it says

19   2-26-1996 in that column, do you believe that you received

20   discovery in this case on 2-26?

21       A    No, I didn't.

22       Q    And why is it that your understanding is that you

23   didn't receive discovery in this case on February 26, 1996?

24       A    I believe I was appointed after February 26, 1996.

25       Q    Do you recall the date in which Mr. McRae was

1    arrested?

2        A    He might have been arrested on February 26, 1996 or

3    thereabout.  My best recollection without going through a file

4    is that Derrick McRae was arrested at the end of February 1996.

5        Q    So, he was arrested at the end of February 1996,

6    based on your recollection?

7        A    That's correct.

8        Q    If I may Mr. Crump, can you identify the document

9    that I've just handed you?

10        A    This is a document signed by Mr. Crawford who was the

11    assistant district attorney stating that they handed or

12    furnished me discovery on the 18th day of November 1996 by

13    placing copies in my mailbox.  In my mailbox would be the

14    mailbox in Richmond County, Clerk of Courts Office.

15        Q    Can I take you back to Defendant's Exhibit One, the

16    general felony discovery form, the last column that says Notes.

17    Is there a date on there that corresponds to this receipt of

18    discovery --

19        A    Yes.

20        Q    -- or is close in time to this receipt of discovery?

21        A    According to this discovery document, I was furnished

22    oral statements on November 17, 1996.

23        Q    Now, is that your handwriting?

24        A    No.

25        Q    On this general form of discovery?

                    PATRICE B. LEE, CVR-CM
                    OFFICIAL COURT REPORTER

1       A    No.

2       Q    So, is it possible that you received this general

3  felony discovery form sometime after November 17, 1996?

4       A    I would believe -- it would be my belief that that's

5  correct.  That this was put in my box on or about November 17,

6  1996.

7       Q    And yet you did not write that --

8       A    I didn't write that.

9       Q    -- on there, did you?  Thank you.  Now, you had an

10 opportunity to review several statements in this case?

11      A    That's correct.

12      Q    That's correct.  Before we get to those statements,

13 if I may, I'd like to hand you another document.  Would you

14 mind identifying the document marked Defendant's Exhibit Three

15 for the Court.

16      A    Yes.  This is the substance of the oral statements

17 which were attributable to Derrick McRae arising out of this

18 murder case which was furnished today by the State of North

19 Carolina, and it is dated November 17, 1996.

20      Q    And this substance of all statements -- do you

21 recognize the handwriting?

22      A    That's my handwriting.

23      Q    Now, is this a true and accurate copy of the

24 substance of oral statements that you --

25      A    That is true and correct.  It's true and correct.

                    PATRICE B. LEE, CVR-CM
                    OFFICIAL COURT REPORTER

1    Q    It's true and correct.  If you wouldn't mind, can you

2 tell me what you're doing here?  Can you explain to the Court

3 why you have these handwritten notations here?

4    A    Okay.  Let me make a general answer.  The State --

5 I'll also answer for myself, if the Court be pleased.  The

6 State has a duty to furnish to defense counsel defendant's

7 written statements --

8         MR. HAIGH:  Your Honor, I'm going to object at this

9    point.  That calls for a legal conclusion and the witness is

10   commenting on the laws as opposed to fact.

11        THE COURT:  I'll take that into account, but I'm

12   going to overrule the objection for the purposes of this

13   hearing, but I'll try to separate the wheat from the chaff at

14   the appropriate time.

15   A    And also the substance of oral statements by the

16 defendant, which the State intends to introduce into evidence.

17 I take the statement furnished to me, November 17, 1996, and

18 I'm trying to divide this up and figure out where a statement

19 begins and where a statement ends.  They have compiled all

20 statements into one paragraph.  No separation, no attribution

21 of person one, person two, person three, and I'm trying to

22 figure out, in representing Derrick, who made these statements

23 and the context.  And I just analyzed it.

24 BY MR. LAU:

25   Q    And at that point in time, you said you're trying to

1   figure out who made the statements?

2       A    That's right.

3       Q    When you were given, or asked by post conviction

4   counsel about the statements, which we'll discuss individually

5   next -- that they presented to you in post conviction, did you

6   have those statements?

7           MR. HAIGH:  Objection.  Vague, Your Honor, as to what

8    statements.

9           THE COURT:  All right.  I'm going to give you an

10    opportunity to clarify that because I'm not square on what

11    you're asking.  If you can be more specific, I'll certainly

12    allow you to make that inquiry.

13          MR. LAU:  Certainly, Your Honor.

14  BY MR. LAU:

15      Q    Mr. Crump, you were asked by Mr. McRae's post

16  conviction lawyers to review certain statements in this case.

17  Do you recall what statements those were?

18      A    Yes.

19      Q    And can you tell the court what statements you were

20  asked to review?

21      A    The -- Derrick McRae's present attorneys --

22          MR. HAIGH:  I'm sorry, Your Honor, it looks like the

23    witness has brought materials up with him on the stand.  I

24    ask that those be removed.

25          THE COURT:  Mr. Lau, what's your position with

Case 1:21-cv-00577-LCB-JLW  Document 10-16  Filed 12/15/21  Page 30 of 153

1    respect to this.

2         MR. LAU:  I'm happy to rephrase, Your Honor.  I

3    certainly think that it's contemporary to use notes if he

4    wants to testify from them or something that he can testify

5    from.  I would gladly rephrase with his own affidavit if the

6    Court would like me to proceed in that manner.

7         THE COURT:  At this point, based on your objection,

8    if you want to look at what he's got here, I will let you do

9    that.

10        MR. HAIGH:  Thank you, Your Honor.

11        THE COURT:  And we will take time to let you review

12   whatever, but then I'm going to allow him to keep them.

13        MR. HAIGH:  Certainly.  Okay.

14        THE COURT:  Mr. Lau, since you may not have reviewed

15   these, you may certainly do so as well.

16        MR. LAU:  Thank you.

17             (Attorneys review Mr. Crump's records.)

18   BY MR. LAU:

19        Q    Mr. Crump, do you still have the exhibits?

20        A    I have Exhibit Number Two.

21        Q    So, one and three --

22        MR. LAU:  Your Honor, we're prepared to proceed, I

23   believe, if the Court is.

24        THE COURT:  All right.  You've had an opportunity to

25   review all of that?

                    PATRICE B. LEE, CVR-CM
                    OFFICIAL COURT REPORTER

1          MR. HAIGH:  Yes, Your Honor.

2          THE COURT:  Yes, sir.  You may continue.

3    BY MR. LAU:

4      Q    I'm going to go at this a little differently if I

5    may.  Mr. Crump, I'm handing you several statements

6    individually marked as Defense Exhibits 4 through 11.  If you

7    wouldn't mind, can you identify Defendant's Exhibit Number 4

8    for the Court?

9      A    Defendant's Exhibit Number 4 is a statement signed by

10   Corey Robinson and dated March -- looks like March -- I'm going

11   to guess March 1, 1996.

12     Q    Did Mr. McRae's post conviction attorneys ask you to

13   review your file for whether or not you had this statement

14   marked Defendant's Exhibit Number 4?

15     A    McRae's lawyers did request that of me.

16     Q    And did you have those statements?

17     A    No, I did not.

18     Q    Were you given this statement by the State prior to

19   Mr. McRae's trial?

20     A    No, I was not.

21     Q    And how can you be so sure of that?

22     A    This is a highly material piece of evidence.  Where

23   was the gun involved in the killing?  And in my investigation,

24   I had gathered that the defendant, Corey Robinson -- the

25   defendant, Derrick McRae, had sold a gun or given a gun to

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1    Corey Robinson.  This statement is diametrically different and

2    this statement is that Corey Robinson got this gun from Julio,

3    which would be Julio Sturdevant, so that's an extremely

4    material difference that I would have been aware of.  Also, I

5    talked to Corey Robinson and I went to his residence with my

6    investigator, and as best I recall, got an evasive answer, a

7    polite, evasive don't know anything type answer.  And if I had

8    had this, I would certainly have confronted Corey Robinson with

9    well what was Julio's involvement.  It's just the way I would

10   have questioned if I had had this statement.

11       Q    Now, you said through your investigation you heard of

12   the possibility that Derrick McRae sold a gun to Corey

13   Robinson?  Is that --

14       A    That's correct.

15       Q    Now, did you establish that as a fact or was that

16   based on rumor?  What --

17       A    That's just some kind of rumor and I'm talking to --

18   don't know where I got it.  I did get -- well, I don't know

19   where I got it, I'll say that.

20       Q    You didn't get that from Mr. McRae, did you?

21       A    No.

22       Q    And Mr. McRae, during the course of your

23   representation, steadfastly maintained his innocence throughout

24   the period of time that you represented him?

25       A    That's correct.

1    Q    Is there another reason that you know you did not

2  receive this statement?  Do you recall what it was -- the

3  policy of the District Attorney's Office -- was at the time

4  with respect to discovery they had turned over?

5           MR. HAIGH:  Your Honor, I'm going to object at that

6    point.

7           THE COURT:  Well, I'm going to let him answer the

8    question.  It's really two questions.  I think the latter one

9    is the one you want him to answer?

10          MR. LAU:  Yes, Your honor.  I'll rephrase.

11          THE COURT:  That's all right.   I'll let you rephrase

12   it.

13 BY MR. LAU:

14   Q    Did you have personal dealings with the District

15 Attorney's Office during this period of time as the defense

16 attorney?

17   A    Yes.  Until about 2008 when I got off the State Court

18 appointed list, I just had a regular and daily interaction with

19 all my district attorneys.

20   Q    And based on your personal experience with the

21 District Attorney's Office, did you become familiar with their

22 practices with respect to discovery?

23   A    Yes.

24   Q    Can you describe what those practices were?

25   A    The practices in the mid-90s, when Ken Honeycutt

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1    was district attorney, and also the practices --

2            MR. HAIGH:  I'm sorry, Your Honor, I'm going to

3    object at this point as it goes to propensity which is

4    improper.

5            THE COURT:  Okay.  I'm going to let him testify as to

6    what his knowledge was of the procedural process.

7            Go ahead, Mr. Crump.

8    A    The practice then was the absolute minimum.  The

9    absolute minimum that the District Attorney's Office would not

10   give any more than the statute requires, I mean the North

11   Carolina General Statutes.  They just give the absolute

12   minimum, the written statements of the defendants, oral

13   statements that they intended to introduce into evidence, and

14   this Defendant's Exhibit Number 3.  They would jumble up the

15   oral statements where you had to -- defense attorney had to

16   guess and speculate.  I mean, they wouldn't put it on like six

17   different pages or paragraphs.  I mean, it's a shell game.

18   Q    Can you turn to Defense Exhibit Number 5 and identify

19   what Defense Exhibit Number 5 is?

20   A    Defense Exhibit 5 is a statement from Darius Lockard

21   dated February 21, 1996.

22   Q    And did Mr. McRae's counsel ask you to review your

23   file to determine whether or not you received Defense Exhibit

24   5?

25   A    Yes, attorneys did so.  I reviewed my files and this

1   statement was not in my file prior to trial.

2       Q    Did you receive this statement prior to trial?

3       A    No.

4       Q    Can you identify Defendant's Exhibit 6?

5       A    Yes.  This is a statement from Larry Parker dated

6   February 27, 1996.

7       Q    And were you asked by Mr. McRae's counsel to review

8   your files to determine whether or not you had received

9   Mr. Parker's statement?

10      A    I was so asked.

11      Q    And had you received Mr. Parker's statement?

12      A    No, I did not.

13      Q    And did you receive Mr. Parker's statement prior to

14  trial?

15      A    No, I did not.

16      Q    Had you ever seen it before Mr. McRae's counsel asked

17  you to  review your file for --

18      A    I never saw this prior to sometime in the latter part

19  of 2010.

20      Q    And at that point, what happened in the latter part

21  of 2010?

22      A    At sometime, it might have been mid 2010, counsel

23  furnished me with these statements -- it might be six months

24  before -- and counsel asked me for an affidavit.  I was

25  extremely sick, the sickest I've ever been in my life.  I had

1   pneumonia four years ago right now.  I was just unbelievably

2   sick, and I wanted to finish out the year which my secretary --

3   I normally give my secretary a good Christmas vacation.  I

4   wanted this out at the end of the year, and again, I spent

5   about an hour and 45 minutes going through my file and gave an

6   affidavit that these weren't in my file.

7       Q    Now, your affidavit said that it was your strong

8   opinion that these were not provided?

9       A    It's more than a strong opinion.

10      Q    Can you describe that.  I mean, do you know with

11  certainty that you did not receive these from the State?

12      A    Okay.  The ones that you just asked me about, I'm as

13  certain as anything that I didn't receive those.

14      Q    And will you move on to Defendant's Exhibit 7.  Can

15  you identify Defendant's Exhibit 7?

16      A    Defendant's Exhibit 7 is a statement from Serena

17  Parker and it's dated March 31st -- no, I apologize.  It's

18  dated February 27, 1996.

19      Q    And were you asked to review your file --

20      A    I reviewed my file.  I didn't have it in it prior to

21  trial.

22      Q    Did you receive it from --

23      A    I received it from -- in sometime in 2010, as best I

24  recall, it might have been six months, it might have been

25  longer before that affidavit was given.

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1      Q     And if you would, can you identify for the Court

2  Defendant's -- and we'll try to speed up a little --

3  Defendant's Exhibit 7?

4      A     Well, 7 I just answered.

5      Q     I'm sorry, 8.

6      A     Eight is a statement from Marlen Maurice Dumas dated

7  February 26, 1996.

8      Q     And can you identify Defendant's Exhibit 9?

9      A     Nine is a statement from Michael Anthony Ferguson

10 dated March 1, 1996.

11     Q     And can you identify Defendant's Exhibit 10?

12     A     Defendant's Exhibit 10 is a statement from February

13 27, 1996 by Paul Montes Williams.

14     Q     And if you could, Defendant's Exhibit 11?

15     A     Defendant's Exhibit 11 is a statement from Tonya, I'm

16 not sure of the middle name, Clark and it's dated February 28,

17 1996.

18     Q     Now, with respect to Defendant's Exhibits 8 through

19 11, did you have an opportunity to review your file to

20 determine whether or not --

21     A     I did.  I did not have those.  I did not have

22 Defendant's Exhibits 4 through 11 in my file prior to the two

23 trials when I represented Derrick McRae before a jury in the

24 Spring 1998.

25     Q     Have you had an opportunity to review the statements?

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1      A    I have.

2      Q    And having reviewed the statements, do you have a

3    personal opinion as to whether or not they would have been

4    material to Mr. McRae's defense?

5      A    They are all material with different degrees of

6    weight.  Some of them I would put a lot of weight on, but they

7    are all material because they are pieces of the puzzle, and I

8    would question each one of them -- had an investigator and we

9    would try to talk to them.  It would have made it so much

10   easier talking to somebody if you had a statement they made to

11   law enforcement, but some of them -- they are all material, but

12   some of them have greater weight; some of them lesser weight.

13     Q    Is there anything that stands out when you say some

14   of them have greater weight?  Can you describe which, if

15   anything, stands out to you about these statements?

16     A    Well, there are four of them that are very

17   significant.  The first one that is significant is from Corey

18   Robinson, and until I really studied -- in the last month,

19   restudied this file, I was always under the impression, from

20   the street or somewhere --

21     Q    Which files?

22     A    My file.

23     Q    In this case?

24     A    In this case.  I was always under the impression that

25   the evidence was, or the rumor was, that Derrick sold a gun to

1　Corey Robinson, and it's profoundly different that Julio

2　Sturdevant sold a gun to Corey Robinson, that's night and day,

3　so that's a profound difference.  And there are three

4　statements that are very profound to me or very significant and

5　those are Larry Parker, Maurice Dumas, and Serena Parker.

6　　　　Q　Can you explain why each of those are very profound

7　to you or important to you?

8　　　　A　In my past opinion, my opinion 1998, it's just -- in

9　order for the State to get a conviction against Derrick, I

10　think the State needs to place Derrick at the scene of the

11　crime.  That's extraordinarily important.  There is no

12　circumstantial evidence that Derrick did it.  Derrick had an

13　extraordinarily strong alibi and some way he's got to be placed

14　at the scene of the crime for a jury to convict, and these

15　three statements place him at the scene.  Larry Parker placed

16　him at the scene, Serena Parker places him at the scene, and

17　Maurice Dumas places him at the scene, but they are three

18　inconsistent statements.  Larry Parker places the gunshot at

19　10:34.  A little bit after that, Serena Parker places the

20　gunshot at 11:30, and Maurice Dumas places the gunshot at

21　12:30.  So, these are three people who place him at the scene,

22　and they are three inconsistent statements.  And they are so

23　inconsistent that you have to think about well, what's the

24　credibility of the State's evidence.  Also, this was brought

25　out on cross-examination; the State never brought this out.  It

1   was critical the time of death.  When was the last time we saw

2   Jerry Rankin alive, and he was alive -- his mother talked to

3   him at 10:20.  I know that was her testimony on the second

4   trial.

5           My notes reflect that on the first trial she saw --

6   halfway between Hamlet and Rockingham at 10:20, she then drives

7   home and this Larry Parker is of the most -- he is so certain

8   as to the facts that he asserts that Derrick -- that Jerry

9   Rankin came to his house at 10:34 and that's almost an

10  impossibility.  It's just very critical.  Here is somebody

11  giving the State evidence that's just wrong.  I mean, either

12  he's wrong or Jerry Rankin's mother is wrong.  One of them is

13  wrong, and it goes to credibility.  The other thing is during

14  this trial, the State was trying to show motive, and the motive

15  was Jerry Rankin comes on JFK in a red truck --

16          MR. HAIGH:  Your Honor, I'm going to object to

17   nonresponsive at this point.  He's commenting on the state of

18   mind of another person as well.

19          THE COURT:  I'm going to sustain that at this point.

20          Mr. Crump, just let him ask his next question.

21  BY MR. LAU:

22   Q   Mr. Crump, if you knew that the State's file included

23  witnesses that gave several inconsistent statements, as you've

24  testified to, would that have impacted how you represented

25  Mr. McRae?

                        PATRICE B. LEE, CVR-CM
                        OFFICIAL COURT REPORTER

1     A     Of course it would have.

2     Q     And in what way?

3     A     You've got to investigate Larry Parker, Maurice

4  Dumas, and Serena Parker.  And particularly, Larry Parker is

5  just a wrong statement.  You want to know, you know, was there

6  any pressure to bear on him when he gave the statements, how

7  he's correct, and the question is how many people were

8  involved?   Larry Parker -- I want to say Larry Parker said six

9  were there and Serena Parker said three.  It might have been

10 reversed, but it's a profound difference between Derrick McRae

11 and Thurmond Nelson being involved in this crime and a group

12 being involved.  There is a profound difference.

