EXHIBIT P

MAR Hearing Transcript Vol. 2 (pp 156-309)

STATE OF NORTH CAROLINA      IN THE GENERAL COURT OF JUSTICE

COUNTY OF RICHMOND         SUPERIOR COURT DIVISION

                             FILE NO. 96 CRS 001576


STATE OF NORTH CAROLINA

versus                       TRANSCRIPT

                             VOLUME II OF III

DERRICK MCRAE

                             Defendant

_____


    Transcript of proceedings in the General Court of Justice,
Superior Court Division, Richmond County, North Carolina, at
the December 1, 2016 session, before the Honorable David Lee,
presiding.




                  Patrice B. Lee, CVR-CM
               Official Court Reporter
                   Superior Court

# I N D E X

**WITNESSES FOR THE DEFENSE**                          PAGE

MR. ROBERT VOORHEES

       Cross Examination                          223

       Redirect Examination                       230

MR. MICHAEL PARKER

       Direct Examination                         237

       Cross Examination                          290

       Redirect Examination                       296

       Recross Examination                        297

MR. JAMES IRVINE VAN CAMP

       Direct Examination                         299

       Cross Examination                          306

       Redirect Examination                       308

       Recross Examination                        308

# I N D E X Cont'd

**EXHIBITS FOR THE DEFENSE**

| 21 | Autopsy Report | 236 |
| 22 | Medical Examiner Report | 236 |
| 23 | Reporting Form | 236 |
| 24 | Felony Report | 236 |
| 26 | Police File | 236 |
| 27 | Aerial Photo | 236 |
| 28 | Transcript | 236 |
| 29 | Criminal Infraction | 236 |
| 30 | Synopsis | 236 |
| 31 | Criminal DR Response | 236 |
| 32 | Sentencing Order | 236 |
| 33 | Statement by Mr. Nelson | 236 |
| 34 | Testimony by Ms. Rankin | 236 |
| 35 | Statement of Rights | 236 |
| 36 | Murder Indictment | 298 |
| 37 | Murder Indictment | 298 |
| 38 | Witness List | 298 |
| 39 | ADA Notes | 298 |
| 41 | Discovery Sheet | 298 |
| 42 | Oral Statement | 298 |
| 43 | ADA To Do List | 298 |
| 44 | Photo of Scene | 298 |
| 45 | Assignment of Case to SB | 298 |

1          (COURT RESUMES AT 9:30 A.M.)

2          THE COURT:  All right.  Let the record reflect the

3  defendant is with us.  Are we ready to continue with

4  Mr. Voorhees?

5          MR. LAU:  Defense is ready.

6          MR. HAIGH:  State is ready, Your Honor.

7          THE COURT:  All right.

8          If you'll come back around here.  And you understand

9  that you remain under oath?

10          THE WITNESS: I do.

11          THE COURT:  All right.  Thank you, sir.  Have a seat.

12  BY MR. LAU:

13     Q    Good morning, Mr. Voorhees.

14     A    Good morning.

15     Q    Yesterday, at the conclusion of your testimony after

16  you left yesterday, have you spoken with the State with respect

17  to this case since yesterday?

18     A    Not until I entered the courtroom this morning.

19     Q    And when you entered the courtroom this morning you

20  spoke with attorneys for the State?

21     A    I did.

22     Q    What was the conversation you had with the State?

23     A    Just asking about the file that you presented me

24  yesterday.

25     Q    And what were those questions?

1      A    He asked me if I could say with absolute certainty

2 that the file was in the same condition as it was when it was

3 prepared 16 to 18 years ago.

4      Q    Now, yesterday you testified that items had been

5 removed from that file, is that correct?

6      A    Yes.

7      Q    Now, you also testified that when you were asked

8 about that file five to seven years ago, it was not located at

9 the RPD, is that correct?

10      A    That's correct.

11      Q    Do you know that file ever leaving the RPD?

12      A    I wouldn't have direct knowledge of it.  It wasn't in

13 my personal care, custody, and control, you know, the file was

14 used during trial.  There was original documents in the trial.

15 Those documents could have easily -- photographs, documents,

16 statements -- could have been entered into evidence at the

17 trial and removed from the file at that time.  There's dozens

18 of reasons, literally, legitimately, why things could have been

19 removed from that file without my knowledge, and I would never

20 know it and know why it's in the condition that it is today.

21           MR. LAU:  If I may approach, Your Honor.

22           THE COURT:  Yes.

23 BY MR. LAU:

24      Q    Let me hand you what's previously been marked as

25 Defendant's Exhibit 25.  I submit to you that in Defendant's

1    Exhibit 25, there are no records from that period of October

2    15th to October 31st after Mr. Rankin's body was found on

3    October 14th.  Was an investigation taking place during that

4    time?

5        A    Yes.

6        Q    And during the course of that investigation, were you

7    developing leads of possible suspects?

8        A    I would imagine so, but I can't directly remember.

9        Q    You can't directly remember.  And you would have been

10   writing those down?

11       A    Yes.

12       Q    And that would have been material that was in the

13   file or would have been placed in the case file?

14       A    Among other things, yes.

15       Q    Among other things.  You would also be trying to

16   figure out what it was that the victim was doing on that day I

17   would imagine, is that correct?

18            MR. HAIGH:  Objection.  Leading, Your Honor.

19            THE COURT:  All right.  I'm going to sustain that.

20   BY MR. LAU:

21       Q    Would you have thought to determine what the victim

22   was doing that day?

23            MR. HAIGH:  Objection.  Speculation.

24            THE COURT:  I'm going to sustain that.  You can't

25       lead and then turn around and ask it another way, Mr. Lau,

1    I think you are aware of that.  Let's move along.

2  BY MR. LAU:

3    Q    What would have been done during the first few weeks

4  of the investigation?

5        MR. HAIGH:  Same objection, Your Honor.

6        THE COURT:  I'm going to overrule that.

7        Do you know what went on the first few weeks of the

8  investigation?

9        THE WITNESS:  Your Honor, I would have to speak

10  generally.  I don't have a memory that well to remember

11  incidents 18 years ago, you know, step by step.  It would have

12  to be a general overview of what I would normally do during any

13  investigation.

14  BY MR. LAU:

15    Q    And, generally, what would you do during the first

16  few weeks of an investigation?

17    A    Not being the only investigator in this particular

18  case, you know, we would see if we could, at first, figure out

19  what happened on the crime scene, what the incident was to

20  start off with, why individuals that we could put there were

21  there, what occurred leading up to the incident where the

22  victim was shot in the head.  Subsequently after that, it would

23  be who did it, why they did it, what they did it with.

24    Q    There is also no records in the file from December

25  1, 1995 until February 21, 1996, with the exception of a

1    property transfer sheet related to the photos that were taken

2    by Phil Sweat from the Sheriff's Department at the crime scene.

3            MR. HAIGH:  Objection.  Leading again, Your Honor.

4            THE COURT:  Okay.  I'm going to let you answer that,

5        and I'm going to caution you again, don't lead your

6        witness.

7        A    You're very hung up on those dates, but again, I've

8    already testified that there's numerous reasons why something

9    could have been in there at one time and is no longer there,

10   and I don't have direct knowledge to tell you why it's there or

11   not.  It may have been there at one time and no longer there.

12   Whether the Court took it out, it was entered as evidence,

13   whether the district attorney used it for a particular reason,

14   whether it was turned over to one of his defense attorneys, I

15   have no direct knowledge of that.  I can't testify to it.

16   BY MR. LAU:

17       Q    So, the District Attorney's Office would have had the

18   entire file at some point in time?

19       A    Well, yeah, they had access to the whole file at one

20   time.  The file was used at trial.

21       Q    How do you recall the file being used at trial?

22       A    I wasn't the trial officer.  I don't know.

23       Q    So, you know it was present at trial?

24       A    Yes.

25       Q    Now, the master file tabs in that file in front of

1  you, can you tell the Court what tabs are in that file in

2  Defendant's 25?

3      A    You're saying master tab file?

4      Q    The tabs within the file that's marked Defendant's

5  Exhibit 25.  Can you read what those tabs are for the Court?

6      A    Tabs are crime scene, evidence, witness statement,

7  suspect information, victim information, autopsy, reports,

8  synopsis, and pictures.

9      Q    And you indicated that there is nothing behind those

10  tabs?

11      A    That's correct.

12      Q    So, it's your belief that what was behind those tabs

13  has been removed from that file at some point in time as you

14  testified, but you don't know when?

15          MR. HAIGH:  Objection.  Speculation, Your Honor.

16          THE COURT:  Well, I'm going to overrule that.  He can

17      answer that.

18      A    I don't know how or when.

19      Q    You don't know how?

20      A    I don't know how or when anything would have been

21  removed from the file.

22      Q    Thank you.  Now, further you indicated yesterday that

23  the investigation continued after the arrest of Mr. McRae, is

24  that right?

25      A    That's correct.

1    Q    What was done after the arrest of Mr. McRae, do you

2  recall?

3    A    That was a generalization, but as a rule in our

4  investigation department, we always would say an arrest does

5  not mean the investigation is over.  You have to be

6  open-minded.  You have to be always looking for that extra

7  piece of evidence.  There has been numerous times were evidence

8  has presented itself or been discovered from the time of

9  arrest, before trial, more witnesses, physical evidence, there

10  is still lab reports coming in, sometimes a handwritten autopsy

11  report or signed off autopsy report doesn't come in till, you

12  know, much later after a murder case.  I'm speaking in all

13  general terms.  I'm not saying that happened in this case.  I

14  can only speak from generally how we would handle the situation

15  because I, again, don't have a lot of memory as far as details.

16    Q    Mr. Voorhees, I'm handing you what's been marked

17  Defendant's Exhibit 24.  Yesterday, you identified that as a

18  felony report from the Rockingham Police Department's

19  investigation, and you identified that is your handwriting, is

20  that accurate?

21    A    That's correct.

22    Q    Would you mind turning to Page 3, it's actually

23  indicated Page 9, which is the number on it from the file we

24  received, but Page 3 of that document, and can you read under

25  where it says, 'State any comments you wish to make concerning

1   the case about the defendant.'

2       A    'We need to look very closely at the victim in this

3   case.'

4       Q    Do recall why you wrote that?

5       A    No.

6       Q    Was this after the arrest that you conducted that --

7   you wrote this felony report?

8       A    Yes.

9       Q    There is nothing in the Rockingham PD files related

10  to an investigation of the victim.  Do you recall any

11  investigation taking place?

12      A    I'd have to disagree with you there, sir.  I did see

13  information on the victim as I perused through those files

14  yesterday, so to say there's not information, it's not correct.

15      Q    After the arrest?

16      A    I don't know when it was generated.  I don't have

17  that knowledge.  I know it's in the file, and your statement

18  was it's not in the file.  Yes, it is.

19      Q    Is there anything in the file after the arrest?

20      A    I don't know when it got in the file, sir.

21      Q    Can you find what you're talking about within the

22  file?

23      A    There's a whole record of criminal history for the

24  victim in here, Jerry Rankin.

25      Q    Does that have a date on it from when it was ran?

1       A    It appears to be 9-16-1995.

2       Q    Do you know when the arrest was made, or let me just

3   direct you to that felony report, Exhibit 24.  Now, on that

4   felony report, can you read --

5       A    The date of arrest was March 1, 1996.

6       Q    That was for the codefendant, correct?

7       A    Correct.

8       Q    And what about for Mr. McRae?

9       A    February 29, 1996.

10      Q    February 29, 1996.  So, that criminal history report

11  was ran before this felony report was completed?

12      A    Apparently.

13      Q    So, there's nothing in the record from after the

14  arrest was made?

15      A    You're making a statement.  I guess I agree with you,

16  again --

17      Q    You have the records there?

18      A    Well, I asked you yesterday if you wanted me to go

19  through them page by page, and I told you that would take a

20  while.  I did not look at each and every page.  I cannot sit

21  here and tell you exactly what is in the file and what is not

22  and when it got there.

23      Q    I asked you yesterday to take Defendant's Exhibit 26,

24  review Defendant's Exhibit 26 along with Defendant's Exhibit 25

25  and to determine whether or not they were a fair

1  representation, and you did that.

2          MR. HAIGH:  Objection, Your Honor.

3          THE COURT:  I'm aware of what we did yesterday,

4      Counsel, you don't need to go back through that.  Just ask

5      your next question.

6  BY MR. LAU:

7      Q    Is there anything in the file that you have in front

8  of you indicating that an investigation took place of the

9  victim after you did the felony report?

10     A    I don't know.

11     Q    Why don't you look.

12     A    Of the documents that are contained in this file, the

13 latest date I can find in the file is March 1, 1996.

14     Q    So, those files have been removed as well?

15     A    I'm going to testify, again, that I do not know what

16 has been removed, what was added, or what has happened to it

17 while it was not in my care, custody, and control since that

18 time.

19     Q    Did the Rockingham Police Department further

20 investigate the victim after the felony report was completed?

21     A    Yes.  They investigated the entire case.

22     Q    And there's no records of any part of that

23 investigation in what is the Rockingham Police Department's

24 file?

25     A    There's no records past March 1, 1996 in this file

1    that you've handed me.

2         Q    Referring back to your handwriting on Page three of

3    the felony report, you underlined the victim, where you wrote

4    the victim, twice.  Did you view it important to continue

5    investigating the victim?

6         A    I do not remember.

7         Q    Do you remember Jerry Rankin?

8         A    Yes.  I grew up with him.

9         Q    Why would you view it important to continue

10   investigating the victim?

11        A    I do not know why I underlined that particular word.

12   I do not know what was special about the victim that I

13   thought -- I don't know if there was a special connection at

14   the time between the suspect and the victim.  I don't know if

15   they were involved in something, some transaction.  I don't

16   know what led me to that.  Anything that I report to you at

17   this time would be speculation and obviously is inappropriate.

18        Q    So, we'll never know?

19             THE COURT:  Don't be argumentative.  He's indicated

20        he does not know.  I think you've asked him that about

21        three times.  I'm going to caution you again move along if

22        you've got another line of question.  If not, I'm going to

23        turn it over to the State.

24             MR. LAU:  May I approach.

25             THE COURT:  Yes.

BY MR. LAU:

    Q    Mr. Voorhees, I've handed you what's been marked Defendant's Exhibit 5. Can you identify Defendant's Exhibit 5? Do recognize that?

    A    It appears to be a copy of a statement written by Captain RL McQuay.

    Q    Now, yesterday you testified that you would have been present for the interview, conducted the interview, or spoke with the individual who did the interview about the substance of the interview, is that right?

    A    That's correct.

    Q    So, you would have spoken to Captain McQuay after he discussed -- after he met with Darius Lockhart?

    A    Yes.

    Q    Do you recall why it was that Darius Lockhart was at the Rockingham Police Department on this day?

    A    No.

    Q    Did he come voluntarily?

    A    I don't recall.

    Q    Can you read the first sentence beginning with -- from Defendant's Exhibit 5.

    A    'Around two or three weeks ago, I was walking down Zion Street with a guy by the name Derrick McRae.'

    Q    You can stop there. So, about two or three weeks ago he was walking with Derrick McRae. And is there a date on this

1  statement?

2       A    February 21, 1996.

3       Q    That would have been approximately the beginning of

4  February he and Derrick were together?

5       A    Two weeks prior to that.

6       Q    Let me ask you to turn to the second page, and the

7  second sentence up from the bottom beginning with, 'A few days

8  later.' Can you read where it says, 'A few days later'? Can

9  you read to the end of the statement?

10      A    'A few days later, Derrick asked me if I wanted to

11 buy a .380 handgun. He said he had it stashed. I told him no,

12 because the gun was hot.'

13      Q    Generally, it's important in investigations to find

14 the murder weapon, if possible; is that correct?

15      A    Yes, sir.

16      Q    Did you ever seek a search warrant to search Derrick

17 McRae's residence for this gun that he had stashed?

18      A    I personally did not.

19      Q    Did anybody at the Rockingham Police Department do

20 it?

21      A    Do not recall.

22      Q    Is there anything in the record indicating that?

23      A    Not in this record you handed me, no, sir. I don't

24 know about the court records, the court documents, or anything

25 else that you have that I may not have laid eyes on.

1    Q    Was a gun ever recovered in this case?

2    A    I do not recall.

3         MR. LAU:  Your Honor, I have a picture here that I

4    would like to show, and I'm just wondering where it would

5    be best for you and the witness.

6         THE COURT:  It might be over here.

7    BY MR. LAU:

8    Q    Mr. Voorhees, up on the easel I marked Defendant's

9    Exhibit 27, which is an aerial map of a section of Rockingham

10   that includes the JFK housing development.  Are you familiar

11   with this section of Rockingham?

12   A    Yes, I am.

13   Q    Now, if you could, can you get down from the stand

14   and point on that map where Palisade Circle is?

15        MR. HAIGH:  Your Honor, at this point, I'm going to

16   object to foundation.

17        THE COURT:  If you can just tell me what you are

18   offering this for.  What you intend to show.

19        MR. LAU:  I intended to show that the statements

20   themselves -- we're using this to impeach the statements

21   or to establish the materiality of the statements that

22   were not turned over to Mr. Crump.  We're going to ask him

23   to use this map to illustrate some of the movements that

24   are described by the statements.

25        THE COURT:  I'm going to overrule that objection and

1       allow you to do that.

2   BY MR. LAU:

3       Q    Can you indicate where Palisade Circle is on this

4   map?

5       A    This is Palisade Circle.

6       Q    And can you indicate where JFK Drive is on this map?

7       A    This is JFK Drive.

8       Q    And what about Hood Street?

9       A    Hood Street runs back here.

10      Q    And do you know where the victim's home is on this

11  map?

12      A    It's not on the map.

13      Q    The victim's home is not on this map?

14      A    The victim's home is not on this map.

15      Q    Are you certain about that?

16      A    The victim's home is not on this map.

17      Q    Do you remember approximately where the victim's home

18  was?

19      A    It was on Rockingham Road.  It was further up off the

20  map directly across from Rockingham Skating Rink.

21      Q    Thank you.  The home of Alan Fishman, where the

22  victim's body was located, is that on that map?

23      A    Yes.

24      Q    Can you indicate where that is on the map?

25      A    I don't know exactly which house it was without a

1    house number.  Relating to the map, it was one of these houses

2    right here.

3        Q    Okay.

4        A    One of those in that row there.

5        Q    Do you recall where Derrick McRae lived at the time?

6        A    No, I don't know.

7        Q    For the sake of continuing to review Mr. Lockhart's

8    statement, can you grab Defendant's Exhibit 5.  Let me change

9    course for a minute and hand you what's been marked Defendant's

10   Exhibit 28.  And if I may, let me direct your attention to

11   Page 137, Line 18?

12            MR. HAIGH:  Mr. Lau, can you please identify this.

13            THE WITNESS:  I don't know what this is.

14   BY MR. LAU:

15       Q    What I'm handing you is the trial testimony of --

16   your trial testimony from the second trial of Derrick McRae.

17   Do you recall testifying in that trial?

18       A    Vaguely.

19       Q    And on Page 137, Line 18, can you read from Line 18

20   to Line 23?

21       A    Line 18, "Question:  And in your investigation of

22   this case, did you have occasion to learn where he was living

23   in October of 1995?'  Continue?

24       Q    Yes, please.

25       A    "Answer:  Yes.  Where was that, sir?  On JFK Drive

1    off of Rockingham Road, 906."

2        Q    Does that help you remember where it was that Derrick

3    McRae was living at the time?

4        A    I can identify it off of this, yes.  JFK Drive is

5    here (indicating.)

6        Q    And you know where 906 JFK Drive is?

7        A    No.

8        Q    No?

9        A    I assume, because of the low number, it would be near

10   the front of the road, but again, I can't point to the building

11   and tell you which one is 906.

12       Q    Okay.  Now, returning to Defendant's Exhibit 5, the

13   last sentence on the first page beginning with, 'Derrick,' can

14   you read that last sentence?

15       A    Last sentence of the first page?

16       Q    Yes, on to the second page beginning with, 'Derrick.'

17       A    'He saw Jerry on a porch at the house on Hood Street.

18   Derrick leaving his girlfriend's house on Palisade Circle

19   walking by the pool on Hood Street.  When he walked by the

20   house where Jerry sat" --

21       Q    You can stop there.  Now, did you ever -- so,

22   Palisade Circle, can you point to Palisade Circle.  So, if

23   Derrick was leaving his girlfriend's house and he was headed

24   home, would he go on Hood Street?

25            MR. HAIGH:  Objection.  Calls for speculation, Your

1      Honor.

2               THE COURT:  That's sustained.

3    BY MR. LAU:

4      Q    Did you ever determine why it was that Derrick McRae

5    was on Hood Street that night?

6      A    No.

7      Q    You can have a seat for a minute, Mr. Voorhees.  Now,

8    let me direct your attention to Defendant's Exhibit 28,

9    Page 166, Line 3.  And would you mind reading from Line 3 until

10   Line 12?

11              MR. HAIGH:  Your Honor, I'm going to object at this

12        point as improper impeachment.  He has to ask the question

13        first before he can impeach this witness with his own

14        testimony.

15   BY MR. LAU:

16     Q    Do you recall the lighting conditions on that night

17   of the crime when you responded to the scene?

18     A    No, I don't.

19     Q    Do you recall testifying in this case?

20     A    Vaguely.

21     Q    And if you testified to the lighting conditions on

22   the night of the crime or the conditions on the night of the

23   crime, would that have been truthful?

24     A    Yes, it would.

25     Q    Can I direct you to Page 166, Line 3, and ask you to

1   read from Line 3 to Line 12?

