IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DERRICK JOVAN MCRAE,                )
                                    )
Petitioner,                         )
                                    )
v.                                  )        No. 1:21-CV-577-LCB-JLW
                                    )
EDDIE BUFFALOE,                     )
Secretary, N.C. Dep't of Public Safety, )
                                    )
Respondent.                         )

**PETITIONER'S SUPPLEMENT TO WRIT OF HABEAS CORPUS**
**28 U.S.C. § 2254**

Petitioner, Derrick Jovan McRae ("McRae"), by and through undersigned counsel,

respectfully submits this supplement to Petitioner's filed Petition for Writ of Habeas

Corpus.[1] (DE 1.)

**BACKGROUND**

On August 29, 2022, Magistrate Judge Webster granted Petitioner leave to conduct

limited discovery to further pursue the fact that minimal records exist or have been

produced from the first four and a half months of the Rockingham Police Department's

("RDP") investigation into the death of Jeremy Rankin. (DE 18 ("Discovery Order").) The

Discovery Order first allowed Petitioner to seek production of RPD and Richmond County

District Attorney's Office ("DAO") files relating to the murder of Jeremy Rankin dated

---

[1] Petitioner incorporates in full the facts, claims, and arguments from the filed
Petition for Writ of Habeas Corpus

between October 14, 1995, and March 1, 1996. If those files were not produced, the Discovery Order allowed Petitioner to depose relevant members of the RPD and DAO regarding the location and contents of the files. The relevant files were not produced, so, in accordance with the Discovery Order, Petitioner conducted several depositions of relevant members of the RDP and DAO. Following that discovery, and in accordance with this Court's directive, Petitioner now files this supplemental briefing on the issue of actual innocence raised in his Petition for Writ of Habeas Corpus. (*See* DE 1.)

## RELEVANT FACTUAL BACKGROUND

### I. The State's Case at Trial

In the early hours of Saturday, October 14, 1995, Jeremy Lee Rankin was found shot to death on the front porch of a house in Rockingham, North Carolina. (DE 10-4 at 40:25–41:9.[2]) More than four months later, on February 29, 1996, McRae was arrested and charged with the first-degree murder of Rankin.

The State's case against McRae was remarkably weak. The State's case relied solely on two statements from non-eyewitnesses with enormous incentives to testify falsely: (1) Edward Tender and (2) Thurman Nelson. Tender, a 44-year old alcoholic with an extensive record, was in the county jail awaiting trial for nineteen felonies and three misdemeanors when he claimed McRae confessed to him that he murdered Rankin.[3] (DE

---

[2] All transcript citations include the docket number of the cited transcript (where applicable) and the transcript page and line number, not the ECF assigned page number.

[3] Two days after providing a statement to the RPD implicating McRae, twenty of Tender's twenty-two charges were reduced, dismissed, or otherwise favorably resolved. (DE 1-17 at 1–2.)

Case 1:21-cv-00577-LCB-JLW   Document 41   Filed 01/24/23   Page 2 of 21

1-18; DE 10-4 at 116:8-19.) The other witness, Nelson, a friend of McRae's, was charged as a co-defendant in Rankin's murder. (*State v. Nelson*, No. 96 CRS 1675, Indictment for Murder (Mar. 18, 1996).) At McRae's trial, Nelson testified that he was not present to see the murder, and did not participate in it in any way, but said that McRae confessed to him that he killed Rankin.[4] (DE 10-4 at 65:14–6.) Nelson testified to his complete innocence.[5]

The State presented no evidence at trial to corroborate these statements, which plainly contradicted each other. For example, Tender and Nelson gave completely irreconcilable motives for why McRae allegedly murdered Rankin. (*Compare* DE 1-23, *with* DE 1-7.) With only the two contradictory and otherwise suspect statements, the State's case was extremely weak, with the first trial resulting in a mistrial on an 8-4 vote to acquit. (*See* DE 10-26 at 3.)

After the mistrial, the State offered McRae a plea deal for the time he served pretrial, but, continuing to maintain his innocence, McRae rejected that deal. (Ex. 7 at 60:18-21.) On the same weak and suspect evidence, the State tried McRae again, just ten days after his first trial, and he was convicted. (*Id.* at 311:19–24.) The only difference between the

---

[4] Like Tender, Nelson had numerous charges pending against him, all of which were favorably resolved following McRae's conviction, including his indictment for Rankin's murder, which was dismissed. (*See* (DE 1-19 at 1).)

