# EXHIBIT 1

**RPD 30(b)(6) Deposition - George Gillenwater**

1             IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

2

3        DERRICK JOVAN McRAE,       )
                                    )
4                PLAINTIFF,         )
                                    )
5        V.                         ) 1:21-CV-577-LCB-JLW
                                    )
6        ERIK A. HOOKS,             )
         Secretary, N.C. Dep't     )
7        of Public Safety,         )
                                    )
8                DEFENDANT.         )

9

                      Rockingham, North Carolina
10                    Monday, September 26, 2022

11

12   30(b)(6) Deposition of Rockingham Police Department by
                      GEORGE GILLENWATER,
13

14                a witness herein, called for

15        examination by counsel for the

16        Petitioner, in the above-entitled

17        action, pursuant to agreement, the

18        witness being duly sworn by Kylie

19        Fleming, Court Reporter and Notary

20        Public in and for the State of North

21        Carolina, taken at the Clerk's Office

22        Conference Room, Richmond County

23        Courthouse, 105 West Franklin Street,

24        Rockingham, North Carolina, beginning at

25        1:50 p.m.

```
 1                  APPEARANCES OF COUNSEL

 2
        On behalf of the Petitioner:
 3

 4            Jamie T. Lau
              Wrongful Convictions Clinic
 5            Duke University School of Law
              Box 90360
 6            Durham, NC  27708
              jamie.lau@law.duke.edu
 7

 8      On behalf of the Respondent:

 9
              Zachary K. Dunn
10            Kimberly N. Callahan
              Department of Justice
11            114 West Edenton Street
              Raleigh, NC  27603
12            zdunn@ncdoj.gov
              kcallahan@ncdoj.gov
13

14
         Also Present:
15

16            Chuck Habrack, Videographer
              Kelly Keglovits, Duke
17

18

19

20

21

22

23

24

25
```

Case 1:21-cv-00577-LCB-JLW   Document 41-1   Filed 01/24/23   Page 3 of 71

1      INDEX TO EXAMINATIONS AND EXHIBITS

2

   Examination                  Page
3

4       Direct by Mr. Lau        7
          Cross by Mr. Dunn       44
5       Cross by Ms. Callahan    48
          Redirect by Mr. Lau     49
6       Recross by Ms. Callahan   52

7

8                 * * *

9

   Exhibit                   Page
10

   (None Marked.)
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:21-cv-00577-LCB-JLW Document 41-1 Filed 01/24/23 Page 4 of 71

1              P R O C E E D I N G S

2              THE VIDEOGRAPHER:  Today is

3    September 26th, 2022.  The time is

4    approximately 1:50 p.m.  We are now on

5    the record.

6              This is the beginning of media

7    one in the 30(b)(6) deposition of

8    Rockingham Police Department.  The

9    corporate representative is George

10   Gillenwater.  In the matter of Derrick

11   Jovan McRae verse Eric A. Hooks, et al.

12   The case is In The United States

13   District Court For The Middle District

14   of North Carolina, Case Number

15   1:21CV577.

16             Today's location is 105 West

17   Franklin Street, Rockingham, North

18   Carolina 28379.  My name is Chuck

19   Habrack.  I'm the videographer.  The

20   recorder is Kylie Fleming.

21             For the record, can counsel

22   please introduce yourselves, whom you're

23   representing, then the recorder will

24   swear in the witness.

25             MR. LAU:  Jamie Lau on behalf

Case 1:21-cv-00577-LCB-JLW   Document 41-1   Filed 01/24/23   Page 5 of 71

1   of the petitioner, Derrick McRae.

2               MS. CALLAHAN:  Kimberly

3   Callahan on behalf of respondent.

4               MR. DUNN:  And Zachary Dunn on

5   behalf of the respondent.

6               And just before we get started

7   -- well, do you want to swear in the

8   witness first or --

9               THE COURT REPORTER:  You

10  can --

11              MR. DUNN:  Okay.  Just before

12  we get started, I want to put our

13  objection on the record.  We object to

14  the magistrate judge's limited discovery

15  order, and should the district judge

16  rule in our favor, we would further

17  object to this deposition being used in

18  any other proceeding.  Thank you.

19              THE COURT REPORTER:  Okay.

20  And, Mr. Gillenwater, can you please

21  raise your right hand.

22              Do you swear or affirm today

23  to tell the truth, the whole truth, and

24  nothing but the truth?

25              THE WITNESS:  I swear, I do.

Case 1:21-cv-00577-LCB-JLW   Document 41-1   Filed 01/24/23   Page 6 of 71

1              THE COURT REPORTER:  Thank you

2    so much.

3              And, counsel, you may -- you

4    may begin.

5              MR. LAU:  Yes.  And also, I'd

6    like to note for the record that

7    Mr. Gillenwater is here on behalf of the

8    Rockingham Police Department under Rule

9    30(b)(6), as its designee.  Pursuant to

10   Rule 30(b)(6), the party receiving a

11   subpoena is required to confer in good

12   faith about the matters of examination.

13   Counsel for petitioner communicated with

14   the Rockingham Police Department via

15   email about the meeting confer

16   requirement and attempted to schedule a

17   time to do so but has not heard prior to

18   now from the Rockingham Police

19   Department.

20              Accordingly, petitioner will

21   proceed with the deposition today but

22   reserves the right to recall

23   Mr. Gillenwater or another individual as

24   the designee to sit for another agency

25   deposition, if -- if necessary.

Case 1:21-cv-00577-LCB-JLW   Document 41-1   Filed 01/24/23   Page 7 of 71

```
 1                    GEORGE GILLENWATER,

 2                   having been duly sworn,

 3                    testified as follows:

 4                    DIRECT EXAMINATION

 5      BY MR. LAU:

 6   Q. With that, I'd like to -- I'm Jamie Lau,

 7      and I represent Derrick McRae, Chief

 8      Gillenwater.  And I like to generally

 9      ask first, you know, have you had an

10      opportunity to speak with other

11      individuals about the file in the

12      Derrick McRae case?

13   A. Yes.  Yes, I have.

14   Q. Okay.  And what about historical file

15      keeping for the Rockingham Police

16      Department more generally?

17   A. I spoke to Chief -- prior Chief Billy

18      Kelly about that time frame.

19   Q. Do you feel reasonably prepared to

20      answer questions about recordkeeping

21      practices of the Rockingham Police

22      Department?

23   A. Probably not during that time frame, no.

24   Q. Okay.  With regard to your discussions

25      with Mr. Kelly, did you speak
```

1      specifically about that time frame?

2  A.  I did.

3  Q.  Okay.  And what did he share with you

4      regarding that time frame?

5  A.  During the '96 time frame --

6  Q.  Yeah, the --

7  A.  -- specifically?

8  Q.  -- time frame specifically from October

9      of '95.

10  A.  He said that he really wouldn't have had

11      any knowledge about what the records

12      process was back then, either.  I think

13      he was a patrol officer --

14  Q.  Okay.

15  A.  -- in '96.

16  Q.  Did you speak with any of the officers

17      involved with this case?

18  A.  I did not.

19  Q.  Robert Voorhees?

20  A.  I have not.

21  Q.  Chris Brigman?

22  A.  I have not.

23  Q.  Okay.  Any other efforts to confer with

24      others to determine the practices of the

25      RPD during that period in time?

1  A. So my resources are very limited --

**2  Q. Fair enough.**

3  A. -- during that time frame.  Pretty much

4     Chief -- prior Chief Billy Kelly is --

5     is my go-to resource --

**6  Q. Okay.**

7  A. -- during that time frame.  I don't have

8     a way of making contact with Robert

9     Voorhees.

10            I asked Billy Kelly if he had

11     a number or some way to make contact

12     with him, and he said that the last that

13     he had heard basically was that he was

14     driving trucks and is out of town quite

15     a bit and wasn't really sure how to make

16     contact with him, either.

**17  Q. Okay.  Understood.  Can you describe**

**18     your history with the agency?**

19  A. I started at Rockingham Police

20     Department in 2006.  I left briefly for

21     about two years from 2012 to 2014 and

22     was a special agent with the Department

23     of Revenue Drug Techs, and I came back

24     in 2014 to Rockingham Police Department.

25     Much of my time was either in narcotics

1    or criminal investigations division, and

2    I was promoted to chief of the

3    department after Billy Kelly retired in

4    December of last year.

5  Q. With respect to the file-keeping

6    practices of the Rockingham Police

7    Department, would you feel reasonably

8    comfortable answering questions about

9    those practices after 2006?

10  A. Yes.

11  Q. Okay.  And prior to 2006, would you be

12    able to describe any of the practices of

13    the department before that time?

14  A. I would not be able to, no.

15  Q. Okay.  You -- The agency, the Rockingham

16    Police Department, received a subpoena

17    in this matter dated August 31st, 2022,

18    requesting agency records or RPD records

19    related to an investigation in the death

20    of Jeremy Rankin.

21          Specifically, that subpoena

22    requested records from between the

23    period of October 15th, 1995, to

24    February 21st, 1996.

25          Can you describe the efforts

1        made to locate records from that period?

2    A. So I spoke with Billy Kelly, once again,

3       and asked him of the whereabouts of the

4       original file, because I -- up to this

5       point, I had no dealings.

