## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| **DERRICK JOVAN MCRAE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| v. | ) | **1:21CV577** |
| | ) | |
| **EDDIE M. BUFFALOE,** | ) | |
| **Secretary, N.C. Dep't of Public Safety,** | ) | |
| | ) | |
| **Respondent.** | ) | |

### RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Petitioner, Derrick Jovan McRae, a prisoner of the State of North Carolina, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1] (Docket Entry 1.) Respondent has filed a preliminary answer (Docket Entry 7), a motion to dismiss (Docket Entry 8), and a brief supporting that motion (Docket Entry 10). Petitioner filed a response to the motion to dismiss (Docket Entry 12) and Respondent filed a reply (Docket Entry 15).

On August 29, 2022, at Petitioner's request and as part of his efforts to proceed through the *McQuiggin/Schlup* gateway to merits review on an otherwise time-barred habeas petition, the Court entered a discovery order staying the proceeding and also granting limited discovery to Petitioner for production of documents from October 14, 1995 to March 1, 1996, relevant to the investigation of the murder of Jeremy Rankin. (Docket Entry 18.) If those documents could not be located, the discovery order authorized Petitioner to depose individuals from

---

[1] On November 1, 2021, Eddie M. Buffaloe, Jr. became the Secretary of the North Carolina Department of Public Safety. Mr. Buffaloe is automatically substituted as Respondent. *See* Fed. R. Civ. P. 25(d).

both the Rockingham Police Department ("RPD") and the Richmond County District Attorney's Office (the "DA") who had access to and/or responsibility over the relevant files. (*See id.*) Relevant documents were not produced, and thus, Petitioner deposed the relevant agencies and individuals who might have knowledge and/or control of the documents, assuming those documents existed. (Docket Entry 41, Exs.) The parties then filed supplemental memoranda (Docket Entries 41, 42, and 43) and Petitioner then filed a notice of subsequently decided authority (Docket Entry 48).[2] This matter is now ready for a ruling.

## Background

In the early morning hours of October 14, 1995, Allen Davis discovered the body of Jerry Rankin on the porch of Davis' residence. *State v. McRae*, 139 N.C. App. 387, 388 (2000). Rankin had been shot in the head from close range. *Id.* Approximately five months later, on March 18, 1996, Petitioner and Thurman Nelson were indicted for Rankin's first-degree murder. *Id.*; (Docket Entry 1 at 8 (citing Nelson Indictment)). Although Petitioner was initially found to be incompetent to stand trial, he was medicated for schizophrenia and thereafter proceeded to trial more than two years later on April 27, 1998. *State v. McRae*, 163 N.C. App. 359, 361 (2004).[3] The trial ended in a mistrial on May 1, 1998, with the jury deadlocked at eight to acquit and four to convict. *Id.* (*See* Docket Entry 10, Ex. B at 325-334 and Ex. C at 2.)

---

[2] In his notice, Petitioner brings to the Court's attention *Dickey v. Davis*, 69 F.4th 624 (9th Cir. 2023). (Docket Entry 48.) The Court has reviewed *Dickey*, does not require briefing on this case, and concludes that it does not change the analysis set forth herein.

[3] According to Petitioner's trial counsel (George Crump), he recommended that Petitioner accept a plea deal based on the forecast of evidence presented to him by the State because there was a "very reasonable chance" that a jury would find him guilty. (Docket Entry 1, Ex. 15 at 5.) Petitioner would have plead guilty to second-degree murder and served at least 94 months. (*Id.* at 3; Docket Entry 10, Ex. W at 163-64.) Later, but still prior to the first trial,

2

Petitioner's second trial began less than two weeks later, on May 12, 1998.[4] (*See* Docket Entry 10, Ex. C at 34.) Both sides presented primarily the same evidence, but Petitioner called an additional witness from the clerk of court's office to testify to witness Edward Tender's criminal record. (Docket Entry 10, Exs. B and C; *Id.*, Ex. C. at 275-77.) More specifically, at Petitioner's second trial, the State presented evidence from the police and Davis regarding the discovery of the body and from the medical examiner regarding the cause of death.[5] (Docket Entry 10, Ex. C at 39-43, 95-104, 136-156.) Rankin's mother testified that she had brought Rankin some food in an empty lot between 10:00 and 10:30 p.m. on October 13, that Rankin had seemed nervous and asked her to leave very quickly, but that he appeared to be clean and not currently using drugs. (*Id.* at 174-77.)

Petitioner's co-defendant, Nelson, who was out on bond for Rankin's murder, testified that Petitioner had sold Rankin some crack cocaine around dusk on October 13th, but Rankin had paid with folded up paper instead of money, making Petitioner angry. (*Id.* at 61-67, 73,

---

the State lowered the minimum to 81 months. (*Id.*) Counsel again recommended that Petitioner take the plea offer. (*Id.*) Petitioner declined the plea deal and wished to go to trial. (*Id.*)

[4] According to Crump, before the second trial, the State offered Petitioner a plea deal in which he would plead guilty to voluntary manslaughter, receive between 25 to 39 months of imprisonment, with credit for time served for approximately 26 months, along with six to eight months' probation for a drug violation. (Docket Entry 10, Ex. W at 164-65.) Crump strongly encouraged Petitioner to enter into a guilty plea, but after consultation with his family, Petitioner declined to do so. (*Id.* at 165-67.)

[5] This included testimony from law enforcement that Petitioner's residence was about 400 yards from where Rankin's body was found. (Docket Entry 10, Ex. C. at 142-43.)

78.) Nelson testified that Petitioner stated that he intended to "get" Rankin for cheating him and that he later told Nelson that he had indeed "got" him. (*Id.* at 64-66, 77.)

Edward Tender also testified that, when he was in the Richmond County Jail, Petitioner admitted to him that he had killed Rankin and that he intended to kill all white people, whom he hated, starting with several local law enforcement officers. (*Id.* at 115-16.) Tender described Petitioner as a militant like Malcolm X or Stokely Carmichael. (*Id.* at 119.) The March 26, 1996 signed statement that Tender provided to RPD Detective Chris Brigman, which was consistent with his testimony, was also read into evidence. (*Id.* at 121-25; Docket Entry 1, Ex. 23.)

Petitioner countered the State's case with an alibi defense. (Docket Entry 10, Ex. C at 185-274.) Multiple witnesses testified that Petitioner had spent the afternoon and evening at a cookout hosted by his brother and his brother's girlfriend. (*Id.* at 187-89, 193, 203-04, 216-17, 236-38, 272-74.) They stated that Petitioner drank so heavily at the cookout that he had to be escorted home by three people (who all testified) at around 8:00 p.m. and that he spent the rest of the night either vomiting or sleeping in his bed. (*Id.* at 188-89, 203-207, 222-23, 227-29, 238-41, 243-246, 253-55, 272-74.) Petitioner's mother testified that she spent that night awake in her living room because she was caring for her mother, and Petitioner stayed in bed until the next morning. (*Id.* at 255-56.) Petitioner also called an employee of the Richmond County Clerk of Superior Court's Office to testify that Tender had been convicted of misdemeanor possession of stolen goods and 16 counts of common law forgery on March 28, 1996. (*Id.* at 274-77.) The jury returned a guilty verdict after just over an hour. (*See id.* at 307-16.) Petitioner was sentenced to life without parole. *McRae*, 139 N.C. App. at 388.

4

Petitioner appealed his conviction and sentence to the North Carolina Court of Appeals. *Id.* He argued that (1) the trial court erred by not conducting a competency hearing immediately before the beginning of the second trial, *id.* at 389; (2) he was involuntarily medicated to make him competent in violation of his due process rights, right to confront witnesses, and right to assistance of counsel, *id.* at 392; (3) the trial court erred by sustaining an objection during Nelson's cross-examination regarding his pending charges, *id.*; and (4) the State improperly denied him the right to cross-examine Tender regarding his charges, *id.* at 394. The Court of Appeals denied claims two through four but remanded the case for a hearing to determine Petitioner's competency at the time of the second trial. *Id.*

Pursuant to the orders from the appellate court, the trial judge held hearings on June 7 and August 31, 2001 to determine if he could make a retrospective competency determination. *McRae*, 163 N.C. App. at 361; (*see* Docket Entry 12, Exs. 3-4.) After hearing testimony from four psychiatrists, the trial court determined that, based on the testimony, the original competency evidence, and its own observations from the second trial, it could make a retrospective determination that Petitioner had been competent to stand trial at his second trial. (Docket Entry 10, Ex. H at 83-89.) The Court of Appeals found no error in the trial judge's conclusions, *McRae*, 163 N.C. App. at 362-72, and Petitioner was thereafter unsuccessful at the North Carolina Supreme Court. *State v. McRae*, 358 N.C. 548 (2004).

The North Carolina Center on Actual Innocence brought Petitioner's case to the attention of the Duke Wrongful Convictions Clinic ("WCC"). (Docket Entry 10, Ex. M at 14.) During the investigation of the case, the WCC received the case file from the DA's office, which had not been provided prior to either of Petitioner's trials. (Docket Entry 1 at 22.) This

5

file included nine previously undisclosed statements taken from witnesses in a period spanning February 21 through March 1, 1996. (*Id.* at 7 n.4.) The WCC also interviewed Tender, who twice stated that he testified falsely against Petitioner to receive a more lenient sentence on his own charges. (*Id.* at 26.) The WCC also interviewed Marlin Dumas, whose statement was not released to Petitioner before trial but who claimed to be an eyewitness to Petitioner's and Nelson's shooting of Rankin. (*Id.* at 16 n.20, 25-26, 26 n.36.) The WCC gathered other evidence, including Petitioner's medical records from his two years of pre-trial confinement. (*Id.* at 28.) In addition, the WCC secured Rankin's criminal records, which showed that a warrant for his arrest (for several counts of larceny) had been issued on the day of his death. (*Id.* at 28-29.)

With the WCC as counsel, Petitioner filed a Motion for Appropriate Relief ("MAR") in state court on June 28, 2013. (Docket Entry 10, Ex. M.) It included the following claims:

(1) The State failed to disclose material impeachment evidence regarding the favorable treatment Tender received in exchange for his testimony.

(2) The State failed to correct Tender's false and misleading testimony.

(3) Tender recanted his testimony, providing new exculpatory evidence.

(4) The State failed to disclose material impeachment evidence regarding the favorable treatment Nelson received in exchange for his testimony.

(5) The State failed to correct Nelson's false and misleading testimony regarding the favorable treatment he received in exchange for his testimony.

(6) The State failed to correct Nelson's false and misleading testimony regarding his involvement in the murder of Rankin.

(7) The State failed to disclose other material exculpatory and/or impeachment evidence.

6

(8)   The cumulative effect of the State's failure to disclose material impeachment evidence and to correct false and misleading testimony violates the United States and North Carolina Constitutions.

(9)   By holding criminal charges against the State's key witnesses to ensure their favorable testimony in Defendant's trial, the State violated Defendant's due process rights under the United States Constitution and the Constitution and laws of North Carolina.

(10)   Defendant's mandatory life sentence without parole is unconstitutional.

(*Id.* at ii-iii.)

The MAR court held a hearing on Petitioner's claims on December 1-3, 2014. (Docket Entry 10, Exs. O, P, Q, and R at 1.) Petitioner presented evidence from George Crump, Petitioner's trial counsel; Robert Voorhees, the lead detective on Petitioner's case; Tender; Michael Parker, the original assistant district attorney assigned to Petitioner's case; James Van Camp, Nelson's attorney; Don Snell, the private investigator who interviewed Tender and recorded his alleged recantation; and Dr. Nicole Wolfe, the state-employed forensic psychiatrist who evaluated Petitioner multiple times before trial.[6] (*See id.*) The State presented evidence from Scott Brewer, who prosecuted in both trials. (*See* Docket Entry 10, Ex. Q.)

After the three-day hearing, the MAR court judge issued a ruling on February 4, 2015, denying Petitioner's MAR.[7] (Docket Entry 10, Ex. R.) The MAR court judge concluded that

---

[6] Dr. Wolfe later stated in an affidavit that had she known about the rejection of the plea offer before the second trial, she "probably would have found [Petitioner] incompetent to stand trial" and "certainly would have investigated his competency even more thoroughly[.]" (Docket Entry 1, Ex. 16 at 3.)

[7] The MAR court held its ruling on Petitioner's tenth claim, pending the determination of the retroactivity of the identical issue decided in *Miller v. Alabama*, 567 U.S. 460 (2012). (Docket Entry 10, Ex. R at 8.) Upon the determination that *Miller* could be applied retroactively, Petitioner was re-sentenced to life imprisonment with the possibility of parole. (Docket Entry 1 at 5, referencing *State v. McRae*, No. 96 CRS 1576, Resentencing Form (Sept. 28, 2017).)

7

neither Tender nor Nelson had "any arrangement with the State" in exchange for their testimony. (*Id.* at 13, 21.) Claims one and four, therefore, failed because the State did not withhold any evidence regarding favorable treatment in exchange for testimony. (*Id.* at 13-14, 21-22.) Similarly, the MAR court rejected claims two and five because it concluded that there was no proof that either the witnesses or the prosecution knowingly allowed false or misleading testimony. (*Id.* at 14-17, 22-24.) The MAR court also concluded that Tender did not recant his trial testimony, that he remembered Petitioner confessing to him in the county jail, and that he claimed to have testified truthfully at both trials, rejecting Petitioner's claim three. (*Id.* at 18-19.) Regarding claim six, the MAR court found that Petitioner did not prove that Nelson testified falsely regarding his lack of involvement in Rankin's murder and therefore could not meet the burden to prove that the prosecution knowingly allowed false or misleading testimony. (*Id.* at 24-27.)

The MAR court also denied claim seven. (*Id.* at 27-45.) Although the prosecution did not disclose the witness statements, they were not material under *Brady v. Maryland*, 373 U.S. 83 (1963). (*Id.*) The statements inculpated Petitioner and/or counsel testified that he would not have called any of the witnesses because of this fact. (*Id.*) Petitioner could have discovered this evidence from sources other than the statements to police. (*Id.*) Finally, the court denied claims eight and nine, ruling that Petitioner had not presented enough evidence cumulatively to present a valid *Brady* claim and that the State was allowed to prosecute Petitioner before his co-defendant without violating Petitioner's due process rights. (*Id.* at 47, 50.)

Before the MAR court held a hearing to evaluate claim ten, the claim alleging that his mandatory life sentence without parole was unconstitutional, Petitioner sought to amend his

MAR to include an ineffective assistance of counsel claim. (*See* Docket Entry 10, Ex. S.) The court allowed the amendment and held a two-day evidentiary hearing on that claim. (*See* Docket Entry 10, Exs. V and W.) The court allowed Petitioner a second amended MAR to include evidence gathered from the hearing, but then denied the amended MAR on October 5, 2018. (*See* Docket Entry 10, Ex. Y.) The North Carolina Court of Appeals denied a petition for a writ of certiorari on November 13, 2019 (*see* Docket Entry 10, Ex. BB), and the North Carolina Supreme Court dismissed a petition for a writ of certiorari on March 10, 2021 (*see* Docket Entry 10, Ex. EE). Petitioner filed the instant petition in this Court on July 13, 2021. (Docket Entry 1.)

## **Petitioner's Grounds**

Petitioner raises five grounds for relief in his petition. Specifically, he contends: (1) the State violated his "rights under the Fifth and Fourteenth Amendments by failing to disclose material witness statements as required by *Brady v. Maryland*" (*id.* at 45); (2) the State violated his "rights under the Fifth and Fourteenth Amendments by failing to correct Edward Tender's false testimony about his criminal charges, in contravention of *Napue v. Illinois*" (*id.* at 63); (3) the State violated his "rights under the Fifth and Fourteenth Amendments by failing to disclose that Edward Tender received favorable treatment . . . in exchange for his testimony, as required by *Giglio v. United States*, and by allowing him to testify falsely that he received no such treatment, in contravention of *Napue*" (*id.* at 75); (4) the State violated his "rights under the Fifth and Fourteenth Amendments by failing to disclose that Thurman Nelson received favorable treatment . . . in exchange for his testimony . . . and by allowing him to testify falsely

that he received no such treatment" (*id.* at 85); and (5) ineffective assistance of counsel under *Strickland v. Washington* (*id.* at 95).

## Discussion

Respondent argues that Petitioner filed the § 2254 petition beyond the one-year limitations period imposed by 28 U.S.C. § 2244(d)(1) and requests dismissal of the petition. (Docket Entry 10 at 2-3.) Regarding the one-year statute of limitations that controls habeas-corpus petitions filed under § 2254:

> Under § 2244(d)(1)(A)-(D), the one-year limitation period begins to run from the latest of several potential starting dates:
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

*Green v. Johnson*, 515 F.3d 290, 303-04 (4th Cir. 2008).

Under subparagraph (A), Petitioner's one-year limitations period began on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). The North Carolina Supreme Court denied Petitioner's petition for discretionary review, which sought review of his direct

10

appeal, on June 24, 2004. *McRae*, 358 N.C. at 548. Because Petitioner did not request certiorari review from the United States Supreme Court, his conviction became final under the Anti-terrorism and Effective Death Penalty Act ("AEDPA") in late September of 2004, when the ninety-day period for seeking such review expired. *See Hill v. Braxton*, 277 F.3d 701, 704 (4th Cir. 2002) ("If no petition for a writ of certiorari is filed in the United States Supreme Court, then the limitation period begins running when the time for doing so—90 days—has elapsed.") (citation omitted).

Petitioner had one year from that date to file his Petition. He filed the instant petition on July 13, 2021. (Docket Entry 1.) Petitioner concedes that he filed his petition several years beyond the limitation period. (*Id.* at 29 ("[T]his petition is filed outside the one-year statute of limitations[.]").) He argues that this Court should nonetheless review the merits of the petition because his actual innocence demands it. (*Id.*)

When a § 2254 petition is procedurally barred, as Petitioner's concedes his is, the petitioner can still seek a writ of habeas corpus by passing through an "actual innocence gateway*." McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013); *see also Schlup v. Delo*, 513 U.S. 298 (1995). But to do so, the petitioner must present "new reliable evidence" and "demonstrate that the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt." *Teleguz v. Pearson*, 689 F.3d 322, 328-29 (4th Cir. 2012) (cleaned up). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. Thus, in considering such a petition, a court must consider "all the

11

evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial," *House v. Bell*, 547 U.S. 518, 538 (2006) (cleaned up), and then make "a probabilistic determination about what reasonable, properly instructed jurors would do," *Schlup*, 513 U.S. at 329.

If the court determines "that it is more likely than not that no reasonable juror would have convicted" the defendant, based on the totality of the evidence, then the defendant can pass through the actual-innocence gateway and have his procedurally defaulted claims heard on the merits. *Id.* at 327. The actual-innocence showing is "a procedural mechanism" to open the gate to having the petitioner's substantive claims considered, and any entitlement to habeas relief would ultimately depend on the merits of his procedurally defaulted claims. *Teleguz*, 689 F.3d at 327-28. The Supreme Court has explained that such instances are rare. *McQuiggin*, 569 U.S. at 386 ("We caution, however, that tenable actual-innocence gateway pleas are rare: A petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.") (citations and alterations omitted). If a state court "has made a factual determination bearing on the resolution of a *Schlup* issue, the petitioner bears the burden of rebutting th[e] presumption [of correctness] by 'clear and convincing evidence.'" *Teleguz*, 689 F.3d at 331 (quoting 28 U.S.C. § 2254(e)(1)).[8]

---

[8] The Court does not agree with Petitioner's contention that "[c]lear and convincing evidence shows that many of the MAR Court's factual findings relied upon by Respondent are erroneous." (Docket Entry 12 at 8.) Moreover, even setting aside the presumption of correctness afforded to the MAR court's factual findings in these circumstances, the Court would still conclude that Petitioner has failed to meet the actual innocence standard for the reasons set forth herein.

Case 1:21-cv-00577-LCB-JLW    Document 49    Filed 02/27/24    Page 12 of 101

## The Evidence Presented at Trial

The Fourth Circuit advises that in evaluating an actual-innocence gateway claim, the court "must first turn to the evidence and testimony considered at the . . . trial." *Finch v. McCoy*, 914 F.3d 292, 294 (4th Cir. 2019). As described above, the evidence presented at Petitioner's second trial was nearly the same as the evidence presented at his first trial, which resulted in a deadlocked jury with eight jurors voting for acquittal. The State presented testimony from the man who discovered Rankin's body on his porch, the officers who responded to the scene, and the medical examiner to establish the approximate time and manner of death. (Docket Entry 10, Ex. C at 39-43, 95-104, 136-156.) The State also presented evidence from Rankin's mother, who last saw him alive around 10:30 p.m. on the night of his death. (*Id.* at 174-78.) She testified that he had called, asking for money to purchase food, and that instead of giving him money, she brought him some food.[9] (*Id.*) She met him in a lot a few miles from where his body was found later that night. (*Id.*) She said that he got into her van for a few minutes and was well-groomed, but that he was nervous and was constantly looking around out of the windows. (*Id.*) The visit lasted five to ten minutes. (*Id.*) She and her husband owned a red

---

[9] At the first trial, but not at the second (which is summarized above), Rankin's mother testified that the lot at which she met Rankin was about three miles from Hood Street, which is where the house at which Rankin's body was found was located. (Docket Entry 10, Ex. B at 84-85.) Mrs. Rankin also testified at the first trial, but not at the second, that in "some other conversation" beyond the one had the night she met her son to bring him food, Rankin had mentioned that "he had been told that when Dale first saw him he was going to beat the ass out of him . . . ." (*Id.* at 79.) There was no reference to a "Dale" at the second trial.