13    Q     So, you would have questioned the State's

14 investigation?

15    A     Oh, yes.

16          MR. LAU:  May I approach, Your Honor.

17          THE COURT:  Yes.

18 BY MR. LAU:

19    Q     Mr. Crump, I'm going to hand you what's been marked

20 Defendant's Exhibit 12.  Can you identify Defendant's Exhibit

21 12 for the Court?

22    A     It's a notice that I gave to Derrick McRae, and I

23 wanted it in writing, and I wanted it witnessed to completely

24 tell my evaluation of this case to this young man.  And I did

25 that on - I went over that with him on April 23, 1998, and his

1  first trial started on or about April 27, 1998.

2      Q    Is this a true and correct copy?

3      A    It's correct.

4      Q    If you wouldn't mind turning to Page 4 of Defendant's

5  Exhibit 12, the notice to Mr. McRae.  On the top of Page 4 it

6  says, Forecast of Evidence?

7      A    That's correct.

8      Q    Would you read that section of your notice for the

9  Court?

10     A    Yes.  "In the event that Derrick McRae decides to

11  plead not guilty and have a trial, George E. Crump, III makes

12  the following forecast of what he thinks the State's evidence

13  may be and also what Derrick McRae's evidence may be.  The

14  Assistant District Attorney named Scott Brewer, who will try

15  the case and prosecute the case on behalf of the State of North

16  Carolina, told George E. Crump, III on Monday, April 20, 1998,

17  that he had three witnesses who will testify that Derrick McRae

18  admitted to each of them that Derrick McRae shot and killed

19  Jerry Rankin.  Assistant District Attorney Scott Brewer also

20  said there is one eyewitness who will testify that he observed

21  a Derrick McRae involved in the shooting of Jerry Rankin.

22  Assistant District Attorney stated these four witnesses are in

23  addition to the codefendant, Thurmond Nelson.

24          Based on the information and belief, it is George E.

25  Crump, III's opinion that Thurmond Nelson did make an

1 incriminating statement to the police about Derrick McRae.

2 Based on information believed, George E. Crump, III believes

3 that Thurmond Nelson told the police that Derrick McRae

4 admitted to him that Derrick McRae shot and killed Jerry

5 Rankin.  It is the opinion of George E. Crump, III, and this is

6 just a guess, that Thurmond Nelson will not testify against

7 Derrick McRae, but that the State will call at least a couple

8 of people to say Derrick McRae admitted shooting Jerry Rankin,

9 and the state will call an eyewitness who will testify that he

10 saw something incriminating relating Derrick McRae to the death

11 of Jerry Rankin.

12        Derrick McRae has consistently told George E. Crump,

13 III, that he did not shoot Jerry Rankin.  He states he was at a

14 cookout on Friday evening, October 13th and that his brother

15 and his brother's buddies got some liquor and that Derrick

16 McRae was drinking and got very sick.   Derrick McRae had to

17 be helped home and Derrick McRae was asleep all evening and

18 came home sick, remained in his house from approximately 9 or

19 10 pm Friday, October 13th until the next day October 14th.

20 There are three family members who stated that they are ready

21 to testify to the above facts on behalf of Derrick McRae.

22 These family members are Derrick McRae's mother, brother and

23 sister.  There are four nonfamily members who were present at

24 the cookout who state the same thing that Derrick McRae has

25 stated.  These four persons are Antoine Rush, Jeremy

1  Sturdevant, Jermaine Cobbs, and Renée Dockery."

2      Q     Did Mr. Brewer name these witnesses?

3      A     No.

4      Q     He didn't tell you who the witnesses were?

5      A     No.

6      Q     If you had Defendant's Exhibits 4 through 11, would

7  you have changed the forecast of this evidence?  Would it have

8  been included -- the information provided in the statements?

9            MR. HAIGH:  Objection, Your Honor.  It calls for

10   speculation.

11           THE COURT:  I'm going to let him answer if he has an

12   opinion about that.

13     A     It's not a speculation, but it's a little bit

14  different answer.  The forecast of evidence would actually have

15  been substantially the same, however, the recommendation of

16  counsel -- let me back that up.  In all likelihood, I would

17  have put down the people's names.  It was so important.  This

18  is a young man, 16, 17 years of age, I'd put down the people's

19  names.  What would have been different, I tend to think, is my

20  recommendation.  I recommended that Derrick McRae take a plea

21  agreement, and I don't know that I would have made that

22  recommendation if I had those three statements; and again, this

23  is an impressionable 16-year-old person.  I'm an experienced

24  lawyer, and I don't know that I would have made that

25  recommendation, or that strong recommendation.  It would have

1   been more left to him because his case would be a much better

2   case than I had thought it was led to believe by the Assistant

3   District Attorney, Scott Brewer.

4           Also, very critical are Maurice Dumas' statement that

5   they were arguing.  If there was any way I could have made an

6   argument on second-degree murder and maintained his argument,

7   that would have been very critical if I  could get a net

8   underneath him.

9   BY MR. LAU:

10      Q    Mr. Crump, I'm handing you what's been marked

11  defendant's Exhibit 13.  Is it possible for you to identify

12  Defendant's Exhibit 13 for me?

13      A    Defendant's Exhibit 13 is my time sheet, and I-- when

14  these two cases were over, I submitted one time sheet and it's

15  dated May 14, 1998.  That was the second (inaudible), and I

16  wanted to get paid.  You're a sole practitioner -- I'm

17  laughing, but I see I got that fee certificate in that same

18  week.  When you're a sole practitioner, you know, it's hard to

19  ride 171 hours, I chuckle, I got that fee form in that same

20  week for the judge to sign and get it in the mail, but this is

21  my application and I had attached to it my time sheet.

22      Q    Now, if you turn in your time sheet to Page 3 on

23  12-3-1997, it's the third row down from the top and it begins

24  with, Visits Residence, can you find that?

25      A    Yes.

1    Q    Would you mind reading that for the Court?

2    A    Visits residences of Mrs. Rankin, Jeremy Sturdevant,

3    Tony Ferguson, attempted to locate Darius Walker.

4    Q    Now, you previously testified that you did not

5    receive the statements of Tony Ferguson or the statements of

6    Darius Lockhart, correct?

7    A    No, I did not.

8    Q    So, when you are visiting them on 12-3-1997, do you

9    know what their previous statements were to the police?

10   A    I don't know.  I can't testify that I talked with

11   them on that date.  If you look at the next -- what I might

12   have been doing -- it's just 45 minutes, that's a lot to do in

13   45 minutes.  What I might have been doing was getting the

14   groundwork to investigate later with those two private

15   investigators.  I might have talked with them or I might not

16   have, but I doubt very seriously I talked to Mrs. Rankin, but I

17   might have talked to Jeremy.  I might have talked to Tony, I

18   might not have.

19   Q    Let me ask you this.  Does this change your opinion

20   of whether or not you received those statements from the State?

21   A    I didn't receive the statements.

22   Q    Thank you.  And Corey Robinson's name is also here on

23   your time sheet.  Knowing that, does that change your opinion

24   as to whether or not you received Corey Robinson's statement?

25   A    No.  It just reinforces it because if I had his

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1  statement, I wouldn't be out there on Hummingbird Drive just

2  trying to get an evasive answer.  I would have said, "Now,

3  Corey, you told Officer such and such you bought the gun from

4  Julio, tell me what happened."

5       Q    Let me point your attention to one more entry on your

6  time sheet.  It's on Page 2, it's the third entry up from the

7  bottom dated 9-30-1997.

8       A    Yes.

9       Q    Can you read what your activity was on 9-30-1997?

10      A    Discussed plea negotiations with Ken Honeycutt, 30

11  minutes.

12      Q    And this is an accurate description of what you did

13  in this case?

14      A    It's not a perfect description.  Let me qualify that.

15  I had on this case 171 hours and 30 minutes.  I don't pad my

16  time sheet.  And I had on that date, 9-30-1997, 30 minutes on

17  the case, and the primary thing that I did in that 30 minutes

18  was talk with Ken Honeycutt, and I very well may have talked to

19  him 30 minutes.  Now, I didn't talk to him 35, I don't cheat

20  myself, and also, I didn't have 20 minutes, you know, but the

21  primary thing I did on 9-30-1997 was talk to Ken Honeycutt.

22           Let me say this, what my practice is.  I would take

23  files over there -- my office was right across the street.  I

24  wouldn't just take one file, count ten minutes walking over

25  there, talk for ten minutes, walk back, and put down 30

1  minutes.  I would take a series of files, normally, and I very

2  well may have talked to him the whole 30 minutes or I might

3  have been sitting there.  He might have asked an assistant to

4  go get a file, but in substance, I talked to Ken Honeycutt a

5  significant portion, if not all, of 30 minutes on September

6  30, 1997.

7       Q    Thank you.  And that was about Mr. McRae's case,

8  correct?

9       A    Yes.

10          MR. LAU:  If we could just have a minute, Your Honor.

11          THE COURT:  Well, I'll tell you what, we're going to

12     take about ten to 15 minutes, and I know I probably shouldn't

13     be commenting on the evidence at this point, but I am

14     encouraged to know that, at least his testimony is, that he

15     does not pad has time nor does he cheat himself when

16     reporting his time.  (Laughter)  We'll take about a 15 minute

17     break.

18               (Court in recess for break.)

19          THE COURT:  All right.  You may continue.

20  BY MR. LAU:

21      Q    Mr. Crump, I'm going to hand you what's been marked

22  as Defendant's Exhibit 14.  Can you identify this exhibit for

23  the Court?

24      A    This is a motion entitled Motion for Identity of

25  State's Witnesses, and it is dated April 17, 1998.

                    PATRICE B. LEE, CVR-CM
                    OFFICIAL COURT REPORTER

1    Q    And what was the purpose of your filing this motion?

2    A    I didn't remember that I filed it.  It's a good

3 motion though.

4    Q    Would you mind taking a minute to review it and see

5 if it refreshes your recollection?

6    A    It's a good motion.  It makes the allegation that the

7 issue in the defendant's guilt or innocence will be resolved

8 with great degree based on the credibility of State's witnesses

9 and opportunity of State's witnesses to accurately perceive and

10 observe events, and that it's necessary for the defendant to

11 get up there at trial -- it's necessary for the defense to

12 investigate the backgrounds and osmosis of the State's

13 witnesses and also makes this point, which is a good point,

14 that the defendant had been found incompetent to stand trial on

15 three separate occasions.  So, it's of paramount importance to

16 be able to interview the State's witnesses.

17    Q    We've been through this.   So, would you have filed

18 this if you had the witness statements?

19    A    I probably would have.  I probably would have.  A

20 case of this nature, I probably would have.  I probably would

21 have.

22    Q    I'm handing you what's been marked as Defendant's

23 Exhibit 15.  Can you identify Defendant's Exhibit 15?

24    A    This appears to be a criminal disposition of Edward

25 Lewis Tender.

1    Q    And during the course of your representation of

2  Mr. McRae, would you have investigated Mr. Tender's criminal

3  background?

4          MR. HAIGH:  Your Honor, I object at this point.

5    Foundation hasn't been laid for this exhibit.

6          THE COURT:  All right.  I'll sustain that.

7          MR. LAU:  If we could have a minute, Your Honor.

8          THE COURT:  All right.

9  BY MR. LAU:

10   Q    Mr. Crump, are you familiar with Defendant's Exhibit

11 15?  How these are produced?

12   A    Yes.

13   Q    What takes place before something like this,

14 Defendant's Exhibit 15, before a copy is provided to counsel,

15 what would you do?

16   A    This is an informal bar, and all the defense

17 attorneys have a good relationship with the clerk's office.

18 We've always had a good clerk's office, and I would just go

19 down to the clerk's office -- and I remember talking to Jane

20 Karicka, and I would just ask could I have Edward's record,

21 Edward Tender's record.  She would run it off, and they

22 wouldn't hesitate and certify it as a true copy.

23   Q    Now, you recognize that stamp on these?

24   A    It's stamped a true copy.

25   Q    And what does that stamp mean?

1      A     It means that it is true and correct.  That this

2  clerk, Yvette Popps, got these records from the clerk's office,

3  on the clerk's computer as to Edward Lewis Tender.

4      Q     Is this similar to what you would receive from the

5  clerk's office when you ask the clerk's office for a criminal

6  record check?

7      A     It is.  I may or I may not get it certified.  And I

8  have no reason to doubt authenticity.  If I was going to

9  introduce it into evidence, I would get it certified.  I might

10 get the record check without it being certified.

11     Q     Can you just describe what type of information is

12 reflected in these, perhaps?

13     A     You generally had the -- you had the file number, you

14 had the charge, you had, normally, the date of offense, and you

15 had the disposition date in the sentence, just the skeleton

16 information about a case.

17     Q     Can you find Case Number 96, CR 352?

18     A     I can.

19     Q     I believe beginning on Page 30?

20     A     That's correct.

21     Q     And on that record, can you identify the charge?

22     A     Yes.  It's the case of Edward Lewis Tender, and he

23 was charged with felonious breaking or entering.

24     Q     And on what date was that charge resolved?  When is

25 the final disposition of that charge?  Is that reflected in

1    this record?

2         A    It is, but I don't see it right now.  That

3    disposition date is March 28, 1996.

4         Q    Is there another charge for File Number 96, CR 352?

5         A    Yes, it is.  There was also an additional charge,

6    felonious larceny after breaking and entering.

7         Q    And do you see the disposition date for that charge?

8         A    March 28, 1996.

9         Q    And is there another charge for 96 CR 352?

10        A    Misdemeanor probation violation.

11        Q    And you see the disposition date for charge?

12        A    May 28, 1998.

13        Q    You remember when Mr. McRae was found guilty in this

14   case?

15        A    The first trial was April 27, 1998, and I don't know

16   whether it was a four-day trial or three day trial.  Probably a

17   four-day trial.  So, you're talking about the end of April.

18   The second trial it began, over our objections, two weeks

19   later, and that would be on or about May 11, 1998.  And I don't

20   think the trial started, the second -- on the second trial

21   until the second day maybe in the afternoon, maybe about the

22   lunchtime and my fee form, which I remember well, I turned in a

23   fee form on May 14, 1998.  So, it would be my educated guess

24   that that second trial ended May 14, 1998.

25        Q    You wouldn't turn in your fee form until the

1   completion of the trial?

2       A   No, I wouldn't, but I would be -- again, is sole

3   practitioner, by myself, you need these fees, and I would --

4   here's what's critical is, I was trying to get to the judge

5   before an out-of-town judge left, not to come back for a month

6   or six weeks.  So, and normally a judge may hang around for a

7   couple of hours, and if my fee form is May 14, 1998, a very

8   educated guess is that the case ended -- it says date of

9   disposition May 14, 1998.

10      Q   I was going to say can you turn to Page 7, and does

11  that refresh your recollection on when it was that Mr. McRae's

12  case ended?

13      A   May 14, 1998.

14      Q   Thank you.  Can you find Offense Number 96 CR 424?

15      A   Yes, I can.

16      Q   If you wouldn't mind, can I back you up to that last

17  page?

18      A   Okay.

19      Q   Does this record also indicate who is the prosecutor

20  for the State with regards to that misdemeanor probation

21  violation?

22      A   Well, the Assistant DA has initials SB.  And in all

23  probability that would be Scott Brewer.

24      Q   Now, if you can go to the 96 -- did you know any ADA

25  within the district that had the same initials SB?

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1     A    It's conceivable there was somebody else.  I can't

2 think of anybody with a S.  You have Sophia Crawford, and

3 Jonathan Hicks, Michael Parker --

4     Q    So, no one comes to mind?

5     A    No one comes to mind.

6     Q    Let's move on to Record Number 96 CR 424.  Can you

7 read the charge?

8     A    Obtaining property by false pretense.

9     Q    And its disposition date?

10    A    March 28, 1996.

11    Q    And is there another charge with the same file

12 number?

13    A    Misdemeanor probation violation.

14    Q    And do you have the disposition date of that offense?

15    A    May 28, 1998.

16    Q    Does it list the ADA who handled the misdemeanor

17 probation violation?

18    A    The ADA had the initials SB.

19    Q    If you don't mind going back to Page 2.  I'm sorry

20 Page 3, which is the first record 96 CR 352 for felonious

21 breaking and entering.  That was disposed of on 3-28-1996.

22 Does that list the initials of a prosecutor there?

23    A    The initials SB.

24    Q    And that was resolved in March of 1996, correct?

25    A    That's correct.

Case 1:21-cv-00577-LCB-JLW   Document 10-16   Filed 12/15/21   Page 55 of 153

1     Q    And turning the page to the felony larceny, does that
2  list the prosecutor as well?

3     A    SB.

4     Q    Thank you.  And if you would, returning to the first
5  charge for File Number 96 CR 424, which was the obtaining
6  property by false pretenses disposed of on March 28, 1996, is
7  there a prosecutor listed there?

8     A    SB.

9     Q    SB?

10    A    S as in Scott, B as in Brewer.

11    Q    Thank you very much.  Mr. Crump, I'm handing you
12 what's been marked as Defendant's Exhibit 16.  Can I ask you to
13 identify Defendant's 16?

14    A    Yes, sir.  Criminal record check for Thurman Nelson.

15    Q    And do you recognize the stamp at the bottom
16 right-hand corner?

17    A    Yes.

18    Q    And what does that stamp indicate?

19    A    It indicates this is a true and correct copy of these
20 matters obtained of these convictions for Thurman Nelson.

21    Q    Now, when Mr. Nelson testified in Mr. McRae's case,
22 did you conduct a criminal record or criminal history on
23 Mr. Nelson or did you ask the clerk's office, as you previously
24 testified, for Mr. Nelson's criminal record?

25    A    I cannot remember running a record check on Thurman

1    Nelson.

2         Q    Okay.

3         A    I just can't remember.  I'm sure I asked him what he

4    had been tried and convicted of, that would be an educated

5    guess.

6         Q    Okay.  Now, look at Defendant's Exhibit 16.  If I can

7    turn your attention to Page 4, which is 96 CR 9369.  Can you

8    identify the charge with respect to 96 CR 9369?

9         A    Can I have just a minute.

10        Q    Sure.

11        A    What's the question?

12        Q    Can you identify the charge?

13        A    The charge is a misdemeanor possess stolen goods.

14        Q    And does this indicate an offense date?

15        A    The offense date was November 27, 1996.

16        Q    And do you understand that to be after the arrest of

17   Mr. McRae and Mr. Nelson?

18        A    Yes.  It is.

19        Q    It is after.  But sometime after Mr. Nelson was

20   arrested, as a codefendant in the case with Mr. McRae, he was

21   then cited for possession of stolen goods?