2        A    Okay.  'Now, when you arrived, Captain Voorhees, at

3   Mr. Davis' house, would you describe the street light that was

4   present surrounding Mr. Davis' home?  Answer:  There was, as in

5   every street in Rockingham, there is available street lights,

6   however, as we described, the house is elevated from the street

7   level and plus there's a lot of trees and growth around the

8   house and in the area.  So, there is street lighting where you

9   could probably see to navigate without artificial light, but

10  you wouldn't be able to see much.'

11       Q    Mr. Rankin was on the porch of the house on Hood

12  Street, is that right?

13       A    Yes.

14       Q    From what you can recall, did you ever determine how

15  Derrick would know he was on the porch at that house on Hood

16  Street?

17       A    I have no direct knowledge.

18       Q    And if Derrick was walking by on Hood Street, based

19  on your testimony, it would be difficult to see much, is that

20  right?

21       A    I would have to speculate.

22       Q    But you did testify you wouldn't be able to see much?

23       A    I testified at the time of my arrival, that's what

24  you could say.

25       Q    Okay.  At the time of your arrival, based on the

1  conditions that you observed, would somebody be able to see the

2  victim sitting on the porch from Hood Street?

3          MR. HAIGH:  Objection.

4          THE COURT:  I'm going to sustain it as to form of

5      question.

6  BY MR. LAU:

7      Q    From your recollection, at the time you arrived,

8  would it have been possible to see an individual on the porch

9  from Hood Street?

10     A    I think I already testified that I don't have any

11 recollection of me arriving.

12     Q    Mr. Voorhees, I'm handed you what's been marked

13 Defendant's Exhibit 29, which I submit to you is a copy from

14 the clerk of court of a criminal infraction for Darius

15 Lockhart.  And do you recognize that seal at the bottom of that

16 copy?  Can you say what that is?

17     A    The lower right-hand?

18     Q    Yes, the seal.

19     A    That's the seal of the Richmond County Clerk's

20 Office.

21     Q    And you understand that to mean that this is an

22 accurate copy of their records?

23     A    I do.

24     Q    And is there a date of birth for Mr. Lockhart here?

25     A    Date of birth listed on this form is 9-8-1980.

1      Q     But the time he was questioned in February 1996, he

2  would have been 15 years of age?

3      A     If the date of birth on this form is correct.

4      Q     Mr. Voorhees, I'm handing you what's been labeled

5  Defendant's Exhibit 8, which I submit to you is a statement

6  from Marlin Dumas taken by the Rockingham Police Department.

7  Now, is this statement similar to the statement that you would

8  have reviewed, wrote, or discussed with your colleagues with

9  regards to the investigation of the death of Jerry Rankin?

10     A     Yes, it appears to be, but the name does not strike

11 any memory in me whatsoever.

12     Q     You would have reviewed this before submitting your

13 felony report, is that right?

14     A     If it was within the work product that I had in my

15 possession at the time, yes, sir, I would have.

16     Q     Let me once again refer you back to Defendant's

17 Exhibit 24, and I'm looking at Page 5 of Defendant's Exhibit

18 24. Can you find Page 5 of Defendant's Exhibit 24?

19     A     Yes.

20     Q     And at the top of Page 5, is there a witness name

21 listed there?

22     A     Yes.

23     Q     And what witness name is that?

24     A     Marlin Maurice Dumas.

25     Q     Does this indicate that it would have been within

1    your work product?

2         A    Yes.

3         Q    Can I refer you to Page 1, second line up from the

4    bottom beginning with, 'After.'

5         A    What exhibit are we looking at?

6         Q    We're looking at Defendant's Exhibit 8.  I apologize.

7         A    Okay.  And again, Page 1 --

8         Q    The front page of the statement, second line up,

9    beginning with 'After they were,' and can you read from that

10   sentence and I'll let you know when you can stop, how's that?

11   Beginning with 'After they were.'

12        A    I don't see the statement here.

13        Q    Do you have Defendant's Exhibit 8 in front of you?

14        A    I do.

15        Q    Second line from the bottom?

16        A    I was looking at the top.  I thought you said at the

17   top.  'After they looked at me for a while, Thurman and Derrick

18   turned and walked up the hill and stood in front of the club

19   that is beside the pool.  Derrick and Thurman stood in front of

20   the club for about 20 minutes, and I just stood behind a tree

21   and watched them because I wanted to see what they were going

22   to do with the guns.'

23        Q    You can stop there if you don't mind.  Did you ever

24   take Marlin Dumas out -- or do you recall anyone from

25   Rockingham PD taking Marlin Dumas to the scene and asking him

1   where it was that he was at?

2       A    I said when you handed me this, I don't remember the

3   name Marlin Dumas.  It strikes no particular memory in me.

4       Q    Okay.  Now, the previous statement of Darius Lockhart

5   marked Defendant's Exhibit 5, does it at any point -- and you

6   can look at it if you have it there in front of you -- does it

7   at any point reference Thurman Nelson?

8       A    No, it does not.

9       Q    Based on your -- generally, based on your experience

10  as an investigator, would you have tried to determine where

11  Dumans was standing?

12      A    That would have been within the scope of reasonable

13  investigative activity, yes.

14      Q    If I can bring you to Defendant's Exhibit 8, the

15  statement of Marlin Dumas, if I can ask you on Page 2 -- and it

16  may be best if I just point out where I'd like you to begin

17  reading -- beginning where it says, 'I saw --

18      A    'I saw fire come from the gun when it went off.

19  About four or five seconds a second shot was fired.  The first

20  shot came from the gun Derrick had in his hand because it was

21  fired from on the porch of the house, and the second one fired

22  was from Thurman and he was standing on the ground below the

23  porch.'

24      Q    You can stop there.  Do you recall if there was one

25  or two shots fired based on your investigation when you arrived

1    at the scene?

2        A    I don't recall.

3        Q    And you processed the scene, is that right?

4        A    No, sir.  I requested another agency come and process

5    the scene.

6        Q    You were at the scene?

7        A    I was at the scene.

8        Q    Is Defendant's Exhibit 26 there with you?  I'm

9    handing you Defendant's Exhibit 26.  May I direct you to Page

10   69 of this exhibit?

11       A    Okay.

12       Q    And do you recognize what Page 69 is?

13       A    Yes.  It's an inventory report form.

14       Q    How many shell casings were located at the scene?

15       A    One.

16       Q    And how many projectiles were located in the victim?

17       A    One.

18       Q    Mr. Dumas told investigators that two shots were

19   fired?

20       A    That's what that statement I just read was, yes.

21       Q    If you could locate in front of you Defendant's

22   Exhibit 24, which is the felony report that you prepared.  Now,

23   you previously testified that you had the work product of

24   Marlin Dumas with you when you did this, is that correct?

25       A    Yes.

1    Q    Will you turn to Page 2 under Detailed Statement Of

2    Investigating Officer.  Would you read that statement in its

3    entirety?

4    A    'According to witnesses, Jerry Rankin, victim, came

5    to JFK Drive where defendant was.  The defendant sold Jerry

6    Rankin some crack cocaine.  Jerry reportedly sped off, when the

7    defendant looked at the money Jerry had gave him, it was fake.

8    Defendant and codefendant, Nelson, were looking for Jerry.

9    Defendant had a .380 pistol and the codefendant had a small

10   black pistol.  According to eyewitnesses, two defendants found

11   Jerry Rankin sitting on the porch of the house by the pool on

12   Hood Street.  Derrick McRae went up to the porch where the

13   victim was, they argued, a few minutes after, the gun was

14   fired.  Both defendants ran off.'

15   Q    Does that discuss a second shot?

16   A    No.

17   Q    The eyewitness said that a second shot was fired, is

18   that right?

19   A    That's correct.

20   Q    Do you know why it was written out of this, second

21   shot?  Do you know why it's not included?

22   A    It's a summary.  Obviously, it contained -- along

23   with the summary are all the statements.  They're not

24   inconsistent therein or conflict each other.  Anybody that had

25   this felony report would also have all the statements for the

1  victim.  It's not like something was being hid or not stated

2  that wasn't truth.

3      Q    Well, a second shot is inconsistent with the physical

4  evidence collected at the scene, is that right?

5      A    No, sir.

6      Q    Was there any indication at the scene that a second

7  shell casing was there?  A second projectile?  Anything in the

8  house?

9      A    No, sir.  The second gun could've been a revolver

10 that did eject a shell casing, and it was an open wooded area

11 outside.  The chance of finding another slug is astronomical.

12     Q    He fired from the ground at the porch, according to

13 the eyewitness, the second shot?

14     A    Yes.

15     Q    The ground in front of the porch.  He missed the

16 house is your testimony?

17     A    I don't know what position -- I mean, there is a

18 whole other 180 degree field that he could've been standing in

19 that the bullet would not have hit the house.  I mean, this

20 isn't CSI.

21     Q    The second one was fired from Thurman who was

22 standing on the ground below the porch.  So, that could be

23 anywhere below the porch, is that what you're saying?

24     A    Yes.

25     Q    Okay.

1    A    I don't know that it happened.  I don't know that it

2  didn't happen.  I'm just saying it's not inconsistent with the

3  physical evidence.

4    Q    I'm handing you what I've marked Defendant's Exhibit

5  29, and if I can ask you, do you recognize Defendant's Exhibit

6  29?

7       MR. HAIGH:  Excuse me, I believe that there is

8       already a 29 in evidence.

9       MR. LAU:  This will be 30.

10 BY MR. LAU:

11   Q    Now, can you read the second paragraph, beginning

12 with, 'Derrick McRae.'

13   A    Do you want me to tell you what it is first.

14   Q    Sorry.  Yes, there was a question pending.  Can you

15 tell me what this is?

16   A    It appears to be a synopsis with the RPD case number

17 on it, suspects charged – Derrick McRae and Thurman Nelson, and

18 what the charge is of first-degree murder.

19   Q    Now, is this a synopsis that would have been made in

20 connection with your criminal investigation of Mr. Rankin's

21 death?

22   A    Yeah.  I don't know who prepared it though.

23   Q    You recognize this is a record of the Rockingham

24 Police Department?

25   A    It's a computer-generated on a dot matrix printer.

1   Honestly, I don't know if this was prepared in the Rockingham

2   Police Department or in the DA's office.  I don't have that

3   knowledge.

4        Q    Let me direct you once again to Defendant's Exhibit

5   26, Page 15.  Now, is this a copy of the synopsis that's

6   included in the Rockingham Police Department's master case file

7   which yesterday you testified to Defendant's Exhibit 26 was a

8   bare reflection of it?

9        A    Yes.

10       Q    Now, can I ask you to begin reading at Paragraph 2,

11  beginning with, 'Derrick McRae and Thurman Nelson.'  Can you

12  read that paragraph in its entirety?

13       A    Derrick McRae and Thurman Nelson went looking for

14  Jerry Rankin.  Witness, Marlin Dumas, saw Derrick McRae and

15  Thurman Nelson walking through the ball field on Hood Street.

16  Dumas saw a white male on the steps of the house behind the

17  Boys Club on Hood Street by the pool.  Dumas said he knew the

18  house was Fishman's house.  The house was the residence of Alan

19  Davis who is also known as Fishman.  Dumas went on to say that

20  he saw Derrick and Thurman go up to the porch where Jerry

21  Rankin was sitting.  Derrick went up on the porch and Thurman

22  stayed in the yard.  Dumas said he heard Jerry and Derrick

23  arguing and said that he saw a flash of fire from a gun that

24  Derrick was holding and heard a shot.  Then Derrick McRae and

25  Thurman Nelson ran off.  Dumas said that he did not come

1   forward earlier because Derrick had threatened him.'

2      Q    You can stop there.  Once again, there is no mention

3   of a second shot here, is there?

4      A    That's correct.

5      Q    Would it be important to have the second shot

6   mentioned in the case summary?

7      A    I do not know who prepared this, sir.

8      Q    Based on your personal experience as an investigator

9   for the Rockingham Police Department, would it be, in your

10  view, important to include that two shots were fired according

11  to the eyewitness in your case synopsis as well as your felony

12  report?

13          MR. HAIGH:  Objection.  Calls for opinion.

14          THE COURT:  I'm going to let him offer his opinion,

15        if you have one, about whether that would be proper

16        procedure or routine procedure that you would expect.

17      A    I would expect all the information to be made

18  available to the district attorney, and if all the statements

19  were included in discovery to the district attorney, and

20  subsequently, made available to him and all the information was

21  there.  If there was a conscious effort to keep something from

22  him, that would be unusual.  I do not see that here.  There are

23  conflicting witness statements as you've pointed out yourself.

24  Mr. Dumas obviously says something different than Mr. Lockhart

25  does so -- in a synopsis, which is a brief of what occurred, it

1    would not be unusual for it not to contain all the details of

2    each and every thing that every witness says.

3        Q    Let me  refer you back to the front page of

4    Defendant's Exhibit 8, which is the statement of Marlin Dumas.

5    Does the statement of Marlin Dumas include his age?

6        A    It does.

7        Q    And how old was Mr. Dumas at the time?

8        A    Fifteen.

9        Q    And do you recall why Mr. Dumas was at the police

10   department?

11       A    I do not.

12       Q    If a parent was present, would it be the practice of

13   the Rockingham Police Department at the time to include that in

14   his statement?

15       A    Yeah, if he was in custody.

16       Q    Well, even if he was out of custody, would a parent

17   be permitted to be in the room and perhaps listed as someone

18   present when he's giving this account to law enforcement?

19       A    If he requested his parent, yes, it would be.

20       Q    Was it the practice to ask a 15-year-old whether or

21   not they would like their parent present?

22       A    If they were in custody and being questioned about a

23   crime that they were the target of, yes, it was.

24       Q    Was Mr. Dumas investigated himself as a possible

25   suspect in this crime?  Do you have a recollection?

1     A    I don't know.

2     Q    Mr. Voorhees, you said the investigation continued,

3  is that correct?

4     A    Yes.

5     Q    Handing you what's been labeled Defendant's Exhibit

6  31.  Are you familiar with a criminal driver's response?

7     A    Yes.

8     Q    Is this something commonly used by law enforcement?

9     A    Yes.

10     Q    If I may turn you to Page 4, at the very bottom,

11  Criminal History.  Can you begin with cycle one and read --

12  well, as cycle one, does it list the charge there?

13     A    Yes.

14     Q    What's that charge?

15     A    Murder.

16     Q    Does it list an event date?

17     A    Yes.

18     Q    And what's that date?

19     A    August 15, 2006.

20     Q    Now, does Mr. Dumas' statement indicate when he gave

21  his statement to law enforcement?  Is there a date on it?

22     A    February 26, 1996.

23     MR. LAU:  If I can have a moment, Your Honor.

24     THE COURT:  Yes.

25  BY MR. LAU:

1    Q    Let me back up and have you refer to Page 3, and at

2    the top of Page 3, on the right-hand side, it lists the

3    conviction under the column that says Status.  Do you see that

4    there?

5    A    Give me just a second to become familiar with this.

6    This is an out-of-state -- I'm not familiar with all their

7    codes.  If you give me just a moment to review it.

8         MR. HAIGH:  Your Honor, I'm going to object to this

9         exhibit at this time.  There's no indication that the

10         witness is familiar with how it's produced, where it came

11         from, or who produced it, and that it's in the same shape

12         as an accurate representation of what the records reflect

13         in the original system.

14         THE COURT:  What's your position with respect to the

15         authenticity of this.

16         MR. LAU:  Your Honor, this was produced by the State.

17         I mean, if the State -- if we need to call a witness from

18         the State, we're happy to do so.  If the State is

19         unwilling to stipulate that this is a true and accurate

20         copy of their own file in this case.

21         THE COURT:  So, this is something from what file?

22         MR. LAU:  This is in the State's response to our

23         motion for appropriate relief, an addendum that they

24         included.

25         THE COURT:  Do you have any reason not to rely on it?

1          Any reason for me not to rely on it?

2          MR. HAIGH:  Your Honor, doing prosecutions for a

3     decade, I would say that often times the information in

4     these is accurate.

5          THE COURT:  Right.

6          MR. HAIGH:  So, I would say that, absent more

7     information, this doesn't really prove anything without

8     having a witness who operates the system.  I mean Your

9     Honor has been around long enough to know that these have

10    other people's convictions on them sometimes and other

11    issues.

12         MR. LAU:  Is it my understanding that the State is

13    doubting the authenticity of its own record.

14         MR. HAIGH:  Yeah, we don't produce stuff.  It's

15    another entity that does.

16         THE COURT:  I'm going to sustain the objection having

17    been raised is the authenticity of it.  I will give you an

18    opportunity to validate this or authenticate it.

19         MR. LAU:  Your Honor, may we approach.

20         THE COURT:  Yes.

21              (Bench conference was held with both counsel

22              present.)

23    BY MR. LAU:

24    Q    Mr. Voorhees, I'm handing you a copy of what's been

25    marked as Defendant's Exhibit 32, which is a sentencing order

1    from the Circuit Court of the City of Norfolk, Virginia related

2    to Marlin Dumas.  Can you find on Page 1, a list of the charges

3    against Mr. Dumas?

4         A    Yes.

5         Q    And can you read those charges to me?

6         A    Capital murder, robbery, robbery, abduction,

7    abduction, malicious wounding, and appears that he stands with

8    the following petitions of charging conspiracy, two counts of

9    conspiracy.

10        Q    Now, what was the petition date according to this

11   record from the Circuit Court of the City of Norfolk?

12        A    It says at the top, the hearing date was July 9,

13   1997.  The petition date was July 31, 1996.

14        Q    And Marlin Dumas gave his statement on February 26,

15   1996?

16        A    Yes.  That would be five months prior, yes.

17        Q    Now, when the investigation continued, do you have

18   any recollection of learning that the eyewitness in this case

19   was charged with capital murder himself?

20        A    Again, at that point, I wasn't the trial officer.  I

21   wasn't the officer assigned to go to trial with it, no.  Short

22   answer no, I have no recollection.

23        Q    Now, based on your experience as a law enforcement

24   investigator, would it be important to know that the

25   eyewitness, the only person who placed himself at the scene,

1  was himself charged with capital murder?

2      A    Yes.  I would hope that as soon as our department

3  found out about it, we notified the District Attorney's Office.

4  I would hope that would be how it happened.  Or if the District

5  Attorney's Office found out about it and notified us -- again,

6  I don't know which way it occurred.

7      Q    Turning to Page 2 of Defendant's Exhibit 32,

8  beginning with where it says, 'The clerk sentences the

9  juvenile,' can you read that paragraph below indicating the

10 final disposition of the case for Marlin Dumas?

11     A    'Incarceration in the Virginia Department of

12 Corrections for the term of life for capital murder, ten years

13 each for robbery as charged in indictments two and three, five

14 years each for abduction as charged in indictments four and

15 five, and 20 years for malicious wounding as charged in

16 indictment six.  The total sentences imposed is life plus 50

17 years.'

18     Q    And what is the date that Mr. Dumas was sentenced in

19 this case?  Do you see a signature from the judge along with

20 the date?

21     A    July 18, 1997.

22     Q    Do you recall the date of Mr. McRae's trial?

23     A    I do not.

24          MR. HAIGH:  The State will stipulate that it was May

25     11, 1996.

1        MR. LAU:  1998.

2        MR. HAIGH:  I'm sorry, 1998.

3        MR. LAU:  Thank you, State.

4        Your Honor, I don't know if you're inclined to take a

5    break at this point, but I'm about to move on to another line

6    of questions.

7        THE COURT:  I'm always inclined to take a break.

8    Let's go a little bit further.  It's just not quite 11

9    yet.

10   BY MR. LAU:

11   Q    Mr. Voorhees, I'm going to hand you what's been

12   marked Defendant's Exhibit 7, which I submit to you is the

13   statement of Serena Parker.  Now, does this statement of Ms.

14   Parker -- as you testified before, you would have been present

15   for the statement, discussed this statement with the individual

16   who took the statement, or have written that statement

17   yourself?

18   A    I did not write it myself.  This is not my

19   handwriting, but I more than likely would have discussed it

20   with Detective McNeil.

21   Q    And referring back to Defendant's Exhibit 24, which

22   is the felony report in your handwriting with respect to

23   Derrick McRae, at Page 4, under Witnesses, do you see Ms.

24   Parker's name there?

25   A    I do.

1    Q    So, this was work product that you had possession of

2    when preparing the felony report?

3    A    Yes.

4    Q    Does Ms. Parker indicate a time -- well, can you read

5    the first sentence of Ms. Parker's statement for the Court?

6    A    'on October 14, 1995, at about 10:50 p.m, I was in

7    my apartment located at 912 Palisade Circle in Rockingham.'

8    Q    Now, if I could, can you just read the whole report

9    into the record.  I would ask you to read beginning with,

10   'October 14, 1995, to its conclusion?

11        THE COURT:  Take your time so she can take all this.

12        Thank you.

13   A    'On October 14, 1995, at about 10:50 p.m.  I was in

14   my apartment located at 912 Palisade Circle in Rockingham.

15   About at this time, I heard some people talking outside my

16   bedroom window.  The lights were off in my apartment.  I did

17   not have curtains up to my window.  So, when I looked out of

18   the window to see, I saw Derrick McRae, Thurman Nelson, Jeremy

19   Sturdevant, Johnny McRae, Julio Sturdevant talking.  I know

20   these guys from living in the neighborhood, and they used a

21   table in my backyard to play cards on.  A few minutes later

22   this white guy named Jerry Rankin walked up to Derrick McRae

23   and asked him for a rock.  When Derrick gave Jerry the rock,

24   Jerry gave Derrick some money he had folded up in his hand.  I

25   know Jerry Rankin because he used to hang out with my dad.

1   They were using my back porch light so they could see.

2           After Jerry Rankin gave Derrick the money, Jerry

3   walked away going towards JFK Drive through the apartments.  A

4   few minutes later, Derrick unfolded the money that Jerry had

5   gave him and said, "Naw, that motherfucker cheated me.  Nobody

6   cheats me."  Jeremy said, "Let's go and blast -- I can't see

7   that word because of the numbers typed on the bottom of the

8   page -- motherfucker" and Derrick said, "Yes, let's go kill

9   him."  Then Julio said, "No man, let it go" to Derrick.