[5] The absurdity and due process implications of Nelson testifying for the State, while still charged as a principal in the same murder, but inculpating only McRae while completely exonerating himself are obvious, and something former RPD officer Brigman could not believe. (Brigman at 60:14–61:12 (discussing Nelson's testimony and stating "I don't think he testified to his complete innocence").)

Case 1:21-cv-00577-LCB-JLW   Document 41   Filed 01/24/23   Page 3 of 21

two trials was McRae's deteriorating mental health, which resulted in his markedly changed physical appearance. (*See* DE 1 at 10 n.13.[6])

## II. Relevant Post-Conviction Findings[7]

The purported "complete" RPD investigative file (the "File") was provided for the first time years after McRae's conviction.[8] The File, coupled with post-conviction evidentiary hearing testimony from the relevant state actors, revealed significant favorable evidence and further weakened the already frail case the State presented at trial.

Although the lead investigator and later Chief of the RPD until 2012, Robert Voorhees, testified at the 2014 state court post-conviction evidentiary hearing that the File was not "physically in the [RPD] building" the day he looked, the File was eventually located at the RPD by then-Chief William Kelly in 2014.[9] (DE 10-16 at 140:1–11.) Once produced, it became evident that the File is lacking investigative documentation from

---

[6] All citations to prior briefing include the docket number of the cited briefing and the briefing page number, not the ECF assigned page number.

[7] In this supplemental briefing, McRae focuses on the evidentiary issues most closely connected to the Discovery Order, omitting the additional evidence uncovered during post-conviction litigation. For a discussion of all of the evidence, *see* DE 1 at 21–29.

[8] McRae received separate files from the RPD and DAO. The two files received include nearly identical investigative records for the period spanning October 14, 1995 to March 1, 1996. Multiple deponents testified that the RPD would maintain a master investigative file containing all its work product from an investigation. The master file would then be duplicated and a copy provided to the DAO. Throughout this document, "File" is used to describe the master investigative file created by the RPD, which, as testimony makes clear, should include complete records from its investigation.

[9] For testimony indicating Voorhees's statements were untrue, *see infra* Section 1.A.

October 14, 1995 to February 21, 1996, a near four and a half month period spanning the day of the murder until a week before McRae's arrest.[10] In response to questions about this gap at the 2014 hearing, former Chief Voorhees testified that the first months of the investigation would contain crucial records, including witness statements and possible suspects and leads. (*See* DE 10-16 at 144–18, 141–17; DE 10-17 at 157:24–158:14.)

Specifically, Voorhees testified that "[i]f a witness was talked to, it would be standard procedure for it to be documented . . . ." (DE 10-16 at 130:10–15.) He added that the RPD created a "master investigation file" for every case and that "[a]ll the work product of the investigation," including "officer notes," would be included in the File. (*Id.* at 130:16–131:2.) "Anything that could have been documented should have been documented" and sent to the DAO. (DE 10-17 at 222:18–223:2.) He further confirmed that the File had an index for additional materials—e.g., "the crime scene, evidence statement, witness statements, suspect info, autopsy report, report synopsis"—yet, "when you turn to the tab there is nothing there," though something clearly should be. (DE 10-16 141:8–17.)

Additionally, once turned over, the File revealed nine previously undisclosed witness statements taken by the RPD more than four months after Rankin's murder. (*See*

---

[10] The File includes just two documents generated by the RPD between October 15, 1995 and February 21, 1996—a criminal history of Rankin that appears to have been printed out on October 16, 1995, and a property sheet documenting evidence collected from the crime scene dated October 15, 1995. (*See* DE 17 at 2 n.3.) Additionally, Petitioner received a few documents from the RPD's October 14, 1995 crime scene response, including photographs, a crime scene entry log, and incident report. (DE 17 at 2.) No record provided reflects an effort by the RPD to investigate and determine who murdered Rankin during the crucial four and a half month period following his death. (*See*

DE 1 at 7 n.4.) The statements conflict with one another in almost every way and raise significant questions about the accuracy and motive of the witnesses.[11] McRae's trial counsel testified at the 2014 evidentiary hearing that he did not receive these statements and that all he had was a one-page, single paragraph document purporting to summarize the contents of oral statements made by McRae. (DE 10-16 at 66:10-17.) Former Assistant District Attorney ("ADA") Michael Parker testified that the DAO would receive a copy of the full File from the RPD and provide barebones summaries of oral statements to defense counsel. (*Id.* at 245:13-19; 272:19–275:7.)