6                My understanding was that this

7       had come up in 2018, maybe, and he had

8       to find the -- the file and the evidence

9       for that proceeding.

10               He told me that the file and

11      the evidence were retrieved from the

12      clerk's office after that proceeding and

13      they're in a safe.

14               I checked with my evidence

15      technician, and he said that everything

16      was still in place in the safe.  And

17      then I asked my file clerk to go back

18      through the records in '96 to see if

19      there was anything that was out of place

20      that may have anything at all to do with

21      this listed matter.

22               Ms. Brisk said that she was

23      unable to find anything that could be a

24      part of this investigation.  And also

25      back then, there wasn't any Bates

Case 1:21-cv-00577-LCB-JLW   Document 41-1   Filed 01/24/23   Page 12 of 71

1    stamping or anything like that.  So

2    short of there being an OCA number

3    written on any paperwork, we really

4    wouldn't be able to know if it was, you

5    know, a part of the investigation,

6    unless it noted a name or there was some

7    photos or anything like that.  And so --

8    But we were unable to find anything.

9  Q. So you asked your records custodian,

10    just to clarify --

11 A. Yes.

12 Q. -- to review case files from 1996 --

13 A. Yes.

14 Q. -- to try and identify --

15 A. Well, to go through the -- we have

16    filing cabinets for each year.  And we

17    were in the process of -- of purging

18    files, anyway.  So while she was doing

19    that, I asked her to go through and make

20    sure that we weren't missing -- or if

21    there wasn't any documents that were

22    loosely in the filing cabinets, to see

23    if, you know, it was pertinent to the --

24    this -- this matter.

25 Q. Is there a filing cabinet for 1995?

1  A. There would be, yes.

2  **Q. Do you know if she reviewed the 1995**

3  **filing cabinet?**

4  A. She did, yeah.

5  **Q. Are all files maintained by the records**

6  **custodian?  Is that -- Can you describe**

7  **just generally how files are stored --**

8  A. Well --

9  **Q. -- at the Rockingham Police Department?**

10 A. -- right now, they're under lock and key

11    in a file room.  All prior murder cases,

12    high-level felony cases, sexual

13    assaults, rapes, things like that are

14    kept separate.  And myself and the

15    assistant chief has access to the filing

16    room, nobody else.  We have to let the

17    records clerk in if she needs to -- to

18    get any out of there.

19 **Q. How long has that been the process,**

20    **where you or the assistant chief were**

21    **the only ones with keys to --**

22 A. As far as I know, that's been a process

23    when Billy was the chief.  Him and the

24    assistant chief at the time, Major

25    Grant, were the only two who had access

1      to the filing room.

2   Q. Okay.  Now, you testified with respect

3      to these records that they were kept in

4      a safe, the records related to the McRae

5      case.  Is that safe in that filing room?

6   A. It is not.  It's in a separate part of

7      the police department.

8   Q. Okay.  And do you know why the records

9      here were separate from the records that

10     were kept in the file room?

11  A. As I previously stated, my understanding

12     was that this matter came before the

13     courts in 2018, 2019.  And Billy Kelly

14     had spent some time trying to find that

15     file and the evidence that went with

16     that file.

17          And once those proceedings

18     were done here in Richmond County, I

19     guess it was -- it was his intent to put

20     them in the safe so they would be easily

21     accessible if the matter came up again.

22  Q. Did -- Did he describe those prior

23     efforts to locate the file?

24  A. He -- Not to me, no.

25  Q. Okay.  Anything else done with regards

1      to this search for records beyond --

2      well, did you go to the safe and

3      identify files in the safe?

4   A. I did not.

5   Q. Okay.  So the files that are in the safe

6      were represented to you by Mr. Kelly --

7      or former Chief Kelly as being files

8      that were produced back at an earlier

9      time?

10  A. That's correct.

11  Q. Okay.  Did he indicate that there were

12     any records in there that may not have

13     been produced?

14  A. He did not, no.

15  Q. Okay.  With regards to the storage of

16     electronic records, does the Rockingham

17     Police Department have electronic

18     records stored from the period dating

19     back to October of 1995?

20  A. I honestly -- I would assume that we

21     probably do, but I don't know --

22  Q. Okay.

23  A. -- with absolute certainty.

24  Q. Who would have access to the electronic

25     records that potentially exist for the

1      RPD?

2   A. From -- From that time frame?

3   Q. Yes.

4   A. I mean, I would have --

5   Q. Yes, sir.

6   A. -- access to that if they're in the

7      filing room.

8   Q. Has anything been done to identify

9      whether or not electronic records exist

10     from the period of time between October

11     15th, 1995, to February 21st, 1996?

12  A. With -- Specifically in regards to this

13     case, yes, but just in general, no.  Not

14     -- Not for this -- that generalized time

15     frame.

16  Q. Okay.  Who did that search for

17     electronic records?

18  A. My records custodian.

19  Q. Okay.  And are there -- speaking for the

20     agency, there are electronic files

21     dating back that far; is that correct?

22  A. I honestly don't know.

23  Q. Okay.

24  A. I -- I would assume if there was some

25     audiotapes -- and I'm -- I guess that's

1    what you're referring to, because there

2    wouldn't be a CD or a DVD -- but, yes,

3    they would be -- they would be in the

4    filing room.

5  Q. What -- Beyond -- Beyond audiotapes,

6    CDs, DVDs, what about electronically

7    stored documents, documents that were

8    scanned in or otherwise typed into a

9    computer database or system dating back

10   to this period in time?

11 A. I'm not sure that we -- I'm not sure we

12   would have anything like that --

13 Q. Okay.

14 A. -- from back then.  I'd have to -- I'd

15   have to go back and look.

16 Q. Do -- Do you know when the general

17   database began, when -- when

18   investigative records --

19 A. Yeah.

20 Q. -- are being typed into a --

21 A. Yeah, we're --

22 Q. -- server base?

23 A. -- probably a little behind the curve --

24 Q. Okay.

25 A. -- in that -- in that regard.  I would

 1      say Police-Pak RMS came to Rockingham

 2      maybe in '02 or '03.

 3   Q. Okay.

 4   A. So --

 5   Q. And -- And Police-Pak, can you decide --

 6      describe that system?

 7   A. That's our --

 8   Q. Can you --

 9   A. -- records management system.

10   Q. Okay.  So now is everything digitized in

11      that --

12   A. Yes --

13   Q. -- Police-Pak?

14   A. Yes, sir.

15   Q. Okay.  And -- And you -- your

16      understanding was that occurred sometime

17      in the early 2000s?

18   A. That's correct.

19   Q. Okay.

20   A. Yes, sir.

21   Q. Prior to Police-Pak, was there any use

22      of computers to store criminal

23      information that you're aware of,

24      investigation --

25   A. I don't --

1  Q. -- infor --

2  A. -- yeah, I don't know.  That -- That was

3     before my time.

4  **Q. Okay.  Specific to the McRae matter, did**

5     **you make any inquiries of former Chief**

6     **Kelly or anyone else about the contents**

7     **or knowledge of any contents of records**

8     **from October 15th to February 21st,**

9     **1996?**

10 A. No.  My -- My general inquiry with him

11    was, A, where is the file at?  Because I

12    didn't know where it was at to begin

13    with.  And, of course, he wanted to know

14    what was going on, and I explained the

15    situation to him, and that was pretty

16    much the extent of it.

17           He had mentioned that he had

18    gone through this, like I said, in 2018

19    to 2019, and he said that obviously if

20    the file and evidence weren't in the

21    safe, then it would still be with the

22    clerk's office.

23           Now, there was some confusion

24    because I was calling it McRae and --

25    and everybody else was calling it

1    Rankin.  So there was a lot of

2    confusion.  So it took me some time to

3    sort of figure out where everything was

4    at.  But once we got that sorted, it was

5    apparent that everything was where it

6    was supposed to be.

7  Q. Okay, in the -- in the safe.

8              With regards to the -- the

9    file room, you said there's key access

10   that you and the assistant chief has.

11             If -- If files are removed

12   from the file storage room, is there any

13   log or any records kept of the files

14   being removed from that?

15 A. No.

16 Q. If I'm an investigator and I need to

17   access a file, what are the pros --

18   procedures for my gaining access to that

19   file?

20 A. They would have to generate a request to

21   either myself or the assistant chief.

22   Typically they keep -- So at our

23   department, the investigators keep a

24   master file with themselves, and then

25   there is a file that's kept in the file

```
 1    room, and then there's also a digital
 2    file being on their computer.
 3              So there really wouldn't be
 4    any need now for them to go into the
 5    file room.  I can't think of a time that
 6    -- that any of the detectives have
 7    needed to go into the file room to pull
 8    a file, because they have access to it
 9    on -- through the cloud, through their
10    own copies, CD, things like that,
11    because we have to make -- they have to
12    make two investigative files.  They have
13    to send one through to the DA's office
14    through DAS, so there's a record there.
15    They typically keep a -- a record on
16    their computer or laptop, as well.
17    So...
18 Q. So the materials that they have access
19    to through the cloud would be identical
20    to the materials that --
21 A. Yes, sir.
22 Q. -- are kept there?  Okay.
23              And with regards to the
24    materials that -- I guess get
25    transferred into that master file that's
```

1    maintained, can you describe those --

2    the general contents of -- of a master

3    file that's stored --

4  A. Yeah.

5  Q. -- on a given case?

6  A. Yeah.  Depending on the case, any

7    interviews, the original report, any

8    photographs that may have been taken,

9    any audio or digital recordings that

10    would have been taken, and, you know,

11    pretty much everything that would have

12    been done in the case is represented in

13    the case file, and obviously now -- but

14    everything is Bates stamped to ensure

15    that someone's not missing something on

16    either side.