13

truck, her son "did not have permission to drive any of [their] vehicles," and she had not loaned him the truck that evening.[10] (*Id.* at 177-78.)

The only evidence connecting Petitioner to the crime was the testimony of two men. First, Nelson, who was charged with first-degree murder as Petitioner's co-defendant, testified that he saw Rankin drive up to Petitioner in the early evening on the day of the murder and purchase a rock of crack cocaine from him. (*Id.* at 62-64, 67.) After Rankin left in a red truck, Petitioner discovered that Rankin paid him with "some paper" instead of cash. (*Id.* at 63-64.) According to Nelson, Petitioner was angry and threatened to "get" Rankin for cheating him. (*Id.* at 64.) Nelson also testified that he saw Petitioner later that day at Petitioner's brother's house, where Petitioner said, "I got him." (*Id.* at 65.) Nelson also testified that he saw Petitioner asleep in his bed later that same evening, and that Petitioner told him some days after that he had gotten Rankin. (*Id.* at 65-66, 75-76, 81.) Nelson testified that Petitioner had owned a .380 pistol, but that he did not see him with that gun after Rankin died. (*Id.* at 66-67.)

Second, Tender was an inmate awaiting trial on multiple charges in the Richmond County Jail when Petitioner arrived there after his arrest. (*Id.* at 115, 119-20, 128.) Tender testified that Petitioner told him that he killed Rankin because he was white. (*Id.* at 116.) Tender stated that Petitioner spoke like a militant in the manner of Malcolm X or Stokely Carmichael and claimed that he wanted to kill all white people, starting with specific local law enforcement officers. (*Id.* at 116, 119.)

---

[10] Rankin's father briefly testified at the first trial, but not at the second one. At the first trial, he testified that he owned a red Mazda pickup truck which he permitted his son to use sometimes (*i.e.*, "[n]ot that often but now and then"). (Docket Entry 10, Ex. B at 74.)

14

Petitioner's trial counsel attempted to discredit both Nelson and Tender on cross-examination. He challenged Nelson's motives for testifying, asking about the fact that he was also charged with Rankin's murder. (*Id.* at 71.) He brought up the fact that Nelson was out on bond for that charge. (*Id.* at 78.) He also questioned Tender regarding the charges he faced and how they were resolved. (*Id.* at 128-30.) He challenged Tender's description of Petitioner as a militant. (*Id.* at 123-24, 127-28.)

At trial, Petitioner presented an alibi defense. Although Petitioner himself did not testify, multiple witnesses took the stand to state that Petitioner spent the afternoon and evening of Rankin's murder getting very drunk at a cookout hosted by his brother and brother's girlfriend at the apartment complex where they all lived. (*Id.* at 185-274.) Petitioner's brother, his sister, and his friend all testified that Petitioner was so drunk that they had to help him to his mother's apartment, where he lived. (*Id.* at 205-07, 238-41, 242, 244, 271-74.) Petitioner vomited several times and then fell asleep in his bed by 11:00 p.m. (*Id.* at 207, 243, 245-46, 273-74.) Petitioner's mother testified that on hearing from Petitioner's sister that he was drunk at the party, she demanded that he be brought home, where he stayed all night. (*Id.* at 253-56.) Petitioner's mother knew that Petitioner did not leave the apartment because she spent the night awake in the living room, caring for her sick mother. (*Id.* at 256.)[11] Six of the defense witnesses did not tell law enforcement about Petitioner's purported alibi, either before

---

[11] The prosecutor, assistant DA Scott Brewer, referenced Petitioner's appearance in his closing argument to the jury. Although the argument was not recorded, during a colloquy with the judge immediately following closing arguments, Brewer stated that he had argued to the jury that Petitioner "sat there staring into space uncaring, unfeeling, not paying attention and unremorseful[.]" (Docket Entry 10, Ex. C at 307.)

or after he was arrested for Rankin's murder. (*Id.* at 197-98, 224-25, 231-35, 249-50, 256-260, 274.) A seventh, Jeremy Sturdivant, testified that he did tell law enforcement when they questioned him the same day Petitioner was arrested, but that he did not know if they wrote it down. (*Id.* at 213-14.) Officer Brigman later testified that Sturdivant did not tell him about the purported alibi. (*Id.* at 277-79.)

**Analysis**: The State built a circumstantial case against Petitioner, relying on witness testimony, which persuaded the jury beyond a reasonable doubt that Petitioner murdered Rankin. Specifically, Rankin's mother, Jackie, testified that she last saw her son at approximately 10:30 p.m. on October 13, 1995 as he was walking through a patch of woods toward a trailer park at Campus Courts in Rockingham, North Carolina. (*Id.* at 174-180.) Rankin's body was found some four hours later by Allen Davis, who discovered Rankin in a seated position on Davis' front porch, with a bullet wound on his scalp and a spent .380 shell casing in a pool of Rankin's blood nearby. (*Id.* at 40-41, 95, 143-55.) The house where Rankin's body was found was located approximately 400 yards from Petitioner's residence. (*Id.* at 142.)

Petitioner was known to carry a .380 handgun but was not seen with one after Rankin's murder. (*Id.* at 61, 66-67.) Further, it was unrefuted at trial that Petitioner was known to deal crack cocaine in his neighborhood. (*Id.* at 63.) At trial, Nelson testified that he was with Petitioner during the day on October 13, 1995 and witnessed a hand-to-hand drug transaction between Petitioner and Rankin. (*Id.* at 62-64.) After Rankin left, Petitioner realized Rankin had cheated him because the paper that Rankin had handed him in exchange for the drugs was not actual paper currency. (*Id.* at 64.) Petitioner voiced his displeasure and stated, "I'm going to get that dude for shitting me." (*Id.* at 64.) When Nelson saw Petitioner later that night,

16

Petitioner told Nelson he "got him." (*Id.* at 65.) After that weekend, Petitioner again told Nelson he got the dude that cheated him, but Petitioner was more specific. (*Id.* at 65-67.) Petitioner told Nelson he "shot him" with a .380. (*Id.* at 66.) The jury was aware that Nelson was also charged with Rankin's murder and was out on bond. (*Id.* at 67, 78, 82.)

Petitioner also repeated a version of his confession to Tender, who he met while incarcerated in the Richmond County Jail. Tender talked to Petitioner on several occasions, and Petitioner repeatedly disclosed to Tender that he had murdered Rankin. (*Id.* at 116-17.) According to Petitioner, Rankin was asleep on a porch when Petitioner walked up and shot him in the head with a .380 caliber pistol. (*Id.*)

Petitioner's witnesses told a different story. The defense witnesses more or less uniformly testified that Petitioner attended a cookout at Renee Dockery's apartment beginning roughly around 4:00 p.m. on October 13, 1995, became intoxicated, left with some friends at around 8:00 p.m., and returned home. (*Id.* at 185-274.) There, Petitioner threw up on himself and went to bed, where he remained until the next morning. (*Id.* at 255.)

For instance, Sturdivant testified that he and Petitioner had been together all day on the day in question and ended up at Dockery's party where they played cards and drank Tanqueray, Hennessy, and beer. (*Id.* at 204-05.) As it was getting dark, Sturdivant and Petitioner's brother and sister took Petitioner home because he looked like he was going to throw up. (*Id.* at 205-06.) Sturdivant testified that he stayed at Petitioner's apartment for about 30 minutes, where he saw Petitioner vomit and get into bed. (*Id.* at 207.) Four other witnesses (Rush, Cox, John McRae, and Marnell McRae (Petitioner's brother and sister, respectively)) offered similar accounts. (*Id.* at 216-222, 227-229, 245, 271-273.) Finally, Petitioner's mother,

Gloria McRae, testified that John put Petitioner in bed where he remained all night. (*Id.* at 255.) Notably, none of the defense witnesses told law enforcement about Petitioner's purported alibi, either before or after he was arrested for Rankin's murder, even when asked.[12] (*Id.* at 197-98, 213-14, 224-25, 231-35, 249-50, 256-259, 274, 277-79.) Petitioner also called a witness to testify to Tender's criminal record. (*Id.* at 276-77.)

The jury had two mutually exclusive accounts of Petitioner's actions on October 13 and 14, 1995. First, the jury could have believed (beyond a reasonable doubt) that Petitioner sold crack to Rankin, became angry when he realized Rankin cheated him, and shot Rankin in the head with his .380 caliber handgun, consistent with his multiple confessions. Or, the jury could have credited the accounts told by Petitioner's friends and relatives that Petitioner attended a party, got drunk, and was asleep all night. Despite the conflicting inculpatory and exculpatory evidence before them, the jury credited the State's case and found Petitioner guilty beyond a reasonable doubt.

## New Evidence

Petitioner now offers seven pieces of evidence which he claims meet the "no reasonable juror" standard: (1) nine witness statements which inculpate Petitioner in Rankin's murder; (2) affidavits from Marlin Dumas and Darius Lockhart which were not submitted to the MAR court but which allege that law enforcement fabricated statements allegedly made by

---

[12] As noted, Sturdivant testified that he did tell law enforcement about Petitioner's alibi when they questioned him the same day Petitioner was arrested, but that he did not know if they wrote it down. (Docket Entry 10, Ex. C at 213-14.) However, Officer Brigman later testified that Sturdivant did not tell him about the purported alibi. (*Id.* at 277-79.)

18

them that were inculpatory of Petitioner's involvement in Rankin's murder; (3) Tender's out-of-court statements that were inconsistent with his trial testimony, followed by his in-court re-affirmance of his trial testimony; (4) alleged favorable treatment received by Nelson and Tender in exchange for their testimony against Petitioner; (5) Dr. Wolfe's testimony "with respect to medical records undercutting Tender's trial testimony"; (6) records detailing Rankin's "crime spree" the week prior to his murder, which Petitioner's trial counsel did not obtain; and (7) seven depositions taken in late 2022 pursuant to the Court's order permitting limited discovery from officers of the RPD and members of the DA's office who had access to and/or control of the master file regarding the whereabouts and contents of the allegedly missing files. (Docket Entry 1 at 33-34; Docket Entry 41 at 7-10, 16 n.17.) The Court concludes that this evidence, considered alone and holistically with the record, does not establish that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.

### a. Witness Statements

The court "must also take into consideration new evidence proffered since the . . . trial that has a bearing on [Petitioner's] actual innocence." *Finch*, 914 F.3d at 297. Petitioner has presented nine witness statements collected by the RPD over a ten-day period some four months after Rankin's murder. The State did not provide these statements to Petitioner until it gave the WCC the DA's case file in response to its post-conviction investigation of Petitioner's case, though Nelson's statement was read into evidence by Nelson himself at

Petitioner's trials.[13] (Docket Entry 1 at 22-23.) As shown below, these witness statements all implicate Petitioner in the murder, but they contain multiple inconsistencies as to the time and circumstances of the event, and many of them purportedly conflict with the case the State presented at trial. (*Id.* at 22-23.) Several of them implicate Nelson in the murder. (*Id.* at 23.)

A brief summary of each statement follows:

**Statement of Tonya Clark**: On October 15, 1995, the day after Rankin's death, Montez Williams and Jeremy Sturdivant came to her house and the former told her that Petitioner killed Rankin. (Given February 28, 1996.) (Docket Entry 1, Ex. 3 at 2.)

**Statement of Marlin Dumas**: One night in October, around 12:30 a.m., Dumas saw Petitioner and Nelson under a streetlight on Hood Street. Petitioner was holding a .380 caliber handgun, and Nelson was holding a .25 caliber handgun. Dumas stood behind a tree and watched the two as they stood in front of a "Club" for twenty minutes. Dumas then saw them walk toward the porch of a house near the club and heard Petitioner threaten to shoot a "white boy." Dumas heard the object of the threats respond and then saw Petitioner shoot at the porch. "About 4 or 5 seconds" later he saw Nelson shoot a second shot. Both men then ran, and Dumas hid in the woods. (Docket Entry 1, Ex. 4 at 2.) The next day, Petitioner and Nelson

---

[13] Petitioner's trial counsel testified at the 2014 evidentiary hearing that he did not receive these statements and that all he had was a one-page, single paragraph document purporting to summarize the contents of various oral statements attributed to Petitioner. (Docket Entry 10, Ex. O at 66; Docket Entry 1, Ex. 12.) Former assistant DA Michael Parker testified that the DA's office would receive a copy of the full file from the RPD and provide barebones summaries of oral statements to defense counsel. (*Id.*, Ex. P at 245, 272-275.) Nelson's witness statement was introduced into evidence at trial without objection and was read out-loud by Nelson to the jury. (Docket Entry 10, Ex. C at 69-70.) Accordingly, the jury was actually aware of Nelson's statement to law enforcement.

saw Dumas at Quick's Grill, where Petitioner threatened to kill him if he said anything. (Given February 26, 1996.) (*Id.* at 3.)

**Statement of Michael Ferguson**: Two weeks after Rankin's death, Petitioner told Ferguson he sold his gun to Corey Robinson. Two weeks later, Petitioner told him that he had shot Rankin on "Fishman's porch." (Given March 1, 1996.) (Docket Entry 1, Ex. 5 at 2.)

**Statement of Darius Lockhart**: About two or three weeks before he gave this statement, Lockhart was hanging out with Petitioner, who was bragging that he would shoot anyone who tried "to shit him." Petitioner then told Lockhart that he had "blasted" Rankin because he had "tried to shit him for some dope." Petitioner explained that Rankin had grabbed some crack from him and then ran. (Docket Entry 1, Ex. 6 at 2.) Petitioner then told him that he saw Rankin on a porch on Hood Street, ran up to Rankin, and shot him in the head with a .380 caliber handgun. Lockhart closed by stating that Petitioner attempted to sell him the gun a few days after he told him this story. (Given on February 21, 1996.) (*Id.* at 2-3.)

**Statement of Thurman Nelson**: On October 14, 1995, at around 7:30 or 8:00 p.m., Rankin drove up to Nelson and Petitioner in a red truck and purchased crack cocaine from Petitioner. After Rankin sped away, Petitioner realized that he had been given paper instead of money, and he told Nelson that he was going to get Rankin. Later that night, after Nelson returned to Petitioner, Petitioner told him that he had gotten Rankin. (Docket Entry 1, Ex. 7 at 2.) Petitioner told Nelson that he had shot Rankin and ran. Nelson noted that he had seen Petitioner with a .380 handgun "most all the time" but did not see him with it after Petitioner told him he shot Rankin. (Given on March 1, 1996.) (*Id.* at 3.)

**Statement of Larry Parker**: On October 14, 1995, around 10:15 p.m., Rankin came by Parker's house at 910 J.F.K. Drive and sold him some things for $25.00. From his front porch, Parker saw six black men walking down the road. He recognized Petitioner, Jeremy Sturdivant, and Tony Ferguson. Rankin asked Petitioner for some cocaine and assured Petitioner that he had money. The six men left, and Rankin told Parker that he was afraid of them and was going to his brother's house. At 10:45, Parker heard a gunshot coming from the Palisades Pool area. Two or three minutes later, he saw the six men running away from that area. He heard one of them say, "pick up the damn gun," and watched a man in a blue jacket pick up a gun as they all ran away. (Given on February 27, 1996.) (Docket Entry 1, Ex. 8 at 2.)

**Statement of Surinna Parker**: On October 14, 1995, around 10:50 p.m., Parker heard some people talking outside of her bedroom window on 912 Palisade Circle. Parker looked outside and saw Petitioner, Nelson, Jeremy Sturdivant, Johnny McRae, and Julio Servano talking. She then saw Rankin approach them and ask Petitioner for a "rock." Petitioner gave him a "rock," and Rankin gave him some folded-up money and walked away toward J.F.K. Drive. (Docket Entry 1, Ex. 9 at 2.) Parker reported that when Petitioner discovered that Rankin had given him folded-up paper instead of money, she overheard the following conversation:

> **Petitioner**: "Naw that mother fucker cheated me, nobody cheats me."

> **Sturdivant**: "Let's go and blast that mother fucker."

> **Petitioner**: "Yea let's go kill him."

> **Servano**: "No man let it go."

> **Petitioner**: "No I'm going to blast him."

22

           **Servano**: "Well do what you got to do."

(*Id.* at 2-3 (internal capitalization normalized).)

At around 11:15 p.m., Parker saw Petitioner, Sturdivant, and Nelson run toward J.F.K. Drive, in the same direction Rankin had run. At around 11:30 p.m., Parker heard a gunshot. Ten minutes later, she saw Petitioner, Sturdivant, and Nelson run back toward her yard. Later that night, she thought she heard someone knock over her trash can, but she was afraid to investigate. At around 6:00 the next morning, Parker saw in the can "an object wrapped up heavily in plastic." (*Id.* at 3.) She left the object there, but when she returned it was gone. Later that morning, she saw Petitioner, Nelson, and Johnny McRae on her neighbor's porch. Through her slightly open front door, she heard Johnny ask if they got rid of the gun, and Petitioner replied that he had given it to Nelson to throw in the river. When Parker stepped on to her own front porch, Petitioner told her, "yea bitch I know you know what happened and if you tell I'll kill your ass." (*Id.* (internal capitalization normalized).) Three days later, Petitioner threatened to kill Parker and her mother, and a few days after that cut the screens on her windows and set a fire on her porch. (Given on February 27, 1996.) (*Id.* at 3-4.)

**Statement of Corey Robinson**: Near the end of November 1995, a man named Hullio[14] offered to sell Robinson a gun that he said belonged to Petitioner and Nelson. Robinson agreed to pay $300, gave [Julio] $150, and received a ".357 MAG Police Ruger with Brown handles."[15] (Given on March 1, 1996.) (Docket Entry 1, Ex. 10 at 2.)

---

[14] This name is spelled Hullio in the statement; however, in the transcript and MAR order he is referenced as Julio.

[15] The prosecution presented neither this gun nor any other gun at Petitioner's trials.

Case 1:21-cv-00577-LCB-JLW   Document 49   Filed 02/27/24   Page 23 of 101

**Statement of Paul Williams**: Three days after Rankin's death, Sturdivant told Williams that Petitioner and Nelson killed Rankin. He said that Petitioner shot Rankin while Nelson was there. Williams also said that he often saw Petitioner and Nelson "play with" their guns before Rankin's death, but he never saw them with guns after his death. (Given February 27, 1996.) (Docket Entry 1, Ex. 11 at 2.)

**Analysis**: The MAR court found as fact that each of the nine statements "inculpates [Petitioner], often by identifying him as the killer of Jerry Rankin. None of the statements exculpate [Petitioner] or lessen his involvement in the crime." (Docket Entry 10, Ex. R at 32.) The MAR court further found that the "*de minimus* value these statements would have had to [Petitioner] would only have been to impeach Nelson at trial regarding *his* involvement in the murder," but that "the harm done" to Petitioner's case by use of any of the statements "would have far outweighed any benefit to [Petitioner]." (*Id.* at 32-33.)

The MAR court is correct. None of the nine statements exculpate Petitioner in Rankin's murder. In fact, most or all of them inculpate Petitioner in some manner or identify Petitioner as Rankin's killer. Petitioner contends that these statements are so materially different that they raise serious questions about the reliability of any of them. (Docket Entry 1 at 7, 22-24.) The Court disagrees that a reasonable juror would be likely to reach such a conclusion and concludes that, had any of the witness statements been known to the jury (beyond the Nelson statement, which was introduced at trial and read to the jury), they would only serve to further inculpate Petitioner in the crime. The Court concludes that these statements would likely harm Petitioner's cause in the eyes of a reasonable juror, not help it.

24

This evidence, considered alone and holistically with the entire record, does not meet the "no reasonable juror" standard and, in fact, it weakens Petitioner's assertion of actual innocence.

### b. Affidavits

In addition to these pre-trial statements, Petitioner provides written affidavits from three men who recanted or purportedly recanted their original statements incriminating Petitioner. Dumas, who originally claimed to the police that he witnessed Petitioner and Nelson shoot Rankin, gave a statement to investigators in 2011 in which he stated that his earlier statement implicating Petitioner had been fabricated. (*See* Docket Entry 1, Ex. 20.) Dumas was incarcerated in South Carolina for a capital murder in Virginia when he recanted his pretrial statement and he did not testify at either of Petitioner's trials or at the MAR hearing. (*Id.* at 2; Docket Entry 10, Exs. B, C, O, P, Q, V, W.) Dumas stated that "[d]uring [my] questioning, Sgt. Brigman accused me of murdering Jerry Rankin, but I had no idea what Sgt. Brigman was talking about." (Docket Entry 1. Ex. 20 at 2.)