22        A    That's right.

23        Q    And do you see the disposition date here?

24        A    The disposition date was January the 9th 1997.

25        Q    Would it have been important to you knowing

                    PATRICE B. LEE, CVR-CM
                    OFFICIAL COURT REPORTER

1 Mr. Tender's record at the time he testified?

2     A    Is this Mr. Tender or Mr. Nelson?

3     Q    I'm sorry.  Mr. Nelson.  Thank you.

4     A    This is -- I respectfully disagree with Judge

5 Stillman, and I was aware of this, and what was amazing to me

6 was that a young man is charged with murder, commits a

7 subsequent offense and just stays out on bond.

8     Q    Let me go back if you would, with respect to 96 CR

9 9369, does the CR have any meaning to you?

10     A    I believe that all files in Richmond County start off

11 with a CR, probably throughout the state.  When the file

12 reaches a Superior Court level, an 'S' would be added and it

13 would be CRS.

14     Q    Now, if I ask you to turn the page, would you mind

15 turning the page and can you read the file number on the next

16 page?

17     A    You have a CRS.

18     Q    And it's 96 CRS 9369, right?

19     A    That's correct.

20     Q    And can you tell me the charge there?

21     A    Here you have a felony possessed stolen goods, felony

22 possessed stolen goods, so these are felonies.

23     Q    And what's the disposition date?

24     A    The disposition date here is August 26, 1998.

25     Q    And the offense date?

Case 1:21-cv-00577-LCB-JLW   Document 10-16   Filed 12/15/21   Page 58 of 153

1     A     The offense date was the same, November 27th 1996.

2     Q     So, on November 27, 1996, the offense is committed

3 and that's after the individuals are arrested and this is

4 resolved before or after Mr. McRae's trial?  Do you know?

5     A     It appears that Thurman Nelson was charged with three

6 offenses occurring on November 27, 1996.  Two of them were

7 felonies.  One of them was a misdemeanor, and the misdemeanor

8 was the misdemeanor possession of stolen goods.  It's a typical

9 practice on the misdemeanor for attorneys in this district to

10 stipulate -- to plead not guilty, stipulate the guilt, the

11 judge to find guilt on the misdemeanor and appeal it up, and

12 that way you have all three pending in Superior Court and

13 normally, one or more of those is going to wash out.  It's

14 going to be disposed of one way or the other.

15     Q     So, after that's appealed through the Superior Court,

16 then it's set once again on the court calendar?

17     A     It would go on the Superior Court calendar.

18     Q     And it wasn't resolved until --

19     A     It was not resolved until August 26, 1998.

20     Q     Thank you.  If I could move you forward to 96 CRS

21 6547, which is Page 9 in the record.

22     A     Okay.

23     Q     Can you describe the charge on 96 CRS 6547?

24     A     The charge is carrying a concealed gun.

25     Q     And do you see the offense date?

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1    A    August 24, 1996.

2    Q    Now, is that before or after you understand

3  Mr. Nelson to have been arrested for first-degree murder?

4    A    That would have been after.

5    Q    And do you see the disposition date with respect to

6  this charge?

7    A    The disposition date on this is January 15, 1997

8  which is before --

9    Q    Are you looking at CRS -- 96 CRS?

10    A    No.  I'm looking at CR.  If I turn over to CRS, you

11  got a disposition date later, August 26, 1998.

12    Q    So, that would be the same --

13    A    It's probably the scenario that the misdemeanors are

14  someway appealed up to Superior Court.

15    Q    So, the file resolution was in Superior Court?

16    A    That's right.  In August, 1998.

17    Q    And if I could direct your attention to 97 CRS 1880.

18  Have you found that record?

19    A    Yes.

20    Q    Can you tell me what -- can you tell me which charge

21  is listed under 97 CRS 1880?

22    A    Drive left of center.

23    Q    Now, is there a second charge associated with that

24  file anywhere on the next page?

25    A    Carrying a concealed weapon.

Case 1:21-cv-00577-LCB-JLW  Document 10-16  Filed 12/15/21  Page 60 of 153

1     Q    What's the offense date of that charge?

2     A    March 7, 1997.

3     Q    Is that after Mr. Nelson was arrested for

4  first-degree murder along with Mr. McRae?

5     A    That's correct.

6     Q    What's the final disposition date on 97 CRS 1880?

7     A    August 26, 1998.

8     Q    Is that after Mr. McRae's trial?

9     A    That's after.

10    Q    You practiced in this district for a long time,

11  haven't you?

12    A    I have.

13    Q    Is it the common practice to have someone out on bond

14  for first-degree murder picked up twice while carrying a

15  concealed weapon?

16    A    Let me backtrack.  I might have made a mistake.  I

17  was arguing -- it might have been on the two carrying a

18  concealed weapon charges -- I was trying to get buys, and it

19  might have been on those two charges that I was arguing rather

20  than the shoplifting case, but --

21       MR. HAIGH:  Your Honor, I'm going to object at this

22   time.  It calls for speculation and that goes to somebody

23   else's state of mind.

24       THE COURT:  I'm going to sustain that objection.  You

25   don't need to answer that, Mr. Crump.

PATRICE B. LEE, CVR-CM<br>
OFFICIAL COURT REPORTER

1          MR. LAU:  If we may.

2          THE COURT:  Yes.

3          MR. LAU:  Defense has no further questions, Your

4    Honor.  We would move to admit Defense Exhibits 1 through 16

5    into the court record.

6          THE COURT:  All right.  Let those exhibits be

7    admitted.

8                (Defense Exhibit Nos. 1 through 16 were

9                admitted.)

10         THE COURT:  Cross-examination.

11         MR. HAIGH:  Yes, sir.

12                      **CROSS EXAMINATION**

13   BY MR. HAIGH:

14        Q    Now, Mr. Crump, you mentioned that you did ten murder

15   cases up through 2005.  At the time of Mr. McRae's murder case,

16   how many murder cases have you done at that point?

17        A    I was trying so many murder cases that -- basically I

18   tried murder cases in the 1990s.  I tried a capital murder

19   case December 1996, where I was a lead attorney, and that was

20   after I got appointed to this case, and he's on death row right

21   now.  I then was second chair in a capital murder case in

22   February of 1997.  The lead attorney was in another case, and I

23   was primarily gathering the evidence on that case.  I then

24   tried a case by myself, I think, in April of 1997, and then I

25   tried, a year later, I tried Derrick the first time and Derrick

1   the second time.  I tried five murder cases in 18 months.

2       Q    Okay.  Now, you were only lead counsel on two murder

3   cases prior to Derrick McRae's first case, isn't that right?

4       A    No.  That is not right.

5       Q    I'm sorry.  So, how many were you lead counsel in

6   prior to Derrick McRae's case?

7       A    Without being smart, I had so many murder cases.  I

8   don't know how many, and the DA's office so many times would

9   just charge somebody with capital murder, and I had quite a few

10  murder cases that were pled out.  They were capital murder

11  cases that weren't true capital murder cases.  There was

12  another case -- this is kind of interesting, I just thought

13  about this.  I tried a capital murder case in front of a jury

14  that I'm not even counting, you know, they set it up as a

15  capital murder case, then it comes back second degree.

16           MR. HAIGH:  Your Honor, I'm going to call

17    nonresponsive at this point.

18       Q    Can you just answer the question in terms of how many

19  cases were you lead counsel on prior to this that actually went

20  to trial?

21       A    It would be two.

22       Q    Okay.  Now, with your experience, presumably, you had

23  a methodology by which you would keep track of the discovery

24  that came to you by the State in each case?

25       A    Yes.

                    PATRICE B. LEE, CVR-CM
                    OFFICIAL COURT REPORTER

1      Q    Did you have a ledger that you would use or something

2   of that --

3      A    No.  No.

4      Q    What was your methodology?

5      A    I have a six part folder, and it's going to be in one

6   of those sections.

7      Q    Okay.  But you don't have a primary document that you

8   would list when you received each document?

9      A    No.

10     Q    So, it's fair to say that you don't have any record

11   of what you received when?

12     A    I have an excellent record.

13     Q    Can you please share with the State your record?

14     A    I have a six part folder.  In one section I have my

15   work file, one section I have motions and orders, another

16   section I have discovery, then I have another section mental

17   health, then I have another section first trial and second

18   trial.  It's just in a six part folder.

19     Q    Right.  But you're saying that you don't have any

20   record of when you got each piece of discovery from the State,

21   do you?

22     A    I had no reason to --

23     Q    It's a yes or no question, sir?

24          THE COURT:    All right.  Don't be argumentative.

25          Can you answer that yes or no?  Do you have a record

                    PATRICE B. LEE, CVR-CM
                    OFFICIAL COURT REPORTER

1  of when --

2      A    The answer is yes for what Sophia Crawford gave to

3  me.  She's Assistant DA.  I got it Xeroxed, it's in my file,

4  and I had no reason to disbelieve Sophia Crawford.

5  BY MR. HAIGH:

6      Q    So, the only record that you have is something that's

7  prepared by somebody else, is that right?  Yes or no, sir.

8      A    That's substantially true.

9      Q    Thank you.

10         MR. HAIGH:  Your Honor, may I approach.

11         THE COURT:  Certainly.

12  BY MR. HAIGH:

13      Q    I'm showing you what's previously been marked for

14  identification purposes as State's Exhibit 1.  Do you recognize

15  that?

16      A    I do.

17      Q    Have you seen that before?

18      A    I have.

19      Q    And that is -- can you please identify that for the

20  Court?

21      A    This is a written statement by Thurman Nelson dated

22  March 1, 1996.

23      Q    And do you recall that statement being entered into

24  evidence in Mr. McRae's first trial, April 27, 1998?

25      A    I assume it was, but I don't -- I make that

1    assumption.

2         Q    I'm showing you what's been marked as State's Exhibit

3    2, and that's front and back, sir.  Do you recognize that?

4         A    I don't know that I've seen this before.  I didn't

5    sign -- it's a -- State's Exhibit Number 2 is an evidence log

6    that the clerk signs just verifying what was introduced into

7    evidence, and it shows that Thurman Nelson's statement was

8    introduced into evidence.

9         Q    Okay.  And the date on that is what?  May 1, 1998?

10        A    Where?  It's the date released May 1, 1998.

11        Q    Okay.  Now, you were the attorney of record in the

12   first case, is that correct?

13        A    That's correct.

14        Q    So, you were, obviously, made aware of Mr. Nelson's

15   statement on that date if you hadn't received it before, isn't

16   that right?

17        A    In the second trial.

18        Q    Let me back up, sir.  This is the --

19        A    I don't have a transcript of the first trial.  I do

20   have a transcript of the second trial.  In the second trial, I

21   cross examined Thurman based on his statement.  I obviously had

22   the statement in the second trial, and I assume -- I have no

23   reason to believe I didn't have the statement in the first

24   trial.

25        Q    Okay.  Now, in looking over your file for preparation

1   for today, did you find Mr. Nelson's statement in your file?

2        A    It was not in my file, and that was not in my file,

3   but I was furnished a copy.  I either -- I may not have

4   received a file, but during my representation of Derrick McRae,

5   I had this in my hand, and I reviewed it and then cross

6   examined Thurman.  It might have been that I just put it back.

7        Q    Okay.  But you are speculating on that.  You really

8   don't know one way or the other?

9        A    That's right.  That's right.

10       Q    Now, what, if any, witness statements or copies of

11  witness statements did you have in your file that were provided

12  by the State?

13       A    I had a one page defense copy substance oral

14  statements.  That's what I had.

15       Q    So, you didn't have any individual statements

16  whatsoever, is that your testimony?

17       A    That's my testimony.  Furnished from the State.

18       Q    I'm showing you what's been marked as State's Exhibit

19  3, and now, the statement of Maurice Dumas that you testified

20  to on direct, this is the statement you are referring to, is

21  that right?

22       A    Rephrase the question.

23       Q    Okay.  On direct examination, you referred to a

24  statement provided by Ms. Dumas, isn't that right?   Mr. Dumas,

25  I apologize?

1      A     I call him Maurice Dumas.

2      Q     Okay.  And this is the same statement, is that right?

3      A     I assume it is.

4      Q     Okay.  Now, I want to start with the first page,

5  fourth line, I'm sorry, fifth line from the bottom.  I'm going

6  to read that and please tell me if it's correct.  'Derrick had

7  what looked like a .380 handgun.'  Did I state that correctly?

8      A     That's what this statement says.

9      Q     Okay.  Now, on the second page, I want to start about

10  seven or eight lines down with 'Derrick walked on the

11  right-hand side of that line.'  Do you see where that starts?

12      MR. LAU:  Objection, Your Honor.  The purpose of this

13   is to try to establish the veracity of the statement

14   inculpatory evidence.  The purpose of this hearing is whether

15   or not Mr. Crump received the statement or not.  It's not a

16   matter of what's necessarily within the statement,

17   inculpatory to Mr. McRae.

18      MR. HAIGH:  Your Honor, on direct, one of the things

19   that was an issue, clearly, is that how Mr. Crump would have

20   responded to having these statements, and he said that they

21   were material.  He already testified on their nature.

22   Moreover, when you're looking at an alleged Brady violation,

23   one of the things to consider is, you know, A. Whether it's

24   inculpatory and what light it puts the case in should those

25   have been provided.  So, this is absolutely relevant to what

1    Mr. McRae's counsel is alleging in this case.

2           THE COURT:  I agree with you, and the objection is

3    overruled.  Continue.  One thing I am going to ask though, if

4    you intend to offer into evidence these State's Exhibits,

5    it's been very helpful to me with the defendant handing up

6    the exhibits as they were introduced so that I could read

7    along with you or look at it for myself.  So, after we take a

8    break, I know you may not have copies now,  but if you can do

9    that during our lunch break for any exhibit you intend to

10   offer, it's just helpful for me to have those up here.

11          MR. HAIGH:  And Your Honor, for the record, this is

12   Defendant's Exhibit 8.  That's what we're looking at.

13          THE COURT:  Right.  I put that together, but it would

14   simply be easier and better for me when reviewing all this if

15   I could have copies.  If you don't intend to offer them into

16   evidence that's fine.  If you're just going to ask him about

17   them and go no further than that, I don't really need them,

18   but if you intend to offer them into evidence I need to see

19   them.

20          MR. HAIGH:  All right.

21   BY MR. HAIGH:

22       Q    Now, sir, were you able to identify the line which

23   I --

24       A    I did, sir.

25       Q    Okay.  So, 'Derrick walked up on the porch and he was

1    pointing his gun and saying, 'Man, I will shoot you.  I will

2    shoot you, white boy.'  I then heard someone say, 'I'm not

3    bothering you niggers.'  I saw fire come from the gun when it

4    went off.  After four or five seconds, a second shot was fired.

5    The first shot came from the gun Derrick had in his hand

6    because it was fired from on the porch of the house, and the

7    second one was fired from Thurman, and he was standing on the

8    ground below the porch.  After the second gunshot, I heard

9    Derrick say, 'Let's go.'  Derrick and Thurman ran down the hill

10   that is in front of the house and started running toward me,

11   and they still had the guns in their hands.  I ran into the

12   woods and hid because I was scared they were going to shoot

13   me.'  Did I read that correctly correct, sir?

14       A    You did.  You did.

15       Q    Okay.  If you would look on the third page, middle of

16   the fourth line and I'm going to start with the Derrick said.

17   'Derrick said, "We know you saw what we did last night, and if

18   you say anything, we will kill you too just like we did him."

19   Did I read that correctly?

20       A    You did.

21       Q    Okay.  Now, on direct you indicated that Mr. Dumas'

22   statement was material and very important to you, is that

23   right?

24       A    That is correct.

25       Q    Now, understand -- it's fair to say that this witness

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1    inculpates Mr. McRae should the statement be true, isn't that

2    right?

3        A    That's correct.

4        Q    So, you said earlier that it wouldn't have a

5    bearing -- you said the case was better if you had been aware

6    of the statements previously, right?

7        A    It would have been better, yes, much better to defend

8    it.

9        Q    Okay.  So, you're saying that you would have

10   considered putting Mr. Dumas on the stand to discredit Nelson

11   when he inculpates McRae so clearly?

12       A    Can I have a minute?

13       Q    Yes.

14       A    No.  I would not have called Maurice Dumas to

15   testify.

16       Q    Okay.

17       A    But can I answer my question why it's material?

18       Q    Well, I think you already did?

19       A    I haven't completely answered it.

20       Q    Well, we'll wait for redirect for that.  Thank you.

21            MR. LAU:  Your Honor, I think the witness should have

22       the opportunity to complete his answer.

23            THE COURT:  I have a feeling that somewhere along the

24       line he's going to be asked to follow up on that.

25            Mr. Crump, why don't you go ahead and explain your

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1    answer while it's fresh in your mine and mine.

2        A    Somewhere I read that -- it might have been the

3    state's synopsis that there was an argument, that they were

4    arguing.  That Derrick McRae was arguing with Jerry Rankin, and

5    that's extraordinarily important when you're talking about an

6    execution, first degree murder, where somebody has smoked crack

7    cocaine and has just passed out and somebody goes and executes

8    him or where there is an argument and you don't know what the

9    other side said because you're getting into second-degree

10    murder.

11        So, I would not have called Maurice Dumas to testify,

12    but I would have investigated, and I would want to know

13    everything he saw, you know, the distance and you want to

14    compare it with Larry Parker who is two hours earlier in time,

15    and Serena Parker who is one hour -- you've got three

16    inconsistent statements.  But no, I would not call Maurice

17    Dumas to testify.

18        Q    Is it fair to say the risk would be too great in

19    terms of what would come out?

20        A    Unless he told me that the officers put words in my

21    mouth, et cetera, et cetera.  You just wouldn't do it.

22        Q    Now, on the second-degree murder part, my

23    understanding is your analysis is based on the fact that there

24    was an argument between the deceased and Mr. McRae, isn't that

25    right?

1      A     That's right.

2      Q     Now, there's nobody's testimony that places the

3  argument on or about the same time as the execution, is there?

4  There is not a single witness that does that.

5      A     Somewhere I read --

6      Q     We can give you time, if you want to look.

7      A     Okay.

8           THE COURT:  Why don't we give him about an hour and

9   20 minutes?

10          THE WITNESS:  How about you give me about 30 seconds?

11          THE COURT:  We're going to go ahead and break for

12   lunch.

13          THE WITNESS: I got you.

14          THE COURT:  All right.  We'll be in recess, Sheriff,

15   till 2:00.

16          THE BAILIFF:  Court will be in recess till two p.m.

17                (Lunch break was taken at 12:30 p.m.)

18                (Court resumes at 2:00 p.m.)