10  Derrick, "No.  I'm going to blast him."  Julio said to Derrick,

11  "Well, do what you got to do."  At about 11:15 p.m, Derrick,

12  Jeremy and Thurman ran down towards JFK Drive the same way that

13  Jerry had gone.

14          At or about 11:30 p.m, I heard one gunshot.  About

15  ten minutes later, I saw Derrick, Jeremy, and Thurman running

16  back up towards my house.  When they got in my yard, they

17  stopped and bent over resting their arms on their knees.

18  Jeremy was the first one I saw coming towards my apartment.

19  They then disappeared somewhere behind my apartment.  Later

20  that night, I heard what sounded like someone knocking over my

21  trash cans, but I was afraid to go outside to see what the

22  problem was.  The next morning, I figured I would get up real

23  early so I could see what was in my trash can before anyone

24  could see me.

25          So, I got up about 6 a.m the next morning, and when I

1    looked in my can, the only thing that was in there was an

2    object wrapped up heavily in plastic.  I left it in there to go

3    get my dad, and when I returned it was gone.  A little later

4    that morning, I was getting ready to go out my front door when

5    Derrick, Thurman and Jeremy were on the porch of my neighbors.

6    Karina, who lives at 910 JFK Circle --

7         Q    Can you reread that 910.

8         A    I'm assuming that's, 'Karina who lives at 910

9    Palisade Circle, I heard and saw them through my front door

10   which I had cracked open.  I heard Johnny ask Derrick, "Did you

11   get rid of the gun?"  Derrick told Johnny that he gave it to

12   Thurman to throw in the river.  I then came out my front door

13   and Derrick said, "Yeah, bitch, I know you know what happened,

14   and if you tell I'll kill your ass."  About three days later, I

15   was at my mother's house on JFK Drive when Derrick got into an

16   argument with my mother about what I saw.  Derrick said, "I'll

17   kill y'all ass just like I did that white boy Jerry."  He then

18   told me that the night doesn't have eyes.  A few days later

19   Derrick began cutting the screws on my windows and he set a

20   fire on my front porch.  I decided to come forward because I'm

21   tired of Derrick and his boys going around scaring people.

22   Signed Serena Parker, witnessed by Detective GW McNeil.'

23        Q    Now, in your experience as an investigator, when

24   witnesses give a statement, can you describe the importance of

25   corroborating the statements?  Do you have an opinion as to

1  whether it's important to corroborate statements?

2      A    It is.

3      Q    Do you recall anyone speaking to Julio Sturdevant in

4  this case?

5      A    I don't recall.

6      Q    Do you know Julio?

7      A    Yes.

8      Q    You're familiar with him?

9      A    Yes, sir.

10     Q    Now, if you had spoken with him, to corroborate this

11 statement, would that be information that would be included in

12 the felony report sent over to the District Attorney's Office?

13          MR. HAIGH:  Objection.  Speculation, Your Honor.

14          THE COURT:  I'll let you answer if you know whether

15     that would be included.

16     A    If it existed prior to the felony report being

17 generated, if it was -- if the statement was taken after such

18 time the felony report was taken, it would have been just

19 forwarded to the DA's office at such time that it was

20 available.

21 BY MR. LAU:

22     Q    So, is it the practice that the continuing

23 investigation of the Rockingham Police Department after the

24 felony report was forwarded to the DA's office as the

25 information became known?

1    A    Usually, what would occur is right before the

2    indictment and grand jury, one entire package would be

3    delivered to the DA's office with however many copies they

4    requested for discovery and anything subsequent to that that

5    came up in the investigation, yes, it was turned over to the

6    DA's office as soon as it became available.

7    Q    Did you speak to -- or do you recall yourself or

8    anybody from the Rockingham Police Department speaking to

9    Serena Parker's mother?

10   A    I don't recall.

11   Q    Anyone going out to Serena Parker's house to see if

12   there's any evidence of screens being cut or fires being set on

13   the porch?

14   A    I don't recall.

15   Q    But you did speak with her dad, is that correct?  Do

16   you remember?  Do you know who Serena Parker's dad is?

17   A    I'm assuming he's a Parker.  I vaguely remember an

18   individual, but I can't remember his full name.

19   Q    Mr. Voorhees, I'm handing you what's been labeled

20   Defendant's Exhibit 6, which I submit to you is the statement

21   of Larry Parker.

22   A    Yes, sir.

23   Q    Did you know Larry Parker to be Serena Parker's dad?

24   A    It seems so, yes, sir.  After my memory is being

25   refreshed and the address being the same, yes.  She refers to

1    her father in her statement.

2        Q    Refers to her father in the statement.  Now, if you

3    don't mind, can you look at Defendant's Exhibit 6 and ask if

4    anybody recorded Mr. Parker's recollection of going to a trash

5    can because his daughter -- to determine what was inside?

6        A    His statement does not say anything about the trash

7    can.

8        Q    Is there a date on Mr. Parker's statement?

9        A    2-27-1996.

10       Q    And how about Ms. Parker's statement?

11       A    2-27-1996.

12       Q    Based on your experience as an investigator, would it

13   have been important to corroborate from Ms. Parker's father for

14   account of attempting to see what was in the trashcan?

15       A    If he was still available to the investigator at the

16   time.  If he spoke to Ms. Parker before he spoke to Mr. Parker,

17   yes, that would obviously be something he'd ask during the

18   interview.  I don't know in which order they were interviewed.

19   I don't know if Mr. Parker made himself available again after

20   his initial interview.  There was obviously some issue about

21   they feared for their lives.  I don't know the conditions under

22   which they agreed to talk.

23           If the stars lined up correctly for the investigator,

24   and they were perfectly willing to speak and speak openly and

25   candidly without reservations, and the officer had full access

1    to them, yes, that would be something that would be important

2    to ask, but if he didn't have full access, it's possible he

3    couldn't have asked it.

4        Q    Do you recall why they were at the police department

5    that day?

6        A    No, I do not.

7        Q    Now, if I can direct you to the last paragraph of Ms.

8    Parker's statement on Page 30, which was Defendant's Exhibit 7.

9    Can you read that last paragraph?

10       A    'I decided to come forward because I'm tired of

11   Derrick and his boys going around scaring people.'

12       Q    Now, does Ms. Parker's statement, going back to

13   Defendant's Exhibit 8, which is the statement of Mr. Dumas, is

14   Ms. Parker's statement consistent with the statement given by

15   Mr. Dumas?

16           MR. HAIGH:  Objection, Your Honor, calls for

17       conclusion.

18           THE COURT:  I'll let you offer your opinion as to

19       whether it's consistent or not.

20       A    There are both -- I would say there's inconsistencies

21   and consistencies between the two statements.

22   BY MR. LAU:

23       Q    Can I ask you to turn to the last page in Mr. Dumas'

24   statement.  Can I ask you to read the last paragraph about

25   Mr. Dumas' statement?

1  A  'The only reason I came to you tonight and told you

2 about this is because it has been bothering me and I could not

3 get it off my mind.'

4  Q  Both these witnesses gave altruistic reasons for

5 coming forward, is that right?

6  A  Yes, sir.

7  Q  Do you recall -- have any reason to doubt the

8 veracity of these witnesses?

9  A  I don't recall.

10  Q  Do you recall doing anything to reconcile the

11 inconsistencies among the two statements?

12  A  I don't recall my direct actions, no, sir.

13  Q  Do you know of the Rockingham PD making any effort to

14 reconcile the inconsistencies in these two statements?

15  A  As far as something I could sit here and testify

16 today that they actually did, no, sir.  I have no knowledge.

17  Q  And would those efforts be forwarded to the District

18 Attorney's Office if they were made and the inconsistencies

19 could be reconciled?

20  A  They could have been forwarded or they could have

21 been made in conjunction during the trial preparation.

22  Q  So, the District Attorney's Office would have known

23 what it was -- what actions took place to reconcile?

24  A  I would hope so.

25  Q  Are you familiar with Thurman Nelson's testimony in

1    this case?

2         A    I know he testified.

3         Q    Mr. Voorhees, I'm handing you what's been marked

4    Defendant's Exhibit 17, which I submit to you is a copy of

5    Mr. Nelson's testimony at Mr. McRae's second trial.  And if you

6    would, could you turn to Page 75 of Mr. Nelson's testimony,

7    beginning at Page 10, I'm sorry, beginning at Line 10 and going

8    to Line 25.  Could you read that for me?

9         A    Yes.  'Did you go inside the house where Derrick

10   McRae lived on JFK Drive?  Yes.  Between 10:30 and 11:00 on

11   October 13, 1995.  The same night you saw Jerry Rankin

12   spinning tires?  Uh-huh.  You went into the house where Derrick

13   McRae was staying?  Uh-huh.  And you went in with Antoine Rush?

14   Uh-huh.  Did you see Derrick McRae?  Uh-huh.  What was he

15   doing?  He was asleep.

16        Q    Now, Ms. Parker told the Rockingham Police Department

17   at 10:50 Derrick, Julio, Thurman, Jeremy, and Johnny McRae were

18   in her backyard.  Do you have an opinion as to whether that's

19   consistent with the statement the witness said at trial?

20             MR. HAIGH:  Objection, Your Honor.  He's asked to

21        comment on the sworn testimony of another witness.

22             THE COURT:  I'm going to sustain that.

23   BY MR. LAU:

24        Q    Did Thurman Nelson tell you, or do you have any

25   recollection of Mr. Nelson telling you or anyone at the

1   Rockingham Police Department that  Mr. McRae was asleep during

2   the period in which Ms. Parker says they were together?

3        A    I have no recollection of ever speaking with

4   Mr. Thurman.

5        Q    Mr. Voorhees, I'm handing you what's been identified

6   as Defendant's Exhibit 33 which I submit to you is a statement

7   of Thurman Nelson.  Can you tell me who it was that witnessed

8   the statement on Page 2?

9        A    Captain RL McQuay and Detective GW McNeil.

10       Q    So, this is a record of the Rockingham Police

11  Department's investigation?

12       A    A record of their interview with him.

13       Q    And if you don't mind, can you read the statement

14  into the record?

15       A    Okay.

16            THE WITNESS:  Before we start, Your Honor, this last

17  line of the statement is not photocopied in whole.  I will not

18  be able to --

19            THE COURT:  All right.  Just read what you can read.

20       A    'I Thurman Nelson, give this statement to Captain RL

21  McQuay of the Rockingham Police Department of my own free will.

22  On 10-14-95, around 7:30 or 8 p.m, I was with Derrick McRae on

23  JFK Drive in Rockingham.  A guy by the name of Jerry Rankin

24  pulled up in a small red truck.  He made a buy of crack cocaine

25  from Derrick.  When Jerry handed the money to Derrick for the

1   crack, he took off spinning the rear tires.  After Jerry left,

2   Derrick looked at the money Jerry had given him and he realized

3   it was not money, but a piece of paper folded up.  Derrick told

4   me that he would get that dude Jerry for giving him this fake

5   shit.  I hung around for a while with Derrick and then I left

6   JFK with some friends and we walked up to East Boston Street.

7   Later that night, I went back to JFK Drive and I got up with

8   Derrick McRae.  Derrick told me that he got that guy back who

9   gave him the fake money.  I told Derrick that I -- it trails

10  off (unreadable) -- Derrick told me that he shot the guy Jerry

11  Rankin, and I heard some other people talking about a guy who

12  was shot in the head on Hood Street.  Derrick didn't tell me

13  what he shot Jerry with, but Derrick had kept a .380 handgun

14  with him most of all times.  I didn't see Derrick with the .380

15  handgun at any time after Derrick told me he shot Jerry.

16  Signed Thurman Nelson.'

17       Q    Referring you back to Defendant's Exhibit Number 7,

18  the statement of Serena Parker.  Having read these two

19  statements today, and in your experience as an investigator, do

20  you have an opinion as to whether they are consistent?

21       A    They describe the same incident from their point of

22  view.

23       Q    Well, what time does Ms. Parker describe an incident

24  occurring?

25       A    She says about 10:50 p.m when she first starts her

1    statement.

2        Q    And what time does Thurman Nelson describe the

3    incident occurring?

4        A    He starts his recollection around 7:30, 8:00 earlier,

5    and then he describes going back at some point to get back up

6    with Derrick and it doesn't specify a time.  So, it's sometime

7    between then and when he got back up with him.

8        Q    And does Mr. Nelson indicate that he and

9    Mr. Sturdevant went with Derrick to get Mr. Rankin later that

10   day?

11       A    Mr. Nelson doesn't mention Mr. Sturdevant.

12       Q    And in your experience as an investigator, according

13   to Mr. Nelson's statement, Derrick was given fake paper for

14   drugs between 7:30 and 8 p.m that night, is that correct?

15       A    Yes.

16       Q    And according to Ms. Parker's statement, sometime

17   after 10:50 p.m., Derrick McRae was once again given fake paper

18   from Mr. Rankin for drugs?

19       A    I don't believe it was once again.  I believe that

20   they are describing the same incident.

21       Q    Where did Ms. Parker say that the incident occurred?

22       A    Behind her apartment.

23       Q    Where was her apartment located?

24       A    912 Palisades Circle.

25       Q    Would you mind getting up and showing us on the map

1  were Palisades Circle is located?

2      A    (Witness complies.)

3      Q    Where does Mr. Nelson, if you don't mind referring

4  back to Mr. Nelson's statement, Defendant's Exhibit 33, where

5  does Mr. Nelson say that this apparent transaction occurred?

6      A    JFK Drive.

7      Q    And can you point on the map where JFK Drive is?

8      A    (Witness complies.)

9      Q    Now, those are separate streets, are they not?

10      A    Yes, but it's possible for one to be the backyard of

11  another.

12      Q    Tell me about that?

13      A    Well, this is Palisade Circle and if Ms. Williams was

14  to live in any of these -- I mean, Ms. Parker was to live in

15  any of these apartments, the back of her apartment, which is an

16  open field and a basketball court, would face John F. Kennedy

17  Drive.

18      Q    According to Thurman Nelson's statement, where was

19  Mr. Rankin when this transaction occurred?

20      A    Said he pulled up in a small red truck.

21      Q    So, he was in the street; is that right?

22      A    That's an assumption to make from the statement, yes.

23      Q    Drove his truck up onto the backyard?

24      A    No.  I wouldn't make that assumption.

25      Q    Well, these statements indicate two different times

1  and two different places, is that right?

2      A    Yes.

3      Q    Yet you believe they are the same transaction?

4      A    Yeah.

5      Q    And you didn't talk to Julio Sturdevant?

6      A    No.

7      Q    You don't recall speaking, you or anyone from

8  Rockingham Police Department, speaking to Julio Sturdevant?

9      A    I do not.

10         MR. HAIGH:  I'm going to object to the leading nature

11         of the questions at this time, Your Honor.

12         THE COURT:  I'll overrule that.

13  BY MR. LAU:

14      Q    You don't recall?

15      A    No.

16      Q    And according to the top of Page 2 of Ms. Parker's

17  statement, Julio said, "No, man, let it go."

18      A    She said Julio said that.

19      Q    Would it have been important, in your experience as

20  an investigator, to talk to Julio Sturdevant?

21      A    Yes.  If he was at all available to law enforcement,

22  he should be talked to.

23      Q    Do you recall at any time during the course of the

24  Rockingham Police Department's investigation in this case --

25  including your own personal investigation of this case or any

1    officers of the RPD -- identifying a red truck that Mr. Rankin

2    may have been driving that night?

3        A    I had personal knowledge that his father drove a

4    small Mazda red truck.

5        Q    Based on that personal knowledge, was it your

6    assumption that it was his father's red truck?

7        A    Yes.

8        Q    So, to you, it would be your opinion that that would

9    corroborate the statement of Mr. Nelson?

10       A    It would be one indicator that it would be correct.

11       Q    Did you speak with Ms. Rankin or Mr. Rankin, the

12   parents of the deceased?

13       A    I did not.

14       Q    Did somebody from the RPD speak with the parents of

15   the deceased?

16       A    I have no direct knowledge if they did or not.  I

17   assume they did.  They were present at trial.

18       Q    I'm going to hand you what I've marked Defendant's

19   Exhibit 34, which I submit to you as the testimony of the Ms.

20   Jackie Rankin at the second trial of Mr. McRae's case.  If you

21   would, turn to Page 178 and if you could begin on Line 14.  I

22   would appreciate your reading for the Court Line 14 to Line 23.

23       A    'Now, did your -- when was the last time that your

24   son, Jerry Rankin, came to your house prior to his death?

25   Approximately two weeks.  Did you lend your red pickup truck

1 that evening to your son?  No, sir, he did not have permission

2 to drive any of our vehicles.  He had permission to drive none

3 of your vehicles?  None of our vehicles.'

4     Q    You can stop there.  During the course of the

5 investigation, had officers talked to Ms. Rankin, would they

6 have wrote down that her son, the deceased, did not have the

7 red truck on that night?

8         MR. HAIGH:  Objection, Your Honor, misrepresentation

9     of testimony.

10         THE COURT:  I'm going to sustain that.

11 BY MR. LAU:

12     Q    Would it have been important, based on your

13 understanding of Mr. Nelson's statement, to speak with the

14 parents of the deceased, Mr. Rankin, to determine whether or

15 not he had access to the red truck that they owned?

16     A    Yes.

17     Q    And if he had access to the truck, would that be

18 noted by yourself or another member of the RPD in its case

19 file?

20     A    It should be noted by whoever made the contact.

21     Q    And that would then be forwarded to the District

22 Attorney's Office?

23     A    Yes.

24     Q    Going back to that testimony, if you don't mind going

25 up a little further on Page 178 of Ms. Rankin's trial testimony

1   marked Defendant's Exhibit 34, on Line 5, can you read from

2   Line 5 to Line 17?

3       A    'Ms. Rankin, when did you last see the red pickup

4   truck before you went to see your son at Sister Odessa's on

5   October 13, 1995?  I don't recall if it was from the yard or

6   not.  My husband was working in the building behind our house.

7   Sometimes he would pull it around there if he was working on a

8   TV.  He would load a TV up on the truck and pull around.  I do

9   not remember seeing it in the yard.  I don't remember.'

10      Q    And if you could keep reading to Line 17?

11      A    'Now, did your -- when was the last time your son,

12  Jerry Rankin, came to your house prior to his death?

13  Approximately two weeks ago.'

14      Q    Would it be important, during the course of the

15  investigation and your experience as an law enforcement

16  officer, to know the recent movements of Mr. Rankin if he's

17  supposed to be in a red truck earlier that evening?

18      A    Yes.

19      Q    Would it have been important that he had not been to

20  his parent's home in the previous two weeks where that red

21  truck was located?

22      A    Yes.

23      Q    And it would have been documented by the officer who

24  spoke with Ms. Rankin that he hadn't been there for two weeks?

25      A    Should have been.

1     Q   If we could go back to Defendant's Exhibit 6, which

2  is the statement of Larry Parker, and if we can go to more than

3  midway through -- I can approach and point out -- beginning at,

4  'A few minutes later.' Can you read the remainder of that

5  paragraph?

6     A   'A few minutes later, the black male left, walking up

7  the sidewalk.'

8     Q   Can we back up? Does it say the black male?

9     A   'A few minutes later the six black males left walking

10  up the sidewalk that goes in front of my house. They were

11  headed towards Palisade Circle. After they left, Jerry asked

12  me what time it was and I told him it was 10:34 p.m. He told

13  me that he was afraid of those guys and that he was going to

14  his brother's house who lives near the skating rink on

15  Rockingham Road. At about 10:45 p.m, I heard a gunshot coming

16  from Palisade area. About two or three minutes after the

17  gunshot, I saw the same six black males running from the pool

18  area real hard. The only three I recognize that was running

19  was Derrick, Tony, and Jeremy.

20       I heard someone say pick up the damn gun, and the

21  black male that was wearing a blue jacket picked up the gun and

22  they all ran behind the apartment towards Rockingham Road. I

23  decided to come forward because Jerry was a friend of mine and

24  the person that killed him should be caught.'

25     Q   Going back to Defendant's Exhibit 7, which is the

1  statement of Serena Parker, do you have an opinion as to

2  whether the statement of Ms. Parker and the statement of

3  Mr. Parker are consistent?

4      A    They describe the same incident.

5      Q    They describe the same incident?

6      A    From their point of view.

7      Q    Now, if you could stand up, go to the map again if

8  you wouldn't mind.  Are you familiar with the location of the

9  skating rink on Rockingham Road?

10     A    It's not on the map.  I'll be glad to stand up.

11     Q    Can you stand up and point to where that location

12  would be?

13     A    It would be further up this way on Rockingham Road.

14  (Indicating)

15     Q    That way.  Okay.  Now, according to Mr. Parker's

16  statement, he lived at 910 JFK Road.  Can you point to

17  approximately where 910 JFK Road is for the Court?

18     A    It would be in this area. (Indicating)

19     Q    And he says that six black males went headed towards

20  Palisade Circle.  In which direction from JFK Road would that

21  be headed?

22     A    You can see this footpath back here behind the tree

23  line and whatnot.  It would probably be in that general

24  direction towards Palisade.  The pool they're talking about is

25  right here.

1    Q    And Jerry Rankin was headed toward the skating rink.

2    And which direction would he have been going?

3    A    That way. (Indicating)

4    Q    Okay.  And where was the victim killed at?

5    A    This row of houses right here, one of those.

6    Q    You can have a seat.  Now, just a short time after

7    Mr. Parker describes him heading in the opposite direction of

8    where the victim's body was found.  He reports hearing a

9    gunshot from the Palisades pool area.  Did you try and

10   determine, during the course of your investigation, how

11   Mr. Rankin or why Mr. Rankin would change course from going to

12   the skating rink and be shot a short time later?  Do you recall

13   trying to figure out why he was shot a short time later in the

14   opposite direction?