Finally, other materials in the File suggested an investigation into the victim was, or should have been, performed. Specifically, McRae's post-conviction counsel obtained a copy of the neighboring Hamlet Police Department files related to Rankin, which revealed that Rankin engaged in a crime spree in the time period leading up to his murder.[12] (*See* DE 1-1.) Consistent with that revelation, former Chief Voorhees testified that the RPD investigated Rankin after running a felony report for him (DE 10-17 at 165:19-21) and confirmed that the File included a handwritten notation that "we need to look very close at the victim in this case." (DE 1-27 at 4 (emphasis in original); *see also* DE 10-17 at 166:1-17.) Yet, the File contains no records of the RPD investigation into Rankin.

With that, this Court granted McRae limited discovery to seek the files missing from the first four and a half months of the File. (DE 18.)

---

[11] For a more detailed discussion of the nine statements, *see* DE 1 at 22-26.

[12] The particulars of the crime spree suggest that Rankin engaged in minor crimes associated with drug addiction, not that he was engaged in other more violent crimes.

6

## IV.    Discovery Order Findings

In accordance with the Discovery Order, McRae first sought document production from the RPD and DAO, both of which were unable to produce any new records from the first four and a half months of the Rankin murder investigation. Continuing under the Discovery Order, McRae then deposed several relevant individuals at the RPD and DAO.[13]

*General Investigation and Documentation Practices*. The deponents were clear and in agreement that the RPD would immediately begin investigating a crime. (*See* Ex. 1 at 30:16–32:6; Ex. 2 at 34:16–35:3, 12:17–19; Ex. 3 at 31:10–16; Ex. 4 at 42:15–43:3, 46:14–21; Ex. 5 at 17:12–14, 48:3–9; Ex. 6 at 25:8–26:2; *see also* DE 10-16 at 144:6–18.) The former RPD officers confirmed that a "master case file" would be created for each investigation and everything done for that case would be put in the File. (Ex. 1 at 21:23–23:5; Ex. 6 at 19:20–20:1). The type of materials that would be placed in the File include: handwritten officer notes (Ex. 1 at 22:17–21); "a substantial amount of interviews" (*id.* at 30:16–31:5); the investigation of alternative suspects (*id.* at 49:19–50:4); notes about a neighborhood canvas (Ex. 2 at 37:20–23; Ex. 3 at 45:15–20); statements from neighbors (Ex. 2 at 37:12–16, 38:11–14); notes about efforts taken to locate and secure the murder weapon (*id.* at 50:9–18; DE 10-17 at 215:8–216:10); and notes about initial leads (*id.* at

---

[13] McRae deposed the following individuals: (1) Reece Saunders, current District Attorney for Richmond County; (2) George Gillenwater, current Chief of the RPD; (3) Scott Brewer, the former Assistant District Attorney who prosecuted McRae; (4) J. Christopher Brigman, former RPD officer who assisted in the investigation of the murder; (5) William Kelly, former RPD Chief of Police; (6) Gregory W. ("G.W.") McNeill, former RPD detective; and (7) Kenneth Honeycutt, former District Attorney for Richmond County.

Case 1:21-cv-00577-LCB-JLW   Document 41   Filed 01/24/23   Page 7 of 21

63:7–9; DE 10-17 at 158:6–14). Once the RPD's investigation was concluded, an RPD officer would deliver an identical copy of the full File to the DAO. (Ex. 6 at 17:7–14, 23:16–22; Ex. 2 at 20:12–21:18; Ex. 4 at 25:3–8.)