17  Q. Okay.  And -- And are officers'

18    handwritten notes included --

19  A. Yes.

20  Q. -- in that?

21  A. Yes, sir.

22  Q. And -- And how far back do you recall it

23    being the practice that everything that

24    was a product of the investigation went

25    into that master file that's stored --

1  A. Yeah.  As long as -- since I started in

2     '06, '07.  I mean, that's always been

3     the case.  Discovery, you had to make

4     sure that everything was -- was

5     represented in that case file.

6  Q. Okay.  Do you -- Do you have any -- any

7     knowledge about -- going back to the

8     period of time here, what was required

9     to be kept in the master case file?

10 A. Just -- Just my assumptions, but, no, I

11    don't know exactly what would have been

12    required back -- back then.

13 Q. Okay.  So if -- if -- if a file is in

14    the file room, is there a log kept of

15    that file when it's filed there

16    indicating it being placed there and its

17    location in the file room?

18 A. I don't believe so, no.

19 Q. Okay.  Beyond that file room, do you

20    know of any locations where historical

21    or older files are kept by the

22    Rockingham Police Department?

23 A. For a time period, there was an

24    alternate storage facility in Robert L.

25    It's an old building that the city

1    owned, and there were older files and

2    evidence that was in there for some

3    time.

4  Q. Okay.  And -- And -- And does that

5     building still have files and evidence

6     there?

7  A. I don't know.  I -- I haven't been down

8     there in ten years or more.  So --

9  Q. Okay.  So safe to say you -- if -- if

10    material from this case exists there,

11    you don't know?

12 A. I wouldn't know.

13 Q. You wouldn't know.  Okay.

14          Now, with regard to those --

15    those files, who are the -- who's --

16    who's the custodian of the files there,

17    stored there?  Is it still the

18    Rockingham Police Department?

19 A. Yeah, if there's anything down there.  I

20    think Chief Kelly cleaned that area up

21    or -- or, you know -- I don't know that

22    there's anything that exists down there

23    anymore, to be honest with you.

24 Q. Okay.

25 A. But, yeah, that -- that would be the

1      case.

2   Q. That would be the case?

3   A. Yeah.

4   Q. Okay.  Have -- Have you ever known an

5      agency file to -- to be kept offsite for

6      any period of time before coming back to

7      the Rockingham Police Department?

8   A. No, sir.

9   Q. Okay.  Are you aware that Detective

10     Voorhees testified that when he was the

11     chief, he looked for the file and it was

12     not located at the RPD?

13  A. I was not aware of that, no, sir.

14  Q. Okay.  Is there any reason for a master

15     file to be located offsite at any period

16     of time?

17  A. Not that I can think of, no.

18  Q. Okay.  With regards to conveying files

19     or -- or producing files to the district

20     attorney's office, can you generally

21     describe what files are produced to the

22     district attorney's office, how that

23     file -- and -- and -- and how that

24     production is made?

25  A. All felony files are produced to the

1    district attorney's office, and it's

2    done so through a system called DAS,

3    D-A-S.

4              Basically an investigator

5    completes the case file, would have to

6    do a -- basically a header sheet that

7    describes the -- the crime committed,

8    the -- the victim, the suspect, the date

9    and time and place that it occurred.

10             And then the entirety of the

11   file -- and there's a discovery

12   certification page, which is an

13   acknowledgment page saying the DA's

14   office received the discovery -- all

15   this is Bates stamped.  We have a unique

16   identifying number.  Ours is -- starts

17   with a 04.  That's our agency one.

18   And it's scanned in and then sent

19   through this DAS system to the DA's

20   office.

21             And my understanding is, is

22   that one of the assistants there

23   downloads it and either burns it to a

24   disk or prints it out for both the

25   district attorney and the defense

1      attorney.

2   Q. Do you know at what point in time the

3      RPD began using that system?

4   A. I can give you a guess, because this

5      happened while I was there.  I think it

6      was around 2009, 2010.

7   Q. Okay.  And prior to 2009, 2010, how were

8      materials produced to the district

9      attorney's office?

10  A. Hand delivered.

11  Q. And -- And what was a part of that

12     delivery?

13  A. Substantially the same -- the same

14     stuff, just delivered by hand instead of

15     via the DAS portal system.

16  Q. Was there any meetings with officers

17     making that delivery to discuss what was

18     being received?

19  A. I don't recall.

20  Q. Any log that you're aware of documenting

21     the transmission between the agency and

22     the district attorney's office?

23  A. Well, there was -- that certification

24     page was still a part of the process, so

25     you walk it over there and deliver it.

1    There may have been a counsel on it,

2    depending on the -- the case matter.

3    And then the -- the assistant would sign

4    off saying she received it, and we'd

5    sign off saying that we'd given it to

6    them.

7            They'd make a copy of the

8    certification, and we kept it with --

9    with our file.

10  Q. Okay.  And -- And do you know how long

11     that practice was in place to receive a

12     certification of the discovery being

13     provided?

14  A. I don't know.

15  Q. Okay.  Do you know in the McRae case if

16     there's any certification indicating

17     what materials were turned over?

18  A. I don't.

19  Q. With regards to the retention of

20     records, what is the policy regarding

21     the retention of records?

22  A. So all -- all felony cases are

23     maintained.  Homicides are maintained

24     for -- forever, but we follow the record

25     retention laws, the guidelines set for

1    by North Carolina.

2  Q. So homicides are kept forever.  You said

3     that there's a -- a -- a purge of files

4     going on in the current process?

5  A. Yeah.  There was -- When I took over,

6     because they didn't have RMS, you know,

7     leading up to '02 or so, all those

8     incident reports, accident reports, and

9     things like that that could have been

10     purged just were purged.

11            So following those record

12     retention guidelines, we started

13     removing some of that stuff to create

14     some space in the file room.

15  Q. Okay.  Speaking on the behalf of RPD,

16     can you think of any reason why

17     materials would be removed from one of

18     these master case files?

19  A. I cannot.

20  Q. With respect to the McRae case or the

21     Jeremy Rankin homicide investigation,

22     are you familiar with the fact that

23     Mr. Rankin was found deceased on the

24     morning of October 15th, 1996 -- 1995?

25     Excuse me.

1    A. Yes.

2    Q. Okay.  And based on the prior subpoena,

3       we're seeking records from between that

4       time and February 21st, 1996.

5                    With regards to the agency

6       files, do you know of any other case

7       where the first four months of records

8       for -- from an investigation don't

9       exist?

10   A. No, I don't.

11   Q. Would the agency ordinarily inspect

12      records from the first four and a half

13      months of investigation to an existing

14      case?

15   A. Yes.

16   Q. And what sort of investigative

17      activities would the agency generally

18      expect to see in a record through that

19      period in time?

20   A. The first four months of, I guess, just

21      any homicide --

22   Q. A homicide investigation?

23   A. -- investigation, yeah.  Probably a

24      substantial amount of interviews, if

25      there's any witnesses; interviews with

1    the defendant; photos of -- if an

2    autopsy would have been done in that

3    time frame, probably autopsy records;

4    the initial report, we call that the O2,

5    things like that.

6  Q. You said if there are any witnesses.  Is

7    it the agency's practice to wait for

8    witnesses to come forward?

9  A. No, it is not.

10  Q. So would it be the agency's practice to

11    go out and start speaking to people --

12  A. It would be.

13  Q. -- immediately?

14  A. Yes.

15  Q. And would those interviews be

16    documented?

17  A. Yes.

18  Q. And included in that file?

19  A. Yes.

20  Q. Do you know of any case where they've

21    waited four months before going out with

22    respect to a homicide investigation to

23    interview witnesses?

24  A. Not that I'm aware of, no.

25  Q. Would you consider it unusual to wait

1 four months before you inter -- go out

2 and find people to interview in a

3 homicide case?

4 A. I would, yes.

5 Q. Unheard of?

6 A. I've never heard of it.

7 Q. Okay.  Do you know from Chief Kelly when

8 and where the -- the file was first

9 found?

10 A. I -- I don't re -- no, I don't remember

11 if I've asked him or I just don't recall

12 where he said he found the file at.  I

13 know -- I do remember him saying that he

14 had to spend some effort in trying to

15 locate the file.

16 Q. Okay.  And did he describe those

17 efforts?

18   MS. CALLAHAN:  I'm going to

19 have to object for the record based on

20 hearsay of what Officer -- or Chief

21 Kelly --

22   THE WITNESS:  Chief Kelly,

23 yeah.

24   MS. CALLAHAN:  -- told him, is

25 -- is hearsay, so I'm going to object

1    for the record.

2  **Q. You -- You can go ahead and answer --**

3  A. Yeah.

4  **Q. -- whether he described --**

5  A. He did not describe, yeah.

6  **Q. Okay.**

7  A. He just said that basically he

8     remembered having to spend a

9     considerable amount of time trying to

10    locate the file because it was -- it was

11    coming up for -- for whatever the

12    proceeding was in 2018, 2019.