Dumas then stated that he did not make the pre-trial statement, but he agreed that it had his signature on it. (*Id.*) Dumas explains:

> The statement is supposed to be from me, and it says I was an eyewitness to Jerry Rankin's murder. I told the lawyers that the signature is mine, but it isn't my statement because I didn't witness the murder and I don't know anything about guns but the statement suggests I do. I remember signing some papers when I was with Sgt. Brigman, but I do not remember that statement.

(*Id.* at 2-3.) After describing the contents of the statement, Dumas asserted that nothing in the statement was accurate: "None of that is true. I did not witness the murder, and Derrick and Thurman never threatened to kill me." (*Id.* at 3.) Dumas did not go to the police voluntarily,

as the statement said. (*Id.*) Instead, the police "picked [him] up off the street the day [they] questioned [him]." (*Id.*) Sergeant Brigman "handcuffed me, put me in the back of the police car, and took me to the police station, where they kept me in handcuffs and questioned me for 17 hours." (*Id.*) Dumas was fifteen years old. (*Id.*)

Lockhart, who also did not testify at Petitioner's trial(s), claimed that Petitioner had confessed to the killing in an original statement to the police, has also provided a sworn, written affidavit that his original statement was false. (*See* Docket Entry 1, Ex. 21.) Lockhart said that the police arrested him in February 1996 for a drug crime, when he was fifteen years old, and questioned him for several hours about Rankin's death. (*Id.* at 2.) Although he "had no knowledge about who killed Mr. Rankin . . . . Captain McQuage and Detective Voorhees told [him he] would go to jail for a long time if [he] refused to sign [a statement implicating Petitioner]." (*Id.*) Although he signed a statement implicating Petitioner, "[t]he entire statement is false." (*Id.*) Petitioner never told Lockhart "that he was involved in the Rankin murder," and Lockhart "did not witness the Rankin murder." (*Id.*) Lockhart refused to testify against Petitioner at trial. (*Id.* at 3.) Petitioner's counsel did not have Lockhart testify at any of Petitioner's MAR hearings. (*See* Docket Entry 10, Exs. O, P, Q, V, W.)

Petitioner also provides a sworn, written affidavit from Tender, executed in March of 2013, in which he states that his testimony at Petitioner's trials was not truthful. (*See* Docket Entry 1, Ex. 24.) In an interview with investigators from North Carolina Prisoner Legal Services, Tender stated that he "provided false statements to the detectives and testified falsely against Derrick McRae to improve my outcome on my cases." (*Id.* at 2.) He confirmed that "Derrick McRae never told me he killed Jerry Rankin." (*Id.*) During Petitioner's first MAR

hearing, as discussed below, Tender refused to affirm these out of court statements, instead providing vague answers and Tender claimed that he could not remember that far back and could not read statements because he lost his glasses. (Docket Entry 10, Ex. O at 118-23.) However, Tender later stated that he met with Agent Massey from the SBI a couple of weeks prior to the MAR hearing and told him that he firmly remembered Petitioner admitting to murdering Rankin. (*Id.,* Ex. Q at 338-39.) Tender also testified that from what he could recall now (in 2014) of the 1998 trials he testified truthfully. (*Id.*, Ex. O at 125; *Id.*, Ex. R at 12.)

**Analysis**: As an initial matter, neither Dumas nor Lockhart testified at Petitioner's trials, nor were their earlier witness statements (Docket Entry 1, Exs. 4 and 6) introduced by the State. Dumas' and Lockhart's accounting of events were therefore unknown to the jury. Had the affidavits (or their substance) been introduced at trial, they would mean nothing to the jury, as they would only serve to impeach alleged eyewitness testimony that was not offered by the State against Petitioner. Further, the Dumas and Lockhart affidavits were of little to no use to Petitioner's alibi.[16] (Docket Entry 1, Exs. 20 and 21.)

Moreover, even if the Dumas and Lockhart affidavits are correct and they did not witness anything inculpating Petitioner in Rankin's murder, the State had many other statements at its disposal—such as those of Nelson, Tender, Clark, Ferguson, Larry Parker, Surinna Parker, Robinson, and Williams—which did. The fact that two men allegedly recanted

---

[16] Lockhart does not state that he was at the cookout. Dumas does say that he "remember[ed] the cook-out party on the evening before Jerry Rankin got murdered, and . . . remember[ed] Derrick was there and he was drunk." (Docket Entry 1, Ex. 20.) However, nowhere does Dumas assert that he was actually at the cookout or, if he was, how long he was at the cookout, or that Petitioner was incapacitated by alcohol at the cookout.

their statements decades after they made them does not tend to show that Petitioner is actually innocent; rather, it would have given the State slightly less evidence to use against Petitioner at trial had it wanted to.

Additionally, Lockhart's affidavit levels several accusations at then RPD law enforcement officer Ron McQuage and the prosecutor at Petitioner's trials, Scott Brewer. It accuses the former of creating a false statement implicating Petitioner and threatening Lockhart into signing it, and it accuses the latter of knowing the statement was false and trying to cover that fact up and keep Lockhart from testifying. (Docket Entry 1, Ex. 21.) Captain McQuage passed away before Petitioner's convictions (*see* Docket Entry 10, Ex. C at 278) (witness testimony at Petitioner's second trial tending to show that "Captain McQuage has since passed away"), and his testimony about allegedly fabricating Lockhart's statement is not possible. However, there are several other reasons to treat the veracity of this statement with suspicion. First, the affidavit was acquired by the WCC in February of 2014 (Docket Entry 1, Ex. 21), before Petitioner's December 1-3, 2014 MAR hearings (Docket Entry 10, Exs. O, P, Q, V, W), and approximately two decades after Lockhart's initial statement was taken in February of 1996 (Docket Entry 1, Ex. 6). Second, although Petitioner and his counsel were in possession of the Lockhart affidavit during both MAR evidentiary hearings, Petitioner declined to call Lockhart as a witness (which would have exposed him to cross-examination) or to introduce Lockhart's affidavit into evidence. (*See* Docket Entry 10, Exs. O, P, Q, V, W.)

Finally, the affidavit suggests that both Brewer and Crump knew about the supposed fabrication and that Crump asked Lockhart to stay at the courthouse to testify at Petitioner's trial. (Docket Entry 1, Ex. 21.) However, Petitioner and his counsel never asked Brewer or

Crump about the supposed fabrication and cover-up at the MAR evidentiary hearings, despite the fact that both of them testified. (Docket Entry 10, Ex. Q at 402) (Petitioner's post-conviction counsel declining to ask Brewer any questions on cross-examination at MAR hearing); (*Id.*, Ex. O at 23-115) (Petitioner's post-conviction counsel questioning Crump but declining to ask any questions about Lockhart's affidavit). This is despite Petitioner's post-conviction counsel asking at least two witnesses, Crump and Voorhees, specifically about Lockhart's 1996 witness statement. (*Id.* at 111-112) (questioning Crump regarding Lockhart's witness statement); (*Id.*, Ex. P at 167) (questioning Voorhees regarding same).

Consequently, Lockhart's affidavit would likely be viewed by a reasonable juror with suspicion. It alleges police misconduct but says nothing about whether Petitioner actually murdered Rankin (for example, it does not support Petitioner's alibi), it has never been subject to cross-examination, and it took nearly twenty years for Lockhart to come forward with it. (Docket Entry 1, Ex. 21.) A reasonable juror is not likely to find it favorable to Petitioner, especially when considered in light of all the other witness statements discussed above that implicate Petitioner in Rankin's murder.

Nor is a reasonable juror likely to find Dumas' affidavit particularly favorable to Petitioner.[17] Dumas (who was convicted of capital murder in 1997 and later sentenced to life

---

[17] Petitioner also faults the RPD for allegedly failing to investigate Dumas, even after learning that he was later convicted of capital murder in Virginia. (Docket Enry 1 at 41; Docket Entry 12 at 16.) Petitioner states that this demonstrates that the RPD either coerced Dumas into his statement or failed to investigate the only person who placed himself at the murder scene. (Docket Enry 1 at 41.) However, given that the RPD took a statement from Dumas, there was at least some investigation involving him. And, in any event, without evidence of what further investigation would have revealed, it is difficult to conclude that a reasonable jury would see Dumas' later murder conviction or subsequent recantation fifteen years after the fact as evidence of Petitioner's innocence.

29

imprisonment (Docket Entry 10, Ex. P at 188-90)) has never been subject to cross-examination on the truth of the contents of his affidavit. It also took Dumas approximately fifteen years to come forward with his statement. (Docket Entry 1, Exs. 4, 20.) For these reasons, a reasonable juror would not be likely to find either of these affidavits favorable to Petitioner. *See also Herrera v. Collins*, 506 U.S. 390, 417 (1993) ("[M]otions based solely upon affidavits are disfavored because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations. . . . The affidavits filed in this habeas proceeding were given over eight years after petitioner's trial. No satisfactory explanation has been given as to why the affiants waited until the 11th hour[.]").

Additionally, as explained below, a reasonable juror would not be likely to find Tender's affidavit favorable to Petitioner because Tender was unwilling to affirm its substance when subject to cross-examination on the truth of its contents. All this evidence, considered alone and holistically with the entire record, does not meet the "no reasonable juror" standard.

### c. Tender's Recantation, Later MAR Testimony, and the Llewelyn Declaration

During the first day of the MAR hearing, held on December 1, 2014, Tender testified that he was sixty-two years old and a recovering alcoholic who was about twenty-four months sober. (Docket Entry 10, Ex. O at 115-16.) He could only "vaguely" remember being involved in this case back in March 1996. (*Id.* at 117.) Tender emphasized that this case occurred almost 20 years ago and that he had to go to court twice. (*Id.*) He remembered giving a statement in 1996, but not its contents. (*Id.* at 118.) Tender recalled living in the same cell block as Petitioner and speaking with him while they were in custody together. (*Id.* at 119.) When he was read the

statement he gave in 1996, Tender could not verify whether Petitioner had told him that he had killed Rankin because his "mind ha[d] been through a lot." (*Id.* at 120.)

Tender was then handed Defendant's Exhibit 20, an affidavit signed by him in March 2013. (*Id.* at 121-22.) When asked to read it, Tender stated that he could not see the statement because his eyes were bad and he had lost his glasses. (*Id.* at 121-22.) Petitioner's counsel requested that he have the opportunity to recall Tender later in order for him to attempt to get another pair of glasses from his doctor at the Veteran's Administration. (*Id.* at 124.)

On cross examination, Tender testified as follows:

> **Q** Now, Mr. Tender, you testified in two different trials regarding Derrick McRae, right?
>
> **A** Yes, sir. If I can remember correctly.
>
> **Q** Okay. And you were under oath at those times, right?
>
> **A** Yes.
>
> **Q** And you testified truthfully at the first hearing, didn't you?
>
> **A** Yes, sir, to the best of my knowledge. I can't remember.
>
> **Q** All right. And you testified truthfully at the second trial, didn't you?
>
> **A** Best that I can remember.
>
> **Q** All right. Thank you.

(*Id.* at 125.)

During the third day of the MAR hearing, Tender was recalled to the stand. (Docket Entry 10, Ex. Q at 315.) Tender testified that he could not remember his testimony at

Petitioner's first and second trial. (*Id.*) He testified further that he was an alcoholic when he testified at Petitioner's trial and that he was drinking heavily during that period of time. (*Id.*)

When asked if he remembered meeting with investigators reviewing Petitioner's case and giving them a statement, Tender responded:

> I can't remember. I met with a thousand people. Just this morning, I couldn't even come out my door to an investigator there, and my daughter couldn't even come out of the house. Somebody was there, a private detective or somebody – newspaper. And I'm just gonna tell you I'm just confused. Newspaper stayed at my house last Friday all day till 11:00 at night.

(*Id.* at 316-17.)

Tender repeatedly reiterated that he did not recall signing the affidavit marked Defendant's Exhibit 20. (*Id.* at 317-18.) When he was pressed further about whether he gave a recorded statement back in February 2013, and also signed an affidavit, Tender stated that he did not think he was under the influence of alcohol at that time and responded further:

> You know what, like I told you, I did anything just to get – it's been a million people with this mess coming to me with it, and I might have told them anything just to get them out of my hair, and it would get worse and worser and worser. They are really, you know, obsessed.

(*Id.* at 320.)

Tender testified that he did not recall giving a recorded statement to Investigators Gary Baten and Don Snell. (*Id.* at 320-21.) The recording was played. (*Id.* at 321-332.) In the recording, Tender stated that his previous testimony—that Petitioner told him he killed Rankin—was false, made up by law enforcement, and that law enforcement told him they would suspend his sentence if he implicated Petitioner. (*Id.* at 322-23, 325-26.) Tender

acknowledged that it sounded like his voice. (*Id.* at 333.) When asked whether he told investigators that his testimony against Petitioner was a lie, Tender responded, "You know what, if you listen in there, he was saying something about other people. So when the people came, I might have told them anything to get them out of my hair, and it's gotten worser and worser like I say earlier." (*Id.* at 333.) Petitioner then introduced Exhibit 20 (Tender's affidavit) into evidence for the limited purpose of impeachment. (*Id.* at 334.)

On cross-examination, Tender stated that he was first contacted by representatives of the WCC in 2009 and initially told them (1) he really did not remember much; and (2) he had PTSD. (*Id.* at 334-35.) Tender testified that these individuals would not leave him alone and were very aggressive. (*Id.* at 335.) Tender felt like the WCC had been hounding him for five years. (*Id.* at 336.) There was one instance where an investigator came into Tender's residence without his permission. (*Id.* at 343.) The weekend prior to this hearing, Tender could not leave his home and had to turn off his telephone because people kept showing up and/or calling him. (*Id.* at 343-44.) When he was asked whether the change in his recounting of the events that occurred between the time of the trials and the present day came from his own memory or if they were suggested to him, Tender responded, "No. They didn't come - - I can't even remember." (*Id.* at 338.)

Tender was then asked, "So did they [the Duke Clinic] tell you what to say?" (*Id.*) He testified, "Pretty much. I would listen. It's just my short memory. You know, some of the names wasn't even right." (*Id.*) Tender did recall meeting with SBI Agent Massey a couple of weeks prior to the MAR hearing and telling him that he firmly remembered Petitioner admitting to murdering Rankin. (*Id.* at 338-39.) Tender also told the Agent that there was no

deal between him and the State for his previous testimony; rather, the reason for the favorable disposition in his previously pending charges was the State's lack of evidence. (*Id.* at 339-40.)

The MAR Court found as fact in assessing Petitioner's claim that Tender recanted his testimony that "The only statements that can be perceived as recantations were not under oath at this or any earlier trial or hearing. Tender continues to maintain that he testified truthfully at both of Defendant's trials. This Court finds that Tender has not recanted his trial testimony and that, indeed, he has reaffirmed his trial testimony." (Docket Entry 10, Ex. R at 18.)

In his response to the State's motion to dismiss on statute of limitations grounds, Petitioner has filed the declaration of Leigh Llewelyn. Llewelyn was a law student at Duke Law and part of the WCC representing Petitioner. (Docket Entry 12, Ex. B at 2.) According to the declaration, Llewelyn attended the WCC's first meeting with Tender at Fatz Café in Rockingham in November of 2009. (*Id.* at 3.)

Llewelyn states that "[a]t this meeting, Mr. Tender spontaneously recanted his testimony from Mr. McRae's trial. Mr. Tender did not know the Clinic was reviewing Mr. McRae's case at the time of his recantation." (*Id.*) Tender's recantation came as a random response to general questions about preferential treatment to certain people in Richmond County, while others were unfairly charged. (*Id.* at 4.) Tender brought up a case involving a person he said the Sherrif's Deputies "hated and wanted off the street." (*Id.*) He said, "they framed that guy." (*Id.*) He said he thought the defendant's name was "George McDonald," but then said things such as "that's not right" and "was it McDonald?" (*Id.*) Professor Newman (also with the WCC) asked "could it have been McRae?" and he said, "yeah, that's right.

Derrick McRae. They framed him." (*Id.*) Petitioner contends that this demonstrates that the WCC did not "hound" Tender into recanting. (Docket Entry 12 at 8.)

   **Analysis**: The Court concludes that a reasonable juror would be unlikely to find Tender's out-of-court statements persuasive. As the MAR court correctly pointed out, Tender testified that from what he could recall of the 1998 trials he testified truthfully. (Docket Entry 10, Ex. O at 125; *Id.*, Ex. R at 12.) Tender also testified to meeting with Agent Massey from the SBI a couple of weeks prior to the MAR hearing and telling him that he "firmly" remembered Petitioner admitting to murdering Rankin.[18] (*Id.*, Ex. Q at 338-39.) Tender explained that, regarding his purported recantation, he "might have told [investigators] anything just to get them out of [his] hair[.]" (*Id.* at 320.) In other words, Tender continued to maintain that Petitioner admitted to killing Rankin to him and ultimately did not recant his earlier position.[19] Consequently, the Court concludes that a reasonable juror presented with

---

   [18] Petitioner asserts that "contrary to the MAR Court's finding, [Tender] never affirmed the truthfulness of his trial testimony." (Docket Entry 12 at 9.) However, for the reasons set forth above in its analysis, the Court finds this objection unpersuasive.

   [19] In assessing claim three of Petitioner's MAR (the claim asserting that Tender recanted), the MAR court found as fact that "The only statements that can be perceived as recantations were not under oath *at this or any earlier trial or hearing*. Tender continues to maintain that he testified truthfully at both of Defendant's trials." (Docket Entry 10, Ex. R at 18 (emphasis added).) Petitioner apparently challenges this finding, characterizing it as a finding by the MAR court that "Tender did not recant under oath." (Docket Entry 12 at 9.) However, as emphasized above, the MAR court concluded that Tender did not recant while he was under oath at either trial or the MAR hearing or any other hearing where he would be under oath subject to cross examination regarding his recantation.

the same evidence would be unlikely to find Tender's affidavit recanting his earlier trial testimony persuasive.[20]

Additionally, Petitioner focuses on the differing motives Nelson and Tender offered for Rankin's murder and calls them "wildly divergent." (Docket Entry 1 at 37.) According to Petitioner, Nelson testified that Petitioner killed Rankin due to a botched drug deal, while Tender testified that the murder was due to Petitioner being a "well-read militant motivated by racial animus." (*Id.* at 37-38.)

But as the MAR court reasonably recognized in its order,

> Tender testified that [Petitioner's] murder of Rankin was motivated, at least in part, by race. . . . Nelson testified that [Petitioner's] murder of Rankin was motivated by [Petitioner] being tricked in a drug deal. . . .The jury was presented with two motives, not mutually exclusive, for [Petitioner's] murder of Rankin during [Petitioner's] second trial – racial hatred and drugs. Such motives, either individually or taken together do not undermine confidence in the jury verdict.

(Docket Entry 10, Ex. R at 34) (citations omitted).

The MAR court was correct. The jury was presented with two possible motives for Petitioner's murder of Rankin at trial. Any inconsistencies in Nelson's and Tender's testimony regarding Petitioner's motives were before the jury and do not constitute newly discovered evidence. The only alleged new evidence is Tender's recantation, which the MAR court convincingly found had not in fact meaningfully occurred, given Tender's consistent in-court

---

[20] The Court notes too that, generally speaking, recantation statements are viewed with suspicion. *See, e.g.*, *United States v. Hackley*, 164 Fed. App'x 301, 305 (4th Cir. 2006) ("recantation statements are necessarily viewed with considerable skepticism");*United States v. Johnson*, 487 F.2d 1278, 1279 (4th Cir. 1973) (recantation testimony "looked upon with the utmost suspicion") (internal quotation marks omitted); *see also Wadlington v. United States*, 428 F.3d 779, 784 (8th Cir. 2005) ("recantations of testimony generally are viewed with suspicion").

36

testimony at the MAR evidentiary hearing. There is no meaningful reason to believe that reasonable jurors would be likely to conclude otherwise. This evidence, considered alone and holistically with the entire record, does not meet the "no reasonable juror" standard.

### d. Nelson and Tenders' Alleged Favorable Treatment

Petitioner claims that the next piece of newly discovered evidence is the fact that Nelson and Tender received favorable treatment in exchange for their testimony against him. (Docket Entry 1 at 34-40.) Regarding Nelson, Petitioner specifically asserts that:

> [a]lthough Nelson testified that he did not have a deal from the State in exchange for his testimony (2-Trial-Tr. 67:8–14), the extraordinary treatment he obtained before trial (remaining out on bond), the lenient disposition he obtained after trial (murder and other charges dropped, and receiving only eight-month sentence for remaining charges), and the confidence his own lawyers possessed about the ultimate disposition of the murder charge (allowing Nelson to testify at McRae's trial without counsel present (2-Trial-Tr. 60:2–19)) demonstrate that a deal *had* to exist between Nelson and the State, even if only the customary tacit kind of the time, and that his testimony to the contrary was false.