19          THE COURT:  All right.  Let the record reflect that

20    the defendant is present and all counsel is present.

21           I believe that you had asked a question.

22          And I don't recall, Mr. Crump, if you recall the

23  question that was asked or if you would like that repeated.

24          THE WITNESS:  I basically recall the question.  The

25  question was whether Maurice Dumas stated in his statement that

                    PATRICE B. LEE, CVR-CM
                    OFFICIAL COURT REPORTER

1    Derrick and Jeremy Rankin were arguing.  I read his statement

2    and that's not in there, but I was furnished a synopsis of the

3    case when his present lawyers furnished me with the statements,

4    and in that synopsis by law enforcement, they just summarized

5    that Dumas said he heard Jerry and Derrick arguing.

6    BY MR. HAIGH:

7        Q    And so -- -

8        A    That's where I got that from.

9        Q    So, do you have additional information now in front

10   of you that you didn't have previously that we looked at?  Is

11   that something that you received after I was able to look at

12   the documents in front of you?

13       A    I had it present right here.  When I was testifying

14   before lunch, I had this and it was in my group.

15            MR. HAIGH:  May I approach, Your Honor.

16            THE COURT:  Yes.

17       Q    All right.  So, this is not -- what you're referring

18   to is not reflected in Mr. Dumas' statement, but this is

19   another document that you're referring to, is that right?

20       A    This is the law enforcement -- law enforcement's

21   characterization of what Mr. Dumas told me.

22       Q    So, something prepared by someone other than

23   Mr. Dumas, is that right?

24       A    That's right.

25       Q    Now, I think where we left off before the break is

                        PATRICE B. LEE, CVR-CM
                        OFFICIAL COURT REPORTER

1    you indicated that you were familiar with the statement that

2    raised the issue of murder second in that there was an argument

3    at the time of the shooting.  Now, were you able to locate that

4    statement in the notes that are provided there?

5        A    That was what I was referring to in Maurice Dumas'

6    statement.

7        Q    But doesn't give the --

8        A    It doesn't say that, but it does say that they

9    were -- implies that they were speaking and there was an

10   exchange between the two and then the law enforcement

11   characterized it as an argument.

12       Q    But there's no temporal indication of whether the

13   argument and the shooting took place at the same time, is

14   there?

15       A    That's the only logical conclusion is it took place

16   at the same time.  I don't think that Maurice Dumas saw them on

17   two separate occasions.

18       Q    So, you are making a logical leap there, is that fair

19   to say?

20       A    I don't consider it a leap.  I consider that a

21   reasonable inference.

22       Q    Can you point in Mr. Dumas' statement where it

23   references argument?

24       A    That's the reason I read it.  If I can have a minute,

25   I'm going to go back to the State's -- okay, this is

1    Defendant's Exhibit 8.  There's a conversation there on Page 2

2    on Defendant's Exhibit 8.  'Derrick walked up on the porch and

3    he was pointing his gun and saying, "Man, I will shoot you, I

4    will shoot you, white boy."  I then heard someone say, "I'm not

5    bothering you," and then the N-word.  I think that's a

6    reasonable inference, taking the view of the defendant's

7    lawyer, that that's an argument and the law enforcement

8    likewise made a reasonable inference that they were arguing.

9        Q    So, in your opinion, the years that you've been a

10   defense attorney, you believe that those two statements are

11   sufficient for a murder second instruction?

12       A    The judge in this case at the second trial --

13       Q    That's a yes or no question.

14            THE COURT:  In your opinion, regardless of what the

15    judge may have done, do you have an opinion?

16       A    Yes.  It's sufficient.

17   BY MR. HAIGH:

18       Q    And Mr. Crump, do you have what's been marked as

19   Defendant's Exhibit 7 up there?

20       A    Yes.

21       Q    I want to read you a couple of these portions here

22   and see if I have this right.  The first being in the second

23   paragraph, seven or eight lines down on the first page in the

24   middle it says, 'A few minutes later'.

25       A    I have you.

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1    Q    Okay.  "A few minutes later this -- and then it's

2  indecipherable -- guy named Jerry Rankin walked up to Derrick

3  McRae -- and again, indecipherable -- him for a rock, when

4  Derrick gave Jerry the rock -- blank -- gave Derrick some money

5  he had folded up in his hand.'  Does it appear that I entered

6  that correctly into the record?

7    A    You did.

8    Q    Now, about four or five lines down at the very right

9  hand column, 'A few' do you see where I'm referring to?

10   A    Yes.

11   Q    All right.  'A few minutes later Derrick unfolded the

12  money that Jerry had gave him and said, "Naw, that motherfucker

13  cheated me.  Nobody cheats me."  Jeremy said, "Let's go and

14  blast that motherfucker" and Derrick said, "Yeah, let's go kill

15  him," and then, Julio said, "No man, let it go" to Derrick.

16  Derrick, "No.  I'm going to blast him."  Julio then said to

17  Derrick, "Well, do what you got to do," and about 11:15 p.m.

18  Derrick, Jeremy, and Thurman ran down towards JFK' -- and then

19  there's something that's unclear, and it says, 'The same way

20  that Jerry had gone.  At or around 11:30 p.m. I heard one

21  gunshot, about ten minutes later I saw what looks to be

22  Derrick, Jeremy, and Thurman running back up towards my house.

23  When they got to my yard, they stopped and bent over resting

24  their arms on their knees.'  Is that correct?

25   A    That's correct.

Case 1:21-cv-00577-LCB-JLW  Document 10-16  Filed 12/15/21  Page 77 of 153

1    Q    All right.  Now, further down the same page probably

2    about five lines from the bottom, in from the left and down

3    slightly, 'I heard Johnny,' do you see where I'm referring to?

4    A    Yes.

5    Q    All right.  'I heard Johnny ask Derrick, "Did you get

6    rid of the gun?"  And Derrick told Johnny that he gave it to

7    Thurman to throw in the river.  I then came out of my front

8    door and Derrick said, "You Bitch, I know you know what

9    happened, and if you tell, I'll kill your ass."  About three

10   days later, I was at my mother's house on JFK Drive and Derrick

11   got into an argument with my mother about what I saw.  Derrick

12   said, "Yeah, I'll kill ya'll ass just like I did that white boy

13   Jeremy."  He then told me that the night doesn't have eyes.  A

14   few days later Derrick began cutting the screens on my windows,

15   and he set a fire on my front porch.'  Did I put that into the

16   record correctly?

17   A    You did.

18   Q    Okay.  Now, again, this is a statement from Serena

19   Parker and this is a statement that you testified on direct

20   that the case would be much better had you known about this

21   witness?

22   A    That's right.

23   Q    All right.  Now, it's fair to say that this statement

24   inculpates Mr. McRae, isn't that right?

25   A    That's correct.

Case 1:21-cv-00577-LCB-JLW   Document 10-16   Filed 12/15/21   Page 78 of 153

1    Q    Okay.  Now, would you have put this witness on the

2    stand knowing that this would be the scope of their testimony?

3    A    No.

4    Q    All right.  Now, Mr. Crump, do you have what's been

5    previously marked as Defense Exhibit 6 in front of you?

6    A    Yes.

7    Q    All right.  If you could look at that please starting

8    in the second paragraph about eight lines down with, 'Jerry

9    asked Derrick'.  It's in the left margin.

10    A    Okay.

11    Q    Okay.  'Jeremy asked Derrick, "Do you have any

12    cocaine?"  And Derrick replied, "Yeah, do you have the money?"

13    Jeremy replied, "Hell, yeah, I've got money.  I'm not on

14    welfare."  At this time I told them to leave him alone and that

15    I wasn't going to have them fighting in my yard.  A few minutes

16    later the six black males left walking up the sidewalk that

17    goes in front of my house.  They were headed towards Palisade

18    Circle.  After they left, Jerry asked me what time it was, and

19    I told him it was 10:34 p.m.  He told me that he was afraid of

20    those guys and that he was going to his brother's house who

21    lives near the skating rink on Rockingham Road.  At about 10:45

22    p.m. I heard a gunshot coming from Palisade pool area.  About

23    two or three minutes later, after the gunshot, I saw the same

24    six black males running from the pool area real hard.

25            The only one that I recognized that was running was

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1    Derrick, Tony, and Jeremy.  I heard someone say, "Pick up the

2    damn gun," and the black male that was wearing a blue jacket

3    picked up the gun and they all ran behind the apartments

4    towards Rockingham Road.  Did I state that correctly?

5         A    Yes.

6         Q    Okay.  Now, you indicated that this was also an

7    important statement for you?

8         A    It is.

9         Q    Okay.  And that was based solely on -- well, let me

10   ask you this.  One of the reasons it's valuable in your mind is

11   the specific times given by this witness, is that right?

12        A    That's one element.

13        Q    Okay.  And what are the other ones that make you

14   think this is valuable?

15        A    In neither this statement nor Serena Parker's

16   statement, is there any mention of the red truck and, you know,

17   the State perceived it as to a motive to the murder.  That

18   Jeremy Rankin came up JFK in a red truck.  The transaction took

19   place at the red truck or the dissented red truck.  That

20   Derrick was given fake money and then Jerry Rankin sped off in

21   the red truck.  Neither this statement nor Serena Parker's

22   statement has anything about the red truck in it.  Okay, that's

23   critical.

24             Also, in this statement -- the question I would ask

25   myself is, if Derrick McRae pushed Jerry Rankin and they have a

Case 1:21-cv-00577-LCB-JLW   Document 10-16   Filed 12/15/21   Page 80 of 153

1    fight, why would he thereafter shoot and kill him.  And then

2    you have the six men, that's a lot of people that somebody on

3    the street says Derrick was involved.  Where there is a

4    presence there which doesn't rise to the level of aiding and

5    abetting.  So, all those are critical factors.

6         Q    Okay.  So, I want to make sure I understand --

7         A    And also, the timing -- either he's wrong or Jerry

8    Rankin's mother is wrong or he is tremendously mistaken.

9         Q    All right.  So, just to make sure I understand your

10   testimony correctly, the issues that you perceive give this

11   statement value are the temporal issue, the time issue.

12        A    That's right.

13        Q    The fact that it doesn't directly inculpate Mr. McRae

14   in that it only provides that he participated, but may not have

15   been the shooter?

16        A    Well, I don't think you have anything on here about

17   him being the shooter.

18        Q    Right.  That's my point, that it doesn't say that

19   he's the shooter, right?

20        A    That's right.

21        Q    Okay.  And the fact that there is an absence of

22   detail with regard to a red truck?

23        A    Well, I think it's contrary to the red truck.

24        Q    Is there any other vehicle listed there?

25        A    No, but, yeah, he walked up.  You just don't see the

Case 1:21-cv-00577-LCB-JLW   Document 10-16   Filed 12/15/21   Page 81 of 153

1   red truck.

2       Q    All right.  But it's fair to say that if you exit a

3   vehicle, you walk to wherever you're going even to meet people,

4   isn't that right?

5       A    No, because --

6       Q    So, you're saying that --

7            THE COURT:  Let him finish his answer.

8            MR. HAIGH:  All right.  I'm sorry.

9       A    I just think the red truck was very important, and

10  when his mother talked to him, it's brought out that he was on

11  foot so, the implication -- the inference I would make in

12  defending him is that somebody let him out in that neighborhood

13  and he's walking and that it wasn't what Thurmond Nelson says

14  or other people say about a red truck it's just a bogus.

15      Q    Well, there's -- I mean, there is no allegation

16  anywhere in the testimony or statements that Rankin's mother

17  was present for any of this, is there?  Can you please point in

18  those statements or in the record where that's provided that

19  Mr. Rankin's mother had personal information regarding the

20  events of this case?

21      A    Yes.  On Page 183 of the second trial, defense

22  counsel asked when it was that she saw her son at Campus

23  Courts -- this is just an extraordinary critical issue because

24  we get into parameters of the time and date, and she said that

25  she saw her son about 10:20 because she left him; she went to

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1    her house and called her daughter-in-law and her

2    daughter-in-law said it was 10:30.

3        Q    But that's not at the place.  That was at Corpus

4    Campus Courts, right?

5        A    That's about 3 miles away.

6        Q    Right.  But she wasn't on site of the actual drug

7    deal, isn't that right?

8        A    One area of cross-examination is -- you're assuming

9    there is a drug deal -- that one area of our cross-examination

10   was, you know, defense was trying to poke holes in this red

11   truck, and she indicated the red truck had been parked at their

12   house for about two weeks.  He hadn't driven it in about two

13   weeks.

14       Q    All right.  But she doesn't have any personal

15   knowledge of what happened at the scene of the drug deal, isn't

16   that right?

17       A    Of the alleged drug deal.  She was not on -- there is

18   no evidence that -- I believe her name was Janet Rankin was on

19   JFK Drive or Palisade Circle.  I don't think there's any

20   evidence of that.

21       Q    Thank you.  Sir, if you could look at what's been

22   marked as Defense Exhibit 4.  Do you have that there?

23       A    I do.

24       Q    All right.  Now, here's another statement and that's

25   the statement of Corey Spencer Robinson, is that right?

1     A    That's correct.

2     Q    Now, this is another one that you said was material

3 in terms of the value, is that right?

4     A    It is.

5     Q    Okay.  Now, everything in this statement is hearsay,

6 isn't it?

7     A    Let me read this.

8     Q    Yeah, please.

9     A    You are correct.  My understanding is that this can

10 come into evidence is -- Julio is going to have to be there to

11 tie it into Derrick McRae.

12     Q    And other than a first name, there is no other

13 identification provided for Julio, is that right?

14     A    I think everybody knows who Julio is.  Julio

15 Sturdevant, very talkative young man.  As best I can recall,

16 Julio is Marnell McRae's boyfriend.  That's my educated guess.

17 That's my best memory.

18     Q    Okay.

19     A    But he was involved -- very talkative, very polite,

20 there is only one Julio.

21     Q    Okay.  So, you communicated with Mr. Robinson then,

22 is that right?  Prior to trial?

23     A    I did.

24     Q    Okay.  And you said he was very polite, very

25 talkative.

Case 1:21-cv-00577-LCB-JLW   Document 10-16   Filed 12/15/21   Page 84 of 153

1      A     No.  I didn't say that.

2      Q     You didn't say he was very talkative?  I think that's

3  what you -- if you go back on the record, I think your

4  testimony was he's a very talkative young man.

5      A     As I understood, you asked about Julio, and I said

6  that Julio was a very talkative young man.

7      Q     Okay.  Now, you're aware of the relation that Julio

8  had to members of the McRae's family, is that right?

9      A     As best I recall, he was Marnell McRae's boyfriend.

10          MR. LAU:  Your Honor, I would object to these

11      questions involving stuff outside of these statements which

12      is just additional material that I believe, outside of this

13      record, is trying to establish that perhaps in some

14      speculative world, these inconsistencies in the statements

15      could be reconciled.  It's asking questions about

16      relationships with individuals and about, you know, could Ms.

17      Rankin have seen a red truck.  All these questions are trying

18      to introduce facts that aren't in the record here to try and

19      bolster these statements which are, as you will see later

20      through additional witnesses, entirely inconsistent with one

21      another, and we would object to any questions going forward

22      along those lines.

23          MR. HAIGH:  Your Honor, the witness testified to the

24      value and materiality of these statements.  At issue before

25      the Court in this case is, should these statements had not

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1    been turned over, what value did they have, how would they

2    have affected the case, and what I'm trying to figure out is,

3    based upon these statements and Mr. Crump's activities in the

4    case, how they would have affected the outcome.  How it would

5    have affected how he prepared for the case and carried out

6    the case which he testified on direct on.  So, I think it's

7    fair game.

8              THE COURT:  I think both of you have taken advantage

9    of the wide latitude that you've allowed one another and that

10   I've allowed to go into these matters and to attempt to get

11   into Mr. Crump's thought process as he now testifies looking

12   back at this, and I'm going to allow you to proceed as you

13   have been.  That objection is overruled.

14   BY MR. HAIGH:

15        Q    Now, you said earlier that you met with Julio and

16   talked with him about any potential knowledge that he may have

17   had about the events, is that right?

18        A    I did.

19        Q    All right.  So, arguably, you even had better

20   information and that it was firsthand as opposed to this guy,

21   right?

22        A    No, I didn't.

23        Q    You said you spoke to him directly, right?

24        A    Oh, yes --

25        Q    So, wouldn't that be firsthand information?

Case 1:21-cv-00577-LCB-JLW   Document 10-16   Filed 12/15/21   Page 86 of 153

1    A    Yes, but --

2    Q    Okay, thank you.

3    THE COURT:  It's not quite that simple, you ask a

4  question, you get to hear the full answer.

5        Go right ahead, Mr. Crump?

6    A    A key element is the gun and the murder weapon, and

7  my information somewhere, right or wrong, is that Derrick sold

8  the gun to Corey Robinson.  I went to Corey Robinson and he was

9  polite, but not talkative, and if I had his statement that he

10  bought the gun from Julio, I'm going to two people.  I'm going

11  back to Corey Robinson and confront him with the statement.

12  Did he make the statement?  Was it true?  Why did he make it?

13  What were the circumstances?  And then I'm going to Julio and

14  say, "Who took it?  I'm trying to help Derrick.  I got to have

15  the truth.  What happened?  Did you sell a gun to Corey

16  Robinson?"  So, I mean, it would certainly -- it affects my

17  investigation.

18    Q    To the extent that you weren't able to follow up on

19  that particular statement, is that right?

20    A    That's right.

21    Q    Okay.  Now, just out of curiosity, what did Julio

22  share with you about his knowledge of that night?

23    A    Not much.  He -- Julio, he's a very talkative person

24  who doesn't say much, and I think Julio is probably the one who

25  went to the liquor store, if I had to make a guess.  You know,

1  bought the liquor that afternoon and, you know, pretty much

2  just confirmed, as best I recall, he's at the cookout, but I

3  don't have it in my notes a specific thing about Julio.

4      Q   So, you took interviews of different people, but

5  didn't prepare notes on what those interviews entailed?

6      A   They were sketchy notes.  It might be like a one

7  paragraph, something like that, but basically, Julio gave that,

8  you know, gave the liquor store, have a cookout, but I don't

9  have a detailed statement that I put him into bed, et cetera,

10 et cetera, tucked him in, that type of thing.

11     Q   Okay.  Now, I'd like you to take a look at what's

12 been marked as Defendant's Exhibit 10.  Do you have that there?

13     A   I do.

14     Q   I'm going to read the second paragraph.  'About three

15 days after Jerry Rankin was killed, a friend of mine named

16 Jeremy Sturdevant told me that Derrick McRae and Thurmond

17 Nelson killed Jerry Rankin.  Jeremy also told me that Derrick

18 McRae is the one that shot Jerry and that Thurmond was just

19 with him.'  Is that correct?