15           MR. HAIGH:  I'm going to object at this time, Your

16       Honor.  That's a misrepresentation of the statement.  It

17       says in the statement that he was going in that direction,

18       but nobody here can establish where he actually went.

19           THE COURT:  I'm going to sustain that, and with that,

20       we're going to go ahead and take a break.  We'll be in

21       recess for about 15 minutes.

22              (Court in recess for morning break.)

23           THE COURT: All right.  You may continue.

24   BY MR. LAU:

25       Q    Mr. Voorhees, I believe where we left off we were

1   looking at Defendant's Exhibit 6, which was the statement of

2   Larry Parker.  Now, did you ever try to -- or do you recall or

3   do the record or any member of the Rockingham Police Department

4   try to reinterview Mr. and Mrs. Parker to determine whether or

5   not this was indeed the same incident?

6       A   I can only testify to my actions, and no, I did not.

7   I have no recollection.

8       Q   Now, Ms. Parker said three individuals left

9   Mr. Rankin, and Mr. Parker said it was six individuals who came

10  running back and left, is that correct?

11          MR. HAIGH:  Objection.  Compound question, Your

12      Honor.

13          THE COURT:  I'm going to sustain that.  I didn't

14      understand what the question was.  You said one person

15      said one thing, and one said another, is that correct?

16      Are you asking if each of those statements were correct.

17          MR. LAU:  I'll rephrase my question.

18          THE COURT:  Okay.

19  BY MR. LAU:

20      Q   Now, Ms. Parker said that three individuals left

21  after Mr. Rankin, is that right?

22      A   Yes.

23      Q   And Mr. Parker said six individuals came running back

24  after leaving, is that right?

25      A   That's correct.

1          Q    And Ms. Parker said her and her dad went to the trash

2     can the next day, correct?

3          A    Correct.

4          Q    And Mr. Parker said Jerry Rankin showed up at his

5     house to sell some stuff according to his statement.  Can you

6     see that at the beginning of Mr. Parker's statement?

7          A    We didn't read that into the record, but, yes, I see

8     --

9          Q    Well, why don't we now, if you don't mind.  If you

10    don't mind reading from the beginning of the statement,

11    Defendant's Exhibit 6, beginning at "I, Larry Parker.'

12         A    'I, Larry Parker, was in my house asleep on October

13    14, 1995, at about 10:15 p.m.  Jerry Rankin came to my house

14    which is located at 910 JFK Drive.  When I went to the door to

15    see what he wanted, he had some stuff he wanted to sell me for

16    $25.  I've been knowing Jerry for a while because he used to

17    hang out every now and then.  I gave Jerry $25 for his stuff.

18    So while he and I were on the front porch talking, the six

19    black males came down the sidewalk towards my home.'

20         Q    You can stop there.  Ms. Parker talked about Jerry

21    Rankin coming intent to sell some goods to Mr. Parker.

22         A    No.  She does not say that.

23         Q    And you didn't reinterview them to determine what in

24    fact, or if, in fact -- you don't recall reinterviewing them or

25    any member of the Rockingham PD reinterviewing them, do you?

1          A     I personally did not, and have no knowledge whether

2     anyone else did.

3               MR. LAU:  May I approach.

4               THE COURT:  Yes.

5     BY MR. LAU:

6          Q     Mr. Voorhees, I've handed you what's marked as

7     Defendant's Exhibit 4, which is the statement of Corey Robinson

8     given to Detective JC Brickman.  Now, would you have reviewed

9     this statement, wrote the statement, or been aware of the

10    contents of this statement through your conversations with the

11    other detectives in this case prior to completing the felony

12    report?

13         A     Yes, at some point I would have.

14         Q     And does this statement have a date on it?

15         A     Yes.

16         Q     And what's that date?

17         A     March 1, 1996.

18         Q     Would you read that statement to the Court?

19         A     'I, Corey Spencer Robinson, give this statement to

20    Detective JC Brickman of the Rockingham Police Department of my

21    own free will.  Near the end of the month of November, I was on

22    Palisade Circle.  A man named Julio told me that he had found a

23    gun.  Julio told me that he had the gun belonging to Derrick

24    McRae and Thurmond Nelson and that he wanted $300 for it.  I

25    gave Julio $150 and told him I would give him the rest later.

1    Julio gave me the gun and I left.  The gun was a silver in

2    color .357 Magnum Police Ruger with brown handles.'

3         Q    Do you recall yourself, or any member of the

4    Rockingham Police Department, making any efforts to secure the

5    gun from Corey Robinson?

6         A    I don't recall myself doing it, and I have no

7    knowledge to the other actions.

8         Q    Would -- in your opinion and experience, would it be

9    important if you have a witness telling you that they have a

10   gun that connects back to the suspect in a crime to attempt to

11   obtain that weapon?

12        A    Yes.

13        Q    Now .357 Magnum or Mag Police Ruger was not the same

14   caliber as the projectile found at the scene, is that right?

15        A    A casing was found at the scene, and no, that doesn't

16   match.

17        Q    And in your experience, would that matter whether or

18   not you pursue a gun from a witness saying they have a gun

19   connected back to a suspect?

20        A    No, it wouldn't because you have inconsistent

21   statements about another suspect and another gun and it goes

22   back, when I told you before, there could have been a revolver

23   on the scene.  This describes a revolver.  A revolver does not

24   eject a casing -- very well could have been there.

25        Q    So, your opinion is that an investigation that was a

1  thorough investigation would have sought out this gun from

2  Mr. Robinson?

3      A    It would have been good investigative techniques,

4  practices, best practices.

5      Q    Is there -- if that was done, an attempt to secure

6  the gun from Corey Robinson was made, would that be something

7  that would have been reported on?

8      A    Yes.

9      Q    Included in the case file?

10     A    Yes.

11     Q    Is there anything in the case file communicating

12  Mr. Robinson's gun was sought by the Rockingham Police

13  Department?

14     A    I don't know what was in -- as it sits today, these

15  paper works that you've handed me, I have not seen anything.

16  Was it ever in there, I don't know.  Was it ever done, I don't

17  have any personal knowledge.  Maybe introduced in trial as a

18  piece of evidence.  Was it handed over to the original defense,

19  I don't know any of those questions.

20     Q    Do you know why Corey Robinson was at the police

21  department on March 1, 1996?

22     A    I do not.

23     Q    If individuals are being interviewed by the

24  Rockingham Police Department, is there any policy with respect

25  to documenting that interview?  Was it required that

1  documentation take place?

2      A    Yes.

3      Q    And when individuals were interviewed, are they

4  asked, as a regular course of practice, if they're willing to

5  give a witness statement?

6      A    Yes.

7      Q    And they would either handwrite it themselves, or the

8  investigator would write it for them?

9      A    Yes.  The person conducting the interview -- could

10  have been a field interview, could have been a noncustodial

11  interview, could be a voluntary interview, they could have just

12  wrote a substance of oral statement out and documented the

13  interview and not gotten it signed, all those things could've

14  happened.

15      Q    And would that have been the practice irrespective of

16  what the witness told the detective?

17      A    It was the policy of the Rockingham Police

18  Department, if someone was admitting to a crime, to make every

19  effort to get it in their own handwriting if possible, if not,

20  in the officer's handwriting and get them to sign it.

21      Q    What about a witness providing information?

22      A    Again, best case scenario to have it in their own

23  handwriting.  At the very least, get them to sign it, if they

24  will sign it.  If not, the officer is to document it and sign

25  it themselves.

1    Q    And what about information that was potentially

2    favorable to the defendant?  Was that also included?

3    A    It was irrelevant.  If it was information given to

4    us, it was treated all the same.  Obviously, you can see we

5    have several statements that contradict each other, and we

6    certainly didn't weed any of those out because they didn't

7    contradict the --

8    Q    I'm handing you what's been marked Defendant's

9    Exhibit 35.  Do you recognize Defendant's Exhibit 35 as a form

10   used by the Rockingham Police Department?

11   A    At that time, yes.

12   Q    Can you describe this form?

13   A    It was the Rockingham Police Department Statement of

14   Rights Form read to anybody who was under advisement of their

15   Miranda rights.

16   Q    What was the standard to advise them of their Miranda

17   rights?

18   A    They were in custody and they were suspected of a

19   crime.

20   Q    Mr. Sturdevant was in custody and suspected of a

21   crime.  Would his statement, while in custody and suspected of

22   a crime, be something that would ordinarily be wrote down or

23   put into a report?

24   A    He gave one.

25   Q    And if he didn't give one, would something document

1    that he didn't provide a statement?  Would there be a notation

2    made?

3         A    A notation, officer could simply say he didn't make

4    one.  Sometimes they note it on the form itself.  I don't see

5    any indication of that on this form.

6         Q    It's not necessarily that --

7         A    It could be a simple notation somewhere.

8         Q    Let me hand you what's been marked Defendant's

9    Exhibit 19.  Do you recognize this exhibit?

10        A    I can tell what it is.

11        Q    Okay.  And what is it?

12        A    It's a statement that was given on March 26,1996, by

13   Edward Lewis Tender.  Said he requested to speak to Detective

14   JC Brickman and Detective Sergeant Voorhees without his lawyer

15   present.

16        Q    Were you present for this statement by Mr. Tender?

17        A    I didn't sign it, but the officer that wrote it

18   mentioned me, so I'm assuming I was.

19        Q    Now, would you mind reading this statement for the

20   Court?

21        A    'On this the 26th day of March 1996, I, Edward Lewis

22   Tender, request to speak with Detective JC Brickman and

23   Detective Sergeant Voorhees without my lawyer present.  About

24   two weeks ago, Derrick McRae, who is in jail for murder, came

25   to me and told me he wanted to talk to me.  Derrick McRae told

1   me that he walked up on a white boy, Jerry Rankin, while he was

2   on a porch sleeping.  Derrick McRae said that when he walked up

3   on the porch, he put a .380 handgun to Jerry Rankin's head and

4   shot him.  Derrick McRae said that he then took the .380

5   handgun and hid it in some bushes near the house where he shot

6   Jerry Rankin.

7          Derrick McRae said that about two days later, him and

8   two other boys, that I can't remember their names, went back

9   and got the .380 handgun and took it and hid it in Chapel Town

10  near his -- Derrick McRae's house.  Derrick McRae -- the copy

11  fades off -- the reason he shot Jerry Rankin was because he was

12  a white boy.  Derrick McRae also said that all white people

13  need to die.  Yesterday on 3-35-96, Derrick McRae came to me

14  and said that he was going to kill some of the police.  Derrick

15  McRae said that he was going to start with Phil Sweat,

16  Detective Brickman, Captain McQuay, and he was going to work

17  his way down.  Signed Edward Lewis Tender, 3-26-1996.

18  Witnessed Detective JC Brickman.'

19     Q    Now, as an investigator, have you ever employed the

20  practice of sending an individual back to get more information

21  after a statement has been obtained when they allege that

22  somebody's told them something?

23     A    No.  We don't use them as our agent.

24     Q    So, you wouldn't have used Mr. Tender as your agent?

25     A    No.

1      Q      You would, however, seek to corroborate what

2   Mr. Tender had told you, is that right?

3      A      Yes.

4      Q      Did you speak with anybody else in the jail, to your

5   recollection, or did anybody else from the Rockingham Police

6   Department speak with anyone else from the jail trying to

7   determine whether or not Mr. McRae had spoken with Mr. Tender

8   or anyone else?

9      A      I don't know.

10     Q      And this motive is different -- well, is the motive

11  identified here that he shot Mr. Rankin because he was a white

12  man or a white boy?

13     A      That's what he said.

14     Q      Now, in your opinion, is that consistent with the

15  motive offered by others?

16     A      It's not consistent with what's in other witness

17  statements.

18     Q      And do you recall, personally, or any other member of

19  the Rockingham PD discussing with you attempts to corroborate

20  whether or not Mr. McRae was motivated by racial prejudice?

21     A      I don't recall.

22     Q      And if those attempts were made, they would be

23  something that would be documented in the file, is that right?

24     A      That's correct.

25     Q      And that's not in the file in front of you, is that

1  correct?

2      A    What's that?

3      Q    Well, this is from 3-26-1996, and your earlier

4  testimony was that there's nothing in the file subsequent to

5  3-1-96, is that right?

6      A    That's correct.

7      Q    So, any efforts to corroborate any information in

8  Mr. Tender's statement is not in the file?

9      A    There is nothing in the file that you handed me as it

10  sits today dated past 3-1-96.

11     Q    And you don't recall what efforts were made, if any?

12     A    Whether there was anything in this file after 3-1-96,

13  prior to it being handed me today, I do not know.

14     Q    Can you recall any investigative efforts that took

15  place after that date?

16     A    I don't recall being present for this interview.  I

17  have no memory.

18     Q    Now, if efforts were made to reconcile the

19  inconsistencies, that you mentioned yourself in the statements,

20  those records -- those efforts would have been documented, is

21  that right?

22     A    If there was anything, yes.  Any statements, any

23  witnesses that said anything, any physical evidence that was

24  collected, anything that could have been documented should have

25  been documented, yes.

1    Q    And sent to the District Attorney's Office?

2    A    Yes.

3         MR. LAU:  That would complete my questions, Your

4    Honor.

5         THE COURT:  Cross examination.

6                    **CROSS EXAMINATION**

7    BY MR. HAIGH:

8    Q    Now, have you -- I'm sorry, how long have you been in

9    law enforcement?

10   A    I started in 1990, and I resigned in 2003 -- 2002.

11   Q    And I know it's 13 years, you never had two witness

12   statements be identical, have you?

13   A    It's rare.  It's very rare.

14   Q    And normally there are inconsistencies, isn't that

15   right?

16   A    Absolutely correct.

17   Q    And if they are exact, wouldn't that cause suspicion

18   on the statements?

19   A    Yes.

20   Q    So, in fact, it lends to credibility in your mind

21   that there are inconsistencies, isn't that right?

22   A    It's consistent that they are inconsistent with the

23   behavior I normally see from witnesses and suspects when you

24   take statements from them.

25   Q    And just because there is some inconsistencies, that

1    wouldn't make you question the veracity in and of itself, would

2    it?

3         A    No.

4         Q    And the statements that you talked about here, they

5    all point to the defendant as the shooter, don't they?

6         A    Yes.

7         Q    So, on the ultimate issue they are consistent, isn't

8    that right?

9         A    To the main point, yes.

10        Q    And I want to talk about times a little bit.  Isn't

11   it fair to say that when you're looking at witness statements

12   to a particular crime, the times almost never end up being an

13   exact or consistent?

14        A    What's also important to note is many of these

15   statements, as they were written down, were taken months after

16   the original incident.  I think the original incident occurred

17   in October of '95, and many of these statements weren't put to

18   paper till February and March of the following year.

19        Q    Okay.  And let's talk about that.  Can you look at

20   Defendant's Exhibit 6?

21        A    Yes, sir.

22        Q    All right.  Now, where does it say that  Mr. Parker's

23   located?  The second line of the second paragraph there?

24   Doesn't that say 910 John F.  Kennedy Drive?

25        A    Yes, it does.

1      Q    So, let's take a look at Defendant's Exhibit 7,

2  second line of second paragraph.  'I was in my apartment

3  located at 912 Palisade Circle,' isn't that right?

4      A    That's correct.

5      Q    So, she and her dad actually aren't even in the same

6  place, isn't that right?

7      A    No.  910 and 912 would be adjoining apartments or

8  right beside each other in adjoining buildings.

9      Q    So, they're not looking at the events from the same

10  angle or same place, isn't that right?

11      A    That would be correct.

12      Q    Now, I want to talk to you a little bit about what's

13  been marked as Defendant's Exhibit 23.  That's the binder I

14  think.  I'm sorry, it's Defendant's Exhibit 25.  As this file

15  came to you today, was it organized?

16      A    No.

17      Q    Can you elaborate on that.  How can you tell that

18  it's disorganized?

19      A    Well, if it would have been my original work product,

20  everything -- Number 1 would have been in the binder.  It

21  wouldn't have been separated out in folders like this and

22  wouldn't be loose where something could fall out of it, you

23  know, and obviously, as I've noted before, things that -- at

24  least time was taken to create a tab for is not there.  It's

25  been my experience in the past, when I have been in court and

1    had the original file with me, defense or the prosecution would

2    ask for an original document out of the file.  You would hand

3    it to them, they would mark it as an exhibit, put it right into

4    evidence right then and that may explain why some of it is

5    missing.  Again, I probably haven't laid eyes on this binder

6    since '98, '99.  Like I said, the police department was

7    remodeled.  We moved twice during the process.  Things were

8    sent to a warehouse, you know.

9        Q    So, as you sit here today, do you have any personal

10   recollection of what that binder looked like back when it was

11   prepared?

12       A    It's a vague memory, and it's really based off of how

13   I would do all of them.  It's more of a course of conduct; how

14   I would normally put them together.

15       Q    So, you have no specific memory of this particular

16   binder?

17       A    I do not.

18       Q    Is it fair to say that your testimony thus far has

19   been speculation as to what was and what was not in that binder

20   at that time?

21       A    Yes.  I hope that's included.

22       Q    Do you still have Defendant's Exhibit 23 in front of

23   you?

24       A    I do.

25       Q    Can you please draw your attention to Page 4 and onto

1    Page 5?

2         A    Oh, 23.  I apologize.  I do not see an exhibit marked

3    23.

4         Q    Just for the record, what are you looking at there?

5         A    A felony report from the Rockingham Police Department

6    for defendant Thurmond Nelson and codefendant Derrick McRae.

7         Q    Can you please draw your attention to Pages 4 and 5?

8         A    Okay.

9         Q    And what are listed on those pages?

10        A    At the top of the page, the victim information is

11   listed and further -- halfway down continuing is witnesses

12   identified at that time.

13        Q    So, the witness is listed in that report.  Would that

14   list all of the witnesses that you were able to identify and

15   get statements from?

16        A    To that point in time.  Up until, I think, the report

17   is dated March 1, 1996.

18        Q    So, it's fair to say that's the extent of the

19   witnesses if there was no subsequent ones identified later

20   before trial?

21        A    Correct.

22        Q    And those were also provided to the State

23   Prosecutor's Office, is that right?

24        A    That's correct.

25        Q    Now, you were asked on direct about revisiting with

1  witnesses.  Isn't it fair to say that particularly in a murder

2  investigation in somebody's neighborhood, they're going to be

3  reluctant to speak to the police?

4      A    Yes.

5      Q    And have you run into situations where you got

6  initial statements from somebody and were unable to have them

7  cooperate -- to later go back and corroborate issues?

8      A    Yes.

9      Q    Now, do you recall specifically whether that happened

10  in this case or not?

11     A    I don't recall.  Obviously, based on the statements

12  I've read today, at some point it was an issue.

13     Q    Fair to say it's par for the course for things like

14  that to happen?

15     A    Yes.

16     Q    Now, the area that we're talking about for the crime,

17  how prevalent was the -- based upon your information to law

18  enforcement, how prevalent was the sale of crack cocaine in

19  that area that we're talking about in 1996?

20     A    It was just a short time later we actually had that

21  entire area designated a federal weed and seed high crime area

22  and targeted for specialized law enforcement efforts.

23     Q    So, it's fair to say that it was a high drug area, is

24  that right?

25     A    Yes, absolutely it was.

1      Q    All right.  And when you're dealing with the case,

2  high drug area, is it fair to say that your witnesses are not

3  going to be angels, is that right?

4      A    That's correct.

5      Q    And additionally, they may be more reluctant to speak

6  to law enforcement for that reason, isn't that correct?

7      A    That's one reason, yes.

8      Q    And earlier you testified about Ms. Rankins'

9  testimony and the use of a red truck that Mr. Rankin allegedly

10  didn't have permission to use that truck.  Isn't it fair to say

11  that a person can use a truck without having permission?

12      A    I believe if you look at the victim's criminal

13  history, it wouldn't be the first time that he took the truck

14  without permission.

15      Q    Now, you testified that based upon the statement of

16  Mr. Tender, that's exhibit --

17      A    Nineteen, maybe.

18      Q    Yes, 19.  So, you were present for that interview, is

19  that correct?

20      A    I would have to say so based on the interview, but I

21  don't recall it.  I have no memory of it.

22      Q    And you didn't make any offers to Mr. Tender in

23  exchange for his statement, did you?

24      A    Certainly don't have any memory of that.  No, sir.

25      Q    And in fact, you wouldn't have authority to do that

1   anyway, would you?

2       A    I would not.

3       Q    Okay.  And you don't recall any other law enforcement

4   officers making offers to Mr. Tender in exchange for his

5   statement, do you?

6       A    I do not.

7       Q    And in fact, the case that you were dealing with, Mr.

8   McRae's  case, is a Rockingham case, isn't that right?

9       A    That's correct.

10      Q    And the cases that Mr. Tender were held on were

11  Richmond County cases, isn't that right?

12      A    Best of my recollection, yes.

13      Q    And you wouldn't be able to do anything with regards

14  to another law enforcement entities' cases, would you?

15      A    I would have no authority to do so.

16          MR. HAIGH:  No further questions from the State, Your

17      Honor.

18          THE COURT:  Any redirect.

19          MR. LAU:  Just a few questions, Your Honor.

20                  **REDIRECT EXAMINATION**

21  BY MR. LAU:

22      Q    Mr. Voorhees, if I can direct your attention to

23  Defendant's Exhibit 5, if you still have it up there?

24      A    I have it.

25      Q    What's the date of that statement?

1      A    2-21-96.

2      Q    And Defendant's Exhibit 8, the statement of Marlin

3  Dumas.  What's the date of that statement?

4      A    2-26-96.

5      Q    Exhibit 6, the statement of Larry Parker.  Do you

6  have that with you?