The deponents also testified to the RPD's file storage practices. Former Chief Kelly testified that, following the conclusion of a trial, files would go into the file room and would not be removed unless requested. (Ex. 6 at 37:5–14). Chief Gillenwater testified that the RPD retains murder case files forever. (Ex. 1 at 28:19–29:1.) The deponents agreed that there would be "no reason" for files to ever be removed from the RPD. (Ex. 6 at 37:5–8, 44:8–45:6; *see* Ex. 1 at 25:4–17, 29:15–19; *see also* Ex. 2 at 23:2–10.) Importantly, many deponents had never heard of a case where a large portion of investigative records were missing. (*See* Ex. 1 at 30:5–10; Ex. 2 at 34:16–21; Ex. 3 at 30:22–31:2.) Chief Gillenwater also testified that he is unaware of any RPD files ever being lost. (Ex. 1 at 34:13–17.)

Former ADA Scott Brewer, the prosecutor in the case, testified that any documents taken from the DAO file would always be returned once they were done being used. (Ex. 4 at 26:19–24.) Although former elected district attorney ("DA") Kenneth Honeycutt testified that the DAO "had open file discovery" at the time of McRae's trial (Ex. 7 at 29:4-14), Brewer made clear that the DAO's office policy reflected case law at the time, that is, no open file discovery (Ex. 4 at 33:18–34:12; *see also* DE 10-17 at 275:8–276:2; DE 10-16 at 33:20–34:17).

*Investigation into Rankin's Murder*. The deponents' recollection and understanding regarding the Rankin murder investigation was less certain. Given the passage of time since the investigation and trial, the deponents struggled to remember specific details about the

8

investigation (*see, e.g.*, Ex. 4 at 25:23–4; Ex. 2 at 52:19–21; Ex. 5 at 22:15–24:2), but Voorhees testified that it is without question that the File is "missing a lot of the information that's indexed in it" (DE 10-16 at 140:24). According to Voorhees, that missing material includes information about potential suspects outside of Rockingham (DE 10-17 at 234:25–235:14), which would ordinarily be documented in the File during the RPD investigation (*see* Ex. 1 at 49:14–50:4, 22:17–21, 30:23–24; Ex. 7 at 44:14–21). The RPD also had leads about the location of the murder weapon (DE 1-10) and at least one alternate suspect, Marlin Dumas, the only purported eyewitness to the crime who was convicted of capital murder just a month after Jeremy Rankin's murder (DE 10-17 at 190:7–25). These would be crucial pieces of information for the RPD to investigate (Ex. 2 at 50:9–18; DE 10-17 at 215:8–216:10; Ex. 1 at 49:14–50:4), but there is no record of further investigation into these leads.

As succinctly stated by former RPD officer McNeill, "[i]f anything had been done" during the first four and a half months, he would expect there to be records. (Ex. 5 at 60:2–5.) Although several of the deponents could not recall what specifically was done during that period, former RPD officer Brigman confirmed, "[y]ou're not just going to sit there for four months and not do anything," and that he was unaware of any case where there were no records for the opening months of an investigation. (Ex. 2 at 34:18–35:3.)

Finally, regarding the whereabouts and storage of the File at the RPD, former Chief Kelly testified that he saw the File in Voorhees's office at some point after the Duke Law Clinic first asked him for a copy of the file. (Ex. 6 at 37:9–16; 55:17–24.) According to

Kelly, he believed Voorhees was "putting [Petitioner's counsel] off as long as he could." (*Id.* at 43:2–9.; 56:14–21.)

## **LEGAL STANDARD**

To pass through the actual innocence gateway, a petitioner must show that new, reliable evidence not presented at trial makes it "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup v. Delo* 513 U.S. 298, 327 (1995). Though this gateway standard is demanding, it "does not require absolute certainty about the petitioner's guilt or innocence." *House v. Bell*, 547 U.S. 518, 538 (2006). Instead, Petitioner must only show that "more likely than not any reasonable juror would have reasonable doubt." *Id.* When assessing an allegation of actual innocence, the court does not "make an independent factual determination about what likely occurred," *id.*, but instead considers "how a reasonable juror would perceive *all* of the evidence in the record," *Teleguz v. Pearson*, 689 F.3d 322, 330 (4th Cir. 2012) (emphasis added).