13 **Q. Was that file -- Did -- Did he indicate**

14    **whether or not that file was in the file**

15    **storage room?**

16 A. Now, I don't -- let me correct myself.

17    I apologize.  I'm not sure if he knew --

18            MS. CALLAHAN:  I'm just going

19    to go ahead for the record and just do a

20    standing objection to this line --

21            MR. LAU:  Of course.

22            MS. CALLAHAN: -- of

23    questioning.

24 A. I don't -- I don't recall if it was the

25    file specifically or just any and all

1    evidence related to the file

2    specifically.  So it may be that he was

3    able to locate the file and not the

4    evidence or the evidence and not the

5    file.  I'm not a hundred percent sure.

6  Q. Okay.  So -- So at some point in time,

7    former Chief Kelly indicated to you that

8    he searched for records in this case,

9    and you don't underst -- you don't know

10    the full extent of what that --

11 A. I don't.  I don't.

12 Q. -- was?  Okay.

13            Are you aware, does the agency

14    -- On behalf of the agency, are you

15    aware of any files being lost at any

16    period of time from the department?

17 A. I'm not, no.

18 Q. Now, there's been some renovations of

19    the police department over time; is that

20    correct?

21 A. That's correct.

22 Q. And do you know generally what was done

23    to secure the files during the course of

24    those renovations?

25 A. I do not know.  Once -- Once again, that

1       was before I started.

2   Q.  Do you know when those renovations

3       occurred?

4   A.  Not exactly, no.  I think it was '01 or

5       '02.

6   Q.  Okay.  Have -- Have you had any

7       conversations with other members of the

8       Rockingham Police Department with

9       regards to what took place during the

10      first four months of -- of investigation

11      in the Jeremy Rankin --

12  A.  I have not.

13  Q.  -- homicide case?

14              Do you know prior to 2006 the

15      individuals who would have had -- had

16      access to the case files in the

17      Rockingham Police Department?

18  A.  Not with -- Not with any certainty, I

19      don't, no.

20  Q.  Are there some individuals that you

21      would expect had access to the files?

22  A.  I would expect that possibly the chief

23      and/or assistant chief then would have

24      had access to the files.

25  Q.  And who was the chief when you started?

1    A. Robert Voorhees.

2    **Q. And Chief Kelly seceded --**

3    A. That --

4    **Q. -- Mr. Voorhees?**

5    A. That's correct.

6    **Q. And prior to Mr. Voorhees, do you know**

7       **who the chief of the agency was at that**

8       **point in time?**

9    A. Chief Martin.

10   **Q. Okay.  Do you know Mr. Martin's first**

11      **name?**

12   A. He -- He goes by E.R. Martin --

13   **Q. We --**

14   A. -- I don't know --

15   **Q. -- we can --**

16   A. Yeah, I apologize.

17   **Q. That's okay.  I appreciate that.  And --**

18      **And -- And at what point in time, do you**

19      **know, was Mr. Martin -- or Chief Martin**

20      **the chief?**

21   A. I'm not -- I'm not sure when Voorhees

22      became chief in Rockingham.

23   **Q. Okay.**

24   A. He was the chief obviously when I

25      started, and Mr. Martin was the

1    magistrate at the time when I started at

2    the police department.

3  Q. Okay.  You said the assistant chief.  So

4    for as long as you can remember, the two

5    people with access to the files were the

6    chief and the assistant chief; is that

7    right?

8  A. I'm going to assume the assistant chief

9    had access to the files, just because my

10   assistant chief has access to the files,

11   but I -- I can't speak with any

12   certainty on that.

13 Q. So -- So there is a file custodian, but

14   they don't have direct access --

15 A. They don't.

16 Q. -- to the file room?

17 A. No.

18 Q. Has that always been the case?

19 A. I don't know.  I don't -- There's not

20   really a need for them to have access to

21   the file room now, but -- like I said

22   before, because everything is in RMS.

23   So they can answer most questions if

24   someone were to call about a report or

25   an incident via RMS because all the

1    notes that the investigators put in

2    there are typed into RMS, as well.

3    So --

4  Q. Okay.  What -- What is the role of that

5    **custodian if things are more or less**

6    **electronically stored --**

7  A. It --

8  Q. **-- within the department?**

9  A. Well, right now, she is responsible for

10   helping purge some of these older

11   records out to create space for -- for

12   new records.

13          She enters property.  We still

14   do property sheets.  We're working

15   towards digitizing that, but right now,

16   you fill out a property sheet, you hand

17   it to her, and she enters that into RMS.

18   She'll answer any questions that someone

19   may have, generalized questions about a

20   report or investigation.  She can look

21   that up.

22          If it becomes a little more

23   involved, then she transfers that over

24   to the investigator who's handling that

25   case.

1          She also does NCIC entries for

2     us and validations for us, as well.

3  Q. Okay.  Has the RPD ever conducted an

4     audit of its files --

5  A. Not that I'm aware --

6  Q. -- since you've --

7  A. -- of.

8  Q. -- been -- specifically what it has in

9     its possession?

10  A. Not that I'm aware of.

11  Q. Okay.  Any effort to ensure that the

12     contents of the 1995 file cabinet are

13     indeed 1995 records and so forth for

14     additional years?

15  A. As far as the filing -- files, is that

16     what you're --

17  Q. Yes.

18  A. -- the -- as far as -- yes.

19  Q. So that effort has taken place to ensure

20     that within the file storage space, the

21     files are appropriately --

22  A. Yes.

23  Q. -- kept?

24  A. Yes.

25  Q. And are locations of those files

1      something that is documented beyond --

2      anywhere beyond just the -- going to the

3      cabinet?

4    A. Just the filing cabinet?  That's pretty

5      much the -- the extent of it right now,

6      yes.

7    Q. Okay.  What training is done for

8      officers with respect to their

9      file-keeping practices and ensuring that

10     all materials end up in that master case

11     file?

12   A. So obviously they go through their basic

13     law enforcement training, and then they

14     go through an FTO program with us where

15     we cover what's expected as far as being

16     part of their felony file or if it's a

17     misdemeanor case, what's expected to be

18     in -- in their personal file, as well.

19   Q. And -- And an understanding of their

20     personal file, those contents have to at

21     some point in time be conveyed or

22     placed --

23   A. Correct.

24   Q. -- in the master file, as well?

25                 I just want to define some of

1      these things with you.  The master case
2      file is the full record of the
3      investigation for the Rockingham Police
4      Department; is that --
5   A. Correct.
6   Q. -- right?
7            When you spoke with former
8      Chief Kelly, the master case file in the
9      Rankin homicide is presently stored in
10     the safe?
11  A. That's correct.
12  Q. And you understood it to be the master
13     case file in the Rankin homicide?
14  A. That's correct.
15  Q. Okay.  And is there anybody other than
16     you or the assistant chief with access
17     to that safe?
18  A. I don't have access to the safe.  Yeah.
19     It's just not my property.  The
20     custodian has access to the safe.
21  Q. Okay.  And has that been the case over
22     the years, that the property custodian
23     -- So -- So I want to -- I want to flesh
24     this out a little bit.
25  A. Yeah.

1  Q. So what's the difference between the
2     file custodian and the property
3     custodian?
4  A. So the -- the property custodian, he
5     handles -- once you fill out this
6     property sheet and our property custo --
7     or our file custodian enters it into our
8     RMS system, you have to sign over the
9     property to our property custodian, then
10    he places it in the appropriate storage
11    facility.
12            Now, the safe -- the contents
13    of the safe typically are just drugs,
14    money, guns.  We did have one other case
15    that was in the safe.  It was a
16    homicide, as well, just -- and I can't
17    recall why it was -- why it was placed
18    in the safe, but for whatever reason,
19    Chief Kelly put this into the safe, as
20    well.
21 Q. So is there a log of it going into the
22    safe then?
23 A. Yes, there should be.  Yeah.
24 Q. So moving forward from the time it's
25    placed into the safe, it's in your

Case 1:21-cv-00577-LCB-JLW   Document 41-1   Filed 01/24/23   Page 43 of 71

1      property control system?

2   A. Correct.

3   Q. And the property control system would

4      generate a chain of custody any time

5      that file subsequently would be

6      accessed?

7   A. Yeah.  That's -- Well theoretically,

8      yes.  If that's how Chief Kelly had it

9      entered into the safe, then, yes, there

10     should be -- in RMS, but the problem --

11     the problem would be is that this OCA

12     wouldn't have even have existed for RMS.

13     So in order for us to get an OCA, we

14     have to call the ECOM, the central

15     communications --

16  Q. Okay.

17  A. -- and they generate a case number,

18     which we call an OCA.  And we're able to

19     use that to then generate property

20     sheets and incident reports and things

21     of that nature.

22             So to say that it's in the

23     system now, I don't know with any

24     certainty.  I can definitely look into

25     that though.

Case 1:21-cv-00577-LCB-JLW   Document 41-1   Filed 01/24/23   Page 44 of 71

1    Q. Okay.

2    A. Yeah.

3    Q. So for your --

4    A. There -- There should be a record of

5       when he -- whoever picked this stuff up

6       from the clerk's office after the last

7       hearing or proceeding, and when it went

8       back to the Rockingham Police

9       Department, there should be a record

10      probably here of that.