(Docket Entry 1 at 35.) [21]

---

[21] Nelson testified at Petitioner's second trial without his counsel being present. (Docket Entry 10, Ex. C at 60.) The prosecutor, Brewer, explained to the Court:

> **MR. BREWER**: Your Honor, Mr. Nelson is . . . represented by Mr. Eddie Meachum of the Moore County Bar. Mr. Meachum I spoke with last night. Mr. Meachum is in Federal Court today. He indicated to me that he gave me his consent to go ahead and call Mr. Nelson as a witness without Mr. Meachum being present. He said he would communicate that to Mr. Nelson. I have not talked with Mr. Nelson this morning and just wanted to make sure that he understood that if it's okay with him to go ahead with Mr. Meachum being present.

Case 1:21-cv-00577-LCB-JLW    Document 49    Filed 02/27/24    Page 37 of 101

And, regarding Tender, Petitioner specifically asserts that "The jury also did not know Tender's full criminal record, including the very favorable disposition of the many charges he was facing at the time he first implicated McRae in Rankin's murder." (Docket Entry 35 at 1.) This claim is essentially the same as claims I, II, IV, and V in Petitioner's MAR, which were all rejected by the state court. (Docket Entry 10, Ex. R.)

**Tender**: As background, Tender was charged with a series of charges, including breaking and entering, larceny by an employee, and obtaining property by false pretense. (*Id.* at 11.) On March 28, 1996, before either of Petitioner's trials began, Tender plead guilty to one count of simple worthless check, one count of possession of stolen goods, and sixteen counts of misdemeanor common law forgery. (*Id.*) The common law forgery charges were originally charged as obtaining property by false pretenses, which is a felony. (*Id.*) Likewise, the misdemeanor possession of stolen goods charge was originally charged as breaking and entering, a felony. (*Id.*) The MAR court found, "[t]he State disposed of the cases against Tender

---

>**THE COURT**: Mr. Nelson, you've heard what Mr. Brewer has said. Do you consent with proceeding with Mr. Meachum not being here?
>
>**MR. NELSON**: (Nods his head affirmatively.)
>
>**THE COURT**: All right. Would you speak out loudly?
>
>**A** Yes.
>
>. . . .
>
>**THE COURT**: All right.

(*Id.*) Petitioner contends that this is evidence of a verbal agreement with the prosecution that Nelson would benefit from his testimony. (Docket Entry 12 at 11.)

in this manner, not because of an arraignment [sic] with Tender, but because the State had weak cases against Tender." (*Id.* at 11.) After these charges against him had been disposed of, Tender testified against Petitioner in both trials and also testified that he received no promises in exchange for his testimony. (Docket Entry 10, Exs. B at 88-106 and C at 115-32.)

Nevertheless, Tender was facing numerous felony charges when he first implicated Petitioner in a statement to Detective Brigman on March 26, 1996 (Docket Entry 1, Ex. 23) and he still had two charges of misdemeanor probation violation pending when he testified in both of Petitioner's trials (Docket Entry 1, Ex. 17 at 1-2).[22] When Tender provided his statement to the RPD, he was in the Richmond County Jail charged with twenty-two charges, nineteen of which were felonies. All but two of the charges were favorably resolved shortly afterward, and Tender was released, but two charges remained open (the misdemeanor probation violations) for more than two years before Petitioner was convicted and only then were they resolved, two weeks later. (*Id.*) The jury at Petitioner's second trial was aware that Tender had been convicted of misdemeanor possession of stolen goods and 16 counts of common law forgery on March 28, 1996. (Docket Entry 10, Ex. C at 274-77.)

**Nelson**: Likewise, Nelson was facing charges around the time of Petitioner's trials. Nelson was charged with Rankin's murder as a co-defendant. (Docket Entry 10, Ex. R at 49; *Id.*, Ex. C at 70-71.) Nelson remained out on bond, without a trial, for the following two years.

---

[22] The MAR court found that "Tender had no undisposed cases pending when he testified in both of Defendant's trials." (Docket Entry 10, Ex. R at 48; *see id.* at 11.) Nevertheless, Tender did have two misdemeanor probation violations pending when Tender testified. The Court does not view this as material to the outcome of the MAR or of the instant motion to dismiss.

(Docket Entry 1, Ex. 19.) During that time, Nelson was charged with several misdemeanors and a felony (possession of stolen goods), including two separate "carrying concealed gun" misdemeanor charges, but he was never held and never had his bond on the murder charge revoked or modified. (*Id.*) Nelson testified that "When I – when they caught me with the guns, they told me I could go, just be in court." (Docket Entry 10, Ex. C at 83-84.) He denied receiving special treatment or promises from law enforcement regarding these charges. (*Id.*)

Nelson testified for the State in Petitioner's first and second trials while the murder charges were still pending against him. (Docket Entry 10, Ex. B at 133-74; *Id.*, Ex. C. at 61-84; *Id.*, Ex. R at 20-22.) The jury was aware that Nelson was also charged with Rankin's murder. (*Id.*) During both trials, Nelson testified that he had received no promises "regarding what would or would not happen as a result of his testimony." (*Id.* at 20.) After Petitioner's second trial, the murder charges against Nelson were dropped. (Docket Entry 1, Ex. 19 at 2.)

**Analysis**: The Court concludes that had the evidence discussed above been presented to the jury, there is little reason to believe that it would meet the "no reasonable juror" standard. Petitioner claims that the disposition of Nelson and Tender's criminal charges were the result of an implicit or explicit deal between those men and the State and in exchange for their testimony against Petitioner. (Docket Entry 1 at 34-40.) However, the evidence and testimony from the evidentiary hearing on Petitioner's MAR supports the conclusion that any assertion that Nelson or Tender received an explicit or implicit deal or lenient treatment in exchange for their testimony is unpersuasive. Michael Parker, the Chief ADA in Richmond County in 1996, was responsible for Petitioner's case until he assigned it to Scott Brewer sometime in the middle part of 1997. (Docket Entry 10, Ex. P at 238, 286-87, 291.) Parker had

no knowledge of any plea deals or offers being made to other witnesses or the codefendant in this case. (*Id.* at 294.) Ken Honeycutt, the elected DA, was the only person authorized to decide what offers were made to individuals involved in murder cases. (*Id.* at 289, 295, 303; *Id.*, Ex. Q at 395.)

Scott Brewer testified that when he was assigned to this case it had been pending for two years. (*Id.* at 393.) Brewer testified that he never met with Nelson or Tender and did not make either of them any offers in exchange for their testimony. (*Id.* at 395.) He did not have that authority. (*Id.*) Brewer further testified that Nelson was charged with this murder at the time of trial and stated that he put him on the witness stand because he had knowledge of the crime. (*Id.* at 399.) It was a common practice for his office to try the individual that appeared to be most culpable first. (*Id.* at 401.) Brewer's recollection was that Nelson's testimony was consistent with his previous statement to law enforcement. (*Id.*)

Finally, James Van Camp, one of Nelson's defense attorneys at the time, testified at the MAR evidentiary hearing. Van Camp testified that he represented Nelson when he was charged with first-degree murder in connection with this case. (Docket Entry 10, Ex. P at 300.) Van Camp recalled that Nelson testified for the State against Petitioner and could not say that he received a benefit as a result of his testimony. (*Id.* at 301.)

He explained, "As I understand it, the case against him was dismissed, but I don't know that it was [a] benefit for him testifying." (*Id.*) Van Camp did have a general expectation that if Nelson cooperated there would be some consideration for that from the State. (*Id.* at 302.) Van Camp explained however that this potential consideration was not ever defined and there would be no specific offer from the DA's office. (*Id.* at 303, 307.) Van Camp was asked, "when

your client testified that he didn't have a deal with the State, that was a true statement, isn't that correct?" (*Id.* at 307.) He responded, "Yes." (*Id.*)

All the testimony presented at the evidentiary hearing uniformly supports the conclusion that neither Nelson nor Tender received any deal or favorable treatment in exchange for their testimony. Both prosecutors assigned to the case stated that they did not offer Nelson or Tender a deal and, in fact, had no authority to do so. This was corroborated (at least as far as Nelson is concerned) by Van Camp, who testified that although he may have hoped for a benefit, one was never discussed and it was a true and accurate statement to say that Nelson did not have a deal with the State. The testimony at the evidentiary hearing was also in line with Nelson and Tender's testimony at trial; both men testified that they had received no deal or other benefit in exchange for their testimony.[23]

Given this evidence and testimony, the MAR court made detailed findings of fact regarding Petitioner's claim that Nelson and Tender received favorable treatment for their testimony. The MAR court found that Tender received no favorable treatment in exchange for his testimony:

> The record before this Court is convincing that Tender was not offered a deal relating to the disposition of his 1996 charges in exchange for his trial testimony against [Petitioner] in 1998.

---

[23] The Court agrees with Respondent to the extent he contends that a reasonable jury would likely view Petitioner's assertion of an implicit deal as turning on an "unexpressed but internal hope" on Nelson's and Tender's part that their testimony would create a windfall for them in the future, despite no discussion or promise of that occurring. (Docket Entry 10 at 78, n.15.) Moreover, the Court further agrees with Respondent that Petitioner's trial counsel had the opportunity to ask both men if they received a deal in exchange for their testimony, or if they hoped to get some benefit from testifying even without a deal in place. (*Id.*) And counsel was free to argue to the jury that Nelson and Tender were testifying in order to help themselves. (*Id.*)

> Under oath, in both of [Petitioner's] trials in 1998 and in the
> MAR evidentiary hearing of 2014, Tender repeatedly testified that
> he received no special treatment in exchange for his testimony
> against [Petitioner]. Brewer and Parker also testified in a manner
> consistent with Tender's testimony. . . . This Court finds that
> Tender did not have any arrangement with the State in which he
> was promised leniency on his 1996 charges in exchange for his
> testimony against [Petitioner] at trial.

(Docket Entry 10, Ex. R at 12-13 (citations omitted).)

Likewise, the MAR court found that no deal existed for Nelson's testimony:

> This Court finds that Nelson did not have any arrangement with
> the State in which he was promised some benefit in exchange for
> his testimony against [Petitioner] at trial. . . . . No evidence was
> presented which supports [Petitioner's] contention that an
> arrangement existed between the State and Nelson, whereby
> Nelson would receive some benefit to in [sic] exchange for
> favorable testimony against [Petitioner] in his trials. In fact the
> evidence supports the finding that no such arrangement existed.

(*Id.* at 21.)

While the MAR court made these findings while considering the merits of Petitioner's

*Brady* arguments in state court, they are relevant to Petitioner's actual innocence claim and are

presumed correct by this Court. After a hearing at the MAR court, Petitioner did not produce

any reliable evidence tending to show that Nelson or Tender were promised anything from

the State either explicitly or implicitly in exchange for their testimony. Petitioner's suggestions

to the contrary (Docket Entry 1 at 11-18, 35-37; Docket Entry 12 at 10-12) do not create a

persuasive claim that Nelson or Tender were lying, or that he is innocent of murdering Rankin.

43

This evidence, considered alone and holistically with the entire record, does not meet the "no reasonable juror" standard.[24]

### e. Dr. Wolfe

Next, Petitioner claims a new reliable piece of evidence is "Dr. Wolfe's testimony with respect to medical records undercutting Tender's trial testimony." (Docket Entry 1 at 34.) Petitioner claims that Dr. Wolfe's testimony and Petitioner's underlying medical records show that he never mentioned any racial animus towards white people, and that "not a single entry"

---

[24] In footnote 64 on page 82 of Petitioner's brief, he asserts that "in the same judicial district at the time of McRae's prosecution, prosecutors, including Brewer, were determined to have withheld evidence of deals made with witnesses in exchange for their testimony." (Docket Entry 1 at 82, n.64 citing *State v. Hoffman*, Order (95 CRS 15695) at 7 (N.C. Super. Ct. Apr. 30, 2004); *State v. Hamilton*, Order (95 CRS 1670) at 22-23 (N.C. Super Ct. Apr. 22, 2003).) Petitioner has not provided the Court with copies of these cases, despite Local Rule 7.2(c) providing that "[u]npublished decisions may be cited only if the unpublished decision is furnished to the Court . . . ." M.D.N.C. LR 7.2(c). In any event, Brewer is not mentioned in the *Hamilton* order to which Petitioner cites (which the Court has been able to track down). *State v. Hamilton*, Order (95 CRS 1670) (N.C. Super Ct. Apr. 22, 2003). And, while Honeycutt and Brewer are mentioned in the *Hoffman* order to which Petitioner cites (which the Court has also been able to track down), Judge W. Erwin Spainhour conducted a hearing on Hoffman's MAR on April 26, 2004, and granted Hoffman a new trial on April 30, 2004 because Hoffman's trial attorney was unaware of the federal immunity granted to a testifying witness. *State v. Hoffman*, Order (95 CRS 15695) at 7 (N.C. Super. Ct. Apr. 30, 2004). In his order, Judge Spainhour found as fact that neither Honeycutt nor Brewer knew of the grant of federal immunity. *Id.* In a following footnote, Petitioner also asserts that "Brewer was once prosecuted by the State Bar for concealing a deal made in exchange for witness testimony in a capital murder case—one tried in the same year McRae was convicted. Although the case against Brewer was dismissed as time barred, the court made it clear that the decision rested solely on procedural grounds." (Docket Entry 1 at 83, n.65 (citations omitted).) However, because two of the claims were dismissed as time-barred and a third was dismissed for failure to state a claim, the substantive allegations against Brewer (and Honeycutt), which were contested, were never tested or assessed. *See N.C. State Bar v. Brewer*, 183 N.C. App. 229, 230-39 (2007). Nothing about Petitioner's arguments here changes the Court's assessment of his actual innocence claim.

in his medical records "corroborates Tender's claim that McRae was a well-read militant motivated to kill Rankin out of racial animus."[25] (*See* Docket Entry 1 at 28; *see also id.* at 37-38.)

**Analysis**: As a preliminary matter, Petitioner's medical records and Dr. Wolfe's opinion on Petitioner's mental state are not new evidence. Petitioner was of course aware of his own medical records at the time of trial and had personally met with Dr. Wolfe on many occasions. For example, Dr. Wolfe evaluated Petitioner and issued reports on December 10, 1996, September 19, 1997, and February 12, 1998 indicating that Petitioner was not competent to stand trial at those times. (Docket Entry 10, Ex. D at 11-13.) At that time, Dr. Wolfe indicated that Petitioner was both schizophrenic and psychotic. (*Id.*) Dr. Wolfe did not testify at trial, and never provided an opinion at that time whether Petitioner was racist towards white people or knew the names of Black civil rights leaders Malcom X or Stokely Carmichael.

Further, Petitioner overstates Tender's trial testimony; Tender did not directly testify that Petitioner was a "well-read militant." Instead, he testified that while incarcerated together Petitioner told him that he killed Rankin and that he "wanted to kill all white people" because "he hated white folk." (Docket Entry 10, Ex. C at 116.) Tender continued: Petitioner "told me, you know, militant things, like he wanted to kill all white people. He talked *pretty much like* a revolutionary type talk. You know, not the – it was more *like* a Malcom X or Stokey [*sic*] Carmichael *we used to have around*." (*Id.* at 119) (emphases added). On cross-examination, Tender's testimony changed slightly; Tender agreed with a question asking whether Petitioner

---

[25] Dr. Wolfe also executed an affidavit in September of 2011 indicating that the "slack face" and "disinterest" remarked upon by the prosecution at the second trial were consistent "with both [Petitioner's] psychotic state and the effects of Haldol medication he was taking at the time." (Docket Entry 1, Ex. 16 at 2.)

himself "was talking about Malcom X and Stokey [*sic*] Carmichael," and agreed with defense counsel's statement that "[Petitioner] must be a very well read young man to know about Stokey [*sic*] Carmichael." (*Id.* at 127.)

Tender's testimony on this point is at least partially contradictory; while on direct examination Tender appeared to have merely likened Petitioner's statements and rhetoric to that of Malcom X and Stokely Carmichael, on cross-examination he appeared to agree that Petitioner himself talked about the two civil rights leaders and, for that reason, must have been "a very well read young man." Dr. Wolfe's reports or testimony has no bearing on whether or not Petitioner could have been aware of the existence of Malcom X and Stokely Carmichael. And Tender's broader assertion that Petitioner talked about Rankin in racial terms was corroborated by some evidence. ((Docket Entry 1, Ex. 9 at 3-4) (Surina Parker statement indicating Petitioner threatened her by saying "I know you know what happened and if you tell it I'll kill your ass. . . . I'll kill yall ass just like I did that white boy Jerry."); *Id.*, Ex. 4 (Dumas statement indicating Petitioner said "I will shoot you white boy."); *Id.*, Ex. 6 (Lockhart statement including "Derrick said yea, I blasted that punk white mother fucker Jerry Rankin").)

Dr. Wolfe's testimony at the MAR hearing added nothing to the equation. At the hearing, Dr. Wolfe testified that she had re-reviewed Petitioner's medical notes, and she "specifically looked for anything that would have been construed as racial remarks, and I found none." (Docket Entry 10, Ex. Q at 371.) She explained that Petitioner would sometimes be threatening towards staff during those years, but that when he threatened someone, "it was things like I will kick your ass. Again, nothing of any racial issue." (*Id.* at 372.)

46

To the extent that Petitioner contends that Dr. Wolfe's MAR testimony that Petitioner did not appear to make "racial remarks" during evaluation in 1996, 1997, and 1998 means that Tender's testimony was necessarily false is unpersuasive. Evidence in the record (described in greater detail above) provides at least some indication that Petitioner spoke about Rankin in racial terms, calling him a "white boy." And Dr. Wolfe's MAR testimony does not prove that Petitioner was categorically unaware of Malcom X and Stokely Carmichael, or that his confession to Tender was fabricated. In sum, it is unlikely that any reasonable juror would draw the same conclusion between Tender's and Dr. Wolfe's testimony that Petitioner does. Her testimony does nothing to establish actual innocence and does not meet the high evidentiary bar sufficient to demonstrate that every reasonable juror would likely acquit. In other words, this evidence, considered alone and holistically with the entire record, does not meet the "no reasonable juror" standard.

### f. Rankin's Criminal Record

Petitioner also argues that a series of records maintained by the Hamlet Police Department are new reliable evidence which show his innocence. Petitioner posits that the Hamlet Police records show Rankin committed a "crime spree" in the week or so leading up to his murder, and that given this evidence no reasonable juror would have found Petitioner guilty beyond a reasonable doubt. (Docket Entry 1 at 28-29, 34, 38-39, 41.) The Court disagrees.

Specifically, Petitioner points to Hamlet Police records which tend to show that Rankin was suspected of committing a series of car break ins in Hamlet, North Carolina on October 8-9, 1995. (Docket Entry 1, Ex. 1 at 2-23.) Each investigation report identified Rankin as the

likely perpetrator, and described items that Rankin allegedly stole out of various vehicles, including a radar detector, cassette player, hydraulic jack, and .22 rifle. (*Id.*) The reports also identified what Rankin allegedly did with the stolen items. Each report describes Rankin selling or trading the items in exchange for crack cocaine. (*Id.*). Multiple arrest warrants were issued for Rankin's arrest, all on October 13, 1995. (*Id.*)

Petitioner attempts to draw several connections between the police reports and his innocence. First, he claims that the Hamlet Police records "reveal that Rankin stole and crashed a red truck approximately a week before Nelson claimed to have seen Rankin drive up in one." (Docket Entry 1 at 28 (citing Ex. 1 at 17).) He also alleges, in a footnote, that the "uncorroborated presence of the red truck in Nelson's statement strongly suggests that this fact was provided to [Nelson] by the RPD. Either the RPD knew Rankin's family owned a red truck . . . or knew Rankin had recently stolen a red truck." (Docket Entry 1 at 28 n.38.) Petitioner further asserts that these records show that "McRae was not the only individual with a reason to wish Rankin harm. . . . Relatedly, on the night of his murder, Rankin appeared nervous and told his mother that 'Dale' wanted to 'beat the ass out of him.' Thus, ample evidence suggests that others may have murdered Rankin[.]" (Docket Entry 1 at 38.)

**Analysis**: Petitioner's contentions about the red truck, and the Hamlet Police records in general, are not persuasive. The page Petitioner cites to in the police records, (Docket Entry 1 at 28 referencing Ex. 1 at 17), appears to be a juvenile rights warning form for a Johnny Wayne Lowery. (*See id.*) After reviewing the Hamlet Police records attached to the petition in their entirety, the Court can only find possible mentions to a red truck in two places.

48

First, according to a police incident report, Rankin allegedly broke the back window of a 1989 Chevrolet 1500 (a type of truck) belonging to a Suzetta Bullard Nutting and stole a radar detector which he later allegedly sold to "get a rock (crack cocaine)." (*Id.*, Ex. 1 at 2-3.) The '89 Chevrolet on the incident report was "wine" in color. (*Id.* at 2.)