20     A   That's correct.

21     Q   All right.  Now, in the second paragraph, you go down

22 probably about the third or fourth line from the bottom in the

23 right column it starts with 'Derrick.'  Do you see that?

24     A   I do.

25     Q   All right.  That says, 'Derrick had a black in color

Case 1:21-cv-00577-LCB-JLW   Document 10-16   Filed 12/15/21   Page 88 of 153

1    what looked like .380 handgun.'  Is that right?

2         A    That's correct.

3         Q    Okay.  Let's take a look at Defense Exhibit 9,

4    please.  Do you have that there, sir?

5         A    I do.

6         Q    All right.  Now, at the last line of the second

7    paragraph, does that say, 'Derrick told me that he had sold the

8    gun to Corey Robinson'?

9         A    That's correct.

10        Q    And then middle of the second paragraph, close to the

11   left column starts 'Derrick then looked.'  Do you see that?

12        A    Yes.

13        Q    It says, 'Derrick then looked at me and said, "I am

14   the one who blasted that nigger on Fishman's porch."  I asked

15   him what he was talking about.  Derrick said, "I am the one who

16   killed Jeremy Rankin while he was sitting on Fishman's porch."

17   So, presumably, this would not be a witness that you would put

18   on because it inculpates your client, is that right?  Even

19   though there is an inconsistency with the gun?

20        A    No.  I would have called him.

21        Q    All right.  And --

22        A    But -- but --

23        Q    Yeah, please.

24        A    In this one, and also, particularly, I'd like to say

25   in the one with Montes Williams, where you've got hearsay

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1     statements of Jeremy Sturdevant.  Jeremy Sturdevant was the

2     defense witness and you had to confront Jeremy with this

3     statement and find out, you know, what he said, what he didn't

4     say, the truth of it.  You would just have to confront Jeremy

5     with this statement.

6          Q    Speaking of Mr. Sturdevant, you were able to -- you

7     called him as a witness in that second case?

8          A    I did.

9          Q    And he was cooperative with the defense?

10         A    Yes.

11         Q    All right.  He actually refused to make a statement

12    to the State, didn't he?

13         A    I don't know that.  If that's what your records

14    reflect, that's probably the truth.

15         Q    All right.  If you could please take a look at

16    Defense Exhibit 5.  Do you have that there, sir?

17         A    I do.

18         Q    Okay.  I'd like to start in the second paragraph,

19    probably about nine lines down, the right column it says,

20    'Derrick said.'

21         A    Okay.

22         Q    'Derrick said, "Yeah, I blasted that punk white

23    motherfucker, Jerry Rankin --

24         A    Wait.  Stop.  Stop.

25         Q    Okay.

                    PATRICE B. LEE, CVR-CM
                    OFFICIAL COURT REPORTER

1    A    Okay.  Go ahead.

2    Q    Okay.  'Derrick said, "Yeah, I blasted that punk

3  white motherfucker, Jerry Rankin."  I said, "You bullshitting

4  me?"  Derrick said "I swear I did."  Derrick said that Jerry

5  tried to shit him for some dope, and then parentheses, crack.'

6  And then it says, 'He said, "Jerry grabbed some crack from him

7  and ran."  Derrick said that he caught up with him later; saw

8  Jerry on the porch at a house on Hood Street.  Derrick leaving

9  his girlfriend's house on Palisade Circle Walkway by the pool

10  on Hood Street when he walked by the house where Jerry was at.

11  Derrick said he run up to Jerry and pulled out a .380 handgun

12  and he shot Jerry in the head while he was on the porch.

13  Derrick said Jerry just dropped and blood ran everywhere.  A

14  few days later, Derrick asked me if I wanted to buy the .380

15  handgun.  He said he has it stashed.'  Is that correct?

16    A    That's correct.

17    Q    Again, fair to say that there's some inconsistencies

18  there, but in all, it really inculpates Mr. McRae, isn't that

19  right?

20    A    It does.

21    Q    Okay.  And based upon that, would you have called

22  that witness, had you known about --

23    A    No, but I sure wish I had this statement when I was

24  investigating and interviewing him or talking -- and let me

25  qualify that.  I'm not certain I talked to Darius Lockhart.

Case 1:21-cv-00577-LCB-JLW   Document 10-16   Filed 12/15/21   Page 91 of 153

1    We're talking about 18 years later, but I'm almost certain that

2    I did.  I'll say it like that.  Just going back through my

3    notes, I'm almost certain I talked to Darius Lockhart, but I

4    don't have a recollection and sometimes you remember -- you

5    kind of piece things together, but I feel like I talked to him.

6        Q    Okay.  All right.  If we could take a look at

7    Number 11, Defense Exhibit Number 11, please.  Again, with --

8    let me actually get it in.  That last statement in that

9    paragraph, 'When I asked him -- and it's referring to Montes

10   Williams -- who did it, he told me that Derrick McRae had

11   killed him.'  Is that right?

12       A    Yes.

13       Q    Okay.  Now, irrespective of the inconsistencies with

14   some of those statements, they all are consistent in that

15   Mr. McRae sold the gun.  Is that right?  It's just who that he

16   sold it to that's at issue?

17       A    I don't draw that.

18       Q    Okay.  One of the things that you brought up on

19   direct is that you felt that it was necessary for the State to

20   place Mr. McRae at the scene with an eyewitness.  Is that

21   right?

22       A    I do.

23       Q    Okay.  Now, the State was unable to do that and he

24   was still convicted, isn't that right?

25       A    The State convicted Derrick McRae with the motive and

1    two admissions.  And one admission was to a fellow jail inmate.

2    This case was just a scintilla of evidence against Derrick

3    McRae, and my opinion, for a jury to follow their oaths, listen

4    to the evidence, and do their duty that you cannot convict

5    based on that scintilla of the evidence, there has to be

6    something more.  You don't have circumstantial evidence, like,

7    you don't have a gun.  In my mind, as I analyzed this case,

8    particularly the second case, someway you've got to place him

9    at the scene.  You've got to place him at the scene, and you've

10   got three people who place him at the scene, but in three very

11   inconsistent statements and they place him at the scene -- and

12   when I say at the scene, obviously, Maurice Dumas places him at

13   the scene.  The other two people place him at the scene

14   400 yards away with other people.

15       Q    I'm not asking your opinion.  Thank you for providing

16   it, but I'm asking you a factual question.  Isn't it true that

17   Mr. McRae was convicted by a jury of his peers without an

18   eyewitness placing him at the scene of the crime?

19       A    Unfortunately, yes.

20       Q    Okay.  I'm handing you what's been marked as State's

21   Exhibit 3.  Do you recognize that?

22       A    My memory's refreshed, I'll say it like this, it's an

23   ex parte motion for funds to employ a private investigator.

24       Q    Okay.  And that was something that you filed in this

25   case; is that correct?

Case 1:21-cv-00577-LCB-JLW   Document 10-16   Filed 12/15/21   Page 93 of 153

 1      A    Yes.  That's correct.

 2           MR. LAU:  Your Honor, may we approach.

 3           THE COURT:  Sure.

 4               (Bench conference was held with both counsel

 5               present.)

 6           THE COURT:  You may continue.

 7  BY MR. HAIGH:

 8      Q    Now, that's a motion that you filed, is that right?

 9      A    It is.

10      Q    Okay.  And do you recall whether that was granted or

11  not?

12      A    It was granted.

13      Q    And that was -- I'm showing you what's been marked as

14  State's Exhibit 4.  Now, that's the order granting your motion,

15  is that right?

16      A    That's correct.

17      Q    And what date was that issued?

18      A    July 9, 1997.

19      Q    Okay.  So, roughly about ten months or so prior to

20  that final trial, is that right?

21      A    That's correct.

22           THE COURT:  I'm sorry.  I think I might have -- I've

23   got a motion in limine to redact certain motions.  Number 4

24   was --

25  BY MR. HAIGH:

                    PATRICE B. LEE, CVR-CM
                    OFFICIAL COURT REPORTER

1    Q    I'm showing you what's been marked as State's Exhibit

2   5.  Do recognize that?

3    A    I do.  Can I go back though?  Would you mark this?

4    Q    I'm sorry.  And that was a motion filed by you?

5    A    Yes.  Can I read just a second?  Yes.

6    Q    And what was the date of filing that motion?

7    A    This motion is April 17, 1998.

8    Q    Okay.  So, that would have been --

9    A    Ten days before the first trial started.

10    Q    Now, you indicated that you never had Mr. Nelson's

11   statement prior to the first trial?

12    A    I didn't.

13    Q    So, you filed a motion to redact that statement not

14   even knowing what was in it?

15    A    Yes, I did.

16    Q    Okay.

17    A    Can I explain that.

18    Q    You've answered my question.

19         THE COURT:  Go ahead and explain that.

20    A    This is just Defense 101 that -- I don't know that

21   Thurman Nelson's going to testify and my recommendation to

22   Derrick -- I guessed that he would not testify, but what I'm

23   saying here is -- I'm saying based on information believed --

24   he made a statement to law enforcement as to the circumstances.

25   I don't know that he's going to testify, and I don't know that

                    PATRICE B. LEE, CVR-CM
                    OFFICIAL COURT REPORTER

1   the State or the District Attorney's Office is not going to try

2   to get that statement into evidence and keep him off the stand.

3   That's the reason I'm saying -- I'm protecting my client that

4   if they do that, they are going to have to redact all

5   references to Derrick in order to preserve Derrick's right

6   under Bruton versus United States on Sixth Amendment to

7   confront your witnesses.  That's just Defense 101, yes basic,

8   basic defense.

9        Q    I'm showing you what's been marked as State's

10  Exhibits 6.  Do recognize that?

11       A    Yes.

12       Q    And what is that?

13       A    This is a subpoena.

14       Q    Okay.  And who was that subpoena of?

15       A    The subpoena was to Corey Robinson.

16       Q    Okay.  And who issued it?

17       A    George E. Crump, III.

18       Q    Okay.  And that's you, right?

19       A    That's me.

20       Q    All right.  So, it's fair to say that Corey Robinson

21  was under subpoena by you for --

22       A    That's exactly right.

23       Q    Okay.  I'm showing you what's been previously marked

24  as State's Exhibit 7.  Do recognize that?

25       A    Yes.

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1      Q    What is that?

2      A    This is a subpoena issued by myself to Darius

3 Lockhart.

4      Q    Okay. So, you're aware of his potential value as a

5 witness prior to the day in court, is that right?

6      A    I'm aware of a potential, that's correct. That's a

7 correct statement.

8      Q    Okay. All right. So, I'm showing you what's been

9 marked as State's Exhibit 8. Do recognize that?

10      A    Yes.

11      Q    What is that?

12      A    This is where I subpoenaed Jane Karicka who was a

13 deputy -- who I think was a deputy as opposed to assistant

14 clerk of court, to appear and produce a certified copy of

15 Edward Lewis Tender, and this would have been for the second

16 trial.

17      Q    Okay. Presumably, the goal of the certified copy is

18 so you could cross-examine Mr. Tender or put in a rebuttal

19 witness if he testified falsely with regard to his prior

20 history, is that right?

21      A    You're ahead of me on that. Let me take this time to

22 make a correction. I stated that I got off the court appointed

23 list in 2005. I got off of the State list in 2006 and then it

24 took about two years to filter it out. I do not read -- as

25 well-versed as I was at one time, you know, on rules of

1    evidence and impeachment, but keep it clean.  I think that

2    regardless of what the facts would be, whatever Edward admits

3    to, I think I could introduce what he's been tried and

4    convicted of under certain circumstances, and that's the main

5    reason as opposed to in his face and confront him and get a

6    yes, no, this, that.  Just get Jane Karicka in there.  That he

7    was convicted of, I want to say, 16 counts of -- 16

8    misdemeanors, maybe a common-law forgery, something along that

9    line.

10       Q    It's fair to say that you were in a position to

11   challenge his record or how he presented it at trial, isn't

12   that right?

13       A    I was in a position the second trial.  The first

14   trial I'm shooting from the hip as best I can.

15       Q    This whole proceeding today is only about the second

16   trial, right?

17       A    No, it's not.

18       Q    Well, that's the one where Mr. McRae is convicted,

19   isn't that right?

20       A    I'm going to let Mr. Lau argue, but I would argue

21   different.

22       Q    But needless to say, let me make sure I'm

23   understanding, your testimony is that you were prepared to

24   cross examine Mr. Tender on his criminal history during the

25   second trial, is that right?

1      A     That's correct.

2      Q     Now, you had two investigators in this case, isn't

3 that right?

4      A     I did.

5      Q     Okay.  And Jack Fay was one of them, is that right?

6      A     Yes.

7      Q     Who was the other one?

8      A     Charlie Johnson.

9      Q     And they were active for -- let me back up.  You got

10 the order granting you funds to employ investigators about ten

11 months prior to trial, is that right?

12     A     That's right.

13     Q     So fair to say that they were active during that

14 period?

15     A     No.  That's not a fair statement.  Can I have just a

16 minute to review my time?

17     Q     Sure.

18     A     I want to review my time sheet.  What I normally did

19 with these two investigators was I would try to conserve time.

20 They would meet me at my office, maybe after lunch or in the

21 morning, and try to do as much as we could at one time.  From

22 my time sheets, it says on 9-16-97 I investigated with the PI's

23 and that's an hour and 55 minutes, and then on 12-22,

24 investigation with Jack Fay and Charlie, that's three hours.

25 There's not -- doesn't look like there was a lot of time with

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1      these investigators, but generally, when I went to interview

2      witnesses, I would take these two investigators with me.

3          Q    So, they didn't do any independent investigation on

4      their own?

5          A    No.

6          Q    They were only there for purposes of having a witness

7      for what you --

8          A    Yes.  And I just think it's wise -- in the last 20

9      years, you know, in a murder case to have somebody with you

10     wherever you go.  I just think it's just wise.

11         Q    And both of these individuals would be present with

12     you for --

13         A    If it said -- like I said, for example, it said back

14     there on 12-22, it said investigation with Jack Fay and

15     Charlie.  So both of them would be present.  And these are --

16     both of these were law enforcement officers on Long Island or

17     Staten Island.  They retired, moved down to the Pinehurst area,

18     and are friends.  You get two for the price of one.

19         Q    Okay.  Now, while we're on that same document, that's

20     the document marked as --

21         A    Defendant's Exhibit 13.

22         Q    Thank you.  Defendant's Exhibit 13.  If you could

23     look at the entry that I think you looked at before, September

24     30, 1997?

25         A    Yes.

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1     Q    That plea discussion with Ken Honeycutt.  That's the

2  entry that you're showing there?

3     A    That's right.

4     Q    Okay.  So, Michael Parker was assigned this case, is

5  that right?

6     A    The person who tried the case --

7     Q    Maybe I can help you out.  Let me ask this.  From

8  1996 to approximately late March 1998, Michael Parker was

9  assigned to this case, is that right?

10     A    I don't know that.

11     Q    Do you recall correspondence in this case back and

12  forth between you and the prosecutor's office, in general?

13     A    Generally, what I did -- I mean, my office was right

14  across the street.  I generally didn't write letters unless

15  there was some reason I wanted to document something, you know,

16  like a motion in the courthouse.  Michael Parker, as best I

17  recall, was the chief assistant.  Certainly, the chief

18  assistant from December of '96 onward until he left the DA's

19  office.  I assume I talked to Michael Parker, I don't know.  I

20  probably did talk to him at length unless it's in here.  The

21  trial attorney with Scott Brewer.  I can't say that I

22  corresponded with Mike Parker.

23     Q    Let me ask you this, do you recall whose signature

24  was on the motions for the State that were filed in this case

25  between '96 and about March '98?

                    PATRICE B. LEE, CVR-CM
                    OFFICIAL COURT REPORTER

1     A    No.  If it's Michael Parker, I wouldn't dispute that.

2     Q    So, sitting here today you have no personal

3 recollection of any of Michael Parker's involvement in this

4 case?

5     A    No.  That's correct.  But we're talking about 18

6 years ago, and we tried -- no, I don't.

7     Q    We're talking about 18 years ago with all your

8 testimony, aren't we?

9     A    That's right.  That's the reason I brought this.

10 This is pretty much a summary to where I could refresh my

11 memory on anything, but I don't have an independent

12 recollection of talking to Michael Parker.

13     Q    Do you recall Ken Honeycutt being the attorney of

14 record at any time in this case?

15     A    No.

16     Q    Then why meet with Ken Honeycutt to discuss a plea

17 agreement?

18     A    To get the best deal possible.  That's my educated

19 guess.  That's my educated guess.

20     Q    Do you recall who in the office was able to negotiate

21 deals, in the prosecutor's office?

22     A    You would have had -- Scott Brewer would have

23 authority according to my belief.  Michael Parker would have

24 had authority, and Ken Honeycutt.  I generally didn't go to Ken

25 Honeycutt.  I could probably get a better deal, lower down.  I

1 would have gone -- I would have talked to Michael Parker.

2 Scott Brewer --

3     Q   No.  I'm sorry.  Go ahead,

4     A   As a general rule -- as a general rule, I would not

5 have gone very first to Ken Honeycutt.  I would have gone --

6 there are only two ways that I would have gone to Ken

7 Honeycutt.  One way is that I was across the street and I'm

8 talking to the staff -- I'm talking to Scott Brewer, Michael

9 Parker, and they referred to me, you know -- "Ken is here.  Go

10 down the hall.  It's something that Ken is going to need to

11 check on."  That's one way.  The other way I would have gone to

12 Ken Honeycutt -- and this is rare because I'm not going to get

13 as good a deal generally, is that I've gone to one or two of

14 the other people, and I've got as good as I can and I'll try to

15 get something better.

16     Q   Now, in murder cases -- your testimony here today is

17 that in murder cases first assistants, or people other than Ken

18 Honeycutt, had authority to negotiate dispositions?

19     A   That would be my understanding.  It might have been

20 that he's given them authority, you know, on this case, this

21 and this range.  I don't know what his conversations were with

22 his -- you know, I don't know if he had a cap.  It's just like

23 me selling my car, you know, you can go sell my car, but you

24 can't sell it for less than $15,000 or $20,000.  I don't know

25 what authority he gave them, but generally, with Ken

1    Honeycutt -- I would go to an assistant before I'd go to him.

2         Q    Okay.  And can you please show in your fee summary

3    here where you went to another attorney before him?

4         A    Is there one on there?

5         Q    I'm asking you?

6         A    Okay.  Just going through this, I'm reviewing a --

7    looks like you've got a Dorothea Dix report that I'm reviewing

8    September 23, 1997, so I'm probably not doing a whole lot of

9    negotiations before then.