7      A    2-27-96.

8      Q    Exhibit 7, the statement of Serena Parker.  Do you

9  have that with you?

10     A    2-27-96.

11     Q    Exhibit 4, the statement of Corey Robinson?

12     A    March 1, 1996.

13     Q    I don't believe you have Exhibit Number 9 with you,

14  but let me get Exhibit Number 9.  This is what I submit to you

15  is the statement of one Michael Anthony Ferguson.  And what's

16  the date on Mr. Ferguson's statement?

17     A    March 1, 1996.

18     Q    And I'm going to hand you what's been marked

19  Defendant's Exhibit 10 and 11, which I submit to you are the

20  statements of Paul Montes William and Tonya Clark.  Can you

21  tell me what the date of those statements are?

22     A    Tonya Clark is 2-28-96, and it would appear 2-27-96

23  on Paul Montes Williams.

24     Q    Thank you.  And do you still have Defendant's Exhibit

25  33 in front of you?

1       A       I do.

2       Q       And what's the date on Defendant's Exhibit 33?

3       A       March 1, 1996.

4       Q       Now, all those statements come within a very short

5   period of time, is that correct?

6       A       Yes.

7       Q       And how long is that length of time?

8       A       Over a period of from the 26th to the first -- well,

9   the 21st.  Over a period of about two weeks.

10      Q       Now, you testified for the State that these witnesses

11  typically are afraid to come forward, is that right?  Or that

12  they may be afraid to talk to police because of their

13  neighborhood?

14      A       Generally, I testified to that.  I didn't testify to

15  these witnesses in particular.

16      Q       Okay.  Is it common for all of your witnesses in a

17  case to come forward in such a short period of time, four and a

18  half months after an investigation begins?

19      A       It's not uncommon once a piece of evidence presents

20  itself or one particular witness presents itself with a list of

21  other names for people to follow up with for you to immediately

22  seek those people out and talk to them.  No, that's not

23  uncommon.

24      Q       So, they didn't come to you is what you're saying,

25  that you would often go to them?

1    A    It depends.  I don't recall it in this case.
2  Sometimes they would come forward; sometimes you would have to
3  seek them out.
4    Q    The statement of Larry Parker, Exhibit 6; statement
5  of Serena Parker, Exhibit 7; and the statement of Marlin Dumas,
6  Exhibit 8, do you still have those statements with you?
7    A    I do.
8    Q    With respect to Exhibit 8, the last paragraph on
9  Exhibit 8, Mr. Dumas' altruistic reason for coming forward, is
10 that accurate?
11   A    Mr. Dumas said the reason he came forward tonight was
12 to tell you about it because it has been bothering him and he
13 could not get it off his mind.
14   Q    And Defendant's Exhibit 6, this is the statement of
15 Larry Parker, and the last paragraph can you read -- well, that
16 once again is an altruistic purpose for coming forward, is that
17 right?
18   A    He offers the reason for giving the statement, yes.
19   Q    And what is that reason?
20   A    Jerry was his friend and the person that killed him
21 should be caught.
22   Q    And Ms. Serena Parker, the last paragraph of her
23 statement, that offers an altruistic reason as well?
24   A    She also offers a reason.  She was tired of the boys
25 in her neighborhood going around scaring people.

1      Q    Do witnesses typically, if you went out and found

2  them, offer altruistic reasons why they came forward?

3      A    Yes.  It's a matter of routine for an investigator to

4  ask.

5      Q    Would you ask?

6      A    Yes.

7      Q    And then when you went back to talk to them, if they

8  wouldn't speak, would you ask them again?

9      A    We would ask them if anything's been changed, if

10  they've been contacted, threatened or anything changed while

11  they were willing to --

12      Q    Now, you said these witnesses are typically -- had

13  some reluctance coming forward or especially may show

14  reluctance on being revisited by police.  Isn't it also true,

15  in your case, that witnesses tend to lie about their own

16  conduct and minimize the conduct of their own?

17      A    Yes.  I've been lied to many times in my life.

18      Q    Now, when you testified to the binder which is

19  marked, I believe, Defendant's Exhibit 25, you're not

20  speculating about what should have been in the binder, right?

21      A    No.

22      Q    And do you still have Defendant's Exhibit 28 up

23  there, which is your testimony from the second trial?

24      A    Yes.

25      Q    And can you turn to Page 165, beginning on Line 19?

1    A    'Captain Voorhees, would you answer my question.  My

2  question is did you investigate this case as far as any

3  suspects outside the City of Rockingham?  Yes.'

4    Q    You can stop there.  So, the investigation of those

5  suspects, based on your knowledge prior to being  removed,

6  should have been in that binder?

7    A    I'm not going to answer that because that makes the

8  assumption that something's there and been removed and that's a

9  loaded question.

10    Q    Would you have documented the investigation of those

11  suspects?

12    A    Yes.

13    Q    And that documentation would have ended up in that

14  binder, correct?

15    A    If any existed, yes, sir.

16          MR. LAU:  I have nothing further, Your Honor.

17          THE COURT:  Further questions?

18          MR. HAIGH:  Nothing for the State, Your Honor.

19          THE COURT:  All right.  Thank you.

20          All right.  We'll go ahead and take our lunch break

21  and resume at 2:00.

22              (Court in recess for lunch break)

23          THE COURT:  Further evidence for the defendant.

24          MR. LAU:  Your Honor, before calling our next

25      witness, we would move to introduce at this time

1      Defendant's Exhibits 21 through 35.

2           MR. HAIGH:  If I may have a moment, Your Honor.

3           THE COURT:  Sure.

4           MR. LAU:  And I apologize, we would like to introduce

5      21 through 24 and 26 through 35, and we are not going to

6      be introducing the master case file from the Rockingham

7      Police Department.

8           MR. HAIGH:  No objection, Your Honor.

9                (Defense Exhibits 21 – 24 and 26 – 35 were

10               admitted.)

11          THE COURT:  All right.  Again, for the record, I'm

12     going to allow the police department to retain that

13     exhibit not having been introduced as evidence, but I've

14     instructed the custodian not to in any way alter or allow

15     anyone else to have access to the file, understanding it

16     will be in the evidence locker and will be locked in the

17     evidence locker with the Rockingham Police Department, is

18     that correct?

19          THE WITNESS:  In the safe.

20          THE COURT:  In the safe, I'm sorry, and it's to be

21     brought out only upon the order of the Court.  Yes, sir.

22          MR. COLEMAN:  We're going to call our next witness,

23     Michael Parker.

24               The witness, Michael Parker, was sworn and

25               testified as follows to the examination of

1          counsel.

2                    **DIRECT EXAMINATION**

3    BY MR. COLEMAN:

4          Q    Good afternoon, Mr. Parker, how are you?

5          A    Fine.  Thank you.

6          Q    Would you state your full name, where you live, the

7    city in which you live, and where you work.

8          A    My name is Michael Parker, I live in Carriage, North

9    Carolina.  Right now, I'm employed with the Fayetteville --

10   City of Fayetteville as a police attorney.

11         Q    And what is your title in that position?

12         A    Police Attorney for the City of Fayetteville.

13         Q    Prior to your current job, where were you employed?

14         A    I was employed in Scotland in Hope County as a

15   homicide prosecutor.

16         Q    And roughly what period were you employed?

17         A    January 1, 2011 until July 1st of 2014.

18         Q    July 2014 is when you left that position and became

19   police attorney?

20         A    No.

21         Q    No?

22         A    I retired on July the 1st, and I did not take the job

23   with Fayetteville until September the 29th.

24         Q    Prior to January 2011, where were you employed?

25         A    I was the elected district attorney for Richmond,

1   Anson, and Stanley counties.

2       Q    And that includes Rockingham?

3       A    That's Richmond County.

4       Q    How long were you the elected district attorney?

5       A    Six years.

6       Q    Six years as the elected district attorney and prior

7   to that?

8       A    I was the chief assistant district attorney.

9       Q    So, can you give me the time period during which you

10  were the elected district attorney?

11      A    November the 1st 2004 till December the 31st 2010.

12      Q    2010?

13      A    Yes, sir.

14      Q    And you were the chief assistant during what period?

15      A    From around August of '96 to -- I was appointed

16  district attorney in 2004.

17      Q    In November of 2004?

18      A    Yes, sir.

19      Q    And prior to August 1996, how were you employed?

20      A    I was an assistant district attorney.

21      Q    In which district?

22      A    Richmond, Anson, Stanley, Union, and Moore Counties.

23      Q    So, basically, the same district only a little more

24  expanded?

25      A    There was five counties, then they split off Moore

1  County on January the 1st, I think, of '97, and then they took

2  off Union County in 2006, I think.

3      Q    Can you briefly describe what your responsibilities

4  were beginning in 1995 until you became the chief assistant

5  district attorney?

6      A    I would have been -- I was the prosecutor who worked

7  individual counties.  I trained new assistants.  I was in

8  charge of county -- I worked in Stanley County and then I was

9  transferred from Stanley to Richmond County, and I was

10 responsible for the case loads in those counties.

11     Q    And you say you were responsible for the case loads,

12 what do you mean?

13     A    Well, I had the responsibility of prosecuting the

14 cases pending in those counties along with whatever other

15 prosecutor was assigned --

16     Q    I think I interrupted you.  So, when you say that you

17 prosecuted individual cases during this period --

18     A    I did.  I handled cases.

19     Q    And did you prosecute particular kinds of cases or

20 just generally felonies?

21     A    The way our office was set up at that time, you were

22 subject to be -- I was assigned a particular county.  I would

23 be known as the county head at that time, but then another

24 prosecutor, usually younger, was put there with you to work

25 those cases and we were subject to -- we were responsible for

1    all the cases in Superior Court.  We were also subject to being

2    put in District Court as needed.  So, you could be prosecuting

3    a capital murder case this week and be due in juvenile court

4    Monday, depending on what was needed in the office at the time.

5         We did not have specific case assignments.  They were

6    not introduced at that time for regular felonies.  We would

7    work the individual cases up.  We would talk to the lawyers or

8    whatever, and then when they were ready to be tried, we would

9    identify a trial list and then we would divide them up among

10   the prosecutors who were working to try the cases.

11   Q    And when you say, 'we,' you mean you and the

12   assistant who worked with you?

13   A    As an ADA, what I typically do is -- well, I have a

14   system.  My system was whenever I had a term in Superior Court

15   coming up, I would look at the cases and see which ones were

16   the oldest and identify what defendants were in the jail the

17   longest and then those would become my top priority cases for

18   that term of court, so that if you had somebody that had a case

19   that was 18 months old and they're the longest in jail, that

20   become your first case for trial.

21        We didn't have a trial list like they do -- we didn't

22   have the dockets divided.  We had one trial docket.  And they

23   were called trial dockets.  They would have as many as 200 to

24   300 cases on them.  Prosecutors were responsible for every case

25   on there if you were assigned to that court.  Every one of

1    those cases was subject to being called for trial if you didn't

2    reach a plea agreement in the case.

3              What we would typically do, as the prosecutor in

4    charge of the county, is we would identify the cases that

5    were -- should be tried that week or that we were ready to go

6    for and then we would sit down with the other assistants there

7    and we would divide them up and say well, I'll take John Smith,

8    you take Jane Doe and back and forth.  That's how we set the

9    trial order for that week.

10   Q    Beginning in October of 1995, until you were promoted

11   to chief assistant in August 1996, where were you working,

12   which County?

13   A    I'm pretty sure I was in Richmond County then, but I

14   know that I tried -- I'd been sent to -- I know I was in Moore

15   County from 1990 to around '94.  My mother died while I was

16   there, so that's how I remember that.  They let me stay three

17   years which is unusual.  Normally, prosecutors didn't stay in a

18   county more than six to eight months.  They like to switch us

19   around.  But I know I stayed for three years, and I left there

20   and went to Stanley County, and I had to try a big murder case

21   up there, and when that case was done -- and I cannot remember

22   when that case was tried.  I tried to find it, and I haven't

23   been able to find the dates on it, but when that was done I was

24   moved to Richmond County.  So, it would have been somewhere

25   around '95, I'm thinking, is when I came down here.

1    Q    During that period beginning October '95 through
2    August '96, were you county head in Richmond County?
3    A    Yes.
4    Q    You were.  And how many other prosecutors were there
5    in the county?
6    A    I know that there was always one other one.  At some
7    point in time, I believe I was able to get a second one
8    assigned down here, but we really only had two offices and we
9    were falling all over each other trying to do the case load
10   down here.  So I know it was me and there might have been at
11   least one and maybe two.
12   Q    And so during the period when there were two of you,
13   the two of you were responsible for all of the cases in the
14   county?
15   A    The three of us.
16   Q    The three of you?
17   A    For all the cases in Superior Court.
18   Q    You did that until August '96, then you became chief
19   assistant?
20   A    Yes, sir.
21   Q    And as chief assistant, what were your
22   responsibilities?
23   A    My responsibilities then were -- well, they evolved
24   over time, but at that time, I was put in charge of all the
25   murder cases and the cases in Richmond County.  I also did

1    training prosecutors -- in-house training for our office. I

2    scheduled and assigned murder cases to prosecutors to try

3    because we had been doing a different system and it was not

4    working. So, we changed and developed a new system for

5    handling the murders. And I did not at that time -- I can't

6    remember when it progressed. I eventually got to the point

7    where I was assigning prosecutors to handle court during the

8    court assignments across the district, but I don't remember --

9    I know that I didn't get that right off the bat, I think it

10   came a year or so later.

11       Q    During the period that you were the chief assistant,

12   did you handle individual cases? That is, were you the

13   prosecutor in any of the cases?

14       Q    When I was first promoted to that, I was still the

15   head of Richmond County, plus taking on that responsibility. I

16   worked individual cases in Richmond as well as tried to

17   supervise across the district and that didn't work well.

18       Q    So, let me ask you to turn your attention to October

19   of 1995, when you were an assistant in Richmond County. Do you

20   recall a murder case that developed during that period in which

21   Derrick McRae and Thurmond Nelson were codefendants?

22       A    I remember that case because you came and talked to

23   me about it. I cannot tell you if I became aware of it in

24   October of '95. During that time -- many times, law

25   enforcement didn't contact us about their cases. We would find

1  out about the murders when we walked into district court and

2  got the calendar and it had the murder probable cause set on

3  there.  That was one of the things that we changed over time so

4  that we became more involved earlier.  So, I know the case

5  you're talking about because we spoke about it.  I cannot say

6  that I knew about it in October of '95.  I may have; I don't

7  know.

8       Q    Actually, what I meant was during the period of

9  October '95 through the time when you became chief assistant,

10 you at some point during that period, you became aware of the

11 case?

12      A    I don't know if I did.  I probably did, but I can't

13 swear to that.  I don't know.

14      Q    Can you briefly describe how a case came to the --

15 came to your office following the police department

16 investigation.  A typical murder case?

17      A    The law enforcement would -- they'd have a call, they

18 would go out and investigate the case, they would then bring

19 whatever charges they chose to.  Sometimes, if it was a

20 particularly difficult case, they would come and talk to the

21 higher ups probably in the office, and they would charge.  But

22 the regular rank and file prosecutors, we would find out about

23 that case when we walked in and found the probable cause

24 hearing for the murder in District Court.

25           At the time, we used to do probable cause hearings a

1    lot on those cases, and if you were assigned to court, you

2    tried to do the probable cause hearing if your stuff was in

3    order or ready.  Only when it came through District Court or

4    when it was indicted did we actually become aware of it and

5    start working that case in Superior Court.

6        Q    So, beginning with the indictment in the case, your

7    office then would have been substantially involved?

8        A    Yes.  That's when it shows up on a Superior Court

9    calendar, and that's when the prosecutors who work in Superior

10   Court in that county became aware of it and started doing what

11   they -- well, should have started doing what they were doing,

12   whatever they did with them.

13       Q    Can you describe what's delivered to your office by

14   the police department when the case arrives.  What accompanies

15   the case to your office?

16       A    They were supposed to bring us copies of everything

17   in their police files.

18       Q    Copies of everything in their police file?

19       A    Right.

20       Q    And what would you do with whatever it was, the file

21   that they brought you, to preserve it?  Did you do anything to

22   preserve it?

23       A    Typically, I can tell you what I would do is you sit

24   down with the officer -- we had a case summary form that we

25   would write, and write down a shorthand summary of what

1   happened and maybe answer a few questions about the case, was

2   there a search, you know, has the defendant given a statement,

3   that type of thing.  And we would take that file in or the

4   information the officer provided and it would go in a felony

5   file folder and it would be -- you would review the indictment

6   and then the indictment would be signed and go to the grand

7   jury.  So, the way that that worked -- well, once you got it

8   in, you put it in that file.  And then, at some point in time,

9   one of the prosecutors would come and start discovery on that

10  file.

11      Q    Do you know if you received the original copy of

12  the --

13      A    Somebody coughed over here.  Can you start that over.

14      Q    Do you know if you received the original copy, that

15  is the police department's original copy of that file or did

16  you receive a duplicate copy?

17      A    We shouldn't have received the original.  It should

18  have been a photocopy.

19      Q    Should not have received the original?

20      A    They shouldn't give us the original.

21          MR. COLEMAN:  Your Honor, may I approach the witness.

22          THE COURT:  Yes.

23  BY MR. COLEMAN::

24      Q    Mr. Parker, I'm going to show you what has been

25  marked for identification as Defendant's Exhibit 25.  I'm going

1    to ask you to take a look at this.  This is the original, or at

2    least, part of the original file of the Richmond -- I'm sorry,

3    the Rockingham Police Department.  My question is whether you

4    received this copy or something different, if you recall?  And

5    I'm talking now about the actual physical document that you're

6    holding?

7         A    Okay.  I've looked at this.  What is your question?

8         Q    Is that the document that would be delivered to you?

9    That particular document, the original?

10        A    No.

11        Q    And to your knowledge, have you seen that document

12   before?

13        A    I've not seen this.  What typically would happen is

14   they would make a copy of this stuff at their office.  They

15   would bring over the copies to us.  We would take the copies

16   in, fill out our case summary form, and put those in the file.

17   He may come with this.  I can't say what this is.  I don't

18   recall.

19        Q    Do you know if the document, the copy that you

20   received, would have been tabbed in the way that this one is?

21        A    It would not have been tabbed.  They wouldn't bring

22   me a notebook like that.

23        Q    Okay.

24             MR. COLEMAN:  Your Honor, I'm going to return this

25        and he can then --

1          THE COURT:  Is he free to leave?

2          MR. COLEMAN:  He's free to leave.

3          THE COURT:  All right.  Thank you, Officer, you're

4     free to go.

5  BY MR. COLEMAN:

6     Q    When you received the duplicate copy of the police

7  department's files, would you keep it together as a single

8  document, or did you pull it apart?

9     A    Eventually, it would be pulled apart, but it should

10  have been kept in the felony file folder until the prosecutor

11  put it in notebooks.

12     Q    Do you know, if during the trial, you would have

13  relied on the original Police Department file or would you have

14  relied on documents that were part of the duplicate files that

15  you received?

16     A    If you're asking about the McRae case, I don't have

17  any idea because I didn't try that.

18     Q    I didn't say that?

19     A    Okay.  If you're asking about general files with me,

20  I relied upon my files that I had been provided by law

21  enforcement.  If I needed to introduce a document that was,

22  let's say a statement or rights waiver or something like that,

23  I would get the original from the officer who should have had

24  it in the courtroom.  That's what I always wanted to introduce.

25  That way you avoided the best evidence rule or complaints about

1   duplicates and stuff like that.

2       Q    I'm going to ask you to –

3            MR. COLEMAN:  Your Honor, may I approach.

4            THE COURT:  Sure.

5   BY MR. COLEMAN:

6       Q    Mr. Parker, in front of you are the exhibits that

7   have been marked in this proceeding, and what I would like you

8   to do is to take a look at Defendant's Exhibit 23 and 24.

9       A    All these?

10      Q    Yes.  And if you would try to keep them in order.

11  These are felony reports.

12      A    Okay.

13      Q    This would be one of the documents or, in this case,

14  two of the documents that you would receive, one for each

15  defendant in a case with codefendants.

16      A    It should have been provided, yes.

17      Q    Let me ask you on Exhibit 24 to look at the second

18  page of the document.

19      A    Okay.

20      Q    What is your understanding -- the purpose of the

21  statement on Page 2 of Defendant's Exhibit 24?

22      A    Well, it says -- the title of Page 2 on Defendant's

23  24 says a Detailed Statement of Investigating Officer.

24      Q    And what does that mean to you?

25      A    That would mean that that's where the officer

1  basically summarized his findings of the investigation in the
2  case.
3      Q    And so this Page 2 is a description of the result of
4  the investigation by the police department with respect to this
5  defendant?
6      A    That's the way I would take it.  That's how you
7  asked.
8      Q    And if you look at Defendant's Exhibit 23, you'll
9  notice that there is no Page 2, but my question is in the
10 document that would have come to you, there would have been a
11 page two, is that correct?
12     A    I can't answer that.  The document which you've
13 handed me, Defendant's Exhibit 23, has page number two at the
14 bottom of that first page.
15     Q    Forget about that page.
16     A    Okay.  Well, that says Page 2.
17     Q    Yes.
18     A    What you are asking about is the detailed statement.
19     Q    Correct.
20     A    Okay.
21     Q    And there isn't one with this exhibit, but that
22 detailed statement, that would have been in this exhibit, would
23 have summarized the investigation with respect to Mr. Thurmond
24 Nelson, is that correct?
25     A    That's what that purports to say, yes.

1      Q    What I'd like to do now is -- are you familiar with a

2    document that's called a Synopsis Of and then a case number?