Under Fourth Circuit precedent, courts "must first turn to the evidence and testimony considered at the [original] trial," then consider any new evidence proffered since trial "that has a bearing" on actual innocence. *Finch v. McKoy*, 914 F.3d 292, 294, 297 (4th Cir. 2019). If, after reviewing this record, it is "more likely than not any reasonable juror would have reasonable doubt as to the petitioner's guilt, then the petitioner has satisfied the *Schlup* standard." *Teleguz*, 689 F.3d at 328 (internal quotations omitted) (citing *House*, 547 U.S. at 538). Once this standard is met, Petitioner is entitled to review on the merits of his substantive claims, *Schlup*, 513 U.S. at 317, regardless of AEDPA's statute of limitations, *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013).

10

**<u>ARGUMENT</u>**

The evidence—or lack thereof—from the first four and a half months of investigation casts significant doubt on the quality of the RPD investigation into Rankin's murder. Coupled with the extremely thin evidence against McRae, the State is left with such a weak case that, when presented with all the evidence available today, no reasonable juror would find McRae guilty beyond a reasonable doubt.

I.  THERE IS NO LEGITIMATE EXPLANATION FOR THE MISSING DOCUMENTS FROM THE OCTOBER 14, 1995 TO MARCH 1, 1996 PORTION OF THE FILE.

The new information uncovered pursuant to the Discovery Order shows that there is no legitimate explanation for the fact that materials from the first four and a half months of the File is missing in this case. Testimony establishes that: (i) material from this period should exist; (ii) important investigative steps are taken and documented by the RPD in every murder case; (iii) the File includes organizing tabs reflecting that a number of those steps were taken in *this* case; and (iv) certain specific steps were recalled, but that, without explanation, those files are missing from the File.

That records should exist from these first months of the investigation is without question. As explained above, Voorhees, the RPD's lead investigator in the case, testified that other suspects were investigated. (DE 10-17 at 234:25–235:14.) When discussing the existing contents of the File, he testified that "there [are] several things . . . that are indexed that are just completely not there." (DE 10-16 at 141:3–7.) Although Voorhees explained the absence of the records by saying, "[t]here's dozens of reasons, literally, legitimately, why things could have been removed from [the] file" (DE 10-17 at 157:12–20), three other

11

current or former RPD officers testified that there is *no* legitimate reason to remove records from the File, including former RPD officer Brigman who worked with Voorhees to investigate Rankin's death (*see* Ex. 2 at 23:2–10; *see also* Ex. 1 at 25: 4–17, 29:15–19; Ex. 6 at 37:5–8, 43:10–45:6). Brigman also clarified that investigative steps would have been taken during those first four months: "You're just not going to sit there for four months and not do anything." (Ex. 2 at 34:22–35:3.) Another investigator who worked on the Rankin case, G.W. McNeill, testified that he would expect records to exist from this four and a half month period "if anything had been done" and that, if there were no records from that time, he would find it "curious." (Ex. 5 at 60:2-17.)

Given that a copy of the File should be at the RPD and/or DAO, there are only two possible explanations for the missing material being unavailable: (1) it was not provided to the DAO in contravention of RPD policy and was subsequently removed from the File; or (2) the identical set of records was excised from both the RPD and DAO files.

     A.   <u>The lead investigator in the Rankin case personally possessed the file after McRae was convicted and perjured himself when testifying about the file during state post-conviction proceedings.</u>

While two explanations exist for the documents missing from the RPD and DAO file, one is more likely—that then-RPD Detective Voorhees contravened department policy and did not provide the files to the DAO, and later purged the records for some reason, perhaps to ensure they did not fall into McRae's hands. It is now known that Voorhees testified falsely during state post-conviction proceedings. As described above, he falsely testified that there were dozens of reasons to remove records from a file (DE 10-17 at 157:12-20), but, even more significant, he testified falsely that the File was not in the

RPD's possession when he was contacted about the File during post-conviction litigation (*id.* at 157:7-10).[14] He also testified that he had not seen the File in well over five to seven years and did not have knowledge of what had been removed or added because it was not in his "care, custody and control." (*Id.* at 157:11-20.) As detailed below, this testimony was false, and no reasonable juror would accept the findings of an investigation where the lead investigator lied about the records in the case.