11   Q. Okay.

12              MR. LAU:  That would be all my

13      questions.

14                 CROSS-EXAMINATION

15      BY MR. DUNN:

16   Q. Good afternoon.  I wanted to talk about

17      just a couple of points here.  Hopefully

18      it won't take too much of our time.

19   A. Okay.

20   Q. So speaking generally of the time frame

21      from 1995, just call it, to 1998, you

22      weren't in law enforcement of any type

23      at that time, were you?

24   A. I still was in high school.

25   Q. You were in high school, okay.  So

1      exactly what went on in those years,

2      investigative activity, policies and

3      1procedures, you don't have direct

4      knowledge of those --

5  A. I do not.

6  Q. -- from -- from dating back to that

7      time?

8  A. No.

9  Q. You'd have -- You'd have to speculate?

10  A. Correct.

11  Q. Okay.  So you testified a little bit

12      earlier about -- you were asked like

13      what -- what you would expect to see in

14      a master case file, and one of the

15      things -- some of the things that you

16      mentioned were witness statements and

17      anything that happened from the time the

18      case was opened until -- I mean, just

19      ongoing, I suppose --

20  A. Right.

21  Q. -- is that -- is that right?

22  A. Yes.

23  Q. Speaking of the McRae case or the Rankin

24      case specifically, do you know if there

25      was any witness statements collected

1    between October 14th, 1995, and March

2    1st, 1996?

3    A. I do not.

4    Q. Do you know if any neighborhood

5       canvassing was done between October

6       14th, 1995, and March 1st, 1996?

7    A. I do not.

8    Q. So you don't know -- correct me if I'm

9       wrong, do you know of something that

10      should be in this specific McRae/Rankin

11      file that is not in that file right now?

12   A. I have -- I would -- I would have no

13      idea.

14   Q. Just --

15   A. Yeah.

16   Q. -- no idea?

17               You testified a little bit

18      about an offsite storage area that was

19      used, and it may or may not be used at

20      this time.

21   A. Correct.

22   Q. Do you know if the -- I think you

23      referred to them as the felony case

24      files, the -- the murders, rapes, those

25      sorts of things, were they ever stored

1      offsite?  Do -- Do you have any idea?

2  A. I -- I don't know.

3  Q. Okay.  Especially going back to '95 --

4  A. No.

5  Q. -- ninety --

6            Do you know if the storage

7      area -- the offsite storage was used

8      during '95, '98, any -- any of that time

9      period?

10  A. I don't think there are -- any files

11     were stored in that area.  I think that

12     older evidence was stored in that area.

13  Q. All right.

14  A. All the files were still in a filing

15     cabinet --

16  Q. Okay.

17  A. -- is my understanding.

18  Q. And then again -- you state now, current

19     procedure is -- for a certification of

20     discovery to go back into your file

21     after you've turned it over to the

22     district attorney's office; is that

23     correct?

24  A. That's correct.

25  Q. Are you -- Do you know if that was the

1      procedure back when this case was handed

2      over to the DA's office?

3   A. I don't believe it was.  I can't say for

4      sure.  But I remember when the discovery

5      certification sheet became a thing in

6      Richmond County, so I assume that it

7      probably wasn't a thing before --

8   Q. Right.

9   A. -- you know, '09 or 2010.

10  Q. Gotcha.

11                    CROSS-EXAMINATION

12     BY MS. CALLAHAN:

13  Q. If the police department was being

14     renovated, would they have kept their

15     master files where they usually do, or

16     do you have any direct knowledge of what

17     they did with those files during that

18     renovation?

19  A. I don't know what the building looked

20     like before, you know, what it looks

21     like now.  So I don't know where the

22     files were kept before versus where

23     they're kept now.  I don't know if those

24     renovations would have made them alter

25     or move those files to complete those

1    renovations.

2  Q. Okay.  And you've done your very best

3     efforts to comply with the subpoena to

4     look for documents in this particular

5     '95, '96 period of time?

6  A. Yes, ma'am.  That's correct.

7  Q. And you did not find any?

8  A. No.

9          MS. CALLAHAN:  Thank you.  I

10    don't have anything further.

11         MR. DUNN:  No further.

12         REDIRECT EXAMINATION

13    BY MR. LAU:

14 Q. Just -- Just a couple additional

15    questions.  Speaking to the questions

16    from respondent with respect to your

17    knowledge of what transpired during the

18    period of time between October 14th,

19    15th, 1995, through March 1st, 1996, are

20    -- are you aware that Detective

21    Voorhees, former Chief Voorhees,

22    testified that suspects from outside of

23    the City of Rockingham were investigated

24    in the case?

25 A. No, I was not aware of that.

1  Q. Would you expect to find the records of

2     those suspects who were investigated in

3     a master case file?

4  A. Yes, I would expect to see those.

5  Q. And were you aware they testified that

6     they looked into Mr. Rankin himself

7     during that investigation?

8  A. I was not aware of that.

9  Q. Would you expect to find out the

10    information that they learned through

11    the course of their investigation into

12    Mr. Rankin in the master case file?

13 A. I would.

14 Q. Now, with respect to the files offsite,

15    you testified that your understanding is

16    that files were not stored there, but

17    you do not have personal knowledge of --

18 A. I --

19 Q. -- what sorts of --

20 A. Yeah, I don't.

21 Q. And -- And you -- you -- you don't know

22    specifically whether -- or if files or

23    any Rockingham Police Department

24    property still resides in that --

25 A. Not with --

1    Q. -- storage --

2    A. -- not with any certainty, no.

3    Q. Okay.  You said you did not believe that

4        the discovery certification existed back

5        during this period of time, between 1995

6        and 1998?

7    A. I don't think so, no.

8    Q. Do you have any indication of what it

9        was -- you know, have you -- have you

10       familiarized yourself, spoken with

11       former Chief Kelly or anybody about what

12       the agency's obligation to turn over to

13       the DA's office at that period of time

14       was?

15   A. I -- I did not ask him specifically what

16       the obligation would have been in that

17       timeline, and, honestly, he -- he may

18       not know, because I think he was a

19       patrol officer, but I would assume it

20       was substantially the same.  I mean,

21       whatever is in your case file should

22       be turned over to -- to the DA's

23       office.

24              MR. LAU:  I have nothing

25       further.

1                  RECROSS-EXAMINATION

2     BY MS. CALLAHAN:

3  **Q. Do you have any direct knowledge of**

4     **whether police officers kept their**

5     **investigative notes in their master file**

6     **at that time?**

7  A. I don't.

8              MR. DUNN:  Thank you.

9              THE WITNESS:  All right.

10              THE VIDEOGRAPHER:  This

11     concludes the deposition of corporate

12     designee George Gillenwater, media

13     number one.  The time is 2:34 p.m.  We

14     are off the record.

15        (THE DEPOSITION CONCLUDED AT 2:34 P.M.)

16

17

18

19

20

21

22

23

24

25

```
 1                  ERRATA SHEET
 2    Case Name:    Derrick Jovan McRae
 3                  vs.
 4                  Erik Hooks
 5    Case Number:  1:21CV577
 6    Deponent:     George Gillenwater
 7    Date:         September 26, 2022
 8    PAGE   LINE    READS          SHOULD READ
 9        /       /            /
10        /       /            /
11        /       /            /
12        /       /            /
13        /       /            /
14        /       /            /
15        /       /            /
16        /       /            /
17        /       /            /
18        /       /            /
19        /       /            /
20        /       /            /
21        /       /            /
22        /       /            /
23        /       /            /
24        /       /            /
25        /       /            /
```

| 1 | PAGE | LINE | READS | SHOULD READ |
|---|------|------|-------|-------------|
| 2 | / | / | / | |
| 3 | / | / | / | |
| 4 | / | / | / | |
| 5 | / | / | / | |
| 6 | / | / | / | |
| 7 | / | / | / | |
| 8 | / | / | / | |
| 9 | / | / | / | |
| 10 | / | / | / | |
| 11 | / | / | / | |
| 12 | / | / | / | |
| 13 | / | / | / | |
| 14 | / | / | / | |
| 15 | / | / | / | |
| 16 | / | / | / | |
| 17 | / | / | / | |
| 18 | / | / | / | |
| 19 | / | / | / | |
| 20 | / | / | / | |
| 21 | / | / | / | |
| 22 | / | / | / | |
| 23 | / | / | / | |
| 24 | / | / | / | |
| 25 | / | / | / | |

```
 1                    SIGNATURE

 2

 3   I, George Gillenwater, do hereby state
     under oath that I have read the above
 4   and foregoing deposition in its entirety
     and that the same is a full, true, and
 5   correct transcript of my testimony.

 6
     Signature is subject to corrections on
 7   attached errata sheet, if any.

 8

 9   _____
     George Gillenwater
10

11   State of _____

12
     County of _____
13

14
     Sworn to and subscribed before me this
15   _____ day of _____, 20___.

16
     _____
17
     Notary Public
18
     My commission expires: _____
19

20

21

22

23

24

25
```

Case 1:21-cv-00577-LCB-JLW   Document 41-1   Filed 01/24/23   Page 56 of 71

1                CERTIFICATE

2

    State of North Carolina
3   County of Wake

4

    I, Kylie Fleming, a notary public in and
5   for the State of North Carolina, do
    hereby certify that there came before me
6   on the 26th day of September, 2022, the
    person hereinbefore named, who was by me
7   duly sworn to testify to the truth and
    nothing but the truth of his knowledge
8   concerning the matters in controversy in
    this cause; that the witness was
9   thereupon examined under oath, the
    examination reduced to typewriting.