Second, an otherwise blank piece of paper labeled as "Defendant's exhibit 19" contains, in pertinent part, the following passage: "Red truck stolen and wrecked on Dawkins Hill. Sunday night." (*Id.* at 14.) Directly below the quoted passage, the names "Jerry Rankin" and "Johnny Lowery" are listed, along with the words "Saw Drille on Truck" or "Saw on Drille Truck." (*Id.*) Finally, these words are accompanied by what appears to be a drawing of an intersection. (*Id.* at 13.) The statement is not attributed to any person, does not claim that Rankin was the one who stole the red truck that was mentioned, or how the source of the information knew that the red truck had been wrecked.

Given the above-described records and information, it is unlikely that a reasonable juror would draw the same conclusions that Petitioner does. The lone reference to a red truck being stolen and wrecked on "Dawkins Hill" in the Hamlet Police file does not prove that Nelson's trial testimony, that he saw Petitioner driving a red truck on the day Rankin duped Petitioner into selling him crack cocaine for a piece of paper, was fabricated by law enforcement or was otherwise false.[26] Petitioner has not shown that access to the Hamlet

---

[26] Additionally, as part of his effort to challenge Nelson's credibility that Petitioner was in a red truck the day of the murder, Petitioner also points to Mrs. Rankin's testimony at the second trial that her son was on foot that night and that he did not have permission to drive the family's red truck. (Docket Entry 1 at 38 referencing Docket Entry 10, Ex. C at 62-63, 177-79.) However, this evidence is not new. The jury heard this evidence and still convicted Petitioner of Rankin's murder.

49

Police records would more likely than not lead every reasonable juror to conclude that Nelson's testimony was false or fabricated, and that Petitioner was therefore likely innocent. Instead, the most likely conclusion the jury would draw from having access to the Hamlet Police records is consistent with the State's case: the records show that Rankin was a troubled individual addicted to crack cocaine who was not above stealing to fuel his addiction. This is consistent with the State's evidence, which stated that Rankin cheated Petitioner in order to obtain crack cocaine.

Beyond that, Petitioner's suggestion that the victims of Rankin's alleged property theft may have killed him strikes the Court (and would likely strike a jury) as speculative, especially given that these victims apparently instead sought redress by contacting law enforcement. As to Mrs. Rankin's reference to "Dale" in the first trial, the Court concludes that this too is speculative and would strike a jury the same way. Ms. Rankin did not suggest that "Dale" intended to murder her son.

It is also clear from the testimony at the first trial that Rankin did not tell his mother the night he was murdered that "Dale" wanted to hurt him. Instead, Mrs. Rankin explained that her son usually did not tell her why he might be "nervous or what was bothering him" but that he did, in some previous conversation at some unknown time, once tell her that someone named "Dale" "was going to beat the ass out of him." (Docket Entry 10, Ex. B at 79.) The prosecution asked if that "was some other conversation" and Mrs. Rankin answered "Yeah." (*Id.*)

In the end, the Hamlet Police records do not demonstrate that, had they been introduced, "no reasonable juror" would likely have found Petitioner guilty beyond a

50

reasonable doubt. This evidence, considered alone and holistically with the entire record, does not meet the "no reasonable juror" standard.

### g.  Robert Vorhees' MAR Testimony and Additional Depositions

Petitioner received very little discovery from the State prior to his trials. (*See* Docket Entry 1 at 9 n.10.) During his MAR proceedings, the State produced discovery that included the investigative file from the RPD. (Docket Entry 14 at 2-3.) At the MAR hearing, the lead detective in Petitioner's case, Robert Voorhees, testified that the master file was not complete: "It's missing a lot of the information that's indexed in it." (Docket Entry 10, Ex. O at 140.) Petitioner requested that this Court authorize discovery in an effort to gather any documents missing from the file and, if not located, to be able to depose individuals who had access to and/or responsibility over the files. (Docket Entry 13.)

On August 29, 2022, the Court entered a discovery order granting limited discovery to Petitioner for production of documents from October 14, 1995 (the time the investigation was opened) to March 1, 1996 (Petitioner's arrest date) relevant to the investigation of Rankin's murder. (Docket Entry 18.) If those documents could not be located, the discovery order authorized Petitioner to depose individuals from both the RPD and the Richmond County DA's Office who had access to and/or responsibility over the relevant files. (*See id.*) The relevant documents were not produced, and thus, Petitioner began the process of deposing the relevant agencies and individuals who might have knowledge and/or control of the documents, assuming those documents existed. Petitioner contends that these depositions assist him in meeting the "no reasonable juror" standard, particularly when read against the

MAR court testimony of Robert Vorhees. (Docket Entries 41 and 43.) A summary of Vorhees' MAR testimony and of each deposition from limited discovery follows:

**(A) Robert Voorhees MAR Testimony**

Robert Voorhees worked for the RPD for roughly 22 years. (Docket Entry 10, Ex. O at 127.) In 1996, he was a detective sergeant. (*Id.*) Generally, when he investigated a case, he would document contacts he made in his officer notes. (*Id.* at 129.) If a witness was spoken to, it would be standard procedure to document it. (*Id.* at 130.) Generally, the three investigators at the RPD would routinely meet in the morning and "catch each other up with the status of where things were, especially with the more serious pending cases, and we would let them know what . . . relevant facts or what new things were appearing in the cases or new statements, new evidence, if we got lab reports back, if we talked to a new witness, whatever the case may be." (*Id.* at 130.) Vorhees explained that when he initially responded to a homicide he would go to the crime scene, speak to the responding officers, and document what was found. (*Id.* at 131.)

Vorhees explained that when he worked at the RPD a master incident file was created for each case, which would contain the original officer's incident report and his supplement reports (if something changed or new evidence arose) and a subsequent arrest report if an arrest was made and any preliminary investigation. (*Id.* at 132.) All work product went into a different file called a master investigative file, including officer notes. (*Id.* at 130-32.)

Voorhees recalled the investigation of Rankin's death. (*Id.* at 132.) He remembered being called to the crime scene, requesting assistance from the Sherrif's Department, the follow up investigation, the existence of a "significant" gap between the incident and an arrest,

52

the name of the individuals charged, and there being two trials. (*Id.* at 133.) Voorhees explained that he had not seen the file itself for probably five to seven years. (*Id.*) As an investigative sergeant he was the "first line supervisor, the on-site supervisor." (*Id.* at 136.)

Vorhees did not remember ever saying that the RPD no longer had the master case file in the Rankin matter. (*Id.* at 139-40.) He did remember the DA's Office or "someone else" requesting the file and "we maybe looked for it." (*Id.* at 140.) However, "the day [he] was asked, the file was not on premises at the [RPD], physically in the building." (*Id.* at 140.) Vorhees explained that during that time, the RPD had been renovated "and many things were reshuffled, stored, and put in storage." (*Id.*)

Vorhees was handed a file which he identified as appearing "to be a file containing some of the original work product from the case against Thurmond Nelson and Derrick McRae." (*Id.*) Vorhees said, "it looks to be two files that were merged together and one of them is just not complete. It's missing a lot of the information that's indexed in it." (*Id.*) There were "several things in [the file] that are indexed that are just completely not there." (*Id.* at 141.) Vorhees explained, "if I created this file, and it certainly doesn't look like my work product, anything that was indexed – the crime scene, evidence statement, witness statements, suspect info, autopsy report, report synopsis – all those are tabbed and indexed, but yet when you turn to the tab there is nothing there." (*Id.*) According to Vorhees, something should be behind each tab. (*Id.*) Vorhees testified that "There's dozens of reasons, literally, legitimately, why things could have been removed from that file without my knowledge, and I would never know it and know why it's in the condition that it is today." (Docket Entry 10, Ex. P at 157.) Vorhees explained that there were "original documents in the trial. Those documents could

have easily – photographs, documents, statements – could have been entered into evidence at the trial and removed from the file at that time." (*Id.*)

Vorhees stated that an investigation was occurring in the Rankin matter from October 15 to October 31, after the body was found on October 14. (*Id.* at 158.) Voorhees could not remember whether he was developing suspect leads at that time, but "imagine[d] so." (*Id.*) He would have been writing those leads down and placing them in the case file. (*Id.*) Vorhees said that during the first few weeks of an investigation RPD investigators would figure out what happened at the scene (including why individuals were there and what occurred leading up to the incident) and assess who did it, why they did it, and what they did it with. (*Id.* at 159.)

Petitioner's counsel stated to Vorhees that there were no records from the file from December 1, 1995 until February 21, 1996, with the exception of a property transfer sheet related to photos taken from the crime scene. (*Id.*) Vorhees stated that:

> You're very hung up on those dates, but again, I've already testified that there's numerous reasons why something could have been in there at one time and is no longer there, and I don't have direct knowledge to tell you why it's there or not. It may have been there at one time and no longer there. Whether the Court took it out, it was entered as evidence, whether the district attorney used it for a particular reason, whether it was turned over to one of his defense attorneys, I have no direct knowledge of that. I can't testify to it.

(*Id.* at 160.)

Vorhees explained that the tabs in the file without material behind them were marked "crime scene, evidence, witness statement, suspect information, victim information, autopsy, reports, synopsis, and pictures." (*Id.* at 161.) Vorhees explained that he did not know how or when anything would have been removed from the file. (*Id.*) He did not remember what went

54

on with the investigation after Petitioner's arrest but stated that generally an arrest did not mean the investigation was over and investigators had to look for any extra evidence. (*Id.* at 162.)

Vorhees was then presented with a felony report he wrote after Petitioner's arrest, stating "We need to look very closely at the <u>victim</u> in this case." (*Id.* at 163.) He did not remember why he underlined "victim." (*Id.* at 166.) Vorhees also acknowledged a record of Rankin's criminal history from the file, but it was dated September 16, 1995,[27] before the felony report was completed. (*Id.* at 163-64.) Vorhees explained that the RPD further investigated Rankin after the felony report was completed and that they investigated "the entire case." (*Id.* at 165.) Vorhees also acknowledged that there were no records in the file handed to him past March 1, 1996. (*Id.* at 165-66.) Petitioner was arrested on February 29, 1996. (*Id.* at 164.)

Vorhees was presented with Lockhart's original statement and questioned about it. (*Id.* at 167.) Vorhees stated he never sought a search warrant for Petitioner's residence to look for a stashed firearm and did not recall if anyone at the RPD had either. (*Id.* at 168.) Nor did Vorhees determine why Petitioner was on Hood Street, as alleged in the Lockhart statement. (*Id.* at 173.) Vorhees also admitted that he had previously testified that it was difficult to "see much" on Hood Street the night of the murder, despite the fact that the Lockhart statement indicates that Petitioner saw Rankin on a porch on Hood Street that night. (*Id.* at 172, 174.)

---

[27] Petitioner's counsel represents that he has gone back through the file provided by the RPD in June of 2014 and the "criminal history of Jeremy Rankin . . . appears to have been printed out on October 16, 1995." (Docket Entry 17 at 2, n.3 ("In an effort to ensure complete candor to the Court, counsel went back and reviewed the complete file provided by the RPD in June 2014. It contained two identifiable RPD documents with dates between October 15, 1995 and February 21, 1996 – a criminal history of Jeremy Rankin that appears to have been printed out on October 16, 1995 and a property sheet documenting evidence collected from the crime scene dated October 15, 1995.").)

Vorhees admitted that if Lockhart was born on September 8, 1980, Lockhart would have been 15 years old when he was questioned by the RPD in February of 1996. (*Id.* at 175-76.)

Vorhees was next presented with Marlin Dumas' original statement and questioned about it. (*Id.* at 176.) Dumas indicated that both Petitioner and Nelson shot at Petitioner. (*Id.* at 178.) Dumas was fifteen when he gave his statement at the RPD. (*Id.* at 185.) If Dumas was in custody, and a parent was present during his statement, it would be the practice of the RPD to document in the witness statement that parent's presence. (*Id.*) If he were in custody, and being questioned about a crime he was the target of, the RPD's practice would have been to ask Dumas if he would like his parent present. (*Id.*) If Dumas were not in custody, a parent would be permitted in the room if he requested it and "perhaps [be] listed as someone present" in the statement. (*Id.*) Vorhees did not know if Dumas had been a suspect in the Rankin murder. (*Id.* at 185-86.)

Vorhees admitted that only one shell casing was recovered from the scene. (*Id.* at 179.) Vorhees' felony report, and a second different report with an unknown author from the RPD; however, summarized this statement without mentioning a second shot. (*Id.* at 180.) Vorhees pointed out it was a summary and that anyone with the felony report would also have the Dumas statement. (*Id.* at 180-85.) Vorhees denied that there being two shots fired was inconsistent with the physical evidence, because the second gun could have been a revolver and the projectile could have gone into the woods and be hard to find. (*Id.* at 181-82.)

Evidence was presented that Dumas was charged in Virginia with murder five months after he gave his statement in this case and later sentenced to life in prison on July 18, 1997, about a year prior to Petitioner's trial. (*Id.* at 189-91.) Vorhees admitted that it would be

56

important to know if the only witness to a murder were himself charged with a different murder and "hope[d]" the RPD notified the DA, or vice versa, when it found out. (*Id.* at 189-90.)

Vorhees was next presented with and questioned about Surinna Parker's statement. (*Id.* at 191.) Vorhees did not recall if anyone from the RPD spoke to the Julio mentioned in Surinna's statement or to Surrina's mother, or went to the Parker house to see if there was any evidence of screens being cut or fires being set. (*Id.* at 195-96.) Vorhees admitted that Surrina's statement did not mention Rankin coming to her home to sell her father anything. (*Id.* at 213.) Vorhees was also presented with Larry Parker (Surrina's father's) statement and admitted it did not say anything about a trash can. (*Id.* at 197.) Vorhees admitted that if Julio was available, he should have been spoken to. (*Id.* at 205.) Vorhees did not re-interview the Parkers and does not know if anyone from the RPD did either. (*Id.* at 213-14.)

Vorhees was presented with and questioned about Nelson's statement and questioned about its discrepancies with Surrina's statement regarding the time and place of the Rankin-McRae drug exchange. (*Id.* at 201-05.) Vorhees explained that he had personal knowledge that Rankin's father drove a red truck and that he assumed that this was the truck mentioned in Nelson's statement. (*Id.* at 206.) Vorhees did not speak with Rankin's parents but assumed someone from the RPD did. (*Id.*)

Vorhees was then presented with Rankin's mother's testimony from the trial that her son did not have permission to drive the red truck. (*Id.* at 206-07.) Vorhees admitted that it would have been important to speak to Rankin's parents to determine whether Rankin had access to the red truck and that this should be noted by whoever made contact with the parents, and then forwarded to the DA's office. (*Id.* at 207-08.)

Vorhees was next presented with and questioned about Corey Robinson's statement, in which Robinson states that he purchased a .357 magnum from Julio that had belonged to Petitioner and Nelson. (*Id.* at 214-15.) Vorhees admitted that trying to find a gun from a witness in circumstances such as these would be important but did not recall if he or any member of the RPD tried to secure a gun from Robinson. (*Id.* at 215.) Vorhees admitted that seeking the gun mentioned in the statement would have been "good investigative techniques, practices, best practices." (*Id.* at 216.) If an effort to secure such a firearm had occurred, it would have been reported on and included in the case file. (*Id.*) Vorhees next stated that if Jeremy Sturdivant was in custody and was suspected of a crime, and he refused to give a statement, an officer "could simply" note that somewhere. (*Id.* at 218-19.)

Vorhees was next presented with Tender's statement, in which Tender states that Petitioner told him while both were in jail that he murdered Rankin. (*Id.* at 219-20.) Vorhees admitted that he would have sought to corroborate Tender's statement. (*Id.* at 221.) He could not recall doing so or whether the RPD did so. (*Id.*) If such attempts were made, there would be something in the file about them. (*Id.*) Voorhees admitted that Tender offered a different motive for the murder than did the other witnesses. (*Id.*)

The State then questioned Vorhees. Vorhees explained that it was rare for two witness statements to be identical, it would cause suspicions if they were, and that the existence of some inconsistencies did not mean he would question the veracity of a witness statement. (*Id.* at 223-24.) Vorhees indicated that the witness statements he was questioned about pointed to Petitioner as the shooter, so they were ultimately consistent to the main point. (*Id.*) Many of the statements in question were taken months after Rankin's murder. (*Id.* at 224.) Voorhees

58

also pointed out that Surrina and Larry Parker were not in the same home/place in their statements and would not have seen events from the same angle. (*Id.* at 225.)

Vorhees next testified that the Rankin file/binder was disorganized and that his original work product would not have been separated out into folders and there would not be loose papers that could fall out. (*Id.* at 225-26.) Vorhees explained that some of the file might have been missing because it was introduced into evidence in court or because the police department had been remodeled and the RPD moved twice during the process and things were also sent to a warehouse. (*Id.* at 226.) Vorhees had no specific memory regarding the binder/file and agreed that his testimony thus far had been speculation as to what was and was not in the binder earlier. (*Id.*) Vorhees also noted that the McRae/Nelson felony report he had written had a list of identified witnesses and that, at the time the report was dated on March 1, 1996, that was the extent of the witnesses.[28] (*Id.* at 227.)

Vorhees also said that it is typical in a murder investigation for witnesses in a neighborhood to be reluctant to speak to the police. (*Id.* at 228.) There were instances where he got initial statements from someone where they were unwilling to cooperate but where he later went back and got "corroboration." (*Id.*) Vorhees could not remember if that happened in this case but said that "[o]bviously, based on the statements I've read today, at some point it was an issue." (*Id.*) Vorhees admitted that this was "par for the course." (*Id.*) Vorhees also stated that the neighborhood in this case "was a high drug area" and that witnesses in a case like this in a high drug area "are not going to be angels" and "may be more reluctant to speak to law

---

[28] Docket Entry 1, Ex. 27 appears to be the felony report and lists the witnesses as Darious Lockhart, "Sarina" or "Surina" Parker, Larry Parker, Paul Montez Williams, Tonya Clark, Marlow Maurice Dumas, and Edward Tender. (Docket Entry 1, Ex. 27.)

59

enforcement for that reason[.]" (*Id.* at 228-29.) Vorhees also testified that "it wouldn't be the first time that [Rankin] took the [red] truck without permission." (*Id.* at 229.)

Vorhees next testified that he had no recollection of making an offer to Tender in exchange for his statement or of any other law enforcement officer doing so, and that, in fact, he lacked the authority to make any such offer. (*Id.* at 229-30.) Tender was being held on a Richmond County case, not a Rockingham County case. (*Id.* at 230.)

Petitioner's counsel next questioned Vorhees again. (*Id.* at 232.) Vorhees admitted that the witness statements in this case were collected over a period of about two weeks. (*Id.* at 232.) Vorhees stated that generally witnesses would come to law enforcement or law enforcement would seek them out. (*Id.* at 233.) Witnesses would routinely come forward for altruistic reasons and "[i]t's a matter of routine for an investigator to ask" why a witness came forward. (*Id.* at 234.) If he went back to talk to witnesses again after they initially spoke, and they would no longer speak, he would ask them if anything had changed or if they had been threatened. (*Id.* at 234.) Vorhees also agreed that witnesses tend to lie about their conduct and minimize it. (*Id.*)

Vorhees was then presented with his testimony from the second trial in which he answered "Yes," to the question of whether he investigated "this case as far as any suspects outside the City of Rockingham." (*Id.* at 235.) Vorhees stated that he would have documented the investigation of any such suspects and if any documentation existed of any such efforts, it would have ended up in the file/binder. (*Id.*) Finally, Petitioner has brought it to the Court's attention that Voorhees was charged with felony embezzlement for embezzling RPD funds between late 2009 and late 2011 and, in 2013, surrendered his law enforcement license, and pled guilty to four misdemeanor larceny charges. (Docket Entry 12 at 6, n.5; *Id.*, Ex. A.)

60

**(B) Fed. R. Civ. P. 30(b)(6) depositions**

**Current Chief of Police George Gillenwater**: Chief Gillenwater testified that he had no specific knowledge of the recordkeeping practices at the RPD in 1995 and 1996. (Docket Entry 41, Ex. 1 at 7-8, 10-11.) The RPD currently maintains a filing cabinet for each year, and both the 1995 and 1996 filing cabinets were checked for any materials related to Rankin's murder. (*Id.* at 12-14.) All files from murder cases and other high-level felonies are kept under lock and key with access limited to the chief and assistant chief of police. (*Id.* at 13-15.) The electronic records maintained by RPD were also checked, and nothing was found. (*Id.* at 16.) The master file in the McRae case (*i.e.*, the full record of the investigation); however, is currently locked in a safe at the RPD that was separate from the filing room. (*Id.* at 11, 14, 41.)

Former Police Chief Kelly had the file placed in the safe after it was last used in court so that it was accessible if the matter came up again. (*Id.* at 14-15.) Only the property custodian had access to the safe. (*Id.* at 41-42.) Gillenwater testified that "theoretically" the "property control system would generate a chain of custody any time that file [was] subsequently . . . accessed" "[i]f that's how Chief Kelly had it entered into the safe[.]" (*Id.* at 42-43.)