10         MR. LAU:  Your Honor, if it's okay with the Court

11    while he reviews that, if we take an afternoon recess.  I

12    would appreciate that opportunity.

13         THE COURT:  All right.  Let's do that.  We'll take a

14    ten minute break.

15              (Court in recess for afternoon break.)

16         THE COURT:  If you want to repeat your last question,

17    or Mr. Crump, do you recall the last question.

18         MR. HAIGH:  I don't recall having one pending

19    actually.

20    BY MR. HAIGH:

21         Q    Now, sir, if you wouldn't mind looking at Defendant's

22    Exhibit 16.  And is it fair to say that on each of those sheets

23    in the criminal history, it lists initials for an ADA, is that

24    right?

25         A    It list what now?

                    PATRICE B. LEE, CVR-CM
                    OFFICIAL COURT REPORTER

1      Q    Initials of the ADA?

2      A    That's correct.

3      Q    Now, are you aware whether it's the ADA that was

4   assigned the case or the docket attorney that the clerk lists

5   in terms of initials?

6      A    I just don't want to speculate on that.

7      Q    Okay, so you don't know?

8      A    I don't know.

9      Q    Additionally, are you aware what happens to those

10  initials if one DA is assigned the case originally and then

11  another one does the PVH a few years later?

12     A    What's PVH?

13     Q    Probation Violation Hearing?

14     A    I just don't know.

15     Q    Okay.  So, although you speculated earlier as to the

16  initials of Scott Brewer, you're not sure the manner in which

17  they would arrive on this document or what the surrounding

18  circumstances would be of that?

19     A    No, but as a highly educated guess, these would stand

20  for Scott Brewer, but how it got there, I just don't know what

21  the clerk's procedure is.

22     Q    All right.  Thank you.

23          MR. HAIGH:  No further questions.

24          THE COURT:  All right.

25          THE WITNESS:  Can I make a correction?

                    PATRICE B. LEE, CVR-CM
                    OFFICIAL COURT REPORTER

1          THE COURT:  Yes.

2          THE WITNESS:  The question was asked to me before

3     lunch my experience in murder cases, and I said I had ten

4     cases.  I tried two capital murder cases.  Then you asked

5     another question, kind of a different phrase, how many capital

6     cases I had, and then I had a recollection of one of those ten

7     cases.  There was actually nine cases, Derrick's was tried

8     twice.  It started as a capital murder case, but didn't go the

9     whole way.  My recollection now, on that third case, my

10    educated guess is that the State started off as a capital

11    murder case, but by the time we got to a jury trial, it was

12    proceeding first-degree noncapital and then go on.  I don't

13    have a recollection of that case being more than a three or

14    four day trial.

15         THE COURT:  Any further questions about that?

16         MR. HAIGH:  No questions.

17         THE COURT:  Redirect.

18                      **REDIRECT EXAMINATION**

19    BY MR. LAU:

20    Q    On that point Mr. Crump, in your experience, you

21    gained familiarity with the hearsay rule?

22    A    Yes.  Don't ask me the exceptions.

23    Q    I won't ask you about the exceptions, but the hearsay

24    rules are for when you're trying to introduce a statement for

25    the proof of the matter asserted with that statement, is that

1  right?

2      A    That's right.

3      Q    Now, with respect to these statements, of course, if

4  they're inconsistent and you don't believe they're true,

5  wouldn't they be introduced to establish that they're false?

6          MR. HAIGH:  I'm going to object.  It calls for legal

7    conclusion.

8          THE COURT:  Okay.  I'm going to let him offer his

9    opinion about that.

10     A    Two things.  One is certainly you could question

11 about the inconsistencies, and the second thing is I would have

12 known the rule when I tried it.

13         THE COURT:  You can't say?

14         THE WITNESS:   I can't say now, and can I have a

15 follow-up.

16         THE COURT:  Go ahead with your answer.

17         THE WITNESS:  On all those people I subpoenaed, such

18 as Corey Robinson, Darius Lockart, the reason that they are

19 subpoenaed is they didn't incriminate things to me when I

20 talked to them, but in case the State is going to try to slip

21 in hearsay and say well, that's not to prove the truth of the

22 matter asserting or some way, I wanted to have that if Plan

23 B -- to have them in there.

24         THE COURT:  Thank you.

25 BY MR. LAU:

1      Q     So, you would have questioned on the inconsistencies?

2      A     That's exactly right.

3            MR. LAU:  If I may approach, Your Honor.

4            THE COURT:  Yes.

5   BY MR. LAU:

6      Q     Mr. Crump, I'm handing you what's been marked

7   Defendant's Exhibit 17.  If I may direct your attention to

8   Page 75, Line 13.  Let me back up -- let me back that -- let me

9   begin with Page 70, Line 24 and at Page 70, Line 24, can you

10  began reading the transcript --

11           MR. HAIGH:  Your Honor --

12           THE COURT:  Yes.

13           MR. HAIGH:  I don't believe that this exhibit has

14    been listed in the record in terms of what it actually is or

15    anything yet so --

16           THE COURT:  All right.

17           MR. LAU:  I apologize, Your Honor.

18  BY MR. LAU:

19     Q     Mr. Crump, I would purport to you that this is the

20  testimony of Thurman Nelson during the second trial in this

21  case?

22     A     It appears to be so.

23     Q     And you were the attorney of record during this

24  trial, is that correct?

25     A     I was.

                    PATRICE B. LEE, CVR-CM
                    OFFICIAL COURT REPORTER

1    Q    And do you recall Mr. Nelson testifying?

2    A    I recall him testifying, and then I reread the

3    transcript in preparation for today, so my memory's been

4    refreshed.

5    Q    Thank you.  I apologize for any confusion.  If I may

6    direct your attention to Page 70, Line 24?

7    A    Okay.

8    Q    And if you wouldn't mind reading from Page 70, Line

9    24 to Page 75.  I'm sorry, Page 71, Line 15.

10    A    Question -- and this is cross examination by myself.

11    "Mr. Nelson, would you be kind enough to hand me that

12    statement, thank you.  Mr. Nelson, you been charged with

13    first-degree murder. Answer:  Yes. Question:  In this same

14    case? Answer:  Yes. Question:  Did you see when Jerry Rankin

15    was shot and killed? Answer:  No, sir. Question:  Were you

16    present when Jerry Rankin was shot and killed? Answer:  No,

17    sir. Question:  Did you encourage any person to shoot or kill

18    Jerry Rankin? Answer:  No, sir.

19    Q    Thank you.  You can stop there.  Now, Defendant's

20    Exhibit 8, which was read by the State into the record, if you

21    could find Defendant's Exhibit 8.  If I could direct your

22    attention to the bottom of Page 3, beginning at where it says

23    'Derrick and Thurman,' approximately seven lines up from the

24    bottom?

25                MR. LAU:  If I may approach, I can point out to you,

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1    Mr. Crump.

2            THE COURT:  All right.

3  BY MR. LAU:

4    Q    The bottom of Page 3.  Would you mind reading that to

5  the last line on page 3?

6    A    'derrick and Thurman run down the hill that is in

7  front of the house and started running toward me, and they

8  still had the guns in their hands.  I ran to the woods and hid

9  because I was scared they were going to shoot me.'

10   Q    You can stop there if you don't mind.  So,

11 Mr. Nelson, during his testimony, testified that he was not

12 involved in this crime whatsoever, is that right?

13   A    That's right.

14   Q    While he was a witness for the State?

15   A    That's right.

16   Q    And you didn't have the statement?

17   A    I had this statement.

18   Q    I'm sorry.  Mr. Dumas' statement?

19   A    No, I didn't.  No, I didn't.

20   Q    Let me direct your attention to the same transcript,

21 Page 75, Line 13.  And if you can begin reading at line 13, and

22 read through line 25?

23   A    Question:  Between 10:30 and 11:00 on October 13,

24 1995, the same night that you saw Jerry Rankin spinning tires?

25 Answer:  Uh huh.  Question:  You went to the house where

1 Derrick McRae was staying? Answer: Uh huh. Question: And

2 you went in with Antoine Rush? Answer: Uh huh. Question:

3 Did you see Derrick McRae? Answer: Uh huh. Question: What

4 was he doing? Answer: He was asleep.

5 Q So, the Sate witness testified that he was asleep

6 between 10:30 and 11 p.m.?

7 A That's correct.

8 Q Now, can I direct your attention to Defendant's

9 Exhibit 6, which is the statement of Larry Parker. And if I

10 can direct you -- and it might be more helpful if I point it

11 out to you?

12 MR. LAU: Your Honor, I'm going to point to where it

13 begins, 'After they left.'

14 THE COURT: All right.

15 BY MR. LAU:

16 Q If you could just read this sentence here?

17 A 'after they left, Jerry asked me what time it was,

18 and I told him it was 10:34 p.m.'

19 Q What was Mr. McRae doing according to the State's

20 witness at 10:34 p.m.?

21 A He was sleeping.

22 Q Thank you.

23 A He was sleeping between 10:30 and 11.

24 Q Thank you. Now, if I could direct your attention to

25 Defendant's Exhibit 7, which is the statement of Serena Parker,

1   and if you wouldn't mind just reading the first sentence in

2   that statement beginning with on 'October 14th.'

3        A    'on October 14, 1995, at about 10:50 p.m, I was in

4   my apartment located at 912 Palisade Circle in Rockingham.

5   About at this time, I heard some people talking outside my

6   bedroom window.  The lights were off in my apartment, and I

7   didn't have a curtain up to the window.  So, when I looked out

8   the window to see who it was, I saw Derrick McRae, Thurman

9   Nelson, Jeremy Sturdevant, Johnny McRae, Julio Serrano

10  talking.'

11       Q    You can stop there.  At 10:50 p.m, according to the

12  State's witness, what was Derrick McRae doing?

13       A    Between 10:30 and 11 he was sleeping.

14       Q    Thank you.  Now, the State asked you whether it was

15  entirely consistent in each statement that Derrick McRae sold

16  the gun.  Do you recall that question?

17       A    Generally, yes.

18       Q    If you don't mind, let me direct you to Defendant's

19  Exhibit 5, which is the statement of Darius Lockhart.  If you

20  don't mind, if I can call your attention to the second page of

21  the statement, the second sentence up which begins 'He said,'

22  just above the signature line, the second to last statement to

23  beginning with 'He said.'

24       A    'He said he had it stashed.'

25       Q    So, he had the gun stashed?

1      A    That's what that says.

2      Q    So, the statements the State has aren't consistent

3 with respect to whether or not Mr. McRae sold the gun, are

4 they?

5      A    No.

6      Q    Mr. Crump, did you have the complete investigative

7 file of the Rockingham Police Department when you --

8      A    No.

9      Q    --were defending Mr. McRae in this case?

10     A    No.

11     Q    You did not?

12     A    No.

13     Q    And the only materials you had were what was provided

14 to you --

15     A    In discovery.

16     Q    And that was that general felony discovery form,

17 correct?

18     A    That's right.

19          MR. LAU:  May I approach.

20          THE COURT:  Yes.

21 BY MR. LAU:

22     Q    Mr. Crump, I've handed you what's been marked

23 Defendant's Exhibit 18, which is the testimony of Jeremy

24 Sturdevant at Mr. McRae's second trial.  If you would, could

25 you begin on Page 214, Line three.

                    PATRICE B. LEE, CVR-CM
                    OFFICIAL COURT REPORTER

1      A     Okay.

2      Q     Can you read from Line three on Page 214 to Line 24?

3      A     'Question:  Now, you haven't talked to one single law

4   enforcement officer about this so-called cookout, have you?

5   Answer:  Yes.  Question:  Where?  Answer:  Both of them.

6   Question:  When?  Answer:  That day it happened.  Question:

7   The day the cookout happened?  Answer:  No, the day they picked

8   Derrick McRae up.  They came and picked me up the next day,

9   harassing me.  My mama was with me.  I go get my mama, she was

10  with me when they was harassing me.  Question:  You say you

11  told both these officers?  Answer:  I told them the same thing.

12  Question:  About the cookout?  Answer:  Yes.  Question:  They

13  didn't write it down for you?  Answer:  No.  I wasn't paying

14  attention.  I was telling them.  I don't know if they were

15  writing it down or not.  Question:  You weren't given anything

16  to sign like the other people that testified, were you?"

17      Q     You can stop there.  So, Mr. Sturdevant didn't refuse

18  to talk to law enforcement?

19          MR. HAIGH:  Objection, Your Honor, we have no idea

20   what really happened.  We just have the testimony of an

21   individual.  Who's to say whether it's truthful or not?  So,

22   I'm going to object.

23          THE COURT:  I'm going to sustain it as to what his

24   opinion is as to the truthfulness.

25          MR. LAU:  That's fine.  I have no further questions.

1        THE COURT:  Any further questions?

2        MR. HAIGH:  No, Your Honor.

3        THE COURT:  Thank you, Mr. Crump.  You may step down.

4        MR. LAU:  At this time, we would move to have

5   Defendant's Exhibits 17 and 18 admitted, Your Honor.

6        THE COURT:  All right.  They can be admitted.

7             (Defendant's Exhibits 17 and 18 were admitted.)

8        THE WITNESS:  Your Honor, am I free to leave?

9        THE COURT:  Any objection.

10       MR. LAU:  I would just ask that you be on phone

11   standby should we need your testimony.

12       THE COURT:  Yes, sir.  You're free to leave the

13   courthouse.

14       MR. LAU:  Can we have five minutes.

15       THE COURT:  We just had 15 minutes.

16       MR. LAU:  We've got the witnesses sequestered.

17       THE COURT:  All right.  We will be patient.

18       MR. LAU:  I apologize, Your Honor, but we would ask

19   Mr. Crump to come up one more time for clarifying question.

20       THE COURT:  Okay.  All right.

21       MR. LAU:  And then we're ready to proceed on our next

22   witness.

23       THE COURT:  All right.

24   BY MR. LAU:

25       Q    Mr. Crump, just as clarification with respect to one

                    PATRICE B. LEE, CVR-CM
                    OFFICIAL COURT REPORTER

1  final question, you have with you today the State's synopsis of

2  this investigation?

3      A    That's correct.

4      Q    Did you have that prior to the trial in this case?

5      A    No, I did not.

6      Q    And that was furnished to you by Mr. McRae's post

7  conviction counsel, is that --

8      A    That's correct.  Some time in 2010 or thereabout.

9      Q    Thank you.

10         MR. LAU:  I have no further questions.

11         THE COURT:  Any questions from the State?

12         MR. HAIGH:  No, Your Honor.

13         MR. LAU:  The defense calls Edward Tender, Your

14 Honor.

15         THE COURT:  All right.

16             The witness, Edward Tender, was sworn and

17             testified as follows to the examination of

18             counsel.

19                   **DIRECT EXAMINATION**

20 BY MR. LAU:

21     Q    Good afternoon, Mr. Tender.  Would you state your

22 full name for the record.

23     A    Edward Lewis Tender.

24     Q    And Mr. Tender, how old are you?

25     A    Sixty-two.

1     Q    And Mr. Tender, you're an alcoholic, is that correct?

2     A    Recovering alcoholic.

3     Q    And how long have you been sober?

4     A    This January will be -- January 3rd will be 24

5  months.

6     Q    Twenty-four months on January 3rd?

7     A    Yes, 24 months.

8     Q    Now, have you taken the steps, over the course of

9  those 24 months, to maintain your sobriety?

10    A    Yes. I go to my meetings.

11    Q    And what is it that you do with respect to your

12  recovery?

13    A    I go to AA meetings.  I work in the community and the

14  church, and I mentor two little boys.

15    Q    And how frequently do you attend AA meetings?

16    A    At least twice a week.

17    Q    At least twice a week?

18    A    Yeah, twice.  When I first started I was going -- I

19  made about a meeting every night.

20    Q    Now, are you a religious person, Mr. Tender?

21    A    Yes, I am.

22    Q    Can you describe your participation in the church.

23  Are you a member of a church?

24    A    Yes.

25    Q    And what church is that?

1          A    New Bethel AME Zion in Dobbin Heights.

2          Q    And do you have a role within that church?

3          A    Yes.  I'm on the trustee board and on the choir.

4          Q    And what is your role as a trustee?  What are you

5     responsible for?

6          A    I'm responsible for all the property of the church

7     including the building, the van, the building, the parsonage,

8     and all of the real property that new Bethel owns.

9          Q    Now, you understand you're under oath today?

10         A    Yes, I do.

11         Q    And if you may, can we talk about your prior

12    involvement in this case?

13         A    Yes, as far as I can remember.

14         Q    Do you remember being involved in this case beginning

15    sometime in March 1996?

16         A    I can vaguely, yeah.

17         Q    You can vaguely remember.  What can you remember?

18         A    I remember I had to go to court a couple of times.  I

19    think it was two times altogether.  It's been about 20 years.

20    I'm trying to think back now.

21         Q    Now, in March 2013, where you sober?

22         A    Yes.  I'm trying to count back now.  This January,

23    like I said, will be two years.  Yes.

24         Q    Before discussing March, you previously spoke with

25    counsel for Mr. McRae in this case, is that right?  Have you

1    been spoken with by Mr. McRae's counsel, myself?

2         A    Yeah, I spoke with plenty of people.

3         Q    Now, do you remember giving a statement in this case

4    sometime in March 1996?

5         A    I remember talking.  I don't remember exactly what

6    the statement was.

7              MR. LAU:  May I approach.

8              THE COURT:  Yes.

9    BY MR. LAU:

10        Q    Mr. Tender, I handed you Defendant's Exhibit 19.  Can

11   you identify what this exhibit is?

12        A    It's a statement.  I see my name at the top.  I don't

13   have my glasses.  I lost my glasses.  That's my signature at

14   the end.

15        Q    Is that your signature at the end?

16        A    Yes, sir.  A statement at the top, but it's not my

17   writing.

18        Q    This isn't your handwriting?

19        A    No.  That's not my handwriting.  I see my name up

20   there.  I can hold it off and see my name and that's definitely

21   my signature at the end, but I can't see.  Like I said, I lost

22   my glasses.

23        Q    Now, in March 1996, were you incarcerated at that

24   time?

25        A    '96?

                        PATRICE B. LEE, CVR-CM
                        OFFICIAL COURT REPORTER

1     Q    At the Richmond County jail?

2     A    I was incarcerated in '96, yes.

3     Q    In March of '96, do you recall?

4     A    I can't recall.  It's been over 20 some years ago.

5  My math --

6     Q    Do you recall being incarcerated with Derrick McRae?

7     A    Yeah.  I recall being (inaudible) with Derrick McRae,

8  yeah.  It was a lot of other people, they was (inaudible).

9     Q    Did you speak with Mr. McRae while he was in --

10    A    Yeah.  I remember speaking with him.  We was in the

11 same cell.  I can't remember what block.