3      A    Okay.  If you can show it to me, I can tell you if

4    I'm familiar with it.  That doesn't strike me off the top of my

5    head, no.

6      Q    If you look at Defendant's 30.

7      A    Thirty?

8      Q    Yes.

9      A    Okay.

10     Q    You recognize this document?

11     A    Not really, no.

12     Q    Are you familiar with this type of document?

13     A    This is -- it's been so long since we've used these.

14   I'm not really familiar with it.  It appears to have been

15   something that an officer would have created and provided in

16   his file to us.  That's what it looks like to me, but

17   specifically I don't recall a lot about that document, no.

18     Q    All right.  This document indicates that the subject

19   is a Derrick McRae and Thurmond Nelson, so based on past

20   practice, when this document was generated, your understanding

21   is that it would have been generated by the investigating

22   officer summarizing the evidence with respect to these two

23   defendants?

24          MR. HAIGH:  Objection.  Leading, Your Honor.

25          THE COURT:  I'm going to give him a little bit of

1        leeway and ask him if he can answer that yes or no and

2        certainly you may explain your answer, Mr. Parker.

3        A    I don't know that I understood the question.

4             THE COURT:  All right.  Even with the leading

5        question you didn't understand it.  I'm going to give you

6        another shot at it.

7   BY MR. COLEMAN:

8        Q    So, what is a synopsis?  You told me who prepares it,

9   and what I'm asking you now is, what is the purpose of this

10  document?

11       A    That's what I said.  I don't know what the purpose of

12  this one is because to my recollection, our office -- the DA's

13  office, we didn't prepare something like this.  So I have to

14  assume this was done by the law enforcement agency, and if

15  that's the case, then I assume that it is exactly what it says

16  which is a synopsis of what the officer says happened.

17       Q    And synopsis means, again?

18       A    A summary of.

19       Q    A summary of his investigation?

20       A    I don't know that.  I just know it says Synopsis at

21  the top, but I don't know what they would have used this for.

22       Q    Okay.  That's fair.  Now, when you get to the point

23  of seeking an indictment, on what do you rely?  That is in

24  terms of the evidence on which you relied to bring charges

25  against the defendant?  What's the basis for the facts?

1      A    I cannot -- well, usually it's the warrant.  We

2  prepare the indictment off the warrant.

3      Q    And who prepares the warrant?

4      A    Either the officer or the magistrate when they go

5  down to get it.

6      Q    And the warrant would set out what?

7      A    The date of offense, the name of the defendant, the

8  name of the victim, and the officer who -- the arresting

9  officer.

10     Q    And does it summarize the facts?

11     A    It's going to have -- well, you know what a warrant

12  says.  It has a summary of each of the central elements of the

13  crime.  That's what's on a warrant.

14     Q    Okay.  If you would read Defendant's Exhibit 30.  And

15  read it to yourself.

16     A    Is that the one we were just looking at?

17     Q    Yes.

18     A    Okay.

19     Q    Does this summary, this synopsis -- is this

20  consistent with what your understanding of the facts were that

21  were developed by the Rockingham Police Department in this

22  case?

23          MR. HAIGH:  I object, Your Honor.  It assumes

24      knowledge that's not in evidence.

25          THE COURT:  I'm going to sustain it as to the form of

1      question, give you an opportunity to lay a foundation if

2      you wish to further visit that.

3  BY MR. COLEMAN:

4      Q   Can you tell me the basis on which you understood the

5  factual basis for the -- let me start over, too many bases.

6  Can you tell me what was your understanding or how did you gain

7  your understanding of what the facts were that implicated the

8  defendants in the case in which you obtained an indictment?

9      A   We would have -- typically, what you would have done

10  is had the officer come over.  We'd like to have the file

11  before we actually issue the indictment, but on murder cases,

12  because we were trying -- at this time, we were trying to speed

13  up the disposition of them.  We may have simply met with the

14  officer and did a case summary sheet about what happened, and

15  based upon that information, signed the indictment and put the

16  officer's name on it to go before the grand jury with it.

17      Q   Can you tell me what this case summary sheet is?

18      A   It was a sheet in the DA's office that we used at the

19  time, or we still used them whenever I left there, and it was

20  what I mentioned to you before.  It was a summary usually

21  written by the prosecutor based on what he understood the

22  evidence from the officer was.  Then we would go through and --

23  it had blocks on it where you could write down a list of

24  physical evidence that was relevant, whether there was an

25  admission or a statement from the defendant, whether there were

1   a search, what the basis of the search was, that type of thing.

2   It was a sheet designed to allow us to be able to take a plea

3   to that case in court with nothing but the information on that

4   one sheet.

5            In other words, if we had to summarize the facts

6   for the Court during a plea, that was the only sheet that we

7   needed.  It was just a shorthand summary of what we

8   understood -- how the case came about.

9       Q   Where would that document be filed?

10      A   That was kept in the DA's file.

11      MR. COLEMAN:  Your Honor, may I approach.

12      THE COURT:  Yes.

13  BY MR. COLEMAN:

14      Q   Mr. Parker, do you recognize these two documents?

15  Can you identify them?

16      A   Yes.  Defense Exhibit 36 is a murder indictment for

17  Thurmond Nelson case number 96 CRS 1675.  Defense Exhibit 37 is

18  a murder indictment for Derrick McRae case number 96 CRS 1576.

19      Q   These two documents list as witnesses RJ Voorhees and

20  RL McQuay, both documents.  Who are those individuals?

21      A   RJ Voorhees was former chief of the Rockingham Police

22  Department.  I think at this time he was a detective.  McQuay

23  was a detective with the Rockingham Police Department.

24      Q   And by listing them as witnesses, what does that

25  mean?  What was their role in the indictment?

1          A     I don't know what their role was.  I know that these
2     names were typically the ones that came often with the warrant.
3     When the warrants would come into our office, there was a legal
4     assistant who took the warrants and typed indictments based on
5     the warrants that she had.  She would list the names of these
6     officers on there.  They would automatically be put on there,
7     usually from the warrant.  Now, if the prosecutor who signed
8     them or took the case in knew that additional names would be on
9     there, the only way that we could add them would be to tell her
10    to add those names to the indictment list -- I mean, to the
11    witness list on the indictments.  Typically, this is the
12    investigating officers.

13         Q     And the indictments then would be based upon the
14    conclusions reached by the investigating officers?  That is the
15    factual conclusions that the investigating officers reached
16    based on their investigation?

17         A     The indictments were based on the facts in the case.
18    The officers would go in, testify to what those facts were
19    before the grand jury.

20         Q     That was my question.

21         A     Okay.

22              MR. COLEMAN:  May I approach, Your Honor.

23              THE COURT:  Yes.

24    BY MR. COLEMAN:

25         Q     Mr. Parker, can you identify this document?

1    A    Yes.  This is a witness list.

2    Q    And what is a witness list?

3    A    It's a list of people who are potential witnesses in

4 a case.

5    Q    And do you know who developed this list?

6    A    I know that I wrote this list, if that's your

7 question.

8    Q    That's my question.

9    A    Okay.

10    Q    What information did you use in order to prepare this

11 list?

12    A    I would have used the statements that were enclosed

13 in the file.  I would go through and read the statements of the

14 witnesses.  I would try to do it -- we had so many murders

15 pending at the time, I was trying to develop a method to be

16 able to -- like an assembly line to move the cases through.

17 And what I tried to do was read the statements one time and

18 take off information like you'll notice on it, it has the name

19 of the witness and then an address underneath it.  On the left,

20 it has a shorthand summary of what that witness -- what I

21 thought was important at the time when I read the statement of

22 the witness.  There is even a blank spot here for victim's

23 mother.  What I would do, I'd read the statements, I'd

24 highlight the oral statements made by the defendants within

25 those statements and try to write down the name of the

1  potential witnesses and what little bit they said on the side

2  so that our victim witness legal assistant -- at the

3  appropriate time, if the case wound up going to trial, when she

4  needed to subpoena witnesses, she could go and find this and

5  have all the witnesses' names and addresses ready for her to

6  put on subpoenas and send out.

7      Q    And where do you get the information that's on the

8  left side of the list?

9      A    That would be from my reading of the statement of

10  that witness.

11     Q    Now, I noticed that the second -- well, you actually

12  have a summary with no name?

13     A    That's right.

14     Q    You have v's mother last to see alive.  Do you know

15  where that came from?

16     A    There would have been -- one of the things I look for

17  when I do a murder case is you try to identify the last person

18  to see him alive and the first person to find him.  Those are

19  people always important when you're preparing a murder.  At

20  some point in the statement, I would have -- in the information

21  the officer gave me, I would have read that his mother claimed

22  to have seen him the last time alive.  That's why I would have

23  wrote that down.  Now, I would have put on the victim's mother

24  because one of the other things you have to do in a murder

25  trial, if you've tried enough of them to know and I believe you

1    probably have, is you need to be able to identify who the

2    victim is, who that person is, and you need somebody to

3    identify a live photograph of them.  Usually, that's the mother

4    or the next of kin or somebody like that.  So, I would have

5    written here victim's mother.  I didn't know her name at the

6    time.  Somewhere in there I would have read or saw a note that

7    she said or someone noted she was the last one to see him

8    alive, and that's why I would have written that.  Where I found

9    it in the file, I can't answer that.

10        Q    But it would have been in the file that the

11   Rockingham Police Department sent to you?

12        A    It should have been, yes.  For me to have written

13   that, I would have got it from somewhere.

14        Q    Mr. Parker, I've given you what I've marked for

15   identification as Defendant's Exhibit 38 --

16             THE COURT:  I think that would be 39.

17             THE WITNESS:  You've got two 38s up here.

18             MR. COLEMAN:  Okay.  So, let's make this one 39.

19             THE WITNESS:  Do you want me to do anything with it,

20   Judge, or you want to fix it.

21             THE COURT:  I'll fix it.

22   BY MR. COLEMAN:

23        Q    Can you identify that document?

24        A    This is my handwriting.

25        Q    Okay.  Your handwriting, and can you tell me what the

1    document is?

2        A    It's just notes I made in the file.

3        Q    Relating to what?

4        A    Well, it says Alan Davis owned house victim lived at

5    and then it's cut off, gave consent to search, nothing found in

6    house, and then found body.

7        Q    And would you look at the next two pages of the

8    document?

9        A    Okay.

10       Q    Can you tell, based on your note, what those two

11   pages are?

12       A    Not based on my note.  I can tell you that this

13   purports to be an interview of Alan Davis by somebody other

14   than to me.

15       Q    Correct.  And your note refers to that interview?

16       A    No.  My note refers to what Alan Davis may or may not

17   know. I don't know that it refers to this document.

18       Q    Okay.  But you can identify the second and third

19   pages as a report of the interview of Alan Davis conducted by

20   somebody?

21       A    It purports to be an interview of Alan Davis.

22       Q    And if you look at the second page of that document,

23   you see two witnesses?

24       A    Yes.

25       Q    And so you would assume that it purports to be a

1    document prepared by whom, or witnessed by whom?

2        A    Well, that's already on McQuay and the other is PE

3    Sweat which would -- I'm pretty sure that would be Phil Sweat

4    unless they had another officer by that name at the PD.  I

5    don't know.

6        Q    So, the Alan Davis who is referred to in the second

7    and third pages of Defendant's Exhibit 39, is the Alan Davis as

8    the first witness on Defendant's Exhibit 37?  Does that appear

9    to be the case?

10       A    Wait a minute.  This Alan Davis is the first witness

11   on Defendant's Exhibit 37.  I don't have 37.

12       Q    Okay.  Maybe it's 38.  Thirty-eight, your witness

13   list?

14       A    That's 38.

15       Q    Okay.

16       A    So, yes.

17       Q    So, that's the document?

18       A    Does it have the same address?  428 Hood Street.

19   Yes, that should have been the same guy.

20       Q    Okay.

21       A    Was that your question?

22       Q    Yes.

23           MR. COLEMAN:  I got to change an exhibit number.

24   BY MR. COLEMAN:

25       Q    Mr. Parker, I'm giving you a chart that we prepared

that list the witnesses, as I understand it, who were developed

in the investigation in this case.  What I like to do is to

look at Defendant's Exhibit 38, which is your witness list, to

see if we can match up individuals on your list with the people

on this exhibit?

A     Okay.

MR. HAIGH:  Your Honor, I'd object to the exhibit at

this time.  This is prepared evidence.  I mean, we're

talking about a case that finished 16 to 18 years ago and

in addition, there is incorrect information or

unsubstantiated information in this exhibit.  It's the

location of this statement and it lists all of them as

Rockingham PD.  There is no indication that that's the

majority of these statements, where they were made, so

based upon that, I'd object to asking this witness about

this exhibit at this time.

MR. COLEMAN:  May I respond to that.

THE COURT:  Yes.

MR. COLEMAN:  Your Honor, I certainly don't intend to

include anything on here that was not substantiated, and I

think we can solve the problem by simply -- I'll cross out

the location of statement.  I just want to use this as a

chart that organizes exhibits that have already been

introduced into evidence.  It has no substantive purpose

other than to set out at one place the exhibits, the

1        statements that have already been entered into evidence.

2            MR. HAIGH:  And Your Honor, the best evidence of

3        these facts are the actual documents.  Based upon that

4        alone, this would be inadmissible.

5            THE COURT:  I'm not going to admit it as substantive

6        evidence in the case.  I'm going to let both counsel and

7        this witness, as well as counsel for the State, refer to

8        this if this will help us move matters along and be able

9        to match up witnesses to particular exhibits and statement

10       dates because I think we've been over all of these

11       exhibits and all of these dates at one time and sometimes

12       several times.

13   BY MR. COLEMAN:

14       Q    Something that I'd like to do, and see if we can do

15   this very quickly is, Mr. Parker, if you will take the

16   documents from the exhibits that are in front of you, and what

17   I would like to do is to go down to your list of witnesses and

18   see if we can match them to statements that have been

19   introduced into evidence.  So, let's begin with Thurmond Nelson

20   who is a defendant in the case; correct?  Codefendant?

21       A    Yes.

22       Q    And if you look at Defendant's Exhibit 33, which I

23   believe is Mr. Nelson's statement.

24       A    Okay.

25       Q    Now, have you seen that document before?

1    A    I don't know.  It's been 20 years since I've looked

2  at this discovery.

3    Q    Other witnesses have identified it as the statement

4  that Thurmond Nelson --

5    A    That's what it purports to be.

6    Q    Thank you.  The next -- just skip the mother because

7  you didn't have a statement for the mother; correct?

8    A    I don't know if I did or not.

9    Q    Let's take the next witness, Marlin Dumas, and if you

10  look at Defendant's Exhibit 8 --

11    A    Okay.

12    Q    What I'd like to ask you is whether that is the

13  statement given to the -- to your knowledge, if that's the

14  statement given to the Rockingham Police Department by Marlin

15  Dumas?

16    A    I don't know the answer to that.  I don't know.  All

17  I know is it appears to be a statement purporting to be from

18  Marlin Dumas.  I wasn't there when it was given.  I assume it

19  came out of the case file because we're talking about it.

20  That's the best I can give you.  I don't know.  I wasn't there.

21    Q    So, if other witnesses including --

22        MR. HAIGH:  Objection to what other witnesses

23      testified to.  That's the second time counsel has tried to

24      introduce information --

25        THE COURT:  Let me see counsel up here at the bench.

1          (Bench conference with all counsel present.)

2     BY MR. COLEMAN:

3          Q    So, Mr. Parker, what I'd like you to do is to -- you

4     see the footnotes on Defendant's Exhibit 40?

5          A    Yes, sir.

6          Q    One through ten?

7          A    Yes, sir.

8          Q    If you were to look at those exhibits from the

9     footnotes of Defendant's 5, 8, 10, 7 -- and what I'd like to

10    ask you is whether you recognize them as statements that were

11    prepared by the Rockingham Police Department in this case?

12         A    Well, Defendant's Exhibit 8 appears to be a statement

13    written -- a statement from Marlin Maurice Dumas and it's

14    signed as a witness by Detective Brickman who was with the

15    Rockingham Police Department.  So, I would say, I mean, I don't

16    -- I don't remember having -- I can't remember what I read 20

17    years ago.  Do you understand what I'm saying?  But this is

18    what that appears to be.  So, I would say that's --

19         Q    Let me see if I can shortcut this.  What is your

20    recollection of the evidence against Mr. McRae and Mr. Nelson?

21    That is, what is each of them supposed to have done that

22    resulted in the murder charge?

23         A    I can't answer that question.  It's been 20 years

24    since I've read this stuff.  I didn't read the statements.  I

25    haven't read them in 20 years.  I can tell you from what I

1   recollect.  I understand that McRae and Nelson were involved in

2   going to a house and shooting Rankin on the porch.  That's what

3   I recall about this case.

4       Q    And your recollection is that there was a witness who

5   made a statement to the police claiming that he saw Mr. McRae

6   and Mr. Nelson approach the victim and both of them fired their

7   gun?

8           MR. HAIGH:  Objection, Your Honor.  It's leading and

9       it's compound.

10          THE COURT:  I'm going to sustain that.

11  BY MR. COLEMAN:

12      Q    Let me ask you on Defendant's Exhibit 38 -- tell me

13  how you go about -- I think you may have mentioned this, but

14  how do you go about making the notes on the left hand side of

15  this exhibit?

16      A    I would have read through the statements that

17  correspond with these names, and I would have pulled out little

18  snippets to remind me of what those witnesses were going to

19  say.  I would write it down on the side.  The other benefit for

20  this is that in the event our legal assistant starts

21  subpoenaing or contacting these witnesses to come in, they may

22  say, "I don't understand why do you need me," she would have

23  something on the side to say, "Well, our evidence indicates you

24  found Mr. Rankin's body, that's why we need to talk to you,"

25  that type of thing.  This is just a shorthand way so that if

1  I'm trying to recollect at a later time which witness said a

2  certain thing, I can look through the notes that would go with

3  the statement without having to reread them all.

4      Q    And so, whatever statement you read, let's say with

5  respect to Marlin Dumas, you concluded that he was, you said,

6  secret eyewitness and then what does the rest of the note say?

7      A    It says, "Said time about 12:30 a.m."

8      Q    Do you recall what 'secret' means here?

9      A    When you showed me this before, that to concerned me,

10 and that was the one statement I went back and looked at.  If I

11 remember right, I think Mr. Dumas claimed in the statement that

12 he had been threatened by Mr. McRae or by Nelson, I don't

13 remember which.  I just remember there being some threat

14 alleged.  I would have written that for the purpose of trying

15 to protect his identity for as long as I could so that, in the

16 event, there was some danger threat to him, that he would not

17 be at risk.

18     Q    Okay.  But he was an alleged eyewitness.  Is that

19 correct?

20     A    From the statement I read, that's what I recollect.

21     Q    And he was the eyewitness who identified both

22 Mr. Nelson and Mr. McRae as being at the crime scene?

23     A    I don't know.  I haven't read his statement.

24     Q    Well, why don't you read his statement -- Defendant's

25 Exhibit 8?

1          MR. HAIGH:  Your Honor, I'm going to object at this

2     point.  The statement is in evidence and this witness has

3     said that he has no personal recollection of what he read

4     20 years ago.

5          THE COURT:  I'm going to give him an opportunity to

6     read the statement and see if, to any extent, it refreshes

7     his recollection.

8     A    Okay.

9  BY MR. COLEMAN:

10    Q    That purports to be a statement of an eyewitness, is

11 that correct?

12    A    That's right.  That's how I would characterize it.

13    Q    Now, did you add to your list if you got additional

14 statements?

15    A    It depends.  I can't say that I added to this one or

16 not.  It would just depend on what came in and when.

17    Q    How would you account for new statements that you

18 received, if there were any?

19    A    If there were new ones that came in and I had time to

20 do it, I would like to add to the list, sure, so that I can

21 keep a running tally of what's in there, the same thing as

22 before.

23    Q    Do you recall whether you received additional

24 statements from the Rockingham Police Department during the

25 time you were responsible for this case?

1      A    I don't recall that.

2      Q    You don't recall receiving additional statements?

3      A    I don't know.  I may have, I may not have.  I don't

4   recall that.

5      Q    You don't have a recollection?

6      A    That's a better answer, I don't recollect, no, sir.

7      Q    Now, you were responsible for discovery, for

8   complying with the -- your office's discovery obligations?

9      A    Every prosecutor in the office who did Superior Court

10  was responsible for discovery on every case there.  That was,

11  to me, one of the faults with the system we had at the time.

12  We didn't have assigned felonies.  Every prosecutor who was in

13  court was responsible for the cases on the calendar.  If you

14  and I were running court, and you called in sick and the boss

15  came in, he wouldn't want me to say, "Well, that was

16  Mr. Coleman's case.  I don't know the answer to it."  He wanted

17  everybody, both prosecutors, to be familiar with the facts in

18  the case.  So, in that way, we were all responsible for

19  discovery in every case.  I didn't like that system.  I changed

20  it when I got the chance, but, ultimately, everyone that was

21  there was responsible for doing discovery.

22     Q    Let me ask you to look at Defendant's Exhibit 1.

23     A    Okay.

24     Q    And you recognize that document?

25     A    Yes.

1      Q    What is it?

2      A    That's a General Felony Discovery form that I

3  developed.

4      Q    So, does this indicate that the form had been

5  developed and was in use in the Derrick McRae case?

6      A    Yes, sir.

7      Q    Can you tell us what the purpose of the form is?

8      A    The purpose is because all the prosecutors were

9  responsible for discovery.  When we would go back to the file,

10  we didn't have a uniform way to tell what had been given and

11  what had not been turned over.  I developed this form as an aid

12  to assist me in keeping track of what needed to go and what

13  went and when it went.  So that if I, or any prosecutor, came

14  in after me could pick it up and see what had been given and

15  what was left to be done.