Voorhees ascended up the hierarchy in the RPD and eventually became the Chief of Police. While in this position he was asked to provide a copy of the File to McRae's post-conviction attorneys from Duke Law School pursuant to N.C. Gen. Stat. §15A-1415(f). At the time of this request, the Assistant Chief was William Kelly. Kelly testified that, after the request, he saw the File in Voorhees's office and that Voorhees told him "he had been contacted by Duke." (Ex. 6 at 55:17–56:21.) Kelly testified that, in his belief, Voorhees intended to put McRae's counsel off as long as he could.[15] (*Id*. 43:2–9.)

Kelly's deposition testimony directly refutes Voorhees's testimony at the 2014 state post-conviction evidentiary hearing that: (1) the File was not in the possession of the RPD at the time he was contacted after McRae's conviction; (2) Voorhees had not seen the File since well before it had been requested; and (3) Voorhees did not have any knowledge of

---

[14] Voorhees also falsely implied that a renovation to the department may have resulted in his inability to locate the file at the RPD, but deposition testimony established that case files remained at the RPD throughout the renovation and were never stored offsite. (*See* Ex. 6 at 39:4–40:15, 54:22–55:16.)

[15] In fact, Voorhees never turned over the File. It was not until 2014 that his predecessor, Former Chief Kelly, turned the File over ahead of the state court post-conviction evidentiary hearing.

13

material being added or removed because the File was not in his "care, custody and control." (DE 10-17 at 157:11–20.) It is now known that he did have the File and, at least in Kelly's opinion, was intent on frustrating McRae's post-conviction counsel's effort to obtain the File. (Ex. 6 at 43:2–9) Kelly's opinion is bolstered by two undeniable facts— Voorhees never provided the File to McRae's post-conviction counsel and then repeatedly lied about it at the post-conviction evidentiary hearing.

Voorhees's conduct cannot be innocently explained. His willingness to falsely testify about the file calls into question every aspect of McRae's conviction, especially since it is now confirmed that an investigation was ongoing during the initial weeks after Rankin was found deceased. *See Maxwell v. Roe*, 628 F.3d 486, 512 (9th Cir. 2010) ("[T]he finders of fact were deprived of the fundamental inference that if [a witness] lied about X, Y, and Z, it is quite likely that he lied about Q, R, and S.") (quoting *Killian v. Poole*, 282 F.3d 1204, 1209 (9th Cir. 2002)). Given that Voorhees testified falsely about the File, it is a reasonable inference that he was also willing to remove materials from the File, especially when he falsely testified that he did not have knowledge of what had been removed or added because the File was not in his "care, custody and control." (DE 10-17 at 157:11– 20.)[16] Kelly's testimony establishes that the File was in Voorhees's care, custody and control, and that Voorhees lied about that.

_____

[16] While the question may be asked why Voorhees testified truthfully that records were generated during this time period and missing, the answer is obvious—common sense dictates that records were produced during the four and a half month period after Rankin's death and the tabbed sections without documents made it abundantly clear that files had been removed.

B. The DAO should have a copy of all records related to the Rankin homicide but it inexplicably is missing an identical set of records from the first four and a half months of the investigation.

The DAO file casts a longer shadow on the integrity of the File from the first four and a half months of the investigation into Rankin's murder. Multiple witnesses from both the RPD and DAO testified that the RPD provided a complete copy of its file to the DAO. (Ex. 2 at 20:12–21:18; Ex. 4 at 25:3–8; Ex. 6 at 17:7–14, 23:16–22.) That the DAO file is missing the *identical* set of records as the RPD file cannot be a coincidence; it therefore must be further evidence of an effort by the RPD, DAO, or both to conceal exculpatory evidence and thwart McRae's long-fought effort to establish his innocence.

At the state post-conviction evidentiary hearing, consistent with the RPD testimony about the policy of providing the full case File to the DAO, former ADA Parker confirmed that the DAO would get copies of everything in the RPD file. (DE 10-17 at 245:13–19.) ADA Brewer, who prosecuted McRae, explained at his deposition that he "would expect any investigating agency to bring me all of their files…[r]egardless of the nature of it." (Ex. 4 at 25–10.) With that, there is no reason why the DAO should not have the complete File, unless it did not receive the full File in contravention of RPD and DAO policy.