10

11  I further certify that I am not counsel
    for, nor in the employment of any of the
12  parties to this action; that I am not
    related by blood or marriage to any of
13  the parties, nor am I interested, either
    directly or indirectly, in the results
14  of this action.

15

    In witness whereon, I have hereto set my
16  hand, this the 30th day of September,
    2022.

17

18

19  Kylie Fleming
    Notary Public

20

21

22

23

24

25

---

**0**

---

**01** 35:4

**02** 18:2
29:7 31:4
35:5

**03** 18:2

**04** 26:17

**06** 23:2

**07** 23:2

**09** 48:9

---

**1**

---

**105** 4:16

**14th** 46:1,6
49:18

**15th** 10:23
16:11 19:8
29:24
49:19

**1995** 10:23
12:25 13:2
15:19
16:11
29:24
39:12,13
44:21
46:1,6
49:19 51:5

**1996** 10:24
12:12
16:11 19:9
29:24 30:4

46:2,6
49:19

**1998** 44:21
51:6

**1:21CV577**
4:15

**1:50** 4:4

**1procedures**
45:3

**1st** 46:2,6
49:19

---

**2**

---

**2000s** 18:17

**2006** 9:20
10:9,11
35:14

**2009** 27:6,7

**2010** 27:6,7
48:9

**2012** 9:21

**2014** 9:21,
24

**2018** 11:7
14:13
19:18
33:12

**2019** 14:13
19:19
33:12

**2022** 4:3
10:17

**21st** 10:24
16:11 19:8
30:4

**26th** 4:3

**28379** 4:18

**2:34** 52:13,
15

---

**3**

---

**30(b)(6)** 4:7
6:9,10

**31st** 10:17

---

**9**

---

**95** 8:9
47:3,8
49:5

**96** 8:5,15
11:18 49:5

**98** 47:8

---

**A**

---

**absolute**
15:23

**access**
13:15,25
15:24 16:6
20:9,17,18
21:8,18
35:16,21,
24 37:5,9,
10,14,20
41:16,18,

20

**accessed**
43:6

**accessible**
14:21

**accident**
29:8

**acknowledgment**
26:13

**activities**
30:17

**activity**
45:2

**additional**
39:14
49:14

**affirm** 5:22

**afternoon**
44:16

**agency** 6:24
9:18
10:15,18
16:20 25:5
26:17
27:21
30:5,11,17
34:13,14
36:7

**agency's**
31:7,10
51:12

**agent** 9:22

**ahead** 33:2,

---

19

alter 48:24

alternate
23:24

amount 30:24
33:9

and/or 35:23

answering
10:8

anymore
24:23

apologize
33:17
36:16

apparent
20:5

appropriately
39:21

approximately
4:4

area 24:20
46:18
47:7,11,12

assaults
13:13

assistant
13:15,20,
24 20:10,
21 28:3
35:23
37:3,6,8,
10 41:16

assistants

26:22

assume 15:20
16:24 37:8
48:6 51:19

assumptions
23:10

attempted
6:16

attorney
26:25 27:1

attorney's
25:20,22
26:1 27:9,
22 47:22

audio 22:9

audiotapes
16:25 17:5

audit 39:4

August 10:17

autopsy
31:2,3

aware 18:23
25:9,13
27:20
31:24
34:13,15
39:5,10
49:20,25
50:5,8

---
**B**
---

back 8:12
9:23

11:17,25
15:8,19
16:21
17:9,14,15
22:22
23:7,12
25:6 44:8
45:6 47:3,
20 48:1
51:4

base 17:22

based 30:2
32:19

basic 40:12

basically
9:13 26:4,
6 33:7

Bates 11:25
22:14
26:15

began 17:17
27:3

begin 6:4
19:12

beginning
4:6

behalf 4:25
5:3,5 6:7
29:15
34:14

Billy 7:17
9:4,10
10:3 11:2
13:23

14:13

bit 9:15
41:24
45:11
46:17

briefly 9:20

Brigman 8:21

Brisk 11:22

building
23:25 24:5
48:19

burns 26:23

---
**C**
---

cabinet
12:25 13:3
39:12
40:3,4
47:15

cabinets
12:16,22

call 31:4
37:24
43:14,18
44:21

Callahan
5:2,3
32:18,24
33:18,22
48:12 49:9
52:2

called 26:2

calling

19:24,25

canvassing
 46:5

Carolina
 4:14,18
 29:1

case  4:12,
 14 7:12
 8:17 12:12
 14:5 16:13
 22:5,6,12,
 13 23:3,5,
 9 24:10
 25:1,2
 26:5 28:2,
 15 29:18,
 20 30:6,14
 31:20 32:3
 34:8
 35:13,16
 37:18
 38:25
 40:10,17
 41:1,8,13,
 21 42:14
 43:17
 45:14,18,
 23,24
 46:23 48:1
 49:24
 50:3,12
 51:21

cases  13:11,
 12 28:22

CD  17:2
 21:10

CDS  17:6

central
 43:14

certainty
 15:23
 35:18
 37:12
 43:24 51:2

certification
 26:12
 27:23
 28:8,12,16
 47:19 48:5
 51:4

chain  43:4

checked
 11:14

chief  7:7,17
 9:4 10:2
 13:15,20,
 23,24 15:7
 19:5
 20:10,21
 24:20
 25:11
 32:7,20,22
 34:7
 35:22,23,
 25 36:2,7,
 9,19,20,
 22,24
 37:3,6,8,
 10 41:8,16
 42:19 43:8
 49:21
 51:11

Chris  8:21

Chuck  4:18

city  23:25
 49:23

clarify
 12:10

cleaned
 24:20

clerk  11:17
 13:17

clerk's
 11:12
 19:22 44:6

cloud  21:9,
 19

collected
 45:25

comfortable
 10:8

committed
 26:7

communicated
 6:13

communications
 43:15

complete
 48:25

completes
 26:5

comply  49:3

computer
 17:9 21:2,

16

computers
 18:22

CONCLUDED
 52:15

concludes
 52:11

conducted
 39:3

confer  6:11,
 15 8:23

confusion
 19:23 20:2

considerable
 33:9

contact  9:8,
 11,16

contents
 19:6,7
 22:2 39:12
 40:20
 42:12

control
 43:1,3

conversations
 35:7

conveyed
 40:21

conveying
 25:18

copies  21:10

copy  28:7

corporate
 4:9 52:11

correct
 15:10
 16:21
 18:18
 33:16
 34:20,21
 36:5 40:23
 41:5,11,14
 43:2 45:10
 46:8,21
 47:23,24
 49:6

counsel  4:21
 6:3,13
 28:1

County  14:18
 48:6

couple  44:17
 49:14

Court  4:13
 5:9,19 6:1

courts  14:13

cover  40:15

create  29:13
 38:11

crime  26:7

criminal
 10:1 18:22

CROSS-
EXAMINATION
 44:14
 48:11

current  29:4
 47:18

curve  17:23

custo  42:6

custodian
 12:9 13:6
 16:18
 24:16
 37:13 38:5
 41:20,22
 42:2,3,4,
 7,9

custody  43:4

_____

_____
        D
_____

D-A-S  26:3

DA's  21:13
 26:13,19
 48:2
 51:13,22

DAS  21:14
 26:2,19
 27:15

database
 17:9,17

date  26:8

dated  10:17

dating  15:18
 16:21 17:9
 45:6

dealings
 11:5

death  10:19

deceased
 29:23

December
 10:4

decide  18:5

defendant
 31:1

defense
 26:25

define  40:25

deliver
 27:25

delivered
 27:10,14

delivery
 27:12,17

department
 4:8 6:8,
 14,19
 7:16,22
 9:20,22,24
 10:3,7,13,
 16 13:9
 14:7 15:17
 20:23
 23:22
 24:18 25:7
 34:16,19
 35:8,17
 37:2 38:8
 41:4 44:9
 48:13
 50:23