There was a period of time where files were kept in an alternative storage facility in an old building, "Robert L," but Gillenwater did not know if there were still files or evidence in that facility. (*Id.* at 23-24.) He did not know of a file being kept offsite and then being brought back to the RPD and he could not think of a reason why a master file would be kept offsite. (*Id.* at 25.) Homicide records were maintained forever and he could not think of a reason why materials would be removed from a master case file. (*Id.* at 28-29.) Gillenwater did not know

of another case where the first four months of an investigation did not exist and stated that the agency would ordinarily expect such records. (*Id.* at 30.)

Gillenwater testified that during the first four months of a homicide investigation, he would expect to see "[p]robably a substantial amount of interviews, if there's any witnesses; interviews with the defendant; photos . . . if an autopsy would have been done in that time frame . . . things like that." (*Id.* at 30-31.) It was not the RPD's practice to wait for witnesses to come forward, it would instead immediately go out and start speaking to people, and these interviews would be documented and included in the file. (*Id.* at 31.) Gillenwater knew of no case where the RPD waited four months in a homicide investigation to start interviewing witnesses. (*Id.*) This would have been unusual. (*Id.* at 31-32.) Renovations had occurred at the RPD in 2001 or 2002. (*Id.*) He testified that prior to 2006, he would expect that the chief and the assistant chief would have access to case files at the RPD. (*Id.* at 35.)

The State next questioned Gillenwater. He was in high school at the time of the Rankin murder investigation and had no direct knowledge of "exactly what went on in those years" in terms of investigative activity or specific policies and procedures. (*Id.* at 44-45.) He had "no idea" whether something was missing from the master file and he did not know whether witness statements had been collected, or whether any neighborhood had been canvased, between October 14, 1995 and March 1, 1996. (*Id.* at 45-46.) Gillenwater testified that offsite storage may or may not have been used at that time but that in any event he did not think there were any files from 1995-98 stored in that area. (*Id.* at 46-47.)

Gillenwater was again questioned by Petitioner's counsel. He testified that he would expect to see records in the master case file of any suspects investigated during the four-and-

62

a-half-month period in question, along with any information learned about Rankin. (*Id.* at 50.)
He also admitted that he did not have personal knowledge of whether files or property had
been or were stored offsite. (*Id.* at 50-51.) Gillenwater testified further that he did not believe
that a discovery certification procedure existed between 1995 and 1998. (*Id.* at 51.)

Last, the State questioned Gillenwater once more. He testified that he did not have any
direct knowledge about whether police officers kept their investigative notes in their master
file from 1995-98. (*Id.* at 52.)

**Current District Attorney W. Reece Saunders**: Saunders began working in the
Richmond County DA's Office in 2011. (Docket Entry 41, Ex. 3 at 9-11.) From October 1995
onward, he was not aware of Petitioner's file being sent outside of the office except for the
MAR hearings. (*Id.* at 16-18.) He did not know how files were received between 1995 and
1998 from the RPD. (*Id.* at 21.) When asked about missing documents between 1995 and
1996, Saunders testified: "Let me say, the alleged missing records. I don't -- I don't know that
they're missing. I don't -- I don't know that they ever existed. I just don't know." (*Id.* at 30.)

Saunders explained that he was not familiar with any case where four months of records
were unavailable following a murder, but that sometimes cases "just sit for a while," but that
"[i]f anything's happening, there would be" a record of it. (*Id.* at 30-31.) Saunders agreed that
"the agency would expect that an investigation is trying to occur to clear the case" "during the
first four months after an individual's deceased." (*Id.* at 31.) Saunders said he "really [didn't]
know" but it "[p]robably" would be "unusual" not to have records in the four months after a
murder. (*Id.* at 34.) It was "concerning" that "records appear to be missing." (*Id.* at 35-36.)

63

The State then questioned Saunders. He did not have any direct knowledge about the recordkeeping practices of the DA's office between 1995 and 1998 and so any statements he might have made regarding that period of time were speculative. (*Id.* at 36-37.)

Petitioner's counsel then questioned Saunders. Saunders testified that the district attorney's office would typically find things like canvasing notes and witness statements (if they existed) in an investigative file in the weeks after a decedent is found. (*Id.* at 45-46.)

The State questioned Saunders one last time, and he admitted that he could not speak in this particular case about what should or should not be in the file and he admitted further that he did not know if any canvassing was done at the scene of this crime. (*Id.* at 47.)

**(C) Depositions of former members of the Richmond County DA's office**

**Scott Brewer**: Brewer was an Assistant District Attorney at the time of Petitioner's first and second trials. (Docket Entry 41, Ex. 4 at 15-16.) He did not come to Richmond County to handle cases until "the late spring of 1998," so he had "no idea" what occurred in the case from October 15, 1995 to March 1, 1996. (*Id.* at 14.) Although he reviewed the file as the prosecuting attorney, because the trial was 24 years ago, he had no recollection of the specific documents contained in that file. (*Id.*)

Brewer did not recall seeing or hearing about any other suspects in the case and he stated that all of the evidence pointed only to Petitioner as being the killer. (*Id.* at 20, 47.) Brewer did not participate in the first four months of the investigation and would not know if anything unusual had occurred. (*Id.* at 21-24.) Brewer testified that they did not use Bates numbers in their files at the time. (*Id.* at 26.) He testified further that he never removed items from the file and then failed to put them back into the file. (*Id.* at 26-27.)

Brewer also testified that he would expect that there would be an ongoing investigation in the four months after a murder unless it was a case that occurred in front of law enforcement and "they pretty well had the case closed." (*Id.* at 46-47.) Brewer also testified that "[e]very case is different" and nothing is standard about any murder investigation, so there was not a standard time period in which witness statements would be collected. (*Id.* at 48.) Brewer also stated that he would not expect a witness statement to be collected from a person "if they knew absolutely nothing about it." (*Id.*)

**Kenneth Honeycutt**: Honeycutt was the elected DA in the prosecutorial district which included Richmond County at the time of Petitioner's trials. (Docket Entry 41, Ex. 7 at 8-9.) Although Honeycutt was the elected DA, he did not have "anything to do with [Petitioner's] case other than administrative matters." (*Id.* at 8.) Speaking generally, the DA's office would receive a copy of the full investigative file from the law enforcement agency involved in the case. (*Id.* at 17.) Case files were kept in a storage/file room accessible by the DA and his assistants, victim witness coordinators, and paralegals. (*Id.* at 20.)

Honeycutt testified that a law enforcement officer "might have had some chicken scratch notes that he made in his little pad and then went back and wrote a more involved description of it. And we may not have -- we found a lot of times we would not have those little chicken scratch pad notes." (*Id.* at 21.) Honeycutt testified that after he became DA, which was some time before October 1995, he started demanding from law enforcement even "chicken scratch notes." (*Id.* at 21-22.)

The assistant DA assigned as a prosecutor might have the file for a period of time during the trial, but otherwise the file would be in the storage area. (*Id.* at 22-23.) Files were

not thrown away, though some files may have been shredded if the defendant had served their sentence and been released. (*Id.* at 23.) The prosecutorial file would include everything written down by officers, lab and medical examiner reports, and also ultimately include the prosecutor's work product. (*Id.* at 26-27.)

Honeycutt also explained:

> our file is basically a copy. We didn't take the originals. If we had a signed confession, we didn't keep the original. File service is responsible for that until it was labeled and identified and introduced into evidence, then it became part of the clerk's file. But we would not have our hands on it except to offer it up as an exhibit. We may have a copy of it, a photocopy of it in our file so we'd know what was going on. You know, we would never take possession of original documents.

(*Id.* at 28.)

Honeycutt moved to open file discovery shortly after he took office but was not sure whether open file discovery occurred in Petitioner's case. (*Id.* at 30-32.) In a murder case, he was ultimately responsible for authorizing a plea deal. (*Id.* at 36.) If the prosecutor on a given case met, interviewed, and took notes from a family member of a victim in anticipation of calling them at trial, Honeycutt expected that those notes would be placed in the prosecutor's file. (*Id.* at 44.) If the prosecutor met with other witnesses, and the witness was important enough that notes were made, Honeycutt also expected those notes would be in the file. (*Id.*)

When pressed on if it was unusual to have "no investigative activities" recorded for the first four and a half months of a homicide investigation, Honeycutt stated:

> Well, there may not have been witnesses interviewed. There may not, at that time, been witnesses who were willing to be interviewed, or did -- would indicate, yeah, I'm -- I was out there, but I don't want to talk, you know. . . . . And -- and that -- the officers may not write that down, but they would know who they

66

were talking to. These officers know these people, or most of them.

(*Id.* at 46-47.)

Honeycutt also talked at length about a specific case from Union County, North Carolina, in which a period of years elapsed between the murder and investigative activity. (*Id.* at 47-51.) Due to a lack of witnesses and suspects, Honeycutt stated that while some preliminary actions were taken, "we didn't do any actions other than the autopsy and ballistics until [one of the defendants] picked up the phone and called and confessed." (*Id.* at 52.)

Honeycutt testified that besides overseeing the prosecutor, his role in this matter was limited to offering a plea deal after the first trial and before the second, as well as discussions with the prosecutors related thereto. (*Id.* at 56-57.) Honeycutt agreed it would not be uncommon for a murder case "to go cold after the scene is processed and just have nothing in the file from between that time until a lead was discovered." (*Id.* at 58.)

He explained that:

> That's not uncommon. Lot of times people will go -- they'll know about it and they'll say, "I don't want to get involved." And then later we get just enough evidence to show that they were in a position where they should know something, and when we confront them with that or when our officers confront them with that, they'll say, "Well, yeah, I did. I didn't want to testify." And then you get the whole . . . . It opens up, yeah.

(*Id.* at 58-59.) Honeycutt testified further that he would "[n]ot necessarily" expect the investigation of other suspects in this matter to be reflected in the file "if it didn't go anywhere or they alibied out." (*Id.* at 62.)

**Jonathan Hipps**: Hipps executed an affidavit in 2013, which Petitioner has submitted along with his supplemental brief. Hipps worked with the DA's office from December of 1997

67

until January of 2008. (Docket Entry 41, Ex. 8.) He was second chair at Petitioner's murder case in 1998, although, because he was newly hired, his primary purpose was to "observe and learn." (*Id.*) Hipps had very little to do with the planning of the case but he did conduct direct examination of the medical examiner. (*Id.*)

> Hipps also stated that

>> During the preparation of the case and the many conversations with Assistant District Attorney Scott Brewer and District Attorney Kenneth Honeycutt there was never any discussions about giving any witnesses any deals or concessions for their testimony. There were not concessions given to any witness in either trial. Furthermore, it was the policy as I remember it to never do so in any case that we handled.

(*Id.*)

**(D) Depositions of former members of the Rockingham Police Department**

**J. Christopher Brigman**: Brigman worked as a police officer at the RPD from 1991 to 2001 and was a detective at the time of the Rankin murder. (Docket Entry 41, Ex. 2 at 6-7.) Brigman stated that he did not receive recordkeeping training, but that "when we done a case," everything was put in a file. (*Id.* at 8.) Brigman stated that if he questioned a witness and took a statement, it would be placed into the file. (*Id.* at 9.) However, if Brigman was canvassing a neighborhood, he would not document who he spoke with (unless a statement was given) or what homes he visited. (*Id.*)

Brigman was not at the Rankin murder scene but stated that generally there would be no delay in investigating a homicide case, but "if you don't have any leads, you have nothing to go on." (*Id.* at 12.) Brigman stated that if there was a file in this matter, there would only be one file, and it would include all the work product of the investigation, including any

statements, detective notes, photographs, property sheets, and records of a neighborhood canvas (if they existed). (*Id.* at 17-18.)

Detectives would have had access to the file and there would be no log of who accessed the file. (*Id.* at 18.) At the time, he (Brigman), Voorhees, and Bill Kelly were detectives. (*Id.* at 19.) At the time of an arrest the file could have been in Brigman's filing cabinet, or in Bill Kelly's filing cabinet, or in Voorhees' filing cabinet; however, Brigman did not remember which. (*Id.* at 19-20.) Whichever officer had a file would be the one to bring it to the DA's office, where a copy would be made and kept by the DA. (*Id.* at 21.) If law enforcement followed up on any leads after that, those would be supplemented at the DA's office. (*Id.*) Brigman did not recall ever being unable to locate a file and did not see why someone would remove a file from the police department without anyone being aware of it. (*Id.* at 22.) If an officer took a file to court, he would bring it back. (*Id.*) Brigman could not identify a reason why materials might be removed from a file, nor could he think of a case in which a record was removed from a file. (*Id.* at 23.)

Brigman stated that he knew Rankin from grammar and high school, but that they were not friends and that he never communicated with Rankin. (*Id.* at 23-24.) He stated that he was not at the scene where Rankin was found dead and could not speak about it. (*Id.* at 24.) Brigman did not remember in depth his role in the investigation other than "talking and taking statements from people." (*Id.*) He did not remember who he spoke with, or took statements from, or the number of statements he took. (*Id.* at 24-25.) Brigman stated that he would read an individual their rights if they were a potential suspect and questioned for "a specific thing." (*Id.* at 25-26.) He remembered Voorhees and Kelly were involved in the Rankin investigation,

69

they were at the crime scene, and that they were detectives as well at the time. (*Id.* at 26.) Brigman did not remember if anyone at the RPD looked into Rankin's background but acknowledged that it would be one way to obtain leads in an investigation. (*Id.* at 27.)

Brigman was then presented with Rankin's criminal record from October 8, 1995 through October 9, 1995, from the Hamlet Police Department. (*Id.* at 28.) Brigman did not recall whether the RPD had those records at the time of its investigation, but stated it was a known fact that Rankin had a drug problem. (*Id.* at 29.) Brigman did not know if Rankin's drug abuse was investigated as a potential source of why he was killed. (*Id.*) Brigman did not agree that the victim of a property crime would have a potential motive to harm the crime's perpetrator but admitted that a property crime or other "prior criminal conduct" "could be" a lead. (*Id.*) Brigman stated that he was "sure" that Rankin's prior arrests were known to the detectives but could not recall if this was investigated as a potential lead. (*Id.* at 29-30.)

Brigman was then presented with Tender's original statement. (*Id.* at 30.) Brigman recognized his own handwriting, which indicated that Tender requested to speak with him and Voorhees, but he could not remember taking the statement. (*Id.* at 30-31.) Nor did Brigman remember a Bobby Little. (*Id.*) Brigman said Little "could" have been an informant, but that he did not remember because it was "a long time ago." (*Id.*) Brigman did not remember investigating suspects other than Petitioner. (*Id.*) When asked if an interview with Little would have generated "the type of record that would be incorporated into the file," Brigman said, "If [Little] was questioned, I would think so." (*Id.* at 32.)

Brigman stated that while he could not remember who he spoke to in this case, he was "sure" that "at some point" he spoke with Rankin's "mother or father or his brothers." (*Id.*)

He was "sure" that the RPD spoke with them. (*Id.*) Brigman stated that he did not think that these meetings would have been documented or recorded. (*Id.* at 32-33.) "That wouldn't be part of the investigation, that's just advising . . . what happened to their son." (*Id.* at 33.) Brigman also testified that if Rankin's mother had testified that someone named "Dale" wanted to "beat his ass," that "would be considered." (*Id.*) Brigman "assume[d] it would" "be documented[.]" (*Id.*) Brigman did not recall the investigation of a "Dale." (*Id.* at 34.)

Brigman did not recall any investigations he was involved with "where investigative records do not exist for the first four months after somebody was found deceased." (*Id.*) In all of the cases Brigman dealt with, there would be an investigation occurring during the four months following someone being found deceased. (*Id.* at 34-35.) He explained, "You're not going to sit there for four months and not do anything." (*Id.* at 35.)

Brigman was next presented with the file and told that it contained "little, if any, investigative activity between the period of October 15, 1995, and the time that Mr. McRae was arrested on March 1, 1996[.]" (*Id.*) Brigman was then asked if he knew "where those records are for this investigation" and he responded that he did not. (*Id.*) Brigman was asked if he had any explanation for these allegedly missing records and responded that "No, I do not, unless . . . they had spoke to people, it went cold, and then they got information or leads and went from there." (*Id.* at 36.) Brigman stated that he "would think" law enforcement would have been speaking to people after October 14, 1995. (*Id.*) He testified further that he was not aware of anything being removed from the file. (*Id.*)

Brigman was next asked whether he would have expected law enforcement to take a statement from Davis' neighbor (again, Davis found Rankin's body and then went to a

neighbor's house to call 911). (*Id.* at 37.) Brigman stated that he would, that he did not recall speaking with the neighbor, and that he did not recall canvasing the neighborhood later. (*Id.*) Brigman agreed that canvasing the neighborhood could be important in determining the time of death and when shots were fired, but explained that he was not on the scene and that he could not say what Voorhees and Kelly did that night. (*Id.*) Brigman agreed that he would expect a statement from the neighbor, if taken, to be in the file. (*Id.* at 38.)

Brigman did not recall Dumas or his original statement. (*Id.* at 38-39.) Brigman was told Dumas was fifteen years old when he gave his statement and Brigman explained that he was "sure" Dumas' parents would have been present at its taking but indicated that this would not have necessarily have been documented. (*Id.*) Brigman responded "Yes," to the question "If Mr. Dumas says his parents weren't present, you know, would this have been taken in accordance with department policy?" (*Id.* at 40.) When asked if it was possible that Dumas was interviewed without his parent present, Brigman stated, "I can't answer that. I don't know." (*Id.*)

Brigman was directed to Dumas' representation in his statement that he was giving his statement of his own free will. (*Id.*) Brigman explained that he would ask individuals who gave their statement that question and "[t]hat's what they told me, and that's what I'd write down" if they affirmed it. (*Id.* at 40-41.) If someone refused to give a statement, Brigman would not take a statement, nor would he document the refusal. (*Id.* at 41.) However, if someone was "providing [him] information, but wouldn't sign a statement," he would take notes of those conversations, which would then be incorporated into the file. (*Id.*) Brigman said his notes went into the file and that if they were not in the file, "that means there is none to be had."

72

(*Id.* at 42.) His notes, and a statement that he took from someone, would not be distinct because "the statement [is] my notes." (*Id.*) Brigman stated that he never experienced an instance when he was taking a statement during an interview and the individual refused to sign it. (*Id.* at 43.) He "never took notes outside of the notes." (*Id.* at 44.)

Brigman was then presented with a portion of his trial testimony from the second trial in which he stated that he had spoken to Jeremy Sturdivant on March 1, 1996, in the presence of Sturdivant's mother and, at one point, Captain McQuage. (*Id.* at 45-46.) Brigman stated that the notes from that conversation would be in the file. (*Id.* at 46-47.) Brigman did not know the circumstances of speaking with Sturdivant that day. (*Id.* at 47.)

Next, Brigman agreed that Ferguson "was at least brought in and read his Miranda warnings . . . presumably because it was a custodial interrogation[.]" (*Id.* at 48.) Brigman acknowledged that in his statement Ferguson stated, Petitioner "told me that he had sold the gun to Corey Robinson." (*Id.* at 48-49.) Brigman did not recall if a gun was ever sought or obtained from Robinson (or anyone), or if efforts were made to secure a gun. (*Id.* at 49-51.)

Brigman was directed to Robinson's statement in which Robinson references buying a silver .357 magnum from a person named Hullio, who said it belonged to Petitioner and Nelson. (*Id.* at 49-50.) Brigman admitted that if this were the gun purported to be used in the homicide, it would have been sensible to seek it from Robinson but did not recall whether steps had been taken to retrieve the firearm. (*Id.* at 50.)

Brigman stated that he did not know of any policy "to not take notes" during an investigation, did not know of anyone's practice to not take notes, and stated further that he never worked a case and decided not to take notes. (*Id.* at 51-52.) There was neither a practice

nor a policy to withhold from the DA material that did not support the prosecution and, instead, if he had a case, everything he had went to the DA. (*Id.* at 52.) The practice at the RPD was to turn everything over to the DA's office. (*Id.* at 53.)

The State then questioned Brigman. Brigman stated that if he questioned someone in a case and they did not have anything of substance to say about it then he would not keep a record of that. (*Id.* at 54.) Brigman stated that if the neighbor who let Davis use his phone to report Rankin's death had nothing of substance to say beyond, "Yes, this person came to my door. He called – he used my phone to call the police, that's all I know," then there would be nothing to write and no record of that conversation. (*Id.* at 54-55.)

Brigman did not know whether there were any documents missing from Petitioner's RPD file from the time between October 14, 1995 and March 1, 1996, or from any other time. (*Id.* at 55.) Brigman did not know of any statements from Bobby Little or a man named Dale. (*Id.* at 55-56.) Brigman stated that while it would be unusual for no activity to have occurred during the first four months of the Rankin matter, he did not know whether there had been no activity, and it was possible that there simply "was nothing to show for it[.]" (*Id.* at 56-57.)