12    Q    The same cell or the same cell block?

13    A    We was in the same cell block, you know, that big old

14 place where everybody is crammed in.  Like I said, it's vague.

15    Q    Mr. Tender, because you don't have your glasses, I'll

16 read the statement for you, and then I have a couple of

17 questions for you.  'On this day, 26th day of March, 1996, I

18 Edward Lewis Tender, request to speak with Detective JC Britten

19 and Sergeant Voorhees without my lawyer present.' Do you recall

20 ever meeting with law enforcement without your lawyer present?

21    A    Not right, you know, not word for word -- -

22    Q    'About two weeks ago -- continuing -- Derrick McRae,

23 who's in jail for murder, came to me and told me he wanted to

24 talk to me.  Derrick McRae told me that he walked up on a white

25  boy, Jerry Rankin, while he was on a porch sleeping.  Derrick

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1  McRae said when he walked up on the porch, he put a .380

2  handgun to Jerry Rankin's head and shot him.  Derrick McRae

3  said that he then took the .380 handgun and hid it in some

4  bushes near the house where he shot Jerry Rankin.  Derrick

5  McRae said that about two days later him and two other boys,

6  but I can't remember their names, went back and got the .380

7  handgun and took it and hid it in Chapel Town near Derrick

8  McRae's house.  Derrick McRae said that the reason he shot

9  Jerry Rankin was because he was a white boy.  Derrick McRae

10 also said that all white people need to die.  Yesterday on

11 3-35-1996 -- which I believe should be 25 -- Derrick McRae came

12 to me and said that he was going to kill some of the police.

13 Derrick McRae said he was going to start with Phil Sweat,

14 Detective Britten, Caption McQuay, and he was going to work his

15 way down.'  Do you recall this statement?

16     A    Not right off hand.  Like I said, that was twenty

17 something years ago.  I've been through a lot and I can't

18 remember.

19     Q    Do you recall Derrick McRae telling these things to

20 you?

21     A    Like I said, you know, it's been twenty something

22 years so, I can't remember.  My mind has been through a lot.

23     Q    Mr. Tender, I don't -- we talked about this before,

24 is that correct?

25     A    Yeah.

1      Q    And was your mind substantially better then?

2      A    Yes, it was.

3      Q    Mr. Tender, I'm handing you what's been marked

4    Defendant's Exhibit 20.  Can you identify Defendant's Exhibit

5    20?

6      A    I tried to -- like I said, I don't have my -- I see

7    my signature over here.

8      Q    Is that your signature?

9      A    Yes, it is.  It doesn't look like my handwriting

10   because I can even type.

11     Q    Now, on March 2013, you previously testified that you

12   were sober during that time, is that correct?

13     A    Yes, I did.

14     Q    So, during this time in March 2013, you would have

15   been being honest, is that correct?

16     A    Yeah.

17     Q    You would have honestly been speaking about what it

18   was you remembered from this case?

19     A    Yeah, probably was.  I had talked to so many people

20   on this case.

21     Q    And you've told many of those people -- well, first

22   let's -- if you don't mind, can you read your affidavit,

23   Mr. Tender?

24          MR. HAIGH:  I object to hearsay, Your Honor.

25     A    Like I said, my eyes are bad.  I can't see this.

1              THE COURT:  I'm not going to require that you read

2      it.

3              THE WITNESS: I lost my glasses, Your Honor.

4              THE COURT:  That's all right.

5              THE WITNESS:  And the VA providing them.  I've got a

6      doctor's appointment in the morning.

7              THE COURT:  All right.  That's fine.  Thank you.

8      BY MR. LAU:

9          Q    Mr. Tender, Paragraph 11, you said you were being

10     honest.  It says, 'I provided false statements to detectives

11     and testified falsely against Derrick McRae to improve my

12     outcomes of my cases'

13             MR. HAIGH:  Objection.  Hearsay, Your Honor.  This is

14      improper impeachment.

15             THE COURT:  All right.  I'm going to sustain that.

16             MR. LAU:  Your Honor, at this point in time, if

17      Mr. Tender is saying that he --

18     BY MR. LAU:

19         Q    Mr. Tender, can you examine the contents of this

20     affidavit?

21         A    I told you my eyes -- I don't have my glasses.  I

22     can't see.  Everything is blurry.  I lost my glasses.

23         Q    If I read this to you, would that refresh your

24     recollection of your statement dated March 21, 2013?

25         A    I don't think it would.

                         PATRICE B. LEE, CVR-CM
                         OFFICIAL COURT REPORTER

1          Q    That wouldn't refresh your recollection?

2     Mr. Tender, is it possible for you to get another pair of

3     glasses and come back and testify for this Court at a time when

4     you do have your glasses?

5          A    Like I said -- like I said, it's up to the VA, you

6     know.  I'm going tomorrow to see about getting some more.  They

7     might get them in the next few days -- a day or two, it's

8     possible.

9          Q    So, tomorrow's appointment is to see if you can

10    obtain your glasses?

11         A    Yeah, obtain glasses and for the PTSD evaluation and

12    medical evaluation.  It will be after 12:30.

13         Q    Did Derrick ever tell you, Mr. Tender, that he was

14    involved in the death of Jerry Rankin?

15         A    I can't remember, sir.

16         Q    Have you testified in other murder trials,

17    Mr. Tender?

18         A    Not that my recollection -- like I said, it's been

19    over 20 some years, I can't remember.

20         Q    Not in your recollection?  Is testifying a memorable

21    thing to you, Mr. Tender?

22         A    It used to be when I was younger.  I'm 62 years old

23    now, you know, battling with this recovery.  It's a lot of

24    other stuff.

25         Q    So, your testimony is you don't remember whether

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1   Derrick McRae told you?

2       A    I don't.

3            MR. LAU:  Your Honor, at this point in time, I would

4    have no further questions, but I would ask to recall

5    Mr. Tender tomorrow afternoon after his appointment in hopes

6    that he gets glasses, and I would have the opportunity to

7    properly refresh the witness with his previous statement.

8            THE COURT:  All right.

9            THE WITNESS:   I should have them tomorrow.

10           THE COURT:  I can't vouch for whether you're going to

11   get your glasses or not by tomorrow.

12           I'm not going to delay the hearing of this matter

13   beyond the next day or two, beyond the time that it otherwise

14   would take us to conclude the hearing.  I would agree, if you

15   wish to do so, that you could call him out of order even after

16   the State has presented evidence.  I'll leave it open to allow

17   you to do that, but I'm not going to leave it open beyond the

18   normal course of this hearing.

19           MR. LAU:  I understand, Your honor.

20           THE COURT:  For him to get a pair of glasses.  He's

21   answered some questions based on his recollection even

22   without having been refreshed.  I'll certainly consider what

23   he's already testified to, and I'm going to give the State's

24   counsel an opportunity to go ahead and cross examine him at

25   this point as to any of the matters that he's already

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1    testified about, if you wish to do so, because I don't know

2    whether he's going to be back here or not.  You're not

3    required to do so, I'm just telling you this is your

4    opportunity if you wish to do so.

5                       **CROSS EXAMINATION**

6    BY MR. HAIGH:

7         Q    Now, Mr. Tender, you testified in two different

8    trials regarding Derrick McRae, right?

9         A    Yes, sir.  If I can remember correctly.

10        Q    Okay.  And you were under oath at those times, right?

11        A    Yes.

12        Q    And you testified truthfully at the first hearing,

13   didn't you?

14        A    Yes, sir, to the best of my knowledge.  I can't

15   remember.

16        Q    All right.  And you testified truthfully at the

17   second trial, didn't you?

18        A    Best that I can remember.

19        Q    All right.  Thank you.

20             THE COURT:  Any further questions?

21             MR. HAIGH:  No.

22             THE COURT:  Anything further?

23             MR. LAU:  We would ask to reserve.

24             THE COURT:  Thank you, sir.  You may step down.

25             Give me just one second.

                       PATRICE B. LEE, CVR-CM
                       OFFICIAL COURT REPORTER

1          MR. LAU:  At this time, the defense would call Robert

2     Voorhees.

3          THE COURT:  All right.

4               The witness, Robert Voorhees, was sworn and

5               testified as follows to the Examination of

6               counsel.

7          MR. LAU:  Your Honor, at this time, before we start

8     with Mr. Voorhees, I would move to admit Defendant's Exhibit

9     19 and 20.

10         MR. HAIGH:  Your Honor --

11         THE COURT:  Yes.

12         MR. HAIGH:  I object to Exhibit Number 20 in that

13    it's hearsay.  I think there's clear law that's particular,

14    even in MARs, about hearsay affidavits not being viable

15    evidence.  I object to Number 20.

16         THE COURT:  What do you say about Number 20?

17         MR. LAU:  We will, at the appropriate time, move to

18    introduce it, Your Honor.

19         THE COURT:  All right.  I'm going to deny its

20    admission at this point.  I will admit Number 19.

21         MR. LAU:  Thank you.

22              (Defense Exhibit Number 19 was admitted.)

23    BY MR. LAU:

24         Q    Mr. Voorhees, Good afternoon?

25         A    Good afternoon.

                    PATRICE B. LEE, CVR-CM
                    OFFICIAL COURT REPORTER

1    Q    Would you state your full name?

2    A    Robert Joseph Voorhees.

3    Q    Mr. Voorhees, how are you currently employed?

4    A    I'm employed with HO Waltman Trucking Company in

5    Wisconsin.

6    Q    And how were you previously employed?

7    A    The City of Rockingham as a law enforcement officer.

8    Q    And what was your position upon retiring from the

9    City of Rockingham or when you left the City of Rockingham?

10    A    I was the chief of police.

11    Q    Now, how long were you employed by the Rockingham

12    Police Department?

13    A    Roughly 22 years.

14    Q    And in 1996, you would have been employed with the

15    Rockingham Police Department?

16    A    That's correct.

17    Q    And do you recall what your position was in 1996?

18    A    I was in the investigation division and, to the best

19    of my memory, I held several different ranks during that

20    timeframe.  I think I was a Detective Sergeant.

21    Q    And with respect to -- in October of 1996, how were

22    you employed in October of 1996?  If you can recall.

23    A    I was employed in the detective division, criminal

24    investigations with the City of Rockingham Police Department.

25    Q    And can you describe, as part of your employment,

PATRICE B. LEE, CVR-CM
OFFICIAL COURT REPORTER

1  what training you had received at that time for criminal

2  investigations?

3      A    At that time, I had received basic law enforcement

4  training with Randolph Community College, many in-service

5  training things.  I would have to go back and look at a

6  transcript to tell you exactly what.  I did not prepare for

7  that or bring that with me today, but I remember attending

8  several classes such as basic criminal investigation,

9  interrogation.  At some point, I enrolled in Richmond Community

10 College and was in their associates program for criminal

11 justice.  In '96, I believe I was actively enrolled at that

12 time in October '96.  Seems like I finished that somewhere in

13 '98, in that time frame.  It's almost 20 years ago.  It's hard

14 to remember the exact dates.

15     Q    With respect to your training, do you remember

16 anything specifically about how you were trained to document

17 investigations?

18     A    Yes.  During the many criminal investigation courses

19 I took and within departmental policy and procedures and how I

20 was trained internally, I have a clear recollection of the

21 basics of how we would document things.

22     Q    And what were those basics?  What would you do to

23 document the investigations that you conducted?

24     A    Well, different parts of the investigation would

25 require different documentation.  If you're talking about a

1  piece of evidence, there was an evidence control form, physical

2  evidence, whether it be a handwritten statement from someone --

3  depending on whether the officer wrote it or the individual

4  witness or suspect wrote it -- all those things would be

5  documented differently.

6      Q    And how about your investigative activities when you

7  went to a neighborhood?  When you knocked on a door?  When you

8  made contact with someone?  What would you do to document

9  those?

10     A    Those would be in officer notes.

11     Q    And would those officer notes ever incorporate into a

12 supplemental investigation report or any report with respect to

13 documenting, sort of, what was there in the officer's notes or

14 the detective's notes?

15     A    During that time, I knew at one point, officer's

16 notes weren't discoverable and then the rules changed for court

17 procedures and they became discoverable.  So, you know, at

18 different times either we'd put them all in the discovery

19 packet and hand them over to the district attorney or we would

20 retain them until such time we were asked for them or had to go

21 to court to use them to testify.

22     Q    So, if an officer spoke with an individual and made a

23 note of it, how would other officers be aware that that

24 individual had already spoken with an officer because you

25 did -- how would the next officer know that that individual had

Case 1:21-cv-00577-LCB-JLW   Document 10-16   Filed 12/15/21   Page 130 of 153

1  been spoken to?

2      A    Within our department, we only had three

3  investigators at any given time.  Part of our annual or routine

4  in the morning would be, you know, we'd catch each other up

5  with the status of where things were, especially with the more

6  serious pending cases, and we would let them know what, you

7  know, relevant facts or what new things were appearing in the

8  case or new statements, new evidence, if we got lab reports

9  back, if we talked to a new witness, whatever the case may be.

10         If a witness was talked to, it would be standard

11  procedure for it to be documented and either we'd ask the

12  witness to handwrite his own statement or we would write it

13  ourselves and ask him to sign it or document that it was a

14  field interview or whatever.  Like I said, it's several

15  different levels of evidence it may be.

16      Q    Were there any master files with respect to cases

17  that the material would ultimately end up in?

18      A    There is a master file for every case that the

19  Rockingham Police Department generated at the time, and then

20  there was a master investigation file.

21      Q    And what went into the master investigation file?

22      A    All the work product of the investigation.

23      Q    Everything?

24      A    Yes.

25      Q    So, officer notes would eventually make it into that

1  file?

2      A    Yes.

3      Q    When you respond to a crime scene, just generally,

4  can you tell me what it is that you do initially at the scene?

5      A    What type of crime scene?

6      Q    A homicide.  When you respond to a homicide can you

7  tell me what typically was your actions?

8      A    Well if -- as the investigating officer or the

9  assigned detective or detective on call at the time, which as I

10  recall at that time I was, you would go to the crime scene,

11  speak to the responding officers.  You would document what you

12  found, the weather, what it was like, your physical

13  observations, what you saw yourself.  At that point, you have

14  to make a determination whether you are able to process the

15  crime scene or you would request assistance from an outside

16  agency to come assist you in processing the crime scene, which

17  in this case, I believe that's what occurred.

18      Q    Now, I just want to clarify, you said there's a

19  master case file for every case?

20      A    Yes, sir.

21      Q    Is that right?  And then, I think you said, there is

22  a master investigator case file for every case.  Are there two

23  files?

24      A    For every crime that gets reported to the Rockingham

25  Police Department, at that time -- I can't testify to what

1    currently happens today.  But at that time, a master incident

2    file was created, an incident file.  If an investigation was

3    opened up into the crime, an investigation file was opened up

4    subsequently.

5         Q    So, can you tell me what the difference between the

6    two -- what would be in the master incident file versus what

7    would be in the master investigative file?

8         A    In the incident file, it would just be the original

9    officer's incident report and his supplement reports that were

10   filed by the officers and a subsequent arrest report, if an

11   arrest was made, and any preliminary investigation that was

12   done prior to the investigation file being opened.

13        Q    What warranted a supplemental report?

14        A    If something was changed or new evidence was brought

15   to the original officer's attention that he didn't add to the

16   original report that was pertinent to the original crime that

17   was wrote on the O2.

18        Q    And all these were the practices of the Rockingham

19   Police Department in October of 1996?

20        A    Yes.

21        Q    Do you recall the investigation of Jerry Rankin's

22   death?

23        A    I recall the incident, yes.

24        Q    What do you recall from the investigation?

25        A    I was not the only investigating officer in the case.

1    I remember being called out that night to the crime scene.  I

2    remember requesting the assistance of the crime scene

3    investigator from the Richmond County Sheriff's Department to

4    come out and process the scene.  I remember subsequent

5    following up the investigation.  I remember there being a time

6    period between the time of the incident and the actual arrest

7    in the case.  There was -- I would consider it to be a

8    significant -- in other words, it wasn't a couple weeks, it

9    seems like it was months at least, I don't know the exact time

10   period.

11           I remember the name of the individuals that were

12   charged.  I remember there being two trials, and much more

13   specifics then that is all.  I haven't reviewed the case.  I

14   haven't looked at the case.  I haven't worked for the police

15   department in over two years.  I haven't actually seen the case

16   file itself in probably, well, over five to seven years.  So,

17   anything that I would testify to without refreshing my memory

18   or looking at the file would all be speculation.

19      Q    Do you still have any notes personally from this

20   case?

21      A    No, I do not.

22      Q    So, in your possession or --

23      A    No, I do not.

24      Q    Was there ever a doubt that this was a homicide?  Was

25   there ever a period when it was in question whether or not a

Case 1:21-cv-00577-LCB-JLW  Document 10-16  Filed 12/15/21  Page 134 of 153

1    homicide occurred or whether or not it was a suicide or any

2    other sort of cause of death?

3        A    I don't remember if I attended the autopsy or

4    somebody else attended the autopsy.  I do remember that the

5    medical examiner ruled it a homicide, fairly.  There was not

6    much question after his autopsy.

7            MR. LAU:  If I may approach, Your Honor.

8            THE COURT:  Yes.

9    BY MR. LAU:

10       Q    Mr. Voorhees, I'm handing you what's been marked

11   Defendant's Exhibit Number 21.  Can you identify this exhibit?

12       A    If you'll give me just a moment to review it.

13       Q    Sure.  Take your time.

14       A    It looks to be partial what I would recognize as an

15   autopsy report from the medical examiner's office.  I remember

16   them being a lot more than just four one-sided pages.

17       Q    Let me hand you what I've marked as Defendant's

18   Exhibit 22 and that may help you out.  Can you identify

19   Defendant's Dxhibit 22, Mr. Voorhees?  Do you recognize what

20   this document is?

21       A    Yes.  It appears to be the medical examiner's

22   examination report and toxicology report of the autopsy of

23   Mr. Jerry Rankin.

24       Q    And do these documents help refresh your recollection

25   on when it was that the autopsy took place and the medical

1    examiner reviewed the body?

2         A    Yes.

3         Q    On Defendant's Exhibit 21, can you see there at the

4    bottom that date of the medical examiner's review?

5         A    Twenty-one on the bottom.

6         Q    Of the first page.

7         A    I can make out the 10 and 14 are the first two

8    numbers.  The last two I'm going to assume say 95, but the

9    handwriting is poor.

10        Q    And does this form indicate a manner of death?

11        A    It says probable cause of death gunshot wound to the

12   head.

13        Q    And below that, do you see where it says manner of

14   death?

15        A    Homicide.

16        Q    So, at the time the medical examiner viewed the body,

17   it was apparent from that time that it was a homicide?