16      Q    Now, I believe before you took the stand, you

17  indicated that you thought there was an error on Exhibit 1, is

18  that correct?

19      A    Right.  I told Mr. Haigh that at lunch, and I came

20  and told you the same thing.  And it's my mistake if, in fact,

21  it is.

22      Q    And what is the error?

23      A    Do you have Thurmond Nelson's discovery sheet?  Do

24  you have it in evidence?

25      Q    Yes.

1    A    What number is it?

2    Q    It's not in evidence.

3    A    Okay.  Well, Thurmond Nelson has a sheet that's

4    identical to this.  I would have done one for both

5    defendants --

6    Q    Let me mark it and give it to you.

7    A    That's fine.

8    Q    What is Defendant's Exhibit 41?

9    A    That's the General Felony Discovery sheet that I

10   completed for Thurmond Nelson's case.

11   Q    Okay.  So you asked if we had a copy of that exhibit,

12   now, we do.

13   A    Yes, sir.  Yesterday, I don't remember, you talked to

14   me a couple of times before I came up here to testify that you

15   had asked me about this sheet, and one of the things that

16   confused me about this sheet from Derrick McRae was the fact

17   that I noted that I had turned over the defendant's signed

18   Waiver of Rights form.  It was dated February 29th; '96, but

19   according to my notes, I actually turned it over three days

20   before it was signed.  That didn't make sense to me, and so,

21   when I went back and found Thurmond Nelson's, I noted on here

22   that I noted I had turned over Thurmond Nelson's discovery on

23   February 26 of '97, whereas I noted '96 on Derrick McRae's.

24        So, I'm 99.9 percent positive that I made an error

25   when I wrote '96, it should have been '97 on Derrick McRae's

1    discovery because I would have done them both at the same time.

2    There was no sense in doing one on a codefendant case and not

3    doing the other at the same time.  So, that's the error and it

4    was my mistake.

5         Q    So, this should be 2-26-97?

6         A    Yes, sir.

7         Q    Now, as you -- and the discovery was an ongoing

8    process?

9         A    Oh, yes, sir.  You never finish with --

10        Q    And so, as you're provided additional discovery,

11   would you update this sheet?

12        A    That's why it was made that way so that you could go

13   through, and if you had new stuff come in, you would either

14   create another sheet, if there was additional stuff you

15   couldn't fit, or you would come over to this sheet and write

16   down the number and the date of whatever it was and turn it

17   over.  Yes, so I would add to it if I had additional stuff to

18   turn over.

19        Q    Let me ask you to look at Defendant's Exhibit 3?

20        A    Okay.

21        Q    Can you identify that document?

22        A    Yes.

23        Q    What is it?

24        A    That is the Substance of Oral Statement of Derrick

25   McRae.  It was a copy prepared for the defense attorney for

1   discovery.

2      Q    And can you explain how you prepare this and what it

3   is that we see on this document?

4      A    What you see is the substance of the oral statements

5   of Derrick McRae that were contained in the interviews and

6   information that were provided to me by the Rockingham Police

7   Department.

8      Q    So, you took this from the statements that the

9   Rockingham Police Department provided you?

10     A    Right.  Or if I sat down and talked to an officer, I

11  would typically ask them, "What did the defendant say to you?"

12  Sometimes they would say nothing and it would be; well, did he

13  open his mouth and words come out because I've got to write

14  them down because that's what we wanted the substance.

15         The way I would prepare it would be I would read the

16  statements in the file, and I would highlight the statement

17  with a color specific for that defendant.  That way, I could go

18  back later and identify what statement came from -- which oral

19  statement came from which written statement.  This is a

20  codefendant, there should have been two highlighter colors.

21  There would probably be orange and green or I could use blue

22  and yellow or something like that.  I didn't like yellow

23  because you couldn't see it well, but what you would do is I

24  would read this statement, I would highlight the name, I would

25  then come over and put the witnesses' name and address on my

1   sheet with a little note about what they said and I would then

2   type up the substance of those highlighted statements on a

3   form.

4          I kept two forms.  The first form was mine.  I called

5   it the State's copy because I broke it down so that I would

6   have each witness and which statement the witness gave as to

7   which oral statement is attached to it.  The reason I wanted to

8   do that was if the Court ever ordered me to turn over to the

9   defense where it came from, I wouldn't have to go hunting

10  through 15 different sheets of paper.  I could pull it up and

11  find what statement and which witness it came from.

12         Once I completed that form, I copied it on my

13  computer and I would take out the names and the dates of the

14  individual witnesses and then prepare a nice typed substance of

15  oral statement form like this that I would turn over to the

16  lawyer.

17     Q    So, the document that you provided to defense counsel

18  did not identify the witness?

19     A    That's right.  We weren't required to do that.

20     Q    Did not indicate the date?

21     A    No, sir.

22     Q    Did not indicate the circumstances?

23     A    It was the substance.  Now, sometimes circumstances

24  could be indicated if it helped explain the circumstances.  I

25  haven't read this so, I can't say specifically which one.  If

1    you read a statement, and the witness said did you kill Johnny,

2    and the defendant said yes, the substance of that statement is

3    not yes, the substance of that statement is yes, I killed

4    Johnny or whatever.  That's the substance so, that's what you

5    would turn over.  Sometimes that substance was based on

6    circumstance, and if that were necessary to understand the

7    statement, that would be included.

8        Q    Can you tell me, generally, what did your office turn

9    over to a defendant in a criminal case during this period?

10       A    What was required by statute.

11       Q    And one witness said the minimum that was required,

12   would you say that's accurate?

13       A    I would say we turned over what was statutorily

14   required.  That was the office policy and that was how I was

15   trained to do it at the time.  Now, there was actually

16   additional stuff turned over here that went beyond that because

17   I've seen in some of the stuff that Mr. Lau sent me.  There was

18   a note I made about telling Mr. Crump to check the defendant's

19   file because we were going to use that and that's not

20   necessarily spelled out in the statute but that was to give him

21   an opportunity to look at that and see if he wanted to object

22   to it or whatever.

23       Q    Would you turn over the statements -- the witness

24   statements from which you took the oral statements?

25       A    Typically not, unless they became relevant at a later

1    time as Brady material or by defendant's request under the

2    (inaudible) Act.

3         Q    Can you identify Defendant's Exhibit 42?

4         A    Yes.

5         Q    What is it?

6         A    This is Derrick McRae's substance of oral statement,

7    State's copy, and this is the one that I would prepare for me

8    so I could reference where those statements came from if I

9    needed to reveal it.  And I will tell you that apparently that

10   synopsis thing you were asking me about earlier, it was in my

11   file because the top one says that came from the synopsis.  I

12   don't know where that statement would have come from -- where

13   the officer who wrote it got it from, but that should be in

14   that synopsis.

15        Q    And, likewise, for each of the witnesses that you

16   identify, this refers to the statement that the witness gave on

17   that date, is that correct?

18        A    That refers to the substance of oral statements taken

19   from the statement given on that day.  If the witness came back

20   and gave three or four later, then you could add to it with a

21   different statement date because I've had some cases where

22   you've got five and six statements from witnesses, and if

23   you're trying to link up the substance of them to them, it's

24   very confusing, that's why I did this.  I don't know if anybody

25   else in my office did this, but this is the way that I would do

1    it.

2        Q    But from this, we can tell that on November 17,

3    1996 -- is that the date that it was prepared?

4        A    That's the date that I would have printed it out.

5        Q    That you printed it out.  Do you know when you would

6    have prepared it?

7        A    No.  I can tell you that I had -- this was on my

8    Macintosh -- my personal Macintosh computer.  It was a little

9    laptop.  It was one of the first ones that ever came out and

10   nobody else in the office had them.  I was playing with it and

11   I'm pretty sure what I did was put down here the date, insert

12   date, you know, that little one.  So, anytime I printed it out

13   I would get a new date.  So I can tell you that in this, this

14   one was printed out 11-17, so I prepared it or did it on or

15   about that day.

16       Q    And so, on whatever date you prepared this, these are

17   the statements that you had and these are the statements from

18   which you obtained the oral statements?

19       A    These are the oral statements.

20       Q    Yes.

21       A    Those should be the same thing that's in his copy.

22       Q    Correct.

23       A    And I would have printed them both on the same day

24   and that shows the same thing.

25       Q    If you would look at the Defendant's Exhibit 1.

1    There are four columns. One is notes, and there is a date,

2    11-17-96, opposite oral statements. Does that refresh your

3    recollection of what this date -- the date that this document

4    may have been created?

5        A    No. What that tells me is I printed this -- that

6    tells me this, if I later went back and added oral statements

7    and I printed out another sheet, it would have a different

8    date. I would want to know that I turned over -- that if there

9    is a question that came up about the oral statements I provided

10   him, I would go back to this document dated November 11-17-96,

11   so that I could reference this is what I gave him on -- I gave

12   it to him on February 26th of what I believe to be '97. That's

13   how I would do that. If I had another document with a

14   different date, I'd come back under here and I'd write another

15   oral statement, you know, two pages, the due date, and then a

16   date over there so I could tell this one from the next one that

17   comes down the line.

18       Q    So that this document, Defendant's Exhibit 1, would

19   be updated as you provided additional information?

20       A    It could be updated or I could create a second one.

21       Q    Or you could create a second one?

22       A    Right. Most of the prosecutors in the office

23   handwrote theirs. I had that new computer and I typed mine.

24       Q    But you would have created a General Felony Discovery

25   form to reflect any discovery that you would provide?

1      A    Yes.  And I encouraged all of our prosecutors to use

2  these.  I had them printed and put in all the offices.

3      Q    Okay.  Would this document reflect the complete

4  record of what you provided in discovery?

5      A    Which document?

6      Q    The General Felony Discovery form, Defendant's

7  Exhibit 1?

8      A    This document -- it reflects what I provided on

9  whatever date this says, okay.  If I turned over anything else,

10  and I don't have something like this, I can't swear to you that

11  I turned it over to them.  If it's not on here, I can't tell

12  you that I did or I didn't.  That's why I used that form was to

13  report.  This was before we started Bates stamping which was a

14  great innovation for us to Bates stamp and then give out the

15  documents with numbers on them.  This was my attempt before

16  that of trying to keep track of it and bring some order out of

17  the chaos that you could get into on a big case.

18      Q    Did you have a way to keep track of things that you

19  were doing in your cases?

20      A    What do you mean?

21      Q    That is, something that indicated -- did you prepare

22  a to do list?

23      A    Yes.

24      Q    And can you tell us what your to do list -- what was

25  the purpose of the to do list?

1    A    Remind me of stuff to do.

2    Q    How did it work?

3    A    If I saw a need for something, I would write it down

4    on the list and then I would try to contact the officer at some

5    point in time, and I would say I need a diagram or a photograph

6    or a lot of the times one of the big things was a live

7    photograph of the victim.  I need you to get that for me to

8    complete the file and do discovery.  As they would come in, I

9    would mark it off.  I would keep the to do list in a certain

10   place in the file, so that I could pull up a file and see what

11   was left or needed to be done as you were working on it.

12   Q    And did you add to the list as you identified

13   projects that needed to be done?

14   A    You could add it to the list, yes.

15   Q    Did you generally try to add to the list?

16   A    I would, unless, I finished all of it on one page and

17   then I would typically throw that paper away and start a new to

18   do list.  It was something very satisfying to me about marking

19   off things that needed to be done.

20   Q    Can you identify this document?

21   A    Yes.

22   Q    What is it?

23   A    This is one of my to do lists.

24   Q    Okay.  This is a list that you created of things that

25   you wanted to do in the case.

1          A     Right.

2          Q     And where was the list kept?

3          A     It was kept in the file.  Eventually, I actually

4     developed a filing system where we had everything in the same

5     place in the files.  Generally, this list was kept either on

6     the left side of the front hand when you would open up the file

7     so it would be one of the first things you would see.

8          Q     And the items that are crossed out, what does that

9     indicate?

10         A     That indicates I was satisfied or couldn't get them

11    and I didn't need to do that anymore.

12         Q     Either it had been done or you no longer --

13         A     Or it couldn't be done.  Right.

14         Q     And items that are not crossed out are things that

15    remain to be done?

16         A     Right or that need to be done.

17         Q     So, in this case; get a witness list, do discovery?

18         A     Right.

19         Q     Now, that get witness list or get WI list, was that

20    the list that we just talked about earlier?

21         A     It could have been that.  That's usually what I mean

22    is to get the witness list, to write down a list like that.  It

23    can also be -- now, usually if it's ordered, I would say put in

24    witness order.  There was a difference between a witness list

25    and a witness order.

1       Q     Now, one of the items that you have here is go to

2   scene.

3       A     Right.

4       Q     Is that for you personally to go to the scene?

5       A     If I was trying the case, I tried to go to the scene.

6       Q     And did you go to the scene of this -- of this crime?

7       A     I don't recall going to the scene.

8       Q     But does the cross out indicate that you may have

9   gone to the scene?

10      A     It indicates that, but if I did -- I don't know if I

11  crossed it out.  I know that I wrote it because that's my

12  handwriting.  I don't know if I crossed it out or not and I

13  don't have any independent recollection of going to the scene.

14  Now, this would have indicated -- now, if you've got pictures

15  of it, I could look at it and see if I can remember, haven't

16  seen it before.

17      Q     I do.

18      A     But now, this would have indicated that either I

19  didn't need to go, or I did go and I was satisfied with what I

20  saw.

21      Q     Can you tell me why you would have wanted to go to

22  the scene?

23      A     I always like to go to the scene because it helps you

24  to visualize what the witnesses say.

25      Q     So, you go to the scene to try to understand what a

1    witness claims to have seen from his vantage point?

2         A    Or, more often, I find things of interest to me that

3    would lead me to new evidence that I can go and find that type

4    of thing.  It helps you to be prepared to try the case.

5         Q    I'm going to show you what I'm marking now as

6    Defendant's Exhibit 43 - 44.  Mr. Parker, do you recognize this

7    document, this photograph?

8         A    No.

9         Q    It doesn't refresh your recollection about the scene?

10        A    No.

11        Q    Let me ask you to look at the photograph on the easel

12   in front of you.

13        A    Okay.

14        Q    Does that look familiar to you?

15        A    No.  What's on that easel would have been what I

16   said, get town map of the area, if that includes the location

17   of this residence.  The other thing I notice on my to do list

18   is I say get new scene photos, which tends to indicate to me

19   that I would have gone out there or ridden by and not been

20   satisfied with what they had turned over.  According to this, I

21   made a note -- and that's my handwriting -- that those were

22   taken on November the 13th which I notice I've also -- about

23   four days before I did oral statements, so that tells me that I

24   would have probably been working this case during that month,

25   that week of November.

1      Q      Okay.

2      A      But as far as remembering this place, I don't recall

3  this.  I may have gone.  I can't tell you how many I've done,

4  and I just can't remember them all.

5      Q      Where would the photographs, assuming they were taken

6  on November 13th '96, where would they be?

7      A      They would have been taken by the PD or the Sheriff's

8  office because sometimes the sheriffs would do the crime scene

9  for the PD, and then they should have had a copy turned over to

10  us.

11      Q      Let me ask you to look at the second page of your to

12  do list.  I'm not sure about the second page, is that also your

13  list?

14      A      That's my handwriting.  Now, whether or not it's part

15  of this to do list or not I don't know, but that's my

16  handwriting.

17      Q      And it asks questions.  So those would have been

18  questions that you would have asked?

19      A      Those are questions I would have asked the officer.

20      Q      Okay.  'Did we interview Jeremy Sturdevant?'  Do you

21  see that?

22      A      Yes.

23      Q      The note there -- what is the note?

24      A      Which one, there's two?

25      Q      Yes.  To the left.

1    A    "Yes, but refused to talk,' and then I  drew an arrow

2    to Johnny McRae interview.  I don't know what that means.

3    Q    Okay.  But, 'yes, refused to talk' would be

4    information you obtained from the officer?

5    A    Yes.

6    Q    And based on this note, you would have assumed that

7    the officer said that -- told you that he attempted to

8    interview Mr. Sturdevant, but he refused to talk?

9    A    Yes.  And it has something to do with Johnny McRae's

10   interview from Serena Parker because I made an arrow to it, but

11   I don't have any independent recollection of what that is.

12   Q    Did you have a practice in cases to file a motion in

13   limine to exclude a defendant's statement?

14   A    Self-serving statement.

15   Q    Self-serving statement?

16   A    Yes.

17   Q    Can you explain what that is?

18   A    I'm just trying to figure out whether you want -- how

19   long an answer you want.

20   Q    Go with the short answer.

21   A    Okay.  If the defense lawyer attempts to introduce a

22   defendant's statement in evidence from one of my witnesses,

23   then that statement is hearsay because it's not offered by a

24   party opponent.  I had an issue with a lawyer in Anson County,

25   Hank Drake, very fine lawyer who loved to try to do that, and I

1    developed this motion in order to put him on notice that if he

2    asked my officers questions about what his client said, I'm

3    going to object to it because it's hearsay and I want to be

4    able to offer it myself or let him put his client on the stand

5    at the appropriate time and then I could cross examine him.

6            My whole goal was I wanted to be able to cross

7    examine the defendant about claims of self-defense or alibi or

8    whatever he may have told the officer.  I filed that in every

9    case whether I intended to use the confession or not.  It was

10   just a standard motion I used.

11        Q    Did you at some point assign this case to a different

12   prosecutor?

13        A    Yes.

14        Q    Do you recall to whom you assigned it?

15        A    Scott Brewer.

16        Q    Do you recall when that occurred?

17        A    I'm sorry?

18        Q    When that occurred?

19        A    I don't know.  I've been trying to find when I signed

20   it to him, and I can't answer that question for you.  I know

21   that when I was promoted to chief assistant, we had 41 murders

22   pending then or shortly thereafter in Richmond County by

23   itself.  I was trying to go through and do discovery on all of

24   these cases.  I could work three at a time, and if you ever

25   added a fourth one, I got confused and I had to quit.  But I

1   would try to get the discovery out to the defense lawyer, so we

2   could start talking about a plea.

3          I know that I got promoted around August of '96 and I

4   worked on those cases.  At the time, there were only, like, two

5   people in the office who tried murder cases and one of Ken

6   Honeycutt's goals at the time was to involve other prosecutors

7   and try them.  So we started assigning them -- I started

8   assigning them out based on the prosecutor's skill.  I cannot

9   recall when I assigned this case to Scott.  I do know that I

10  had a -- I tried Philip Dawkins in 1997.  Scott tried Josh

11  Griffin between '97 and '98, and then my Philip Dawkins trial

12  hung, and I had to retry it during the same time this was going

13  on.  We moved, I think, 30 or 40 murders that year in '96 or

14  '97 across the district.  I want to say it was probably around

15  the middle part of '97 that I assigned that case to him.  It

16  would have been after I turned over -- it would have been after

17  February of '97 because that was when I did discovery on the

18  case, but it would have been sometime around -- it would have

19  been sometime after that.  That's a lawyer's answer to a

20  question.  Short answer is I don't know.

21       Q    Once you turned the case over to him, would the

22  responsibility for discovery then shift to him?

23       A    Yes.

24       Q    Mr. Parker, can you identify the handwriting on this

25  document?

1    A    Yes.

2    Q    Whose handwriting is it?

3    A    That's Scott Brewer's.

4    Q    And do you have an opinion about what this document

5 is?

6         MR. HAIGH:  Objection.  Calls for speculation.

7         THE COURT:  I'll let you restate your question.  I'm

8    not going to let you offer an opinion about what it is.

9    I'll sustain that.

10 BY MR. COLEMAN:

11   Q    Do you know what this document purports to be?

12   A    It purports to be the witness order.

13   Q    Did you have any role in the case at this point?

14   A    No.  This would have been done by the prosecutor

15 taking it to trial.  I mentioned to you before, there's a

16 difference between a witness list and a witness order.  A

17 witness list has all the witnesses you know of that you're

18 writing down.  Then you go through and you interview those

19 witnesses and you decide which ones you are going to use and

20 you put together an order, which is, which ones you're going to

21 call first, second, third and what they're going to testify to.

22 This appears to be a witness order.

23   Q    Can you tell me in a case involving codefendants, who

24 had the authority to negotiate a deal with one of the

25 codefendants in the office at the time of this case?

1          A     You're talking about the murder cases --

2          Q     Murder cases.

3          A     Murder cases, Ken Honeycutt.

4          Q     And he would be the person who ultimately would

5     decide what a witness would receive who has testified for the

6     State?

7          A     In a murder case --

8          Q     In a murder case.  We're talking about murder cases?

9          A     It didn't matter if there was a codefendant or not.

10    At this time, Ken was the one who made the plea offers on the

11    cases.  The prosecutor who was assigned to work on them -- and

12    this is one of the things I did as chief assistant was I spent

13    a lot of time trying to find out from lawyers, does your

14    client -- is he interested in a plea?  Let's get your discovery

15    and then work to try to get the two of them together so they

16    could reach a resolution to the case, but he was the one who

17    had the authority to make the plea offers.

18              MR. COLEMAN:  That's all I have, Your Honor.

19              THE COURT:  Before you start your examination, noting

20         the hour, why don't we go ahead and take a break.  We will

21         be in recess for about 15 minutes.

22                   (Court in recess for afternoon break.)

23              THE COURT:  Mr. Parker, if you'll come back to the

24         stand, please, sir.

25              Questions, Mr. Haigh.

1                         **CROSS EXAMINATION**

2   BY MR. HAIGH:

3      Q   Now, Mr. Parker, you testified on direct that your

4   memory was a little bit fuzzy as to what may or may not have

5   been in the prosecutor's file at this point today, is that

6   right?

7      A   That's right.

8      Q   So, it's fair to say that in looking at documents

9   now, barring those that may have your handwriting on them, you

10   may not know what's been added or what has been potentially

11   removed, is that right?