Notably, however, testimony from former DAO officials regarding discovery and the File has been contradictory. For example, former DA Honeycutt falsely testified at his deposition when he claimed that once he became the elected DA, the office engaged in open file discovery, including in McRae's case. (Ex. 7 at 30:17-19.) Honeycutt's assertion is plainly contradicted by: (1) the fact that the nine witness statements were concealed; (2) the testimony of McRae's trial counsel and former ADA Parker at the 2014 post-

15

conviction evidentiary hearing regarding what materials were provided at trial (DE 10-17 at 275:8–276:2; DE 10-16 at 34:8–17); and (3) testimony that the DAO's policy reflected the law at the time, which did not mandate open file discovery (*see, e.g.*, Ex. 4 at 33:18–34:12).[17]

Given the testimony established that an investigation was ongoing during the first months after Rankin's death and that these investigative records should be in the File, it would be naïve to believe that it is only a coincidence that the RPD and DAO separately lost the identical set of documents from the File. The better, more reasonable explanation is that the files from the first four and a half months of investigation were at some point intentionally suppressed or removed from the File, a fact that would prove fatal to the State's already weak case against McRae.

## II. THE INADEQUACY OF THE RPD INVESTIGATION WOULD PREVENT ANY REASONABLE JUROR FROM FINDING PETITIONER GUILTY BEYOND A REASONABLE DOUBT.

The current File maintained by the RPD is plainly inadequate. Respondent has argued, and will likely continue to argue, that there is a reasonable, innocent explanation for why there are no files from the crucial four and a half months after Rankin's murder. Respondent has previously offered the following possible explanations: (1) there were never any files created because there was no work done or nothing to record; and (2) trial and state court post-conviction hearing exhibits reflect the RPD's investigative efforts. (*See*

---

[17] DA Honeycutt also attempted to minimize his involvement in the case, claiming to be far less involved than previously established. (*See* Ex. 8 (former ADA had "many conversations" with ADA Brewer and DA Honeycutt about the case).)

DE 16 at 4–7.) Respondent is also likely to add that years have passed since the investigation, and former Chief Voorhees and the recent deponents cannot recall any specific investigatory steps or documents that should be in the File. (*Id.* at 5–6.) These explanations simply fail, as they are clearly and consistently contradicted by the deponents' testimony.

Even assuming arguendo, as Respondent has previously argued, that the sparse records from this time period included in the File accurately reflect the extent of the investigation, that explanation is still favorable to McRae—either the RPD investigation was so inept that it did not perform any investigation in the time period immediately following Rankin's murder or did not document whatever investigation it conducted.

As discussed above, the deponents' testimony makes clear that an investigation was ongoing during this period. (*See* Ex. 1 at 30:16 to 32:6; Ex. 2 at 34:16–35:3, 12:17–19; Ex. 3 at 31:10–16; Ex. 4 at 42:15 to 43:3, 46:14–21; Ex. 5 at 17:12–14, 48:3–9; *see also* DE 10-16 at 144:6–18.) But, even assuming no investigative work was done, that alone can sway a jury. *See Kyles v. Whitley*, 514 U.S. 419, 446 (1995) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant.") Even more extreme than *Kyles*, a nonexistent investigation is obviously "insufficiently probing" and creates a case that is "significantly weaker" than what was presented to the jury. *Id.*

Alternatively, the RPD may have decided not to record whatever minimal investigative steps it took, a conclusion Respondent will likely argue is appropriate. But, that bald assertion is directly contradicted by deposition testimony from former RPD

17

officers, which make clear that basic, initial policework should have been recorded. Thus, any argument from Respondent that there was nothing worth recording is both unlikely and alarming in light of the clear testimony on this point.[18] And, even if we are to assume that work was done, and just not documented, the State's case fares no better. Given the fragility of the case against McRae, even minimal new evidence is sufficient to create reasonable doubt. *United States v. Agurs*, 427 U.S. 97, 113 (1976) (If a "verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.").

Here, although McRae has only uncovered very limited information from the first four months after the investigation, the little known to him reveals that, among other things, there was reason to further examine the background of the victim (DE 10-17 162:22–163:8), to investigate an individual named "Dale" (DE 10-3 at 79:9–13), and that the RPD considered suspects from outside Rockingham (DE 10-17 at 234:25–235:14.) That information would have been critical for McRae's defense at trial as evidence of other suspects can be crucial to raise reasonable doubt. And, if those suspects were not fully pursued, that lack of thoroughness is ideal fodder for the defense.[19] *See Kyles*, 514 U.S. at

---

[18] To the extent Respondent argues it is plausible that no investigation was done during the first four and a half months because deponents could not remember what specific investigative steps were taken more than twenty years ago, such a conclusion is improper and illogical – "Simply put, a witness's statement that she does not know that something happened or how it happened is *not* affirmative evidence that something else happened or how." *Graves v. Loi*, 930 F.3d 307, 326 (4th Cir. 2019) (emphasis added).