depending

22:6 28:2

deposition
 4:7 5:17
 6:21,25
 52:11,15

Derrick  4:10
 5:1 7:7,12

describe
 9:17
 10:12,25
 13:6 14:22
 18:6 22:1
 25:21
 32:16 33:5

describes
 26:7

designee
 6:9,24
 52:12

Detective
 25:9 49:20

detectives
 21:6

determine
 8:24

difference
 42:1

digital  21:1
 22:9

digitized
 18:10

digitizing
 38:15

**direct**   7:4
  37:14 45:3
  48:16 52:3

**discovery**
  5:14 23:3
  26:11,14
  28:12
  47:20 48:4
  51:4

**discuss**
  27:17

**discussions**
  7:24

**disk**   26:24

**district**
  4:13 5:15
  25:19,22
  26:1,25
  27:8,22
  47:22

**division**
  10:1

**documented**
  31:16 40:1

**documenting**
  27:20

**documents**
  12:21 17:7
  49:4

**downloads**
  26:23

**driving**   9:14

**Drug**   9:23

**drugs**   42:13

**duly**   7:2

**Dunn**   5:4,11
  44:15
  49:11 52:8

**DVD**   17:2

**DVDS**   17:6

---

**E**

**E.R.**   36:12

**earlier**   15:8
  45:12

**early**   18:17

**easily**   14:20

**ECOM**   43:14

**effort**   32:14
  39:11,19

**efforts**   8:23
  10:25
  14:23
  32:17 49:3

**electronic**
  15:16,17,
  24 16:9,
  17,20

**electronically**
  17:6 38:6

**email**   6:15

**end**   40:10

**enforcement**
  40:13
  44:22

**ensure**   22:14
  39:11,19

**ensuring**
  40:9

**entered**   43:9

**enters**
  38:13,17
  42:7

**entirety**
  26:10

**entries**   39:1

**Eric**   4:11

**et al**   4:11

**evidence**
  11:8,11,14
  14:15
  19:20
  24:2,5
  34:1,4
  47:12

**examination**
  6:12 7:4
  49:12

**Excuse**   29:25

**exist**   15:25
  16:9 30:9

**existed**
  43:12 51:4

**existing**
  30:13

**exists**
  24:10,22

**expect**   30:18
  35:21,22
  45:13
  50:1,4,9

**expected**
  40:15,17

**explained**
  19:14

**extent**   19:16
  34:10 40:5

---

**F**

**facility**
  23:24
  42:11

**fact**   29:22

**Fair**   9:2

**faith**   6:12

**familiar**
  29:22

**familiarized**
  51:10

**favor**   5:16

**February**
  10:24
  16:11 19:8
  30:4

**feel**   7:19
  10:7

**felony**   13:12
  25:25
  28:22
  40:16

Case 1:21-cv-00577-LCB-JLW   Document 41-1   Filed 01/24/23   Page 62 of 71

46:23

figure   20:3

file   7:11,
14 11:4,8,
10,17
13:11
14:10,15,
16,23
19:11,20
20:9,12,
17,19,24,
25 21:2,5,
7,8,25
22:3,13,25
23:5,9,13,
14,15,17,
19 25:5,
11,15,23
26:5,11
28:9 29:14
31:18
32:8,12,15
33:10,13,
14,25
34:1,3,5
37:13,16,
21 39:12,
20 40:11,
16,18,20,
24 41:2,8,
13 42:2,7
43:5 45:14
46:11
47:20
50:3,12
51:21 52:5

file-keeping

10:5 40:9

filed   23:15

files   12:12,
18 13:5,7
15:3,5,7
16:20
20:11,13
21:12
23:21
24:1,5,15,
16 25:18,
19,21,25
29:3,18
30:6
34:15,23
35:16,21,
24 37:5,9,
10 39:4,
15,21,25
46:24
47:10,14
48:15,17,
22,25
50:14,16,
22

filing
12:16,22,
25 13:3,15
14:1,5
16:7 17:4
39:15 40:4
47:14

fill   38:16
42:5

find   11:8,
23 12:8

14:14 32:2
49:7 50:1,
9

Fleming   4:20

flesh   41:23

follow   28:24

forever
28:24 29:2

forward   31:8
42:24

found   29:23
32:9,12

frame   7:18,
23 8:1,4,
5,8 9:3,7
16:2,15
31:3 44:20

Franklin
4:17

FTO   40:14

full   34:10
41:2

---

### G

gaining
20:18

general
16:13
17:16
19:10 22:2

generalized
16:14
38:19

generally
7:8,16
13:7 25:20
30:17
34:22
44:20

generate
20:20
43:4,17,19

George   4:9
7:1 52:12

Gillenwater
4:10 5:20
6:7,23
7:1,8
52:12

give   27:4

go-to   9:5

good   6:11
44:16

Gotcha   48:10

Grant   13:25

guess   14:19
16:25
21:24 27:4
30:20

guidelines
28:25
29:12

guns   42:14

---

### H

Habrack   4:19

half  30:12

hand  5:21
27:10,14
38:16

handed  48:1

handles  42:5

handling
38:24

handwritten
22:18

happened
27:5  45:17

header  26:6

heard  6:17
9:13  32:6

hearing  44:7

hearsay
32:20,25

helping
38:10

high  44:24,
25

high-level
13:12

historical
7:14  23:20

history  9:18

homicide
29:21
30:21,22
31:22  32:3
35:13

41:9,13
42:16

homicides
28:23  29:2

honest  24:23

honestly
15:20
16:22
51:17

Hooks  4:11

hundred  34:5

——————————
            I
——————————

idea  46:13,
16  47:1

identical
21:19

identify
12:14  15:3
16:8

identifying
26:16

immediately
31:13

incident
29:8  37:25
43:20

included
22:18
31:18

indicating
23:16
28:16

indication
51:8

individual
6:23

individuals
7:11
35:15,20

infor  19:1

information
18:23
50:10

initial  31:4

inquiries
19:5

inquiry
19:10

inspect
30:11

intent  14:19

inter  32:1

interview
31:23  32:2

interviews
22:7
30:24,25
31:15

introduce
4:22

investigated
49:23  50:2

investigation
10:19
11:24  12:5

18:24
22:24
29:21
30:8,13,
22,23
31:22
35:10
38:20  41:3
50:7,11

investigations
10:1

investigative
17:18
21:12
30:16  45:2
52:5

investigator
20:16  26:4
38:24

investigators
20:23  38:1

involved
8:17  38:23

——————————
            J
——————————

Jamie  4:25
7:6

Jeremy  10:20
29:21
35:11

Jovan  4:11

judge  5:15

judge's  5:14

**K**

keeping   7:15

Kelly   7:18,
  25 9:4,10
  10:3 11:2
  14:13
  15:6,7
  19:6 24:20
  32:7,21,22
  34:7 36:2
  41:8 42:19
  43:8 51:11

key   13:10
  20:9

keys   13:21

Kimberly   5:2

knew   33:17

knowledge
  8:11 19:7
  23:7 45:4
  48:16
  49:17
  50:17 52:3

Kylie   4:20

**L**

laptop   21:16

Lau   4:25
  6:5 7:5,6
  33:21
  44:12
  49:13
  51:24

law   40:13
  44:22

laws   28:25

leading   29:7

learned
  50:10

left   9:20

limited   5:14
  9:1

listed   11:21

locate   11:1
  14:23
  32:15
  33:10 34:3

located
  25:12,15

location
  4:16 23:17

locations
  23:20
  39:25

lock   13:10

log   20:13
  23:14
  27:20
  42:21

long   13:19
  23:1 28:10
  37:4

looked   25:11
  48:19 50:6

loosely
  12:22

lost   34:15

lot   20:1

**M**

made   11:1
  25:24
  48:24

magistrate
  5:14 37:1

maintained
  13:5 22:1
  28:23

Major   13:24

make   9:11,
  15 12:19
  19:5
  21:11,12
  23:3 28:7

making   9:8
  27:17

management
  18:9

March   46:1,6
  49:19

Martin   36:9,
  12,19,25

Martin's
  36:10

master   20:24
  21:25
  22:2,25
  23:9 25:14
  29:18

40:10,24
41:1,8,12
45:14
48:15
50:3,12
52:5

material
  24:10

materials
  21:18,20,
  24 27:8
  28:17
  29:17
  40:10

matter   4:10
  10:17
  11:21
  12:24
  14:12,21
  19:4 28:2

matters   6:12

Mcrae   4:11
  5:1 7:7,12
  14:4 19:4,
  24 28:15
  29:20
  45:23

Mcrae/rankin
  46:10

media   4:6
  52:12

meeting   6:15

meetings
  27:16

members   35:7

mentioned
19:17
45:16

Middle   4:13

misdemeanor
40:17

missing
12:20
22:15

money   42:14

months   30:7,
13,20
31:21 32:1
35:10

morning
29:24

move   48:25

moving   42:24

murder   13:11

murders
46:24

**N**

narcotics
9:25

nature   43:21

NCIC   39:1

needed   21:7

neighborhood
46:4

ninety   47:5

North   4:14,
17 29:1

note   6:6

noted   12:6

notes   22:18
38:1 52:5

number   4:14
9:11 12:2
26:16
43:17
52:13

**O**

object   5:13,
17 32:19,
25

objection
5:13 33:20

obligation
51:12,16

OCA   12:2
43:11,13,
18

occurred
18:16 26:9
35:3

October   8:8
10:23
15:19
16:10 19:8
29:24
46:1,5
49:18

office   11:12
19:22
21:13
25:20,22
26:1,14,20
27:9,22
44:6 47:22
48:2
51:13,23

officer   8:13
32:20
51:19

officers
8:16 27:16
40:8 52:4

officers'
22:17

offsite
25:5,15
46:18
47:1,7
50:14

older   23:21
24:1 38:10
47:12

ongoing
45:19

opened   45:18

opportunity
7:10

order   5:15
43:13

ordinarily
30:11

original
11:4 22:7

owned   24:1

**P**

p.m.   4:4
52:13,15

paperwork
12:3

part   11:24
12:5 14:6
27:11,24
40:16

party   6:10

patrol   8:13
51:19

people   31:11
32:2 37:5

percent   34:5

period   8:25
10:23 11:1
15:18
16:10
17:10
23:8,23
25:6,15
30:19
34:16 47:9
49:5,18
51:5,13

personal
40:18,20
50:17

pertinent
  12:23

petitioner
  5:1  6:13,
  20

photographs
  22:8

photos   12:7
  31:1

picked   44:5

place   11:16,
  19  26:9
  28:11  35:9
  39:19

places   42:10

point   11:5
  27:2  34:6
  36:8,18
  40:21

points   44:17

police   4:8
  6:8,14,18
  7:15,21
  9:19,24
  10:6,16
  13:9  14:7
  15:17
  23:22
  24:18  25:7
  34:19
  35:8,17
  37:2  41:3
  44:8  48:13
  50:23  52:4