Brigman was then directed to Dumas' original statement in which Petitioner purportedly stated to Dumas, "We know you saw what we did last night, and if you say anything we will kill you too, just like we did him." (*Id.* at 57.) Brigman explained witness intimidation could play a part in when a witness came forward and that this could have been at play here. (*Id.* at 58.)

Petitioner's counsel then questioned Brigman. He admitted that determining the time when a homicide occurred was an important part of a homicide investigation, that the

neighbors in this case were in a position to hear a gunshot the night of the murder, and that "the investigators would find that to be fruitful information [about] what time the homicide occurred[.]" (*Id.* at 58-59.) Brigman also stated that he was "sure" investigators "took the information [about Dale] and they went and spoke to" him. (*Id.* at 59.) Brigman then clarified that he "personally" would have done this, but that he could not speak to what others had done. (*Id.* at 59-60.) Brigman further admitted that Rankin's past drug use and people related to his lifestyle would potentially be sources and leads in an investigation. (*Id.* at 60.) These were sources and leads Brigman said investigators "would probably talk to." (*Id.*) Brigman did not recall if Nelson testified at trial but "didn't think he testified to his complete innocence." (*Id.* at 60-61.)

The State then questioned Brigman further. Brigman explained that it was normal for suspects to minimize their role in a crime. (*Id.* at 61.) He also explained that "if police went to all of the neighbors and each neighbor said, you know, I was asleep or I just didn't hear any gunshot" he "wouldn't think" there would be a record of that conversation and he personally would not keep such a record. (*Id.* at 62.) Brigman also stated that if he went to talk to Dale, and Dale said (and could prove) something like, "I was out of the country at that time" he would not have made a witness statement or investigative record of that. (*Id.*)

Petitioner's counsel then questioned Brigman further. Brigman explained that "there would be no record when leads were closed off[.]" (*Id.* at 63.) Brigman "assume[d]" notes would be taken of a lead to begin with, but he did not know what other investigators might have done. (*Id.*) Brigman's personal practice was to document a lead and then follow up on it.

75

(*Id.*) Brigman did not recall when he learned that Dumas was charged with capital murder a few months after giving his statement. (*Id.*)

**William Kelly**: Kelly started as a police officer with the RPD in 1992, worked his way up through the ranks, and retired as chief in 2021. (Docket Entry 41, Ex. 6 at 6-7.) At the time of the Rankin murder, Kelly was a patrol officer. (*Id.* at 7.) When Kelly was a patrol officer, he would prepare incident reports, have them approved by a supervisor, and give them to a secretary to be typed up. (*Id.* at 8-9.) Kelly did not know what happened to the reports after that. (*Id.* at 9.)

Later, when he was promoted to detective in 1996-97, he would be assigned a case, submit a report to the secretary who would type it up, and that process continued until they got computers in 2000-2001. (*Id.* at 7, 9-10.) Kelly explained that he (and other detectives) would keep a case file for an assigned case in his office through the entire court proceedings and then would file them in the office in a different filing cabinet once the case was disposed of or leads were exhausted. (*Id.* at 9-10.) There was only one file for a case kept in the office of the lead detective and multiple members of law enforcement would contribute to it. (*Id.* at 10.) Kelly was not sure what happened to the file once leads were run down and the case was resolved but thought that they would go in a filing cabinet in the lead investigator's office indefinitely. (*Id.* at 9-13.) Kelly thought that there "would be a point" where the file would have to go "somewhere else," but he was not sure where. (*Id.* at 13.) Kelly did not recall there being a log or record or way to identify where a file went after the case was closed. (*Id.*)

More recently, when Kelly was Chief, detectives would work their own cases, close them out, and then take them to a separate file room at a certain point and file them. (*Id.*) That

file room was created after a building renovation in 2003 or 2004. (*Id.* at 14-15.) Kelly thought a lot of the 90's files were in that file room, which contained around 25-30 filing cabinets. (*Id.* at 14.) The Chief, his assistant, the detectives, and the patrol commander all had keys to this file room. (*Id.* at 15.) According to Kelly, there was no log recording who went into the file room or what files were in the room and there was no reason for an officer to go into the filing room. (*Id.*) The only way to find a file would be to go flip through all of them until it was found. (*Id.* at 16.) There was no reason to add anything to these files, or remove it, and nothing was ever taken out as far as Kelly knew. (*Id.* at 16-17.) If someone from another county called and wanted to know something about a case, copies would be made, and the file would be put back. (*Id.* at 17.) As far as Kelly knew, at no point during his time at the RPD did officers receive training on record keeping practices. (*Id.* at 17-18.) There was no training on files because "[y]ou put everything in a file," including notes. (*Id.* at 19-20.)

Kelly testified that in the mid-90's, when a case was ready to be sent to the DA, the RPD would prepare a felony packet, make copies, and then give it to the DA. (*Id.* at 21.) At the time, there was not a record of what was in the packet, beyond a "little check-off sheet." (*Id.*) The practice now is to Bates stamp the contents of the file. (*Id.* at 21-22.) The lead detective from the RPD would generally go over the contents of the file with the assistant DA. (*Id.* at 22.) In murder cases, "pretty much" all detectives were called to work it, but the supervisor would generally keep the main file. (*Id.* at 23.) The entire file would go to the DA. (*Id.*) When Kelly had a case that went to trial, he would have an initial meeting with the DA and then "circle back" and go over things with the DA in preparation for trial. (*Id.* at 24.)

Kelly then spoke about his general experience of being lead detective in a murder case. (*Id.* at 25.) Generally, the lead detective in such a case would respond to the scene, send someone with the body to the autopsy who would bring any evidence back, talk to and take statements from witnesses, submit evidence to the lab, and submit relevant evidence to the SBI. (*Id.*) Kelly would document every step in case it came up later. (*Id.* at 26.)

Kelly explained more specifically that he did not go to the crime scene the day Rankin was killed because he was on the day shift. (*Id.*) Kelly knew Rankin because he played ball with Kelly's younger brother, and he knew of Rankin's parents. (*Id.*) Kelly also knew Rankin was heavily into drugs and doing a lot of stealing around that time. (*Id.*) Kelly did not investigate any of these crimes but heard anecdotally from other people about them. (*Id.* at 27.) Kelly had no role in the investigation of Rankin's murder. (*Id.*) Kelly explained that the only thing he knew about the Rankin murder was what Voorhees told him in 1998: that the first trial resulted in a hung jury, that the DA offered Petitioner a plea deal "where he could walk out free that day," but that his mother told him to take it to trial, and he was convicted at the second trial. (*Id.* at 27-28.) Kelly stated that he never looked at the file. (*Id.* at 28.)

Petitioner's counsel told Kelly that it was his understanding that Kelly was the person who at some point located the file. (*Id.*) Kelly said he did not think it was him, that he never looked in a file, and that "[i]f [he] went and got in a file, [he] pulled it out and gave it to – whoever it was came over here the last time for court[.]" (*Id.*)

Kelly was then presented with a chain of custody document with his signature on it. (*Id.* at 29.) The document did not refresh Kelly's recollection. (*Id.* at 30.) Kelly was asked how he would know where to find the Rankin file and the Rankin evidence and he responded, "in

78

the file room." (*Id.* at 32.) Kelly did not have a specific memory of getting the file or evidence but acknowledged that he remembered Petitioner's counsel coming to the RPD to view it. (*Id.*) Kelly explained that the last time Petitioner's counsel visited the RPD, he had the evidence and the file (which are generally not together) placed together because he anticipated that counsel would be back again. (*Id.* at 33.) Kelly explained that this was why the evidence and the file were together, which is not typically the case. (*Id.*) Before this, the evidence was located in the Roberdell storage area and the file was in the file room. (*Id.* at 34.) In any event, Kelly did not remember if he was the person who retrieved the file. (*Id.* at 36.)

Kelly explained that whoever retrieved the file would have gone into the file room, known the month and the year of the file, and then gone into that filing cabinet. (*Id.*) Sometimes, if the file was thick, as in a murder case, the file might be stored on top of a cabinet rather than in it. (*Id.*) There was no reason that the file at that point would ever have been removed from the RPD. (*Id.* at 37.) Following the conclusion of trial, it should have gone into the file room and remained there. (*Id.*) Kelly stated, "I think I may – may have seen Voorhees with the file when he was still there [*i.e.*, when he was still chief], but I ain't heard or seen all that." (*Id.*) Kelly explained further that "it was before '12. I want to say he had the file, but I'm not 100 percent sure on that. Other than, it should be in the file cabinet. There's no other reason to have a file out." (*Id.* at 37-38.) If Voorhees had removed the file, and took it to his office, there would be no log of it. (*Id.* at 38.)

Kelly next addressed the RPD renovation. (*Id.* at 39.) The renovation occurred in 2003 or 2005 and created a file room and before that the secretary's office was the *de facto* file room.

(*Id.* at 40-41.) While he was not 100 percent sure, Kelly explained that "when she got full, they either boxed them up and moved them, but I can't tell you where." (*Id.* at 40.)

Kelly explained that he had not spoken with Voorhees since he "quit, terminated, whatever he did" except for one time when Voorhees visited the station and was angry because of the way an accident that he (Voorhees) was in was reported. (*Id.* at 41.) Vorhees and Kelly never discussed the Rankin/McRae case, other than Voorhees mentioning a hung jury after the first trial and a rejected plea offer before the second trial. (*Id.* at 41-42.) There was no discussion of the file. (*Id.* at 42.)

Kelly explained that he "want[ed] to say" that Voorhees had the file sometime after the renovation. (*Id.* at 42-43.) The only conversation the two had about this was, "something about y'all were looking into this or that case or you wanting copies of – something. Other than that, no, he really didn't go into anything. I think he was putting you off as long as he could really." (*Id.* at 43.) Petitioner's counsel represented that Voorhees previously testified that when he looked for the file around 2010, it was not physically located at the RPD building. (*Id.*) Kelly was asked if, in his opinion, he had any reason to believe that this was not the case. (*Id.*)

In response, Kelly explained that, "If it's not in the file room, it should be with him. If it's not with him, because he was lead detective, and going through all this, it should be in the file room." (*Id.* at 44.) The file should not have been somewhere else in the police department building. (*Id.*) Kelly was unaware of any instance where a file was removed from the police department and there was no reason to remove a file from the police department. (*Id.* at 44-45.) Kelly knew nothing about the allegedly missing records from the file or whether anything was missing at all because he did not work on the case. (*Id.* at 45-46.) Instead, "Voorhees was

80

the main one that worked it," "Brigman might have helped," and "maybe Captain Ron McQuade." (*Id.* at 46.)

The State then questioned Kelly. Kelly stated that he may have seen the file in the filing cabinet at some point, but he never went through it. (*Id.* at 49.) When a file was sent to the DA, only a copy was provided. (*Id.* at 50.) Kelly also stated that when he was a detective "[b]ack then" (*i.e.*, the 90's), he would not generate a report if a potential witness told him they did not know anything or have information. (*Id.* at 51.) This was a typical practice at the time. (*Id.*) Consequently, if there were no documents or witness statements for "a chunk of time," this did not necessarily mean that there was no investigation occurring. (*Id.* at 52.) It could instead be "a cold case," "a lot of dead ends that didn't lead to anything." (*Id.*) Kelly explained that the lead detective on a murder case also had other cases to work on ("[t]wo to three a day, maybe") and that the murder case was not that detective's only responsibility. (*Id.*)

Kelly next stated that he could not remember if he had ever worked a crime that Rankin had been involved in. (*Id.* at 53-54.) Kelly then described the "Robert L." [sic] storage area and explained it was for evidence rather than files. (*Id.* at 54.) The Rankin/McRae file was never stored there, it would have remained in the RPD office and then been moved to the renovated storage area in the RPD upon completion. (*Id.* at 54-55.)

Kelly explained further that he saw Voorhees with the Rankin/McRae file in Voorhees' office sometime between 2005 and 2011 in connection to a request from the Duke Law Clinic before Vorhees was "let go in '11." (*Id.* at 55-56.) Kelly remembered Voorhees telling him he had been contacted by Duke and it was Kelly's "impression" and "opinion" that Voorhees "was just going to put them off until he had to do something." (*Id.* at 56.) Kelly did not see

Vorhees with the file at any other time. (*Id.*) Kelly never saw Voorhees remove any documents from the file or take any files home with him. (*Id.* at 56-57.)

Kelly next explained that when he was a detective, he would only document a lead "if something turned up." (*Id.* at 60.) He would only write down an investigatory effort if "it turned up something." (*Id.*) He would only write down where he went in relation to an investigation, "if it turned something up." (*Id.*) Kelly explained that "back then we didn't write down everything like I would do today. And, again, I don't know what they did on this case." (*Id.*) "[I]f you told me that you thought some property was at [someone's] house, and we went over there, we asked permission, we went and looked, there was no property, it wouldn't be written down, no." (*Id.*) If multiple detectives worked a case along with him, Kelly would tell them where he went as part of an investigation. (*Id.* at 60-61.) If a witness, a victim's family, or a victim's friends, told him something "pertinent to the case" Kelly would write it down, but otherwise he would not. (*Id.* at 61.)

**Gregory W. McNeill**: McNeill was a detective with the RPD during the relevant time period. (Docket Entry 41, Ex. 5 at 5-7.) McNeil would document his investigations by writing down "everything that related to the investigation." (*Id.* at 10.) His primary role in investigating the Rankin murder was taking statements from witnesses. (*Id.* at 11.) McNeill stated that generally he would not necessarily take note of every potential witness he spoke to but would only document "relevant" information. (*Id.* at 12.) For example, if he canvased a neighborhood, the fact that he had canvased a neighborhood and the results would only be documented if "relevant." (*Id.*)

Normally, McNeil would keep his notes until the investigation was complete and then he would forward a copy of whatever information he had on the investigation to his immediate supervisor, Lieutenant McQuage. (*Id.* at 13-15.) McNeil did not make records or keep a log or notes about what he handed over to his supervisor. (*Id.* at 15-16.) He did not know where the file was ultimately kept by the RPD. (*Id.* at 16.) If McNeil needed a file after that, he would ask a supervisor for it. (*Id.*) McNeil stated that he did not know of a homicide investigation that took more than two weeks to begin. (*Id.* at 17.)

McNeil investigated Rankin's homicide case. (*Id.*) Otherwise, while he was a detective, he would investigate, "[m]isdemeanor, bicycles, just general type of cases." (*Id.*) He would not delay in starting the investigation and would start as soon as he had enough "relevant information" to begin. (*Id.* at 18.) He would obtain information by going to the victims or "any names" he had and would start from there. (*Id.*)

If a victim told him information about the crime, that information would be reduced to a written statement, which would become a witness statement. (*Id.* at 18-19.) McNeil explained that when he was speaking with individuals in an effort to obtain information to begin his investigation, he would reduce information he was told to writing if it was relevant. (*Id.* at 19.) Beyond a victim, McNeil would speak with anyone else he thought had relevant information. (*Id.* at 20.) McNeil explained that he decided something was relevant "[i]f it had anything to do with the case [he was] investigating." (*Id.*) When asked if he would write down leads that did not "pan out" McNeil stated, "[s]ometimes. I don't know. I don't know. I don't know." (*Id.*)

Regarding the Rankin investigation and his role in it, McNeil recalled that Rankin had been found shot and recalled going to that location and recalled taking an initial report and also taking witness statements. (*Id.* at 22-23.) McNeil reviewed the witness statements in question, but they did not refresh his recollection because they were taken "25 years ago." (*Id.* at 23-24.) McNeil did not recall taking any other witness statements other than the ones used to refresh his recollection. (*Id.* at 24.)

McNeil was presented with a note "about an individual, Jeff Travers [who allegedly] knew a lot about Jerry's death." (*Id.* at 26.) McNeil agreed that this was the type of lead that would be reduced to writing and that he would expect to follow up on. (*Id.* at 26-27.) If an investigator followed up on this lead, McNeil explained, they would have to use their discretion to decide what to reduce to writing. (*Id.* at 27.) McNeil stated that it was necessary to document steps taken in an investigation. (*Id.*)

Investigators did not generally meet to talk about cases, and he did not remember sitting down and talking about what each investigator was doing in this case. (*Id.* at 27-28.) McNeil was presented with a notation in the felony investigation report referencing Petitioner, which said, "We need to look very closely at the victim in this case." (*Id.* at 28.) McNeil stated that he was not involved in investigating Rankin and does not recall what took place to investigate him, although he "would expect an investigation to be done" and that he "would hope all avenues were explored" and that it was his practice to "explore all avenues." (*Id.*)

McNeil was then presented with Rankin's arrest warrants from the Hamlet Police Department from October of 1995 issued shortly before Rankin was murdered. (*Id.* at 29-32.)

McNeil stated that whether these arrest warrants, some of which were issued the day or morning Rankin was murdered, were relevant was up to an investigators' discretion. (*Id.* at 33.)

McNeil was then directed to the witness statement from Larry Parker. (*Id.* at 34-35.) McNeil did not recall taking the statement, did not recall doing any investigation prior to February 27, 1996, did not recall why Larry was at the RPD on that date, and did not recall whether he transported Larry to the RPD that day. (*Id.* at 35.) McNeil said Larry was a "citizen" and did not know if he had known Larry prior to the date the statement was given. (*Id.*) McNeil did not recall if he did anything to corroborate anything in Larry's statement. (*Id.* at 38-39.)

McNeil was next directed to Surinna Parker's statement. (*Id.* at 40-44.) McNeil agreed that whether Rankin cheated Petitioner in a drug deal was "relevant." (*Id.* at 44.) McNeil also agreed that it was "relevant" to the investigation to corroborate Surrina's statement. (*Id.*) However, McNeil did not recall doing anything to corroborate Surrina's statement. (*Id.* at 44-45.) McNeil was asked whether he would expect evidence of threats against Surrina from Petitioner would be reduced to writing and documented. (*Id.* at 45.) McNeil explained he would expect a thorough investigation to be done and documented, but he did not know if such documentation existed here as to Surrina's statement. (*Id.*)

McNeil was next directed to Tonya Clark's statement. (*Id.* at 46-47.) He did not recall if he had done anything to follow up on the information provided in this report and did not recall what investigation had occurred for the four months prior. (*Id.* at 46-48.) McNeil admitted that he had never investigated a case where for the first four months there was no documented investigation occurring, nor was he aware of a case conducted by the RPD where

no investigative records were created during such a period of time. (*Id.* at 48.) McNeil stated

that he was not aware of any impropriety with regard to the RPD files. (*Id.*)

The following exchange then occurred between McNeil and Petitioner's counsel:

> **Q.** When we previously talked, you said you were asked if you had ever seen Detective Vorhees and Detective Brigman discard documents. Do you recall that question?

> **A.** No.

> **Q.** You responded, I am not confident things were done correctly. Extrapolate from that. Do you recall that answer?

> **A.** Yes.

> **Q.** Why were you not confident that things were done correctly with regards to the files at the Rockingham Police Department with regards to this case?

> **A.** Every investigator has their – their own way of doing things.

> **Q.** So why were you not confident in the other investigators in this case?

> **A.** I am only confident in my abilities.

> **Q.** Do you recall saying that the investigators in this case, it would not surprise you if they reappropriated or recharacterized files in this case, that it was an integrity problem and you're not 100 percent sure that is not what happened?

> **A.** I think you should investigate a – each investigator conducts their cases how they – how they seek to conduct it.

> **Q.** You specifically said thinking about their character with respect to Detectives Voorhees and Brigman that you would not be confident that they followed procedure. What is it about the character of Detective Vorhees and Brigman that leads you to lack confidence in their investigations in handling files in this case? And remember, you are under oath, sir.

> **A.** I only have confidence in my abilities.

86

**Q.** Did you ever witness Detective Vorhees or Brigman reappropriate files?

**A.** No.

**Q.** What did you mean by the word "reappropriate"?

**A**. As I said, I only have confidence in my abilities. And I don't know what another investigator or other officer would or would not do. That's what I mean by that. Unless I do it myself, I am not confident in any other investigator unless I do it myself. I can only speak for myself confidentially. [Sic]

**Q.** Have you witnessed other investigators discard files?

**A.** No.

**Q.** Have you ever seen them move files from one location to another to make them more difficult to find?

**A.** No.

**Q.** Have you ever seen documents manipulated or altered by investigators –

**A.** No.

**Q.** – at the Rockingham Police Department?

**A.** No.

**Q.** Would you agree that it's different to say that the prior – the other investigators lacked integrity than to say that you were only confident in your own investigations?

**A.** I won't say that.

**Q.** You don't believe they are different?

**A.** What was your question again?

**Q.** Well, you had said that the other investigators, you were thinking about their character, and that you spoke about it being

87

an integrity problem. That's different than being confident in your own investigations, isn't it?

**A.** As I said, I only have confidence in my – my investigations.

**Q.** But you, sir, attacked their integrity. I didn't. Why?

**A.** Because I am only confident in my abilities, in my investigations and what I do in any investigation.

**Q.** So you make it a habit of attacking the integrity of others because they are not yourself?

**A.** No.

**Q.** But you did when we previously talked, which is what I am trying to understand.

**A.** I only have confidence in my abilities, in my investigations or my abilities.

. . . .