18        A    Yes.

19        Q    Now, as the sergeant, the investigative sergeant,

20   what were your responsibilities with respect to the other

21   investigators on staff?

22        A    I want to make it clear that I'm not testifying to

23   exactly what my rank was at the time.

24        Q    Okay.

25        A    I was in the investigation division.  I'm not

1    absolutely sure when I was promoted to Detective Sergeant.

2        Q    I understand.

3        A    But I was in the investigative division.  I did hold

4    the rank of investigator, and I was one of the investigators on

5    this case.

6        Q    When you were the investigative sergeant, what was

7    your responsibility with respect to the roles and things?

8        A    Well, in that time, there was two other individuals

9    in the police department, a Captain and a Detective Lieutenant,

10   that would have had operational control over me, you know, over

11   the investigation department that we would report to.  As a

12   Sergeant, I was more or less the first line supervisor, the

13   on-site supervisor, although that night, I was the only one

14   there.

15            MR. LAU:  May I approach.

16            THE COURT:  Sure.

17   BY MR. LAU:

18       Q    I'm handing you what's been marked Defendant's

19   Exhibit 23.  Do you recognize what Defendant's Exhibit 23 is?

20       A    It is a one time used form at the police department

21   for reporting felonies to the District Attorney's Office.

22       Q    Now, on the upper left-hand corner, Defendant's

23   Exhibit 23, it is the investigative officer and it says RJ

24   Voorhees, is that you?

25       A    Yes.

                    PATRICE B. LEE, CVR-CM
                    OFFICIAL COURT REPORTER

1      Q     And what was your rank at the time?

2      A     At the time this report was filled out, it says I was

3    Detective Sergeant.

4      Q     Now, in preparing this report, what would you do to

5    prepare this report?

6      A     I would sit down and fill it out based on the best of

7    my knowledge and the knowledge contained in the investigative

8    report to give a summary to the district attorney of what

9    information we had.

10      Q     Would you review the case file?

11      A     Yes.

12      Q     And would you review the statements and the notes and

13    whatever was there in the case file?

14      A     Yes.

15      Q     Why was that important?

16      A     Well, filling out this report would be our first

17    communication with the district attorney to allow them to know

18    what was contained in the case file until such time we did

19    discovery, and it would give them an idea of what was in

20    possession of the police department and if they needed any

21    further review for indictment or whatever, they could ask for

22    it immediately before they received the entire packet.

23      Q     So that which was listed here was the materials that

24    were in the case file?

25      A     Correct.

1     Q    And the purpose of this was to communicate what those

2  materials were to the district attorney?

3     A    Correct.

4     Q    On that report that you have in front of you, does

5  that indicate a defendant?

6     A    Yes.  It indicates two defendants.

7     Q    And who are the defendants in the case?

8     A    Thurmond Nelson and Derrick McRae.

9     Q    Now, on the top of that form, is there a primary

10  defendant that that felony report is in reference to?

11     A    Yes.  One had been filled out for everyone that was

12  charged.

13     Q    Okay.  Who is the primary defendant with respect to

14  the form that I just handed you?

15     A    In respect to the form it was Thurmond Nelson.

16     Q    Thank you.  Now, if you don't mind, turning the

17  felony report that you have in your hand to Page 4 where it

18  lists witnesses?

19     A    Yes, sir.

20     Q    Now, that's where you begin listing out what evidence

21  specifically that the police department has in its file, is

22  that accurate?

23     A    Yes, at that time.  It's important to note this was

24  done at time of the arrest and just because the arrest occurred

25  the investigation didn't stop.

1     Q    The investigation didn't stop?

2     A    No.

3     Q    At the time of the arrest.  Now, those investigative

4 records, those also would be in the master file, would they

5 not?

6     A    Yes.

7     Q    Mr. Voorhees, I'm going to hand you another felony

8 report, this being marked Defendant's Exhibit 24.  Do you

9 recognize this report?

10    A    Yes.

11    Q    And again, who is responsible for creating this

12 report?

13    A    Appears to be my handwriting.

14    Q    And who was the primary defendant with respect to

15 this report?

16    A    Derrick McRae.

17    Q    And again, this report would summarize the evidence

18 for the District Attorney's Office?

19    A    Correct.

20    Q    Do you recall prior communication, Mr. Voorhees,

21 where you indicated that the Rockingham Police Department no

22 longer had a master case file on this case?

23    A    No, I don't.

24    Q    Do the District Attorney's Office, post conviction

25 lawyers, or anyone else associated with this case?

1      A     I don't have a clear memory of it.  I do remember

2  someone called and I can't remember if it was the District

3  Attorney's Office or someone else called and asked if we had

4  the file and we maybe looked for it.  During that time, we had

5  renovated the police department.  We actually moved our offices

6  twice during the renovation and many things were reshuffled,

7  stored, and put in storage.  This case was closed.  At the

8  time, we didn't know of any pending court appeals or whatever

9  and we did not -- the day I was asked, the file was not on

10  premises at the Rockingham Police Department, physically in the

11  building.

12      Q     Mr. Voorhees, I'm handing you what's been marked

13  Defendant's Exhibit 25.  Do you recognize what Defendant's

14  Exhibit 25 is?

15      A     It appears to be a file containing some of the

16  original work product from the case against Thurmond Nelson and

17  Derrick McRae.

18      Q     Now, on the spine of that, would that binder -- would

19  that indicate that that's the RPD's file for this matter?

20      A     That is part of the filing system, yes, sir.  It

21  indicates the type of crime and the original OCA number, but

22  just a cursory look at it, it looks to be two files that were

23  merged together and one of them is just not complete.  It's

24  missing a lot of the information that's indexed in it.

25      Q     Which file is missing a lot of information?

1       A    Well, you handed this to me as one file.  I would

2   have to say if you're handing this to me --

3       Q    Well, what do you think does not belong in the file?

4       A    There is nothing in here that I would say doesn't

5   belong.  If it's work product, everything belongs in there.

6   But what I'm saying is there is several things in here that are

7   indexed that are just completely not there.

8       Q    By indexing that they are, what are you referring to?

9       A    I'm saying that if I created this file, and it

10  certainly doesn't look like my work product, anything that was

11  indexed -- the crime scene, evidence statement, witness

12  statements, suspect info, autopsy report, report synopsis --

13  all those are tabbed and indexed, but yet when you turn to the

14  tab there is nothing there.

15      Q    So, your belief is something should be behind each of

16  those tabs?

17      A    Yes.

18      Q    Mr. Voorhees, I'm handing you what's been marked

19  Defendant's Exhibit 26, and I'm going to ask you to take some

20  time and compare what's in Defendant's Exhibit 26 to what's in

21  Defendant's Exhibit 25 and ask you if Defendant's Exhibit 26 is

22  a true copy of the material in Defendant's Exhibit 25 prior to

23  any post conviction matters which I understand  may be --

24      A    Okay.  You're ready for this? I mean, you're asking

25  me to do something that I can't do in five minutes.

Case 1:21-cv-00577-LCB-JLW   Document 10-16   Filed 12/15/21   Page 142 of 153

1     Q    I understand, but it's important?

2     A    Well, indulge me and I'll be glad to do it.

3          THE COURT:  We'll indulge you.

4          THE WITNESS:  He's asking me to do something

5 that's --

6          MR. LAU:  Thank you.

7              (Witness reviews Exhibits 25 and 26.)

8          THE COURT:  Mr. Voorhees, how far along are you?

9  I'm not rushing you.  I'm just trying to get an idea of where

10  our time is.

11         THE WITNESS:  At this point, I'd be willing to say

12 that they are a fair representation of each other.  They are

13 not exact by any means.  One contains some stuff from trial

14 that obviously couldn't be in the investigation report.  Some

15 things are dated after my tenure with the police department.  I

16 can't testify as to how they got in there or why it's missing

17 from one and not the other.  To say it's a fair representation

18 of each other, I would say, yeah.

19         THE COURT:  Does that satisfy you?

20         MR. LAU:  That would satisfy me.  I don't know if it

21  satisfies Mr. Haigh.

22         MR. LAU:  If I may just ask the witness.

23         THE COURT:  Sure.

24 BY MR. LAU:

25     Q    With respect to the investigative documents that are

1    included in Defendant's Exhibit 26 and those that are included

2    in the file Defendant's Exhibit 25, those are accurate

3    representations of the investigation conducted by the RPD and

4    the records that they have with that investigation?

5         A    I can't speak for 400 officers whose signatures are

6    in this file and one of them whom is dead at this point.  I can

7    speak for my work product and my work product only.

8         Q    Now, as the individual who conducted the felony

9    report or drafted the felony report to the District Attorney's

10   Office, you would have reviewed all of the materials though,

11   isn't that correct?

12        A    I would have access to them all, yes sir.

13        Q    And you would have reviewed it when providing that to

14   ensure that you had all the material provided to the District

15   Attorney's Office that it needed?

16        A    I'm quite sure I would have transcribed addresses,

17   phone numbers from one to the other.

18        Q    And reviewed the statements?

19        A    I'm not sure whether I would have sat there and

20   reread the statements just filling out a name and address on a

21   felony report, no, sir.

22        Q    Would you have known the substance of the statements?

23        A    Yes.

24        Q    Because you would have discussed them with the other

25   officers, is that right?

1      A    I would have physically read them myself, been

2   present for them, or discussed them, yes, sir.

3      Q    Now, with respect to the materials in Defendant's

4   Exhibit 26 -- let me ask you this first.  How important are the

5   first few months of the investigation from your experience?

6      A    Generalizing, the first part of any investigation is

7   always critical and when you tend to receive the most

8   information, but the breaking information or the most important

9   piece of information can come months, years, decades later from

10  a crime.

11     Q    Now, of course, on October 14, 1995, medical

12  examiners said that this was a homicide, correct?

13     A    That's correct.

14     Q    So, your investigation would have began on

15  October 14, 1995?

16     A    Investigation would have started whatever time I was

17  called to the crime scene during that incident, my

18  investigation.

19     Q    Do the records of the Rockingham Police Department

20  have any investigative records in it from October 14, 1995

21  through the end of October 1995?

22     A    I have no direct knowledge, sir, what's in the

23  current files at the Rockingham Police Department.

24     Q    Well, you have a copy of it there.  Are there any

25  investigative notes in your copy that you have there,

1  Defendant's Exhibit 26?

2      A    I'm not sure I understand the question.  Try me one

3  more time.

4      Q    Well, I'm asking you is that the Rockingham Police

5  Department's file, which is what you looked at when you did the

6  felony investigative report or what you had access to, should

7  it contain records from the month of October 1995 identifying

8  Mr. Rankin dead on a porch on Hood Street?

9      A    Anything to do with the case, yes, sir, it should be

10  in the investigative file.

11      Q    Anything to do with the case.  And you were

12  investigating during that period of time, am I correct?

13      A    That's correct.

14      Q    So, I'm asking what's in the file that I've handed

15  you that indicates what took place during the investigation

16  after Mr. Rankin was found dead on Hood Street until the end of

17  October?

18          MR. HAIGH:  Your Honor, I'm going to object at this

19   point.  This is irrelevant.  If you look at the claims that

20   are presented before this Court, none of them deal with the

21   investigation of Rockingham Police Department or this

22   particular witness.  It's all about statements or recanted

23   testimony.  So, I object to the relevance at this point.

24          MR. LAU:  Your Honor, if you are aware there is a

25   Brady claim about the cumulative evidence withheld.

1    Additionally, at the time the MAR was filed, the prior

2    representations to counsel was that this record did not

3    exist, that the master case file was lost, and you heard

4    testimony to that extent or lost or somehow not in the

5    possession of the Rockingham Police Department.  So, this

6    only came to our knowledge after it was inadvertently, or

7    advertently, I don't know, after it was revealed to us in

8    response to a public record request that we made relating to

9    this case and our preparation for this hearing.  So, I

10   believe it does add to our Brady claim especially the cattail

11   one, and if necessary, we would have amended this point in

12   time to include that on the basis of what we learned through

13   this testimony.

14           MR. HAIGH:  May I respond, Your Honor.

15           THE COURT:  Yes.

16           MR. HAIGH:  If you look at the actual statute, they

17   are required to file an amendment at least 30 days prior, so

18   it's a barred.  Actually, evidence is already started, that

19   locked it in at that point.  They could have filed one before

20   evidence started today and we would have had an opportunity

21   to continue the case at that point.  They didn't do so.

22   Moreover, if you look at what we're talking about here, these

23   are materials that were provided months ago from our office

24   so they did have awareness of what was in the file, and I

25   know that Mr. Lau went to the Rockingham Police Department to

1  personally review those records.  We have a videotape of that

2  process, and that happened several months ago as well.

3       MR. LAU:  Your Honor, I would say this in response to

4  that.  The same statute that Mr. Haigh refers to discusses

5  our opportunity to amend at the conclusion of this hearing

6  based on the evidence presented.  The problem with the

7  State's position is that this Court will see that the records

8  do not exist from the response by the Rockingham Police

9  Department until February 21, 1996.  There is nothing there.

10  Now, can we file a Brady claim on the basis of nothing?  We

11  need to talk about what took place during that period of

12  time.  Whether or not there were potentially favorable

13  evidence that should have been turned over, and we didn't

14  have that opportunity until today, until we got to ask

15  questions of Mr. Voorhees and other investigative officers if

16  Mr. Voorhees can't answer those questions.

17       Furthermore, there may be a claim, if it's

18  established in his testimony -- we have to have the testimony

19  come out today and amend as required by the testimony.  If the

20  exculpatory evidence is purged in bad faith or favorable

21  evidence is purged in bad faith, then under Arizona versus

22  Youngblood, which is a Supreme Court decision, that's a due

23  process violation entitled in our client to relief.  We're

24  simply trying to understand why it is that this investigation

25  seems to have only -- not only given to the District Attorney's

Case 1:21-cv-00577-LCB-JLW  Document 10-16  Filed 12/15/21  Page 148 of 153

1  Office only statements and evidence that are inconsistent or

2  inculpatory of Mr. McRae and everything else seems to be purged

3  from the record.  What we're trying to learn was, was those in

4  the record and what's the reason it was purged.  And that's

5  where this is going.

6        MR. HAIGH:  Your Honor, I would just make one

7  distinction before the Court and that is defense counsel is

8  right, that they can be amended at the close of the evidence,

9  but they can amend with regard to relevant evidence of a

10  claim that is already made, not a completely new claim, and

11  that's the distinction here.  This is something that is --

12  they're limited by what's before the Court once evidence

13  started here today.

14        MR. LAU:  And as I said, we made the claim.  It's a

15  Brady claim that says that we weren't provided certain

16  evidence and we're just trying to see what, in addition,

17  wasn't provided to have a full understanding of the record of

18  what happened in this case.

19        MR. HAIGH:  Your Honor, we're here for a hearing, not

20  a fishing expedition.  This is something that should've have

21  been done ahead of time.

22        THE COURT:  Let me be sure I understand.  You have

23  had everything that's in Defendant's Exhibit 26?

24        MR. HAIGH:  Your Honor, this is something that I

25  provided to the defense.

Case 1:21-cv-00577-LCB-JLW  Document 10-16  Filed 12/15/21  Page 149 of 153

1          THE COURT:  Right.  I thought when we had the bench

2     conference, the last few pages didn't --

3          MR. HAIGH:  There are materials that I have never

4     seen before that was provided directly to defense counsel

5     from Rockingham Police Department.  At least, that's my

6     understanding.

7          THE COURT:  But you didn't provide those.

8          MR. HAIGH:  No, I did not.  But this witness, again,

9     you know, it's long past his tenure there.

10         THE COURT:  I don't think it's fair for you to be

11    surprised by materials in this packet that have not been

12    reviewed yet.  I would otherwise be inclined, as I have been

13    all day long, to let you gentlemen inquire of this or any

14    other witness about these documents if there is no unfair

15    surprises.

16         Now, the documents themselves, whether they fall

17    within a claim that's been asserted, I'll decide.  And it may

18    be that they indeed do not, but for purposes of this hearing

19    and not having to play games with what -- not to play games,

20    but having to decide what goes before a jury and what doesn't

21    go before a jury, I'm inclined to hear everybody out.  It may

22    very well be that this does not come with any of those claims,

23    and your argument is well taken with respect to what they may

24    do at this point.  I don't know whether you're going to try to

25    find some way in your present claim to go into that.  You've

Case 1:21-cv-00577-LCB-JLW  Document 10-16  Filed 12/15/21  Page 150 of 153

1    indicated you think you can do that.  I'm going to give you the

2    chance.

3            MR. LAU:  We have to understand what it is that's

4     missing.

5            THE COURT:  I just said I'm going to give you that

6     chance, but you understand what I'm saying about the claim's

7     been filed for months and months and months if we're going to

8     go on what there is here, but I'm going to give you a full

9     and fair opportunity.  I'm going to give both of you a full

10    and fair opportunity to ask about these documents.

11            Noting the time, why don't we just stop here today

12    and take whatever time you need in the course of the evening to

13    look over your additional documents.

14            And you say you just got these additional documents

15    today?

16            MR. HAIGH:  Yes, when counsel went up to the bench

17     with that exhibit.

18            THE COURT:  All right.  And I understand this officer

19     is from the Rockingham Police Department, and sir, you wanted

20     to retake custody of your file.

21            THE WITNESS: I would, sir.

22            THE COURT:  All right.  And you can be back with us

23     at 9:30 in the morning with your file?

24            THE WITNESS: Yes, sir.

25            THE COURT:  All right.  Thank you.

                      PATRICE B. LEE, CVR-CM
                      OFFICIAL COURT REPORTER

1            Anything further this afternoon.

2            MR. LAU:  No, that would be all.

3            THE COURT:  We'll be in recess till 9:30 tomorrow

4    morning.

5                    (Court adjourned at 5:00 p.m.)

6

7

8                    END OF VOLUME I OF III

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF NORTH CAROLINA                    )

                                           )

COUNTY OF RICHMOND                         )


                    C E R T I F I C A T E

     I, Patrice B. Lee, the officer before whom the foregoing

proceeding was taken, do hereby certify that the foregoing

pages, inclusive, are a true, correct and verbatim transcript

of said proceedings.

     I further certify that I am neither counsel for, related

to, nor employed by any of the parties to the action in which

this proceeding was heard; and further, that I am not a

relative or employee of any attorney or counsel employed by the

parties thereto, and am not financially or otherwise interested

in the outcome of the action.

     IN WITNESS WHEREOF, I have hereunto subscribed my name,

this 29th day of November, 2016.


*Patrice B. Lee*

_____

Patrice B. Lee, CVR-CM
Official Court Reporter
Superior Court
704-287-3609