12      A   That's right.

13      Q   If you wouldn't mind taking a look at Defense Exhibit

14   43 and Defendant's Exhibit one.

15      A   Okay.

16      Q   Now, you'll see on Defendant's Exhibit 43, you had do

17   discovery about two thirds of the way down on that page and

18   that's not crossed out?

19      A   That's right.

20      Q   But when you look at Defendant's Exhibit 1, you

21   clearly have submitted discovery based upon that, is that

22   right?

23      A   I had provided discovery of what I had in this.

24      Q   So, what, if any, distinction exist between

25   Defendant's Exhibit 43 with regard to that and Defendant's

1   Exhibit 1?

2       A    Well, Defendant's Exhibit 1 shows what I turned over

3   while I was working this case on this.  I do notice that on

4   Defendant's Exhibit 43 -- do you see the one that says 'do OS'?

5       Q    Yes.

6       A    That OS is oral statements.  So, I have already done

7   those, and I marked them out.  So, I know that that mark would

8   have taken place after November 17, of '96 to turn it over.

9   There could have been additional things in this discovery that

10  I was waiting for to come in because most prosecutors know that

11  discovery is never done and it's a continuing process.  You

12  wind up turning over stuff all the way up to and through trial.

13      Q    So, is it fair to say that that may have remained not

14  crossed out through the duration just as a reminder to disclose

15  whatever came in the door?

16      A    Well, it could be.  I wouldn't have done that.  There

17  was something specific.  If I didn't mark it out, there was

18  something that I was waiting for, and I don't know what it was.

19      Q    Now, you handled this case from the moment of

20  indictment up through the time that it was handed over to Judge

21  Brewer, is that right?

22      A    Yeah, I mean, I would have been responsible for it.

23      Q    And is your testimony that you don't really recall

24  exactly when that transition occurred?

25      A    No.

1    Q    And there was a case that Judge Brewer, you mentioned

2    previously, was trying at one point preceding this case that

3    brought him up into the middle of -- or beginning of year 1998,

4    do you recall that?

5    A    Yes.  I went back and looked at my notes on disposed

6    murders and I noticed that he was trying a case with Donna Step

7    and Ken Honeycutt in Monroe called the Josh Griffin case.  That

8    was a police officer who killed a motorist.  I don't know if

9    you remember it, and I think, according to my notes, that case

10   was over March the 8th.

11   Q    So, would it be fair to infer then that it was

12   shortly there after that case got resolved that he would have

13   been assigned this case?

14   A    I'm not going to say that because when I start

15   signing out cases, it would have been in '96 or '97.  It wasn't

16   a secret who got them.  I had a large board that I would put

17   prosecutors names across the top and months of the year.  Each

18   murder got its own index card and I would assign it by placing

19   it in the month and the name of the prosecutor it was assigned

20   to try.  That would have taken place during '96 and '97.

21         I would have notified the prosecutor you're working

22   or handling so and so case because we were assigning murder

23   cases.  Richmond County was our worst county at that time.  I

24   mean, there were like 40 pending homicides.  The rule was that

25   we were supposed to be handling a murder every time the court

1    house doors opened up we need to be trying one or doing

2    something with it.  So, there's no way one or two prosecutors

3    could do it, so we started assigning those cases to prosecutors

4    outside of Richmond County like Hunt Quinn.  He did Jerry

5    Hamilton down here; Scott did McRae.  I did Philip Dawkins and

6    we tried a bunch of those that way.  And so that way, they

7    would rotate in, they would do their case and they would leave.

8    So he could have been assigned that case months before, but I

9    can tell you that remembering the Josh Griffin case -- they

10   worked on that case pretty solid forever. I think that case was

11   like a three month trial, and they worked on that, I know, for

12   months prior to that.  So I don't know what time he would

13   have -- I don't know when I gave it to him or when he would

14   have known he had it.  I can't find those notes.

15        Q    Or when he would have been able to work on it?

16        A    Now, that's true, I don't know.

17        Q    But it's fair to say that at some point, the duties

18   and records associated with this case transitioned from you to

19   Judge Brewer?

20        A    Yes.

21        Q    And with regard to any offers that may have been made

22   to witnesses or codefendants in this case -- well, do you

23   recall any offers being made?

24        A    No.

25        Q    And at least --

1    A    Well, no, let me say this.  I remember having heard

2  after the fact of the discussions that Scott had with the

3  lawyer for McRae about a plea in that case.  I mean, I was

4  trying another murder case then, and I didn't hear about that

5  until after the fact, so I don't know what discussions were

6  made before.

7    Q    All right.  And that's with Mr. McRae, the defendant,

8  right?

9    A    Yes.

10   Q    I'm talking about other witnesses or codefendants?

11   A    No.  I don't know anything about those.

12   Q    You didn't hear anything about any offers or any

13  deals being made with those kinds of people?

14   A    No.  If they had done that, and I had known about it,

15  I would have written it down somewhere and put it in the file,

16  and I would have turned that over.

17   Q    And generally speaking, with you running the office

18  in Richmond County, wouldn't you have known whether that was

19  the case in a murder trial?  If there was a deal pending in

20  that context?

21   A    I would like to think so, but if Ken had negotiated

22  the case outside of my presence, because, you know -- you

23  remember, at this time, I was getting ready to try Philip

24  Dawkins again, so I don't know what was going on down here.  I

25  was working that case up for two or three months before that.

1    I should have heard, and I should have known about it if it

2    happened, yes.

3         Q    Okay.  So, it's fair to say then, that Ken Honeycutt

4    is the ultimate person that would have had authority or

5    knowledge about any deals or offers being made?

6         A    Yes.  Now, sometimes he would tell the prosecutor,

7    this is what we got, you need to get X, Y and Z out of them,

8    and the prosecutor would go and try to negotiate the plea that

9    way, but ultimately, he was the one who decided what pleas were

10   made on murder cases.

11        Q    Okay.  And Scott Brewer, given that he tried the

12   case, he would have had knowledge if there were any such deals?

13        A    If there was one, he should have known.

14        Q    All right.  But you can't really say one way or the

15   other?

16        A    I can say I don't remember any.

17        Q    Again with disclosure, you wouldn't have any

18   knowledge of what was disclosed after this case was turned over

19   to Mr. Brewer than either, would you?

20        A    No, sir.

21        Q    All right.  Similarly, you would have no knowledge of

22   what may have been disclosed at trial, whether via (inaudible)

23   motion or by way of Mr. Brewer just turning over a statement

24   after a witness testified?

25        A    No.  I wouldn't know that.

1          MR. HAIGH:  Nothing further.

2          THE COURT:  Any?

3          MR. COLEMAN:  Just a couple of questions.

4          THE COURT:  Sure.

5                    **REDIRECT EXAMINATION**

6     BY MR. COLEMAN:

7          Q    On plea deals and agreements, if Mr. Honeycutt

8     negotiated one and didn't tell you, you wouldn't know about it?

9          A    That's true.

10         Q    And you have no way of knowing what deals he

11    negotiated?

12         A    If he had negotiated a deal with a lawyer, and I made

13    the lawyer an offer that wasn't that way, the lawyer would have

14    told me.  Do you see what I'm saying?  If he negotiated and

15    didn't tell me, I wouldn't know unless the defense lawyer told

16    me.

17         Q    You indicated that you would go to a crime scene so

18    that you could see for yourself different perspectives and then

19    you would follow that with having photographs made.  Can you

20    explain the approach you would take for the photographs that

21    were made?  How do you stage them?

22         A    I never stage a photograph.  I would take a

23    photograph of the scene, of the area, and what I like to do is

24    to get a macro photograph so that you could help the jurors to

25    visualize and see what was actually happening out there, like,

1    you would start with an overhead, an aerial diagram, and then

2    you would peg the photograph.  This is a photograph that I

3    would have liked to have had made.  If this is where the murder

4    took place, I don't know but if it is, you start from the back

5    and you come forward smaller so that you can relate what's

6    around it to what is actually there.  It's called macro to

7    micro photography and it's a forensic technique.

8            MR. COLEMAN:  That's it, Your Honor.

9            THE COURT:  Any?

10           MR. HAIGH:  Just one thing.  A follow-up to make sure

11       I understood.

12                    **RECROSS EXAMINATION**

13   BY MR. HAIGH:

14       Q    I want to revisit Defendant's Exhibit 45 for a

15   moment.  So, you only testified as what this purports to be,

16   right?

17       A    That's right.

18       Q    You have no personal knowledge of what this actually

19   is by the creator of this document?

20       A    That's right.

21       Q    You have no personal knowledge of whether the

22   contents of this document are accurate or not, is that right?

23       A    I didn't write it.

24       Q    Thank you.

25           THE COURT:  Thank you, sir.  You may step down.

1          THE WITNESS: I don't know if it's appropriate, but
2  can I be released.
3          THE COURT:  Yes, sir.  Thank you, Mr. Parker.
4          THE WITNESS:  Thank you, Your Honor.
5          MR. COLEMAN:  Your Honor, at this time we'd like to
6      move the admissions of Exhibits 36 through 39 and 41
7      through 45, not 40.
8          MR. HAIGH:  And, Your Honor, I'd object to the one we
9      just discussed, because --
10         THE COURT:  Number 45 is the last one we discussed.
11         MR. HAIGH:  I would object to this one, Your Honor
12     because the witness wasn't able to lay a foundation for
13     it.
14         THE COURT:  What do you say to that, Mr. Coleman.
15         MR. COLEMAN:  Your Honor, he identified it.  He
16     doesn't know what it is.  He knows what it purports to be
17     based on the general practice in the office, and he was
18     able to identify the handwriting as that of the prosecutor
19     in this case.
20         THE COURT:  I'm going to admit it for whatever value
21     it might have.
22             (Defendant Exhibits 36 – 39 and 41 – 45 were
23             admitted.)
24         MR. COLEMAN:  We will call James Van Camp.
25         THE COURT:  Yes, sir, Mr. Van Camp.

1          The witness, James Vancamp, was sworn and

2          testified as follows to the Examination of

3          counsel.

4                    **DIRECT EXAMINATION**

5    BY MR. COLEMAN:

6        Q    Mr. Van Camp, would you state your name, where you

7    live, and your place of employment.

8        A    James Irvine Van Camp.  I live in Southern Pines,

9    North Carolina.  My offices are in Pinehurst.

10       Q    And how long have you practiced law?

11       A    Forty-nine years.

12       Q    And have you practiced law in this jurisdiction?

13       A    I have.  You're talking about in Richmond County?

14       Q    Yes.

15       A    Yes.

16       Q    In Superior Court in Richmond County?

17       A    Yes.

18       Q    And can you just briefly describe other areas of the

19   state where you practice law, and why don't we limit it to

20   murder cases and major felonies.  Does that narrow it down any?

21       A    I wasn't sure of the question, but I would say most

22   of the state I practiced in and had murder cases in most areas

23   of the state.

24       Q    And you practice in federal court as well as state

25   court?

1    A    In all three divisions, yes.

2    Q    Does your practice consist of representing criminal

3 defendants?

4    A    Part of my practice, yes.

5    Q    Do you recall the case of State of North Carolina

6 versus Thurmond Nelson, a murder case?

7    A    I remember the name.

8    Q    Do you recall that you were counsel to Mr. Nelson in

9 that case?

10    A    I have refreshed my recollection that I was.

11    Q    Did you represent him alone or did you represent him

12 along with other lawyers from your firm?

13    A    I understand that Mr. Mechium sat in on one occasion,

14 but the others -- I know one occasion when I was unavailable

15 and I had a conflict with another.

16    Q    Even when that happened, you remained counsel to the

17 client?

18    A    Yes.

19    Q    Now, have you represented clients who have testified

20 as witnesses in cases in Richmond County?  That is defendants

21 who have testified on behalf of the State in this county?

22    A    I only know of this one.  I can't recollect any

23 others.

24    Q    Have you represented witnesses in this county who

25 have testified for the State?

1    A    At this time, I don't recollect that.

2    Q    Are you familiar with the customary practice in this

3    county for deciding whether a witness who testifies for the

4    State receives a benefit for doing so?

5         MR. HAIGH:  Object, Your Honor, of facts not in

6         evidence.

7         THE COURT:  I'm going to sustain that general

8         question.  I'll let you be specifically direct with

9         reference to any of these matters, if you wish to do so,

10        Mr. Coleman.

11   BY MR. COLEMAN:

12   Q    Do you recall that Mr. Nelson testified in this

13   case -- the case involving Mr. McRae?

14   A    Yes.

15   Q    And he testified for the State, is that your

16   recollection?

17   A    That's my recollection.

18   Q    And do you recall whether he received a benefit as a

19   result of his testimony?

20   A    I cannot say as a result of his testimony.  I know

21   the result of the case.  As I understand it, the case against

22   him was dismissed, but I don't know that it was the benefit for

23   him testifying.

24   Q    Do you know if, when Mr. Nelson testified, he had an

25   expectation of the prosecutor taking into consideration his

1   testimony?

2        MR. HAIGH:  Objection.  Goes to another person's

3        knowledge or expectation, Your Honor.

4        THE COURT:  I'm going to sustain it as to the form of

5        question.  I'll let you restate your question,

6        Mr. Coleman.

7   BY MR. COLEMAN:

8        Q    Did you, as Mr. Nelson's counsel, did you have any

9   expectation that if he testified for the State, he would

10  receive a benefit?

11       A    Yes.

12       Q    And what was the basis for the expectation?

13       A    You're talking about in 1997?

14       Q    Yes.  '98.

15       A    It was generally understood, I understood it, that if

16  a defendant cooperated, there would be some consideration for

17  that, for that cooperation.

18       Q    And when you say some consideration, what do you

19  mean?

20       A    There would be some -- in the result of his case if

21  he had a pending case and the result of his case.  In this

22  case, Mr. Nelson's case.

23       Q    In this case, would you have permitted Mr. Nelson to

24  testify without that expectation?

25       A    That certainly would have been up to Mr. Nelson, but

1    I certainly would have advised him -- I don't know what the

2    privileges are here in terms of client privilege.  I would have

3    advised him probably that he did not have to do that, testify.

4        Q    And can you explain how the benefit to the client

5    would be realized?  When would it be realized?

6        A    It was not defined.  There was never any definitive

7    understanding about that except there would be some

8    consideration.

9        Q    So, the understanding was that there would be some

10   consideration and then at some later point, the actual

11   consideration would be decided?

12       A    That would be decided by the District Attorney's

13   Office, yes.

14       Q    Did you deal with a particular lawyer in the District

15   Attorney's Office in reaching that result?

16       A    I don't recollect that.

17       Q    Do you know who in Richmond County made the decision

18   about the benefit?

19       A    In 1998?

20       Q    Correct.

21       A    It was the District Attorney, Mr. Honeycutt.

22       Q    And would you or Mr. Mechium have dealt directly with

23   him?

24       A    I would have to speculate.  I don't know that I did.

25   I have no recollection of dealing with Mr. Honeycutt in this

1  case, personally.

2       Q    So, did the fact that Mr. Nelson testified benefit

3  him in the end based on your personal knowledge?

4            MR. HAIGH:  Objection, Your honor.  The witness has

5       already answered previously that he doesn't know whether

6       the result was directly from the fact that he testified or

7       the value or merit of the case of his client.

8            THE COURT:  I'm going to sustain that particular

9       question.  Sustain the objection.

10 BY MR. COLEMAN:

11      Q    After your client testified, how did you go about

12 deciding how charges pending against him would be disposed of?

13      A    I have no recollection of how that happened.  It's

14 been 17 years.  I know the result, at least I've been told what

15 the result is.  I don't know the process.

16      Q    And what is the result?

17      A    I understood that the first-degree murder case was

18 dismissed.

19      Q    And was it your belief that that result was affected

20 by his decision to testify?

21      A    It would certainly have been a factor in that, but I

22 can't tell you how much of one or how it was factored into the

23 decision by the District Attorney's Office.

24      Q    Do you know how the District Attorney went about

25 deciding how a case would be disposed of after a witness

1  testifies?

2      A    No.

3      Q    Do you personally believe, based on -- well, first of

4  all, how did your client come to testify for the State in this

5  case, do you recall that?

6      A    I do not recall.  I know he did, but I do not how

7  that came about.

8      Q    And you don't have any idea how that came about?

9      A    If you want me to speculate how that happened, I can

10 do that, but I have no recollection of what the process was

11 that brought him to testify, other than obviously, there was a

12 discussion between he and I about that, but other than that, I

13 don't know about the process.

14     Q    Do you know if you or Mr. Mechium were present when

15 Mr. Nelson testified in the second trial?

16     A    Mr. Mechium, I understand, was present when he

17 testified.

18     Q    Do you recall whether there was occasion when

19 Mr. Nelson testified without his lawyer being present?

20     A    I don't know that.

21     Q    Do you believe that in the case, the murder case

22 against Mr. Nelson, after he testified, that it would have been

23 possible for the prosecutor to prosecute him on the murder

24 charge?

25          MR. HAIGH:  Objection.  Speculation.

1        THE COURT:  That's sustained.

2   BY MR. COLEMAN:

3        Q    I'm asking for your assessment of his exposure if he

4   testified.  What was his exposure on the murder charge?  Your

5   assessment of his exposure?

6            MR. HAIGH:  Your Honor, I'm going to object to facts

7        not in evidence.  Mr. Van Camp has already said he wasn't

8        present for the defendant's testimony, therefore, he

9        wouldn't know.

10           THE COURT:  I'm going to let him testify, if he has

11       an opinion, as to an assessment.  Do you have an

12       assessment about that, Mr. Van Camp.

13           THE WITNESS: obviously, had he incriminated himself

14   in the factual basis of the case,  that would have been a

15   factor as to his culpability and his possibility of being

16   prosecuted.

17  BY MR. COLEMAN:

18       Q    Based on his testimony that he was not involved in

19   the murder, did you believe that he had any exposure?

20       A    Based upon his testimony, no.

21           MR. COLEMAN:  That's all I have, Your Honor.

22           THE COURT:  Cross-examination.

23           MR. HAIGH:  Thank you, Your Honor.

24                   **CROSS EXAMINATION**

25  BY MR. HAIGH:

1          Q    Mr. Van Camp, I just want to go into the process

2     between you, as counsel, and the interactions with the State in

3     this case for a little bit.  So, correct me if I'm wrong, but

4     isn't it true that the State would actually make no offer to a

5     witness such as Thurmond Nelson in exchange for his testimony?

6          A    The word 'offer' is somewhat -- there would be no

7     specific offer.

8          Q    And in fact, isn't it more of an expectation on the

9     part of the defense attorney that suggest their client

10    cooperate that the State will take that into consideration?

11         A    Yes.

12         Q    So, that's a fair characterization.  And based upon

13    that, isn't it true that you may suggest in a nebulous manner

14    to your client that if you testify, the State may consider that

15    in the disposition of your case?

16         A    There would be a consideration.

17         Q    Right.  But you would never go to your client and

18    say, "If you testify, you're going to get X, or there's going

19    to be a guaranteed effect."

20         A    In this district, that was never the way it was done.

21    It was just an understanding.

22         Q    So, when your client testified that he didn't have a

23    deal with the State, that was a true statement, isn't that

24    correct?

25         A    Yes.

1      Q    Thank you.

2      THE COURT:  Any further questions, Mr. Coleman?

3      MR. COLEMAN:  Just one.

4      **REDIRECT EXAMINATION**

5 BY MR. COLEMAN:

6      Q    Have you ever had a client who testified for the

7 State who did not receive a benefit?

8      A    On one occasion.  I recall that the client recanted

9 and changed his testimony based upon a previous debriefing, it

10 was in federal court, and he did not receive --

11      Q    I'm talking about in this district?

12      A    In this district, I don't believe so.

13      Q    Thank you.

14      **RECROSS EXAMINATION**

15 BY MR. HAIGH:

16      Q    And I recall your initial testimony on direct was

17 that this is the only case -- Mr. McRae's case or Mr. Nelson's

18 case is the only case that you can recall doing as a murder

19 case in Rockingham in Superior, is that right?

20      A    I've had several murder cases in Richmond County.

21      Q    During Ken Honeycutt's tenure as prosecutor?

22      A    I'm sure I did.  I can't give you names now, but we

23 had several here during -- of course, for a period of time, he

24 was our district attorney too, until Moore County was taken and

25 given to Randolph in Montgomery.

1       Q     Thank you, sir.

2             THE COURT:  Thank you, Mr. Van Camp.  You may be

3       excused and released from your subpoena.

4             MR. LAU:  May we approach, Your honor.

5             THE COURT:  Yes, counsel, you may approach.

6                  (Bench conference with all counsel present.)

7             THE COURT:  All right, folks.  We're going to go

8       ahead and break a little early today.  We will start

9       promptly at 9:30 in the morning.

10            Sheriff, we'll be in recess until 9:30 in the

11     morning.

12

13               (Court adjourned at 4:30 p.m.)

14

15               END OF VOLUME II OF III

16

17     *****************************************

18

19

20

21

22

23

24

25

STATE OF NORTH CAROLINA            )

                                   )

COUNTY OF RICHMOND                 )


               C E R T I F I C A T E

     I, Patrice B. Lee, the officer before whom the foregoing

proceeding was taken, do hereby certify that the foregoing

pages, inclusive, are a true, correct and verbatim transcript

of said proceedings.

     I further certify that I am neither counsel for, related

to, nor employed by any of the parties to the action in which

this proceeding was heard; and further, that I am not a

relative or employee of any attorney or counsel employed by the

parties thereto, and am not financially or otherwise interested

in the outcome of the action.

     IN WITNESS WHEREOF, I have hereunto subscribed my name,

this 28th day of November, 2016.


*Patrice B. Lee*

_____

Patrice B. Lee, CVR-CM
Official Court Reporter
Superior Court
704-287-3609