[19] Furthermore, although not a suspect when questioned by the RPD about Rankin's murder, it is inexplicable that there is no documented investigation into Marlin Dumas, the only purported eyewitness who was convicted of capital murder just months after

18

445-46 (explaining that it is common to attack and discredit the "caliber of the investigation" because it can "damage…the prosecution's case").

Finally, and as argued above, the most likely explanation is that the RPD investigated the murder during the first four months, recorded that investigation, but then suppressed and destroyed those materials because they contained favorable evidence that would have raised doubt about McRae's guilt. To be sure, without the materials, McRae is left in the dark, having to speculate about what the materials could have revealed. But, as already discussed, the crumbs of information the state left behind suggest that, at minimum, the materials from the first four months would have included information about alternative suspects; "classic *Brady* material." *Juniper v. Zook*, 876 F.3d 551, 570-71 (4th Cir. 2017) (citation omitted). Moreover, if the evidence was not meaningful, there would be no reason for the RPD to go through the effort of suppressing or destroying it. *See Long v. Hooks*, 972 F.3d 442, 482 (4th Cir. 2020) (Wynn, J., concurring) (expounding "why, if this evidence was *not* meaningful, the officers chose to hide it"). The missing evidence must be presumed to be favorable to McRae.[20] *See, e.g.*, *Jimerson v. Payne*, 957 F.3d 916 (8th Cir. 2020) (explaining that where the state concealed evidence that is now lost "an adverse inference may be drawn and it is appropriate to weigh the value in favor of [Petitioner]").

---

implicating McRae in Rankin's death. A capital murderer's admitted presence at the crime scene should have prompted further investigation.

[20] While the habeas petition in *Jimerson* included a claim under *Arizona v. Youngblood*, 488 U.S. 51 (1998), the adverse inference for lost evidence should apply with equal force when a court examines the totality of the evidence under *Schlup*.

19

In sum, Respondent may advance a few different arguments to explain why there are no documents from the first four months after the murder. But no matter the explanation, the limited documentation available and deposition testimony establishes that the lack of materials would further damage an already extremely frail case against McRae and tip the scale such that no reasonable juror would now find him guilty, especially when coupled with the new evidence presented in McRae's Petition. (*See* DE 1 at 31-43.)

## Conclusion

The RPD either performed a grossly inadequate investigation or intentionally hid or destroyed documentation from the four and a half months following Rankin's murder; either explanation further undermines the case against McRae. A review of the entire record now establishes that no reasonable juror would find McRae guilty beyond a reasonable doubt, satisfying the *Schlup* actual innocence gateway.

Respectfully submitted, this the 24th day of January, 2023.

/s/ Jamie T. Lau
Jamie T. Lau (N.C. Bar No. 39842)
Evan S. Glasner*
Wrongful Convictions Clinic
Duke University School of Law
jamie.lau@law.duke.edu
Box 90360
Durham, North Carolina 27708
Telephone: (919) 613-7764
Fax: (919) 613-7262
*Counsel for Petitioner*

*Appearing by special appearance pursuant to
L.R. 83.1(d)

## CERTIFICATE OF SERVICE

I certify that on January 24, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification to the following:

Ms. Kimberly N. Callahan
kcallahan@ncdoj.gov
*Counsel for Respondent*

Mr. Zachary K. Dunn
zdunn@ncdoj.gov
*Counsel for Respondent*

Respectfully submitted, this the 24th day of January, 2023.


/s/ Jamie T. Lau
Jamie T. Lau (N.C. Bar No. 39842)
Wrongful Convictions Clinic
Duke University School of Law
*jamie.lau@law.duke.edu*
Box 90360
Durham, North Carolina 27708
Telephone: (919) 613-7764
Fax: (919) 613-7262

*Counsel for Petitioner*