Police-pak
  18:1,5,13,
  21

policies
  45:2

policy   28:20

portal   27:15

possession
  39:9

possibly
  35:22

potentially
  15:25

practice
  22:23
  28:11
  31:7,10

practices
  7:21  8:24
  10:6,9,12
  40:9

prepared
  7:19

presently
  41:9

pretty   9:3
  19:15
  22:11  40:4

previously
  14:11

prints   26:24

prior   6:17
  7:17  9:4

10:11
13:11
14:22
18:21  27:7
30:2  35:14
36:6

problem
  43:10,11

procedure
  47:19  48:1

procedures
  20:18

proceed   6:21

proceeding
  5:18  11:9,
  12  33:12
  44:7

proceedings
  14:17

process   8:12
  12:17
  13:19,22
  27:24  29:4

produced
  15:8,13
  25:21,25
  27:8

producing
  25:19

product
  22:24

production
  25:24

program
  40:14

promoted
  10:2

property
  38:13,14,
  16  41:19,
  22  42:2,4,
  6,9  43:1,
  3,19  50:24

pros   20:17

provided
  28:13

pull   21:7

purge   29:3
  38:10

purged   29:10

purging
  12:17

Pursuant   6:9

put   5:12
  14:19  38:1
  42:19

---

**Q**

questioning
  33:23

questions
  7:20  10:8
  37:23
  38:18,19
  44:13
  49:15

---

**R**

---

raise   5:21

Rankin   10:20
  20:1
  29:21,23
  35:11
  41:9,13
  45:23
  50:6,12

rapes   13:13
  46:24

reason   25:14
  29:16
  42:18

recall   6:22
  22:22
  27:19
  32:11
  33:24
  42:17

receive
  28:11

received
  10:16
  26:14
  27:18 28:4

receiving
  6:10

record   4:5,
  21 5:13
  6:6 21:14,
  15 28:24
  29:11
  30:18

32:19
33:1,19
41:2 44:4,
9 52:14

recorder
  4:20,23

recordings
  22:9

recordkeeping
  7:20

records   8:11
  10:18,22
  11:1,18
  12:9 13:5,
  17 14:3,4,
  8,9 15:1,
  12,16,18,
  25 16:9,
  17,18
  17:18 18:9
  19:7 20:13
  28:20,21
  30:3,7,12
  31:3 34:8
  38:11,12
  39:13 50:1

RECROSS-
EXAMINATION
  52:1

REDIRECT
  49:12

referred
  46:23

referring
  17:1

regard   7:24
  17:25
  24:14

related
  10:19 14:4
  34:1

remember
  32:10,13
  37:4 48:4

remembered
  33:8

removed
  20:11,14
  29:17

removing
  29:13

renovated
  48:14

renovation
  48:18

renovations
  34:18,24
  35:2 48:24
  49:1

report   22:7
  31:4 37:24
  38:20

REPORTER
  5:9,19 6:1

reports   29:8
  43:20

represent
  7:7

representative
  4:9

represented
  15:6 22:12
  23:5

representing
  4:23

request
  20:20

requested
  10:22

requesting
  10:18

required
  6:11 23:8,
  12

requirement
  6:16

reserves
  6:22

resides
  50:24

resource   9:5

resources
  9:1

respect   10:5
  14:2 29:20
  31:22 40:8
  49:16
  50:14

respondent
  5:3,5
  49:16

responsible
  38:9

retention
  28:19,21,
  25 29:12

retired  10:3

retrieved
  11:11

Revenue  9:23

review  12:12

reviewed
  13:2

Richmond
  14:18 48:6

RMS  18:1
  29:6
  37:22,25
  38:2,17
  42:8
  43:10,12

Robert  8:19
  9:8 23:24
  36:1

Rockingham
  4:8,17
  6:8,14,18
  7:15,21
  9:19,24
  10:6,15
  13:9 15:16
  18:1 23:22
  24:18 25:7
  35:8,17
  36:22 41:3

44:8 49:23
50:23

role  38:4

room  13:11,
  16 14:1,5,
  10 16:7
  17:4 20:9,
  12 21:1,5,
  7 23:14,
  17,19
  29:14
  33:15
  37:16,21

RPD  8:25
  10:18 16:1
  25:12 27:3
  29:15 39:3

rule  5:16
  6:8,10

─────────
        S
─────────

safe  11:13,
  16 14:4,5,
  20 15:2,3,
  5 19:21
  20:7 24:9
  41:10,17,
  18,20
  42:12,13,
  15,18,19,
  22,25 43:9

scanned  17:8
  26:18

schedule
  6:16

school
  44:24,25

search  15:1
  16:16

searched
  34:8

seceded  36:2

secure  34:23

seeking  30:3

send  21:13

separate
  13:14
  14:6,9

September
  4:3

server  17:22

set  28:25

sexual  13:12

share  8:3

She'll  38:18

sheet  26:6
  38:16 42:6
  48:5

sheets  38:14
  43:20

short  12:2

side  22:16

sign  28:3,5
  42:8

sir  16:5
  18:14,20

21:21
22:21
25:8,13

sit  6:24

situation
  19:15

someone's
  22:15

sort  20:3
  30:16

sorted  20:4

sorts  46:25
  50:19

space  29:14
  38:11
  39:20

speak  7:10,
  25 8:16
  37:11

speaking
  16:19
  29:15
  31:11
  44:20
  45:23
  49:15

special  9:22

specific
  19:4 46:10

specifically
  8:1,7,8
  10:21
  16:12
  33:25 34:2

39:8 45:24
50:22
51:15

**speculate**
45:9

**spend** 32:14
33:8

**spent** 14:14

**spoke** 7:17
11:2 41:7

**spoken** 51:10

**stamped**
22:14
26:15

**stamping**
12:1

**standing**
33:20

**start** 31:11

**started** 5:6,
12 9:19
23:1 29:12
35:1,25
36:25 37:1

**starts** 26:16

**state** 47:18

**stated** 14:11

**statements**
45:16,25

**States** 4:12

**storage**
15:15

20:12
23:24
33:15
39:20
42:10
46:18
47:6,7
51:1

**store** 18:22

**stored** 13:7
15:18 17:7
22:3,25
24:17 38:6
41:9 46:25
47:11,12
50:16

**Street** 4:17

**stuff** 27:14
29:13 44:5

**subpoena**
6:11
10:16,21
30:2 49:3

**subsequently**
43:5

**substantial**
30:24

**substantially**
27:13
51:20

**suppose**
45:19

**supposed**
20:6

**suspect** 26:8

**suspects**
49:22 50:2

**swear** 4:24
5:7,22,25

**sworn** 7:2

**system** 17:9
18:6,9
26:2,19
27:3,15
42:8 43:1,
3,23

— **T** —

**talk** 44:16

**technician**
11:15

**Techs** 9:23

**ten** 24:8

**testified**
7:3 14:2
25:10
45:11
46:17
49:22
50:5,15

**theoretically**
43:7

**thing** 48:5,7

**things** 13:13
21:10 29:9
31:5 38:5
41:1 43:20

45:15
46:25

**time** 4:3
6:17 7:18,
23 8:1,4,
5,8,25
9:3,7,25
10:13
13:24
14:14 15:9
16:2,10,14
17:10 19:3
20:2 21:5
23:8,23
24:3 25:6,
16 26:9
27:2 30:4,
19 31:3
33:9 34:6,
16,19
36:8,18
37:1 40:21
42:24 43:4
44:18,20,
23 45:7,17
46:20 47:8
49:5,18
51:5,13
52:6,13

**timeline**
51:17

**today** 4:2
5:22 6:21

**Today's** 4:16

**told** 11:10
32:24

town  9:14

training
  40:7,13

transferred
  21:25

transfers
  38:23

transmission
  27:21

transpired
  49:17

trucks  9:14

truth  5:23,
  24

turn  51:12

turned  28:17
  47:21
  51:22

type  44:22

typed  17:8,
  20 38:2

typically
  20:22
  21:15
  42:13

---

**U**

unable  11:23
  12:8

underst  34:9

understanding
  11:6 14:11

18:16
26:21
40:19
47:17
50:15

understood
  9:17 41:12

Unheard  32:5

unique  26:15

United  4:12

unusual
  31:25

---

**V**

validations
  39:2

verse  4:11

versus  48:22

victim  26:8

Voorhees
  8:19 9:9
  25:10
  36:1,4,6,
  21 49:21

---

**W**

wait  31:7,
  25

waited  31:21

walk  27:25

wanted  19:13
  44:16

West  4:16

whereabouts
  11:3

witnesses
  30:25
  31:6,8,23

working
  38:14

written  12:3

wrong  46:9

---

**Y**

year  10:4
  12:16

years  9:21
  24:8 39:14
  41:22 45:1

---

**Z**

Zachary  5:4