**Q.** Do you recall saying those two [Vorhees and Brigman] were not beyond reproach?

**A.** I don't recall saying it. I don't recall saying it.

**Q.** Do you know of any reason why you believed that they were not beyond reproach?

**A.** I think everyone is human.

(*Id.* at 48-53.)

The State then questioned McNeil. He testified that irrelevant information would not be recorded. (*Id.* at 54.) For instance, if McNeill conducted a neighborhood canvas but no one he spoke to had anything of substance to the investigation, he would not document it. (*Id.*) McNeil also explained that the fact that he did not recall doing an investigation prior to the taking of the witness statements mentioned above did not mean that no investigation was

88

done. (*Id.*) McNeil was not the lead detective on the Rankin murder and there might be some aspects of that investigation of which he was unaware. (*Id.* at 55.) Consequently, if someone investigated Jeff Travers from the note mentioned above, and nothing of substance came of it, McNeil would not necessarily expect a record to be made of that. (*Id.* at 56.) McNeil expected that whoever wrote the note about looking into the victim in this case would look into the victim. (*Id.* at 56-57.) Likewise, Petitioner would have "hoped" that whoever wrote this note looked into Rankin's arrest warrants. (*Id.* at 57.)

McNeil stated that if he hypothetically had investigated the Rankin murder during the four months in question, he "would have made some type of documentation." (*Id.* at 58.) McNeil said he would have kept these with him in his office, but that he did not know if they would have made it into the police file. (*Id.*) McNeil did not have any notes from the Rankin matter. (*Id.*) McNeil did not know if documents were removed from the master file in this case, did not know if documents had been reappropriated from the file in this case, and did not know if anything was discarded from the file in this case. (*Id.* at 59.) If there were notes relevant to the investigation from the four and a half months in question, McNeil would have reduced them to a document and incorporated them into the master file. (*Id.*)

Petitioner's counsel then questioned McNeil a final time and asked him if he would be confident in an investigation with no records for four months. (*Id.* at 60.) McNeil stated that he would be "[c]urious" about a case where there were no records for four months. (*Id.*)

**Analysis**: In light of Vorhees' and Kelly's testimony, Petitioner contends that "Voorhees never provided the File to McRae's post-conviction counsel and then repeatedly

Case 1:21-cv-00577-LCB-JLW    Document 49    Filed 02/27/24    Page 89 of 101

lied about it at the post-conviction evidentiary hearing." (Docket Entry 41 at 14.) Petitioner contends further that,

> Voorhees's conduct cannot be innocently explained. His willingness to falsely testify about the file calls into question every aspect of McRae's conviction, especially since it is now confirmed that an investigation was ongoing during the initial weeks after Rankin was found deceased. *See Maxwell v. Roe*, 628 F.3d 486, 512 (9th Cir. 2010) ("[T]he finders of fact were deprived of the fundamental inference that if [a witness] lied about X, Y, and Z, it is quite likely that he lied about Q, R, and S.") (quoting *Killian v. Poole*, 282 F.3d 1204, 1209 (9th Cir. 2002)). Given that Voorhees testified falsely about the File, it is a reasonable inference that he was also willing to remove materials from the File, especially when he falsely testified that he did not have knowledge of what had been removed or added because the File was not in his "care, custody and control." (DE 10-17 at 157:11–20.) Kelly's testimony establishes that the File was in Voorhees's care, custody and control, and that Voorhees lied about that.

(*Id.*) Petitioner posits that "[T]he most likely explanation is that the RPD investigated the murder during the first four months, recorded that investigation, but then suppressed and destroyed those materials because they contained favorable evidence that would have raised doubt about McRae's guilt." (*Id.* at 19.)

The Court concludes that this new evidence, alone or considered holistically with the remainder of the record, is insufficient to meet the no reasonable juror standard. There is no testimony that any of the deponents (or anyone), including Vorhees, destroyed favorable evidence. Nor did any of the deponents testify that Petitioner was framed for Rankin's murder. It is unlikely that a reasonable juror would conclude from the testimony summarized above that Petitioner was actually innocent of the Rankin murder. It is unlikely that a reasonable

90

juror would conclude that a four-and-a-half month gap[29] in the investigation even existed. And, even assuming a reasonable juror concluded that such a gap existed, it is unlikely that a reasonable juror would also conclude that this was because law enforcement and/or the district attorney collected, suppressed, and destroyed evidence favorable to Petitioner.

Rather, in light of the testimony set forth above, the Court concludes that a reasonable juror would most likely conclude that even if there was a four-and-a-half month gap[30] in investigative documentation, it arose because (1) the RPD at the time was not prioritizing the investigation, (2) there was little to do in the investigation early on, either because of an absence of leads or because of witness/suspect non-compliance, (3) the RPD did investigate Rankin's murder, but that investigation yielded nothing productive and was thus not recorded, and/or

---

[29] Petitioner concedes (Docket Entry 41 at 5, n.10) that the file apparently includes two documents generated by the RPD between October 15, 1995 and February 21, 1996—a criminal history of Rankin that appears to have been printed out on October 16, 1995, and a property sheet documenting evidence collected from the crime scene dated October 15, 1995. (*See* Docket Entry 17 at 2 n.3.) Additionally, Petitioner concedes (Docket Entry 41 at 5, n.10) he received a few documents from the RPD's October 14, 1995 crime scene response, including photographs, a crime scene entry log, and incident report. (*Id.*)

[30] Voorhees testified at the MAR hearing that it "looks to be two files that were merged together and one of them is just not complete. It's missing a lot of the information that's indexed in it. . . . [What] I'm saying is there is several things in here that are indexed that are just completely not there." (Docket Entry 10, Ex. O at 141-142.) Some of the documents that were not "indexed" into the file appeared to be "crime scene, evidence statement, witness statements, suspect info, autopsy report, report synopsis – all those are tabbed and indexed, but yet when you turn to the tab there is nothing there." (*Id.* at 141.) Nevertheless, Voorhees also repeatedly stated that he had no direct knowledge about whether the documents "indexed" into the file had ever been added to or removed from the file. (Docket Entry 10, Ex. P at 160, 165, 226.) He also admitted that he had no specific memory of this particular file and that his testimony as to what was included therein or not was purely speculative. (*Id.* at 75.) And finally, Voorhees made clear that his testimony about what was originally in the file (or not) was speculative. (Docket Entry 10, Ex. O at 141-142; *Id.*, Ex. P at 75.)

(4) the RPD did interview witnesses and did take notes, but did not preserve those notes once they obtained a more definitive statement from witnesses at the four and a half month mark.

For example, Brigman, a detective at the time of Rankin's murder, stated that if he was working a case in 1995 and questioned someone who "didn't have anything of substance to say," he would not keep a record of that interaction. (Docket Entry 41, Ex. 2 at 54-56.) Further, Brigman stated that he did not make a record of when leads were closed off. (*Id.* at 63.) Similarly, if Kelly talked to a potential witness and that potential witness "really didn't see anything and they told me they didn't know nothing, we didn't -- I didn't write down I talked to this guy and he didn't know anything." (Docket Entry 41, Ex. 6 at 51-52.)

Kelly also explained that the lead detective on a murder case had other cases to work on ("[t]wo to three a day, maybe") and that the murder case would not be that detective's only responsibility. (*Id.* at 52.) McNeill also stated that he would not necessarily take notes of every potential witness he spoke to but would only document "relevant" information. (Docket Entry 41, Ex. 5 at 11-12.) Moreover, both Brigman and Kelly stated that the lack of records during the relevant time period did not mean that no investigative activity was occurring. (Docket Entry 41, Ex. 2 at 54-57) (Brigman stating that if a potential witness had nothing of substance to say, "[t]here would be nothing to write" and if there were no fruitful leads during a period of time there would be "nothing to show for it"); (Docket Entry 41, Ex. 6 at 52) (Kelly agreeing that if there are no documents or witness statements exist in a certain period of time, that could have been due to "a lot of dead ends that didn't lead to anything").

Honeycutt also explained that sometimes an officer might not retain their notepad notes where the officer later prepared a more formal statement. (Docket Entry 41, Ex. 7 at

21) (stating that officer "might have had some chicken scratch notes that he made in his little pad and then went back and wrote a more involved description of it. And we may not have - - we found a lot of times we would not have those little chicken scratch pad notes").

None of this suggests Petitioner's actual innocence; the collection, suppression, and destruction of evidence favorable to Petitioner; or would likely lead a reasonable juror to acquit. At most, this evidence could suggest that the RPD was slow to investigate or that an officer did not retain initial interview notes when those notes were later reduced to a more definitive statement. While this is not ideal, it does not meaningfully support Petitioner's speculative conclusion that the RPD (or the DA, or both) gathered, suppressed, and destroyed favorable evidence.

Nor does the Court conclude that a reasonable juror would be likely to conclude that Vorhees perjured himself. At Petitioner's 2014 MAR hearing, Vorhees was asked if he remembered previously indicating that the RPD no longer had the Rankin master case file. (Docket Entry 10, Ex. O at 139-40.) Voorhees stated that he did not and then explained,

> *I don't have a clear memory of it.* I do remember someone called and I can't remember if it was the District Attorney's Office or someone else called and asked if we had the file and we maybe looked for it. During that time, we had renovated the police department. We actually moved our offices twice during the renovation and many things were reshuffled, stored, and put in storage. This case was closed. At the time, we didn't know of any pending court appeals or whatever and we did not -- the day I was asked, the file was not on premises at the Rockingham Police Department, physically in the building.

(*Id.* (emphasis added).)

In December of 2022, Kelly agreed that after the Rankin murder trials, the master case file "should have gone into the file room and basically remained there until when [Petitioner's

93

counsel] were coming to visit you or someone else from your office removed it and put it with evidence." (Docket Entry 41, Ex. 6 at 37.) Kelly explained, "Yeah. But I think I may -- *may have seen Voorhees with the file* when he was still there [as Chief], *but I ain't heard or seen all that.*" (*Id.* (emphasis added).) Kelly explained, "I want to say he had the file, but *I'm not 100 percent sure on that.*" (*Id.* (emphasis added).)

Later in the deposition, Kelly stated that he saw Voorhees with the file between 2005 and 2011, that Voorhees told him (Kelly) that he (Vorhees) had been contacted by Duke, and that it was Kelly's "impression" or "opinion" that Vorhees was "just going to put them off until he had to do something." (*Id.* at 56.)

Specifically, the exchange was as follows:

> **Q.** And then the last thing I want to kind of follow up on is you testified you might have seen Voorhees with the file sometime in, I believe you said, 2012; is that right?
>
> **A.** He was -- he was let go in '11. So I'm saying '11 back somewhere. And the new renovations were in his office. That's where I saw the file, in his office.
>
> **Q.** Okay. And as you remember it, this – him having the file was connected to members of the Duke Law Clinic contacting him about the case?
>
> **A.** That's what I remember.
>
> **Q.** Okay. Did you see him with the file at any other point in time?
>
> **A.** No.
>
> **Q.** And the time that you did see him sometime before 2011, but in -- into the late 2000s, would that be -- or, you know, between 2005 and –
>
> **A**. I would say that.

94

**Q.** -- 2011?

**A.** Yeah, because we were in the new building, as it was, and it was in his office.

**Q.** Okay. And did he -- did you have a conversation with him about the file at that time?

**A.** Nothing about the file. Only thing I remember really is seeing it and him telling me that he's been contacted by Duke. Excuse me. And it was my impression he was just going to put them off until he had to do something. And that's – that's just my opinion.

**Q.** Did you ever see him remove documents from the file?

**A.** No.

**Q.** Did you ever know him to take any files home with him?

**A.** No. Not that I'm aware of, no. I've never seen him walk out of the police department with files, if that's what you're asking.

**Q.** That is what I'm asking.

**A.** No.

(*Id.* at 55-57.)

Petitioner claims that Voorhees perjured himself by testifying falsely during his 2014 testimony as part of the state post-conviction proceedings.[31] (Docket Entry 41, 12-14.) In

---

[31] Petitioner also asserts that Vorhees perjured himself by falsely testifying that there were numerous reasons to remove records from a file. (Docket Entry 41 at 12.) Voorhees testified that in his experience, original documents were routinely taken out of a master case file and entered into evidence in court, explaining their absence from the file. Voorhees stated that in the past, when he had been in court and "had the original file with [him], defense or the prosecution would ask for an original document out of the file." (Docket Entry 10, Ex. P at 225-26.) When that happened, "[y]ou would hand it to them, they would mark it as an exhibit, put it right into evidence right then and that may explain why some of it is missing." (*Id.* at 226.) Honeycutt also explained that sometimes in court originals would be handed into

making this assertion, Petitioner compares deposition testimony from 2022 to in-court testimony from 2014, which concerns events from 1995 to 1998. (*Id.*) However, the Court concludes that the differences, where they exist, between Voorhees' testimony and that of the deponents would likely be viewed by a reasonable juror as resulting from fading memory rather than perjury, as well as different recollections of the same event by different witnesses.

Specifically, the testimony suggests that sometime between 2003 (the earliest time the renovation could have occurred (Docket Entry 41, Ex. 6 at 14-15)) and 2011 (when Voorhees stopped working at RPD) (*id.* at 55), Voorhees was not able to find the master case file (Docket Entry 10, Ex. O at 140) but Kelly was able to locate the file in 2014 (Docket Entry 41, Ex. 6 at 29-36), likely in the file room. It is entirely possible that Voorhees searched for the master case file at some point but was unable to locate it at that time. That Kelly was able to find the file in 2014 to show to members of the Duke clinic does not make Voorhees' testimony false. As noted, Kelly testified that he was "not 100 percent sure" that he saw Voorhees with the file at some point, but if he did it would have been "early on" and before 2012. (*Id.* at 37.) That gives Voorhees about an eight-year window in which he was unable to locate the file on one occasion but could locate it on another. Kelly's and Voorhees' memories are inexact and a reasonable juror probably would not conclude that this is because the latter perjured himself.[32]

_____

evidence where it became part of the clerk's file. (Docket Entry 41, Ex. 7 at 28.) As noted below, a number of documents fitting this description were used at Petitioner's second trial.

[32] For similar reasons (*i.e*, the passage of time), a reasonable jury would be unlikely to conclude that Honeycutt falsely testified, as Petitioner alleges, about when he instituted open discovery and whether it was used in Petitioner's case. (Docket Entry 41 at 15.) In fact,

Beyond this, the issue here is one of Petitioner's actual innocence under the applicable standard. Petitioner's theory is that Vorhees (either alone or with other members of the RPD) collected, suppressed, and destroyed evidence favorable to Petitioner. Kelly explained that he never saw Vorhees remove documents from the file or take them home with him and none of the other deponents testified to the contrary. Moreover, it was Vorhees himself at Petitioner's 2014 MAR hearing who first pointed to a potential gap in the Rankin file, which is not what one would expect him to have emphasized if he was the individual *who caused the four-month gap in the first instance by destroying evidence favorable to Petitioner.* (Docket Entry 10, Ex. O at 140.) The Court does not think that a reasonable juror presented with the testimony described above would be likely to conclude that Vorhees perjured himself; or that he gathered, suppressed, and then destroyed (together or with others) evidence favorable to Petitioner; much less that the testimony helps demonstrate Petitioner's innocence. For all of these reasons, the Court concludes that reasonable jurors presented with the deposition testimony taken in 2022 would be unlikely to acquit Petitioner of Rankin's murder.

Nor does the Court find persuasive Petitioner's alternative contention that, even if the Rankin file accurately reflected the extent of the investigation, "the inadequacy of the RPD investigation would prevent any reasonable juror from finding Petitioner guilty beyond a reasonable doubt." (Docket Entry 41 at 16.) During Petitioner's second trial in 1998, the State introduced, (1) a photo of the house where Rankin's body was found; (2) multiple photos of

---

Honeycutt testified that if Parker testified that open discovery had not occurred in Petitioner's case, then he (Honeycutt) had no reason to doubt this. (Docket Entry 41, Ex. 7 at 32.)

Rankin's body at the crime scene; (3) a diagram from the autopsy showing the injuries to Rankin's head; (4) Nelson's police statement from March 1996; (5) Tender's statement to police; (6) a diagram of Petitioner's apartment in relation to the house where Rankin was found; (7) the shell casing found near Rankin's body; (8) a picture of the crack pipe found in Rankin's hand; and (9) the items found in Rankin's pockets. (*See* Docket Entry 10, Ex. C at 1, 39, 42, 68-69, 97-98, 99, 101, 103, 138-39, 141-42, 144, 147, 148, 151, 153, 171 (admitting the above-described pieces of evidence at Petitioner's second trial).)

Moreover, at the MAR hearing, Petitioner's counsel also introduced other evidence from the investigation, such as witness statements, Tender's and Nelson's criminal history, the autopsy and medical examiner's report, a synopsis, a felony investigation report written by Voorhees, and Rankin's criminal history, among other items. (Docket Entry 10, Ex. O at 32-38, 50-61, 134-35; *Id.*, Ex. P at 162-63, 180, 182, 236, 249-52.) There was a considerable amount of evidence in the file regarding the investigation in this case. In short, the evidence gathered pursuant to this Court's discovery order, considered alone and holistically with the entire record, does not meet the "no reasonable juror" standard.

**<u>The Evidence, Old and New, Does Not Meet the Actual Innocence Standard.</u>**

The Court will now further consider the totality of the evidence holistically, both old and new together. In so doing, the Court incorporates by reference the additional analysis set forth above. Specifically, at trial, the State presented sufficient circumstantial evidence of Petitioner's guilt. Petitioner also presented his evidence, and multiple individuals—mostly friends and family—testified that Petitioner was drunk and asleep, and unable to commit the crime. The jury found for the State beyond a reasonable doubt. The *nine* witness statements to

98

which Petitioner now points—*which uniformly inculpate Petitioner in Rankin's murder*—do not prove a meaningful likelihood of Petitioner's innocence. In fact, despite Petitioner's objections to the contrary, they would tend to support a guilty verdict from a reasonable jury.

Nor is Petitioner's innocence meaningfully advanced by the supposed recantation by two of those witnesses, Dumas and Lockhart. These new statements were never introduced at any prior proceeding, have never been tested through cross-examination, were only provided decades later, and say little to nothing about whether Petitioner was actually innocent of murder. Regarding Tender's purported recantation, Tender reaffirmed his trial testimony and explained he essentially told the post-conviction investigators what he thought they wanted to hear. A reasonable juror would be unlikely to conclude that this favored Petitioner. As for Dr. Wolfe's testimony about Petitioner's underlying medical records and the absence of racial animus towards white people, the Court does not view this as advancing Petitioner's cause for the reasons describe earlier.

And as the MAR court convincingly held, there is no reliable evidence that Nelson or Tender received a deal or lenient sentence in exchange for their testimony against Petitioner. Nor can Petitioner make a credible claim of innocence by pointing to Rankin's police records. Those records tend to confirm what the State endeavored to prove at trial: Rankin was addicted to crack cocaine and was willing to commit crimes in order to get it. This supports the State's theory that Rankin tricked Petitioner into giving him crack in exchange for fake currency, which angered Petitioner and ultimately contributed to Petitioner's decision to murder Rankin. A reasonable juror would be unlikely to conclude that this helped Petitioner's cause.

99

Finally, the discovery gathered in 2022 does not advance Petitioner's position. As shown above, multiple witnesses offered innocent explanations for the purported lack of documents between October 14, 1995 and March 1, 1996. As shown above, former RPD officers Brigman (Docket Entry 41, Ex. 2 at 9, 41-42, 54-55, 62-63), Kelly (Docket Entry 41, Ex. 6 at 51, 60-61), and McNeil (Docket Entry 41, Ex.5 at 12, 18-19, 27, 54, 56) testified that they would not document talking to a potential witness if that person had no pertinent information about the case. In light of the entire record and all of the above, the Court concludes that, had the materials Petitioner brings to this Court been presented to a reasonable jury along with the older evidence already presented to a jury, it is unlikely that Petitioner would have been acquitted. Considering both the old and new evidence holistically, Petitioner has failed to meet the "no reasonable juror" standard. Because Petitioner has not met the actual innocence standard, his Petition is many years time-barred.

<u>**CONCLUSION**</u>

After consideration of "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial," *House*, 547 U.S. at 538 (internal quotation marks omitted), Petitioner has not demonstrated "that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt," *Schlup*, 513 U.S. at 327.

**IT IS THEREFORE RECOMMENDED** that the stay in this case be **LIFTED**, that Respondent's motion to dismiss (Docket Entry 8) be **GRANTED**, that Petitioner's Petition (Docket Entry 1) to vacate, set aside, or correct sentence be **DISMISSED** as time-barred, that judgment be entered dismissing the action, and that, there being no substantial

issue for appeal concerning the denial of a constitutional right affecting the conviction nor a debatable procedural ruling, a certificate of appealability not issue.

_____/s/ Joe L. Webster_____
United States Magistrate Judge

February 27, 2024
Durham, North